IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>vs.<br><br>MITZI BICKERS,<br><br>Defendant. | Case No. 1:18-CR-0098-SCJ-LTW-1<br><br>**SENTENCING MEMORANDUM** |

## DEFENDANT BICKERS' SENTENCING MEMORANDUM

COMES NOW, the Defendant, Mitzi Bickers, by and through her attorneys of record, and files this memorandum in support of her sentencing position. Ms. Bickers hereby moves this Honorable Court for a downward departure and/or a variance below her otherwise advisory guideline imprisonment range and in support of a reasonable sentence which is no greater than necessary to comply with the purposes of sentencing enumerated in 18 U.S.C. § 3553(a)(2).

## INTRODUCTION

The above-referenced indictment charged defendant Mitzi Bickers with the following counts: two counts of Conspiracy to Commit Bribery, one count of Bribery, three counts of Money Laundering, four counts of Wire Fraud, one count of Tampering With a Witness and one count of Filing False Tax Return. Ms. Bickers exercised her Constitutional right to a trial by jury. On March 23, 2022, Ms. Bickers was found guilty by jury trial of counts 1, 4, 5, 6, 7, 8, 9, 10 and 12; not guilty on counts 2, 3, and 11.

On September 1, 2022, counsel for Ms. Bickers received the final disclosed PSR. The probation officer calculated the defendant's total offense level at Level 40, with a criminal history category of I, resulting in a guideline sentencing range of 292-365 months.

1

Ms. Bickers timely filed objections to the guidelines as calculated by the initial PSR. As will be detailed below, Ms. Bickers contends that the guidelines as calculated are factually and legally incorrect and the resulting guideline range is significantly higher than law and justice demands. Ms. Bickers requests that the Court consider her history and characteristics pursuant to 18 U.S.C. § 3553(a)(1) and the substantial support she has from her family and community as indicated in the numerous letters provided to the Court. Further, Ms. Bickers respectfully requests that this Court consider the factors incorporated in 18 U.S.C. § 3553 as well as other judicial decisions and notions of fairness, in determining her sentence.

## LEGAL ANALYSIS

As this Court is fully aware, the United States Supreme Court made the sentencing guidelines advisory by invalidating the statutory provision that otherwise makes them mandatory (18 U.S.C. § 3553(b)) and severing the provision from the remainder of the statute. See United States vs. Booker, 543 U.S. 220 (2005).

The Court is directed to look to certain factors in determining a sentence under 18 U.S.C. § 3553(a). Some of those factors include the history and characteristics of the defendant (18 U.S.C. § 3553(a)(1)), the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense and to afford adequate deterrence to criminal conduct (18 U.S.C. § 3553 (a)(2)(A) and (B)), and the need to avoid unwarranted sentence disparities among similarly situated defendants (18 U.S.C. § 3553(a)(6)). This sentencing memorandum will specifically address the personal history and characteristics of Ms. Bickers, as well as the need to avoid sentencing disparities among similarly situated defendants.

A. **18 U.S.C. § 3553(a)(1): The Personal History and Characteristics of Ms. Bickers.**

Mitzi Bickers was born in Atlanta, Georgia on September 4, 1966. Her life is a testament to the Southwest Atlanta community in which she was raised – rooted in faith, history, and service. Her mother, Ethel Bickers, was a juvenile probation officer in Fulton County for fifty years, and her father, Dr. Benjamin Weldon Bickers, was the senior pastor and founder of Emmanuel Baptist Church in Atlanta for almost fifty years.

Ms. Bickers is a child of the Atlanta civil rights community - her father, Reverend Benjamin Weldon Bickers was a lieutenant of the civil rights movement alongside Dr. Martin Luther King, Jr. He founded Emmanuel Baptist Church in 1958, at the edge of the Atlanta Carver Homes Housing Projects in Southwest Atlanta.[1] The church served as a beacon for people in the Carver Homes community, providing a place of faith and fellowship to an underserved population. For decades, Democratic politicians made a pilgrimage to the church to seek Reverend Bickers' blessing, and he once joked that only candidates who visited his church seemed to win statewide elections.[2]

At the powerful intersection of church of politics, Ms. Bickers was born. At the time, her parents were unwed. Reverend Benjamin Bickers and Ethel Bickers raised their daughter together in her grandparents' home, along with her two aunts and three cousins. Ms. Bickers' parents instilled in her the values of service and faith, and as a child, she was raised as a staple at the Emmanuel Baptist church - she began singing for the choir at 12 years old and played the piano for Sunday services. At 17, she became the lead organist. She attended services every

---

[1] Emmanuel Baptist Church still stands today on a road bearing Reverend Bickers' name – 1582 Benjamin Weldon Bickers DR. SE., Atlanta, Ga.
[2] Ivan Allen, Maynard Jackson, Roy Barnes, Zell Miller, Joe Frank Harris, Presidents Bill Clinton and Jimmy Carter have all visited Emmanuel Baptist – just to name a few. More recently, Atlanta Mayor Andre Dickens visited the church in 2020.

Sunday, taught younger students, and participated in every service opportunity she could. When Ms. Bickers was 15, her parents married, making her, officially, the reverend's daughter.

Ms. Bickers was a good student – she was president of her class at Frederick Douglass High School in Atlanta, Georgia, and was a drum major. She played 13 instruments and was the lead saxophone player and conductor of her high school band. Ms. Bickers went on to attend Spelman college, a historically black college, where she obtained a Bachelor's degree in Political Science in 1989. Never losing sight of her faith, at age 23, she became an ordained minister at her father's church.[3] In 1998, when Ms. Bickers was 33, her father passed away from bone marrow cancer. At that point, Ms. Bickers assumed her father's role as Pastor of Emmanuel Baptist Church – a role she had been preparing for her entire life.

Outside of the ministry, Ms. Bickers found her purpose in the universe of southern politics – a complex and multi-dimensional world, intersecting often with faith. Having grown up in the church, Ms. Bickers knew the importance of faith leaders and communities of worship to a political campaign, as well as the inverse – the power of politics in influencing low-income communities of color like the one she was raised in.  The first time she worked on a "paid race" was when she was a high school senior, when Jesse Jackson ran for President. Prior to that, when Maynard Jackson ran for mayor in 1970, she worked as a volunteer. She also worked for John Lewis' campaign during his first run for congress, and every one thereafter.

In 1993, at age 26, Ms. Bickers was elected to the Atlanta School Board of Education – the youngest person ever elected to the office. Under her leadership, every school in her district was renovated. Her and other School Board members successfully passed two referendums and one SPLOST referendum to funnel taxes towards education funding. She served two consecutive

---

[3] Although, Ms. Bickers would like to add that she had been preaching since she was seven years old on the front porch.

terms – ten years total. In 2003, she ran for Fulton County Commission Chair and lost. After the loss, inspired by the challenge of political campaigning, she turned her attention to political consulting, and found great success. In 2009, she worked as a political strategist for Mayor Kasim Reed's campaign, where Reed won by just over 700 votes. In the wake of the success, the former executive directors of the Georgia Democratic party called Ms. Bickers "the most well-known and well-respected" political operative in the state when it comes to turning out the vote.[4] In 2010, she worked on Roy Barnes' gubernatorial campaign. She strategized for Sheriff Victor Hill's 2012 Clayton County win. Also in 2012, she helped Judge Melynee Leftridge win a seat in State Court. She helped elect Fulton County Superior Court Judge Craig Schwall in 2014. That same year, she went to Mississippi and helped Republican Thad Cochran get re-elected to the United States Senate. Bickers also played a pivotal role in educating her community and getting out the vote for President Obama's first Presidential campaign. Ms. Bickers' contributions to the church and the political sphere have been so widely known that in 2012, the Georgia House passed a resolution praising Ms. Bickers for her "efficient, effective, unselfish, and dedicated public service and many contributions to the State of Georgia."[5]

Outside of her long list of political successes, Ms. Bickers is, at her core, a public servant. The support, both tangible and intangible, she has provided to her community over the course of her lifetime has been immeasurable. Attached to this memorandum are 63 total letters from members of her community whose lives have been touched by Ms. Bickers.[6] Althea Boones, a substitute teacher, says Ms. Bickers "provided shelter and food to my homeless niece and child when I could not."[7] City Councilwoman Andrea L. Boone bears witness to Ms. Bickers'

---

[4] https://www.nationalreview.com/2014/06/meet-mitzi-bickers-eliana-johnson/
[5] C:\pdf\123240.wpd (ga.gov)
[6] Letters are attached hereto as "Exhibit 1"
[7] Ex.1, Letter from Alethea W. Boone.

5

"orchestrating and facilitating food and clothing giveaways multiple times a year for the last 30 years," showcasing her "commitment to the least of these amongst us."[8] Her fellow ministry member, Bishop Richard B. Lankford, Sr., says he has "personally seen her sacrifice her time, her talents, and her energies to better the lives of the less fortunate that may cross her path."[9] Bryan Wilson, founder and headmaster of The Wilson Academy, says Ms. Bickers "implemented multiple youth programs," and "provided job training and employment opportunities" to young people."[10] She has assisted her friends and elderly members of her community, transporting them to doctors' appointments when needed.[11] Some reman friends with Bickers from the high school marching band, describing her as "the most selfless person I know."[12] Her congregants' praises are a testament to Ms. Bickers' heart and unwavering dedication to the community around her.

      Ms. Bickers' life has not been without difficulty. During her 2003 campaign, she was publicly (and without her consent) outed as a gay woman, leading to unwanted media attention surrounding her personal life, her family and her church. After this occurred, other pastors stopped inviting her to various church events. Ms. Bickers also spent much of her life as a single mother – she has a 22 year old son, Emmanuel whom she has cared for since she adopted him at just 4 months old and who suffers from often debilitating Lupus disease. She says, after seeing him at a DFACS facility, "I knew he would be mine. It was life changing, I gained another purpose." Ms. Bickers says the most important thing in her life is her family – her mother, Ethel Bickers; her wife, Keyla Jackson; and her son, Emmanuel.

---

[8] Ex. 1, Letter from Andrea L. Boone.
[9] Ex. 1, Letter from Bishop Richard B. Lankford, Sr.
[10] Ex. 1, Letter from Byron F. Wilson.
[11] Ex. 1, Letter from Carolyn D. Lyles.
[12] Ex. 1, Letter from Chemara Jackson.

Ms. Bickers respectfully requests that her sentence be considered in light of her storied contributions not only to Southwest Atlanta but to the State of Georgia and the political sphere of the South; particularly as it involves politicians of color and issues that disproportionality affect the African-American community.

**B. 18 U.S.C. § 3553(a)(6): Other Similar Cases Around the Country**

As the Court is aware, in determining an appropriate sentence, the Court should consider other similarly situated defendants and the sentences they received to achieve a level of consistency and fairness. The Department of Justice has prosecuted a number of similar cases which involve bribery, conspiracy, and government contracts. The following are cases that Ms. Bickers believes are informative on her potential sentence:

1. U.S. v. White (Eastern District of Virginia, Sentenced July 11, 2014)

    In this case, defendant White plead guilty to a criminal information charging him with conspiracy to commit bribery. He and his co-defendant participated in a five-year bribery scheme in which they provided over $265,000 to public officials working for the United States Military Sealift Command in exchange for favorable government contracts to White's company. White was sentenced to 24 months in prison, followed by three years of supervised release.

2. U.S. v. Jones (Eastern District of Arkansas, Sentenced February 18, 2016)

    Defendant Jones plead guilty to a criminal information charging him with Conspiracy and Bribery Concerning Programs Receiving Federal Funds. During his tenure as deputy director of a multibillion-dollar agency, the Arkansas Department of Human Services, Jones solicited and accepted cash payments from the owners of inpatient and outpatient mental health facilities, in exchange for taking official acts that would benefit the

7

businesses. Jones was sentenced to 30 months in prison followed by 1 year of supervised release.

3. U.S. v. Smith (Eastern District of Virginia, Sentenced June 24, 2014)

In this case, Defendant Roderic Smith plead guilty to a criminal information charging him with conspiracy to commit bribery. Over the course of four years, Smith and others paid more than $265,000 in cash bribes to public officials. Smith was sentenced to 48 months in prison followed by one year on supervised release.

4. U.S. v. Minor (District of Columbia, Sentenced October 24, 2011)

Defendant Eric Minor plead guilty to a criminal information charging him with bribery. He was part of a multi-year covert investigation into corruption by government officials and in the Washington, D.C., metro area which resulted in eleven convictions. Minor was sentenced to 30 months in prison followed by 24 months on supervised release. In the ten related cases, defendants were sentenced to no more than 30 months in prison,

5. U.S. v. Woodason (Southern District of New York, Sentence on December 15, 2011)

Defendant James Woodason plead guilty to two counts of Conspiracy to Defraud the United States, Converting the Property of Another, and Attempting to Evade Taxes. He was sentenced to 70 months in prison, followed by 3 years of supervised release.

The above cases have been highlighted because they show that an overwhelming majority of similar cases are being sentenced well below the current guideline recommendations. Based on the Court's discretion under 18 U.S.C. § 3553(a)(6), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," we ask that the Court vary from the guidelines on this basis.

C. **Trial Penalty**

As a result of their guilty pleas, the alleged co-conspirators of Ms. Bickers, Elvin R. Mitchell, Jr., and Charles P. Richards received sentences of 60 and 27 months, respectively. It could be argued that the three individuals are similarly situated. All three had no prior criminal history, save Mr. Mitchell, who had been at least investigated for prior misconduct which makes him somewhat more culpable in this offense than Ms. Bickers. It was also alleged that Mr. Mitchell recruited Mr. Richards into the offense, same argument abounds.

Outside of their relative employment, the only significant difference between Ms. Bickers and the two men with whom she was convicted of conspiring is that she took her case to trial, while they pled and cooperated.[13] In determining her sentence, Ms. Bickers respectfully requests that this Court consider not imposing any additional penalty for her exercise of her Constitutional right to trial.

In 2018, the National Association of Criminal Defense Lawyers published a report titled "The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction and How to Save It."[14] The report details the systemic issues within the plea-bargaining process that leads to the unjust "trial penalty." The trial penalty problem is two-sided:

> "[I]n exchange for a defendant's agreement to plead guilty, prosecutors may offer to not bring certain charges or to dismiss certain charges. They may agree to recommend, or not to oppose, a particular sentence or sentencing range. In addition, they may agree to argue for or against the application of particular sentencing factors.

---

[13] It should be noted that, outside of the legal facts, there are many differences between Ms. Bickers and the two men: she is a woman. She is a person of color. She is a lesbian. She is from a low-income community. All are factors which render Ms. Bickers vulnerable to the implicit biases in the justice system.

[14] Rick Jones, et. al., The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction and How to Save It (2018). https://www.nacdl.org/getattachment/95b7f0f5-90df-4f9f-9115-520b3f58036a/the-trial-penalty-the-sixth-amendment-right-to-trial-on-the-verge-of-extinction-and-how-to-save-it.pdf. Hereinafter "Trial Penalty Report."

The flip side of all of these options is that prosecutors may also threaten to add charges or to recommend increased sentences if defendants refuse to plead guilty."[15]

The present case illustrates the two sides of the trial penalty coin: Mr. Mitchell and Mr. Richards, who plead guilty and received appropriate sentences, versus Ms. Bickers, who took her case to trial and now faces a significantly higher sentence in return. Such significant discrepancies, on a broader scale, lead millions of criminal defendants to plead guilty before having the chance to evaluate the merits of their case.[16] Data suggests that "these discrepancies can compel even an innocent person to plead guilty."[17]

However, as this Court is well-aware, federal judges maintain significant discretion over sentencing. United States v. Booker, 543 U.S. 220 (2005). Moreover, sentencing judges must consider the 3553(a) factors independent of the guidelines themselves; they cannot presume that a within-guidelines sentence is reasonable.[18] Unfortunately, judicial discretion is often used to uphold trial penalties across the nation, and "[e]ven judges who are generally willing to consider disparity among co-defendants may decide it's irrelevant if one co-defendant goes to trial." Therein lies the problem. As the NACDL report explains, "if judges were *required* to impose

---

[15] Trial Penalty Report, p. 24
[16] In the Northern District of Georgia, only 1.7% of all cases go to trial. Inversely, 98.3% of all cases result in a plea deal. In 2021, 100% of bribery/corruption cases in the Northern District of Georgia resulted in a plea – none went to trial. Nationally, 8.5% of similar cases go to trial. The impacts of trial penalties and plea bargaining are evident in these statistics – particularly in the Northern District of Georgia. gan21.pdf (ussc.gov)
[17] Trial Penalty Report, p. 17. The National Registry of Exonerations has identified 359 specific instances where defendants were later determined to be innocent of the crimes they originally pled guilty to.
[18] Trial Penalty Report, p. 54. See Nelson v. United States, 555 U.S. 350, 352 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable,"); Gall v. United States, 552 U.S. 38, 49-50 (2007) ("The Guidelines are not the only consideration . . . [A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable.").

identical sentences on co-defendants, that would virtually eliminate the incentive to plead guilty in every case."[19] (emphasis included).

In the case at bar, Mr. Mitchell entered a negotiated plea of guilty on January 25, 2017. He was sentenced to 60 months in custody, followed by 36 months supervised release. Mr. Mitchell's sentence was later reduced by 12 months to a term of 48 months in custody.

At Mr. Richards' sentencing hearing on October 10, 2017, Mr. Richards was given a total offense level of 21, with a custody guideline range of 37 to 46 months. The government requested a downward variance of 27 months, explaining "27 months avoids a sentencing disparity between the two defendants [Richards and Mitchell] but it also does not create a new disparity between Mr. Richards and other public corruption Defendants that have been sentenced in this district."[20]

This Court is bound to consider Mr. Mitchell and Mr. Richards' respective sentences, as well as the entirety of the 3553(a) factors, in sentencing Ms. Bickers. In doing so, it should seek to avoid imposing a trial penalty on Ms. Bickers, so as to uphold the sanctity of the Sixth Amendment right to trial, and the procedural fairness embedded within our judicial system and our Constitution.

### D.  Defendant's Objections to the Pretrial Sentencing Report

Broadly speaking, Ms. Bickers' objections to the guideline calculations in her PSR fall into two categories: 1) the calculations and groupings by probation of alleged bribes, payments, and conduct which were found by a jury to have not been bribes and conduct predicated on the actual counts of conviction and 2) enhancements based on Ms. Bickers' City of Atlanta job title as Director of Human services.

---

[19] Trial Penalty Report, p. 55.
[20] Richards Sentencing Hearing, pp. 52-53.

### a. The Grouping of Counts Based on Acquitted Conduct is Inappropriate and Runs Contrary to the Trial Jury's Verdict.

While Ms. Bickers acknowledges the caselaw regarding using acquitted conduct in determining post-trial sentencing calculations, the 11th Circuit has recently recognized:

> "To the extent that Defendant argues that his due process rights were violated by the court's consideration of acquitted conduct when calculating his Guidelines' range, we have noted the possibility that a sentence enhancement based on acquitted conduct might, in 'extreme circumstances,' *deprive the prisoner of due process*…" United States v. Maddox, 803 F. 3d 1215 (11th Cir. 2015). (Emphasis added).

The Supreme Court has similarly recently criticized the practice of including acquitted conduct in sentencing. In the dissent denying certiorari in Jones v. United States, 744 F.3d 1362 (D.C. Cir. 2013), Justice Scalia (joined by Justices Ginsberg and Thomas) argued that judicial fact-finding justifying a sentence would be unreasonable and "may run afoul of the Sixth Amendment." Justice Neil Gorsuch later cited to this dissent while serving on the Tenth Circuit Court of Appeals in United States v. Sabillon-Umana, 772 F.3d 1328 (10th Cir. 2014), calling the practice constitutionally "questionable." So too has Justice Brett Kavanaugh criticized this practice, writing (while serving as a judge on the D.C. Court of Appeals) in United States v. Bell, 417 U.S. App. D.C. 351 (2015), that "[a]llowing judges to rely on acquitted or uncharged conduct to impose higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial." In fact, Congress has shown interest in altering the practice

altogether. Two recently introduced bills – H.R. 4261 and H.R. 5785 – propose to amend 18 U.S.C. § 3661 by adding the following language to the statute: "except that a court shall not consider conduct of which a person has not been convicted."

Ms. Bickers has made objections to the calculations done by probation in her PSR due to the inclusion of acquitted conduct, which constitutes an addition of six levels on Count 1, and which carries a statutory maximum of five years, increasing the guidelines from 33 to 39, and the range from 135-168 months to 262-327 months exclusive of Ms. Bickers' other objections. Similarly, the grouping of counts 4-6, which were predicated on Count 2 of the indictment for which Ms. Bickers was acquitted, similarly increases the guidelines for group 1 from 39 to 40, even though Probation's response to the objection - that the money laundering which occurred four years after the conduct in count 1, "was in furtherance of a single fraudulent scheme,"[21] – relies on a finding contrary to that of the jury's verdict.  Such an extreme departure constitutes, for Ms. Bickers, a deprivation of her Due Process rights as contemplated in Maddox.

As to paragraphs 119 and 125 of the PSR, The government's evidence at trial and supporting exhibits and reports demonstrated totals ranging from $507,987.50[22], $508,265.45[23], and $523,500[24]. The $773,557.08 seems to include the $200,000 paid to Southern Horizon Real Estate, which was already calculated as part of the ~$500,000 number presented at trial.[25]

The $2,027,126.11 represented business income Ms. Bickers generated subsequent to her departure from the City of Atlanta and was found at trial to not have been the result of any

---

[21] Pre-Sentencing Report at para. 122.
[22] Adrian Richards Summary Exhibit.
[23] Adrian Richards Powerpoint Exhibit.
[24] IRS Report 2011, Richard Gaskins and Tammy Willingham.
[25] IRS Exhibit 8 (supporting evidence: appendix A; line 4).

13

bribery payments. The inclusion of this additional $2,027,126.11 with the double-counting of the $200,000 paid to Southern Horizon Real estate nearly doubles Ms. Bickers' guideline range.

Additionally, the grouping of Counts 4-6, which were indicted based on a bribery scheme in count 2 of which Ms. Bickers was found not guilty, further raises the guideline range. Probation's response to the Ms. Bickers' objections to Paragraphs 122 and 150 supplants the findings of the jury and evidence at trial with the officer's own conclusions, namely that there was a single fraudulent scheme. The money laundering, which occurred four years later and was indicted based on alleged 2014 bribery, was not connected by a common scheme or plan and should therefore not be part of the grouping for guideline calculations.

### b. The Loss Amount Resulting from the Wire Fraud Counts of Conviction is Incorrectly Calculated in the PSR.

The calculation of the loss resulting from the wire fraud in Counts 7 through 10 suffers from a similar problem as argued above, namely that the fraud alleged in counts 7 through 10 of the indictment was based on the misrepresentation of Ms. Bickers in her City of Atlanta Ethics §1-814(a)(1) disclosure and set out a limited, specific time period for which four distinct wire transfers occurred based on the fraudulent misrepresentations set out in the ethical disclosure. The probation calculation of loss includes the entire period of Ms. Bickers' employment of City of Atlanta, both before and after the convicted bribery conduct in 2011. The government's indictment separated out four distinct wire payments, and these are the only appropriate basis for the loss calculation.

### c. The Significant Enhancements Under U.S.S.G. §§2C1.1(b)3) and 3B1.1(a) are Factually Inappropriate and Incorrectly Applied to the Guideline Calculation in the PSR.

As to the high-level decision-making four point enhancement pursuant to U.S.S.G. §§2C1.1(b)3), the response to Ms. Bickers' objection by probation highlights the exact problem with the application of this enhancement: The government has never shown, and there is no connection between Ms. Bickers' role as Director of Human Services and the convicted bribery scheme. The only example in the notes referencing 2(c)(1.1)(b)(3) states: "if the payment was for the purpose of influencing an official act by certain officials, the offense level is increased by 4 levels." It was never alleged or shown by the government that Ms. Bickers' role as head of Department of Human Services had any connection to, or influence over, any of the conduct resulting from the bribes. Ms. Bickers had no involvement in the procurement process or award of any sidewalk, bridge, or snow contracts, which were the three areas the Government presented evidence of bribery relative to count 1. The characterization of her role as "high level decision making" grossly overstate the level of authority of her department. Rather, it was shown at trial that Ms. Bickers, as head of Department of Human Services, was directly involved in community-based services like homeless outreach, and that any decisions as to city construction contracts were entirely out of her purview. The government never introduced any evidence at trial that proved that Ms. Bickers position in the City had anything to do with the awarding of any contracts and inferred that she was the payor rather than the payee as it pertained to any official act within the City.

Finally, as to the enhancement applied under U.S.S.G. § 3B1.1(a) for her role in the offense, the evidence at trial demonstrates a conspiracy of 3 indicted co-conspirators and one

15

unindicted co-conspirator, with Mr. Mitchell being the person who recruited and managed Mr. Richards. Mr. Richards testified that he had at most one interaction with Ms. Bickers and was unaware of her role for the initial months of the bribery scheme. Mr. Mitchell and Ms. Bickers had a prior business and friendship relationship and was he not "recruited" by Ms. Bickers as the PSR suggests. The trial testimony evidenced to the contrary, that Mr. Mitchell organized and executed many aspects of the alleged scheme. Evidence at trial further showed Mitchell in direct contact with unindicted co-conspirator Alexander for the purposes of arranging work orders, negotiating payment rates, and performing said work. It was also Mr. Mitchell who had prior allegations of similar behavior in his past. Although Ms. Bickers has been convicted for playing a role in the scheme, it was not a managerial or supervisory role which would warrant a 3-point increase under U.S.S.G. §3B1.1(a). Ms. Bickers and Mr. Mitchell were business *partners* as was testified to on numerous occasions (by government witnesses) during the trial; and they should be considered equal partners for purposes of sentencing.

## CONCLUSION

Based on the above, Ms. Bickers respectfully requests that this Court impose a substantial downward departure and/or a variance below her otherwise advisory guideline imprisonment range while considering her lifetime of service and achievements within the community, in addition to notions of fairness, due process, and equity.

Respectfully submitted,

/s/Drew Findling
Drew Findling
Georgia Bar No. 260425

/s/Marissa Goldberg
Marissa Goldberg
Georgia Bar No. 672798

The Findling Law Firm
One Securities Centre
3490 Piedmont Road
Suite 600
Atlanta, Georgia 30305
404.460.4500

17

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing motion:

**Defendant Bickers' Sentencing Memorandum**

Was served upon opposing counsel:

Assistant United States Attorney Nathan Kitchens
Assistant United States Attorney Jeffrey Davis
Assistant United States Attorney Tiffany Dillingham

By ECF Filing.

Dated: September 6, 2022

                                                                   s/*Marissa Goldberg*
                                                                   Marissa Goldberg
                                                                   Georgia Bar No. 672798