IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Action No. |
| *v.* | 1:18-CR-0098-SCJ-LTW |
| MITZI BICKERS | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by Ryan K. Buchanan, United States Attorney, and Jeffrey W. Davis, Nathan P. Kitchens, and Tiffany R. Dillingham, Assistant United States Attorneys for the Northern District of Georgia, files its Sentencing Memorandum in the case against defendant Mitzi L. Bickers.

### INTRODUCTION

On October 22, 2018, a federal grand jury sitting in the Northern District of Georgia returned a superseding indictment against Bickers, charging her with: conspiracy to commit bribery, in violation of 18 U.S.C. § 371 (Counts 1 and 2); bribery, in violation of 18 U.S.C. § 666(a)(2) (Count 3); money laundering, in violation of 18 U.S.C. § 1957 (Counts 4-6); wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349 (Counts 7- 10); tampering with a witness or informant, in violation of 18 U.S.C. § 1512(b)(3) (Count 11); and filing a false tax return, in violation of 26 U.S.C. § 7206 (Count 12). [Doc. 41]. On March 23, 2022, a jury found Bickers guilty of Count 1 conspiracy to commit bribery, four counts of wire fraud, three counts of money laundering, and filing a false tax return. [Doc. 213].

On September 1, 2022, the U.S. Probation Office issued its Presentence Investigation Report ("PSR") for Bickers. As to Count 1, Probation calculated

Bickers's base offense level to be 14 under U.S.S.G. § 2X1.1 and then applied the following Guideline adjustments:

1. A 2-level enhancement for the offense involving more than one bribe under U.S.S.G. § 2C1.1(b)(1);

2. A 16-level enhancement for the offense involving bribes valued at more than $1,500,000, but less than $3,500,000 under U.S.S.G. § 2C1.1(b)(2) and 2B1.1(b)(1)(I);

3. A 4-level enhancement for the offense involving a public official in high-level decision-making or sensitive position under U.S.S.G. § 2C1.1(b)(3); and

4. A 3-level enhancement for Bickers' role as supervisor or manager of the offense and the criminal activity was otherwise extensive under U.S.S.G. § 3B1.1(a).

(PSR at ¶¶ 123-128.) As a result, Probation calculated Bickers's adjusted offense level for Count 1 to be 39. (*Id.* at ¶ 131.)

Probation grouped Count One with the three money laundering counts pursuant to U.S.S.G. § 3D1.2 because they involve the same victim and two or more acts connected by a common criminal objective, scheme, or plan. (*Id.* at ¶ 122.) Probation calculated the base level offense for Counts 4-6 to be 36 under U.S.S.G. § 2S1.1(a)(1) and then applied the following Guideline adjustments:

1. A 1-level enhancement under U.S.S.G. § 2S1.1(b)(2)(B) because Bickers was convicted under 18 U.S.C. § 1957; and

2. A 3-level enhancement for Bickers' role as supervisor or manager of the offense and the criminal activity was otherwise extensive under U.S.S.G. § 3B1.1.

(*Id.* at ¶¶133, 135.) As a result, Probation calculated the adjusted offense level for Counts 4-6 to be 40. (*Id.* at ¶ 137.) Because Count 1 was grouped with Counts 4-6,

Probation calculated the adjusted offense level for Group A is 40 (the highest offense level), and the group is assigned 1 unit. (*Id.* at ¶ 150.)

As to Counts 7-10, Probation calculated Bickers's base offense level to be 7 under U.S.S.G. § 2B1.1 and then applied a 10-level enhancement because the loss amount was more than $150,000, but less than $250,000 under U.S.S.G. § 2B1.1(b)(1). (*Id.* at ¶¶ 138-139.) Probation grouped Counts 7-10, calculated the adjusted offense level for Group B to be 17, and assigned zero units because the offense level is more than 9 levels less serious than Group A. (*Id.* at ¶ 150.)

As to Count 12, Probation calculated Bickers's base offense level to be 16 under U.S.S.G. § 2T4.1 and then applied a 2-level enhancement because Bickers failed to identify the source of income exceeding $10,000 was from illegal activity under U.S.S.G. § 2T1.1(b)(1). (*Id.* at ¶¶ 144-145.) Probation grouped Count 12, calculated the adjusted offense level for Group C to be 18, and assigned zero units because the offense level is more than 9 levels less serious than Group A. (*Id.* at ¶ 150.)

As a result of these calculations, Probation calculated Bickers's total offense level to be 40, classified Bickers as having a category I criminal history, and determined the resulting custodial Guidelines range to be 292 to 365 months. (*Id.* at p. 42.) Bickers has objected to the following enhancements:

1. The 16-level enhancement for the total value of the payment or benefit received from the bribes;

2. The 4-level enhancement for a high-level decision-making or sensitive position;

3. The 3-level enhancement for her leadership role in the bribery and money laundering counts; and

4. The grouping of the bribery and money laundering offenses as Group A.

(*See id.* at p. 43.)

ANALYSIS

### 1.  Bribe Amount & Restitution

Under the Sentencing Guidelines, the "bribery offense level is calculated using the greater of the value of the bribe payment or the benefit received in return." *United States v. McNair*, 605 F.3d 1152, 1229 (11th Cir. 2010).  Specifically, U.S.S.G. § 2C1.1(b)(2) states, in relevant part, that if "the value of the payment" or "the benefit received … whichever is greatest, exceeded $6,500, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount." *See United States v. DeVegter*, 439 F.3d 1299, 1303-04 (11th Cir. 2006) ("Assuming the bribe achieves its intended result, the benefit would usually exceed the bribe" amount).

The United States bears the burden of establishing the bribe or loss amount by a preponderance of the evidence; however, the "guidelines do not require a precise determination of loss, and a court 'need only make a reasonable estimate of the loss, given the available information.'" *United States v. Moran*, 778 F.3d 942, 973 (11th Cir. 2015); *see United States v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1999). And, of course, it "is well-settled that a sentencing court may consider conduct for which a defendant has been acquitted if the government proves the conduct in question by a preponderance of the evidence." *United States v. Culver*, 598 F.3d 740, 752 (11th Cir. 2010); *accord United States v. Barakat*, 130 F.3d 1448, 1452 (11th Cir. 1997).

Finally, in the context of restitution, the value of the bribe payments received may also serve as the amount of restitution owed by a defendant because such a

4

finding is "consistent with Supreme Court precedent stating that when a public official acquires an ill-gotten benefit as a result of his office, the government suffers losses in that amount." *McNair*, 605 F.3d at 1222 (citing *United States v. Carter*, 217 U.S. 286, 305–06 (1910)); *see United States v. Vaghela*, 169 F.3d 729, 736 (11th Cir. 1999) (the "amount of the loss for purposes of restitution suffered by [the government] as a result of [the defendant's] illegal conduct is equivalent to the amount he received in kickbacks"); *see also United States v. Bryant*, 655 F.3d 232, 254 (3d Cir. 2011) (affirming restitution order requiring defendant to repay amount of bribes received); *United States v. Gaytan*, 342 F.3d 1010, 1012 (9th Cir. 2003) (public official was properly ordered to make restitution in the amount of the bribes he received).

### a. 2010-May 2013 Bribe & Restitution Amount = $910,053.20.

Count 1 charged Bickers with conspiring to accept bribe payments from 2010 to May 22, 2013, in exchange for steering City of Atlanta contracts to businessmen Elvin R. Mitchell, Jr. and Charles P. Richards, Jr. (Doc. 41). At trial, the United States presented compelling evidence demonstrating the bribery conspiracy, and the jury convicted Bickers of Count 1. (Doc. 213 at 1).

As it relates to the bribe amount, the United States presented evidence at trial from a forensic auditor who examined thousands of bank records. Based on that examination, the United States showed that $113,008 in 2010 and $507,987.50 in 2011 (or $620,995.50 total) in bribes flowed from Mitchell and Richards into accounts controlled by Bickers. *See* Govt. Ex. 200-01 (Financial Records Summary Exhibits).

Further, the United States presented evidence showing that in 2011, Bickers deposited an additional $208,000 in bribe money into a Southern Horizon Real Estate account as a down payment on the purchase of her residence in Jonesboro, Georgia. *See* Govt Exs. 26-QQ-1 (Southern Horizon Bank Records); 39 (Currency Transaction Reports); 201.[1] The evidence at trial further showed that Mitchell directly and Richards indirectly paid Bickers bribe money in 2012 and from January to May 2013 (Bickers separated from the City of Atlanta in May 2013). For sentencing purposes and like for 2010 and 2011, the United States prepared a summary of the bank records that were admitted at trial. That summary, coupled with the testimony presented at trial, shows that Bickers accepted an additional $81,058 in bribe money from Mitchell and Richards in 2012 and part of 2013. *See* Attachments A & B.

As a result, the bribe and restitution amounts attributable to Bickers from 2010 through May 2013 are $910,053.20.[2]

**b.  2014 Bribe & Restitution Amount = $2,027,126.11.**

At trial, the government presented compelling evidence that Bickers continued to engage in a bribery scheme with Mitchell and Richards after leaving the City of Atlanta in exchange for steering City of Atlanta contracts to them. Although the

---

[1] The $208,000 was listed in a separate column in the 2011 flow-of-funds spreadsheet because the money was never deposited into an account controlled by Bickers. *See* Govt. Ex. 201 (Column 3, Bickers Incoming Deposits). The United States also presented testimony, Currency Transaction Reports, and bank records proving that Bickers herself deposited the $208,000 in cash into the Southern Horizon Real Estate account.

[2] Should the Court enter a restitution order in this case, the total amount of restitution imposed should reflect: (a) joint and several liability with Mitchell, and (b) payments made by Richards.

jury acquitted Bickers of Count 2, which charged her with conspiring to bribe City of Atlanta officials to obtain contracts for Mitchell and Richards, (Doc. 41 at 16-17), it convicted her in Counts 4 to 6 of laundering the money generated from the Count 2 bribery conspiracy. (Doc. 213 at 1-2). Bickers's ongoing bribery scheme with Mitchell and Richards is relevant conduct for her conviction on Count 1, and the bribes she received and facilitated in 2014 should be included in her loss calculation.

"Under [USSG] § 1B1.3, a sentencing Court must consider 'relevant conduct' when calculating the Guidelines range for the offense of conviction." *United States v. Siegelman*, 786 F.3d 1322, 1330–31 (11th Cir. 2015). Section 1B1.3 provides that relevant conduct includes all conduct committed, aided, or caused by the defendant, as well as "reasonably foreseeable acts" of others in furtherance of a scheme, that "were part of the same course of conduct or common scheme or plan as the offense of conviction." USSG § 1B1.3(a)(1), (2). Two or more offenses are part of a "common scheme or plan" if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." USSG § 1B1.3 cmt. 5(B)(i). "Because the limits of sentencing accountability are not coextensive with the scope of criminal liability, relevant conduct is broadly defined to include both uncharged and acquitted conduct that is proven at sentencing by a preponderance of the evidence." *Siegelman*, 786 F.3d at 1332 (quotation marks and citation omitted).

The Eleventh Circuit affirmed the inclusion of bribes tied to acquitted conduct as relevant conduct in *Siegelman*. In that case, the district court calculated the loss amount based not only on the scheme at issue in the defendant's bribery

conviction, but also loss amounts associated with two other bribery schemes for which the defendant was acquitted. *Id.* at 1330 & n.9–10. The Eleventh Circuit rejected the defendant's challenge to the consideration of his acquitted conduct in the other two schemes, concluding that each of these schemes shared at least one of the factors outlined in Application Note 5(B)(i) of Section 1B1.3 for a "common scheme or plan." Specifically, the Eleventh Circuit noted that one scheme was "substantially connected" to the bribery conviction by a "common accomplice," who helped conceal bribe payments in both schemes. *Id.* at 1334. The Court held that the second scheme was "substantially connected" to the bribery conviction by the other three factors under Application Note 5(B)(i): a common victim, common purpose, and similar *modus operandi*. *Id.* First, both offenses harmed a common victim, the citizens of Alabama, by depriving them of the defendant's honest services. Second, "both offenses were committed for the common purpose of obtaining power and money for [defendant] and his associates." And third, both schemes had the same *modus operandi* because the defendant "used his political power and influence to effectuate both the [relevant conduct] and the [bribery conviction conduct]." *Id.*

All four factors support treating the 2014 bribe payments here as part of a "common scheme or plan" with the Count 1 bribe payments. First, both schemes had common accomplices, Mitchell and Richards, who made bribe payments to Bickers. Second, both schemes had a common victim, the citizens of Atlanta, who were "deprived . . . of the honest services" of a high-ranking City of Atlanta official. *Id.* Third, both schemes "were committed for the common purpose of obtaining . . . money for Bickers," Mitchell, and Richards, who sought lucrative

City of Atlanta contracts in return for the bribe payments. *Id.* Finally, both schemes "shared the same *modus operandi* because [Bickers] used [her] political power and influence to effectuate both the" City of Atlanta contracts at issue in Count 1 and the emergency snow removal and other City work at issue in 2014. *Id.* Accordingly, the 2014 bribe payments are relevant conduct that must be considered in calculating Bickers's bribe amount and restitution owed for her bribery conspiracy conviction.

At trial, the United States presented financial records showing that in 2014, Mitchell and Richard paid Bickers $2,027,126.11. *See* Govt Ex. 202. Based on the preponderance of the evidence standard, Bickers should be held accountable for accepting $2,027,126.11 in bribe money because:

1. Mitchell testified that:

    a. The bribe conspiracy continued in 2014,

    b. Whenever he withdrew more than nominal amounts of cash, he gave that money to Bickers,

    c. He paid Bickers bribe money in 2014 and that Bickers was to spread the money around to other City of Atlanta officials, and

    d. He paid money for bribe payments directly to Bickers and made payments on behalf of Richards.

2. Richards testified that:

    a. The bribe conspiracy continued in 2014,

    b. He believed in 2014 that he was paying Bickers money (through Mitchell) for bribe payments related to the sidewalk contract,

    c. Bickers never worked for him as a consultant, and

      d. Richards made a $15,000 payment directly to Pirouette that he stated was for bribes.

3. In 2014, bank records show numerous payments from Mitchell and a single payment from Richards to Bickers.

4. Mitchell received emergency snow removal work in 2014, even though he was not an approved vendor, and the approved on-call vendors were available to complete the work.

5. As a non-approved vendor, Mitchell received emergency snow removal work, despite charging more than the approved on-call vendors.

6. Despite that he was not an on-call vendor, Mitchell received more emergency snow removal work than any approved vendor.

7. Mitchell and Richards were charged with and pleaded guilty to paying Bickers bribe money in 2014.

As a result, Bickers should be held accountable for receiving $2,027,126.11 in bribes in 2014. Accordingly, the total bribe amount for her bribery conspiracy conviction, including her relevant conduct, is $2,937,179.31.

### c. Wire Fraud Loss & Restitution Amount = $35,854.40

Counts 7 to 10 charged Bickers with wire fraud for defrauding the City of Atlanta out of her salary payments by lying on her annual financial disclosure forms. (Doc. 41 at 22-23). At trial, the United States presented compelling evidence demonstrating the wire fraud scheme, and the jury convicted Bickers of Counts 7 to 10. (Doc. 213 at 2-3). At its core, the jury convicted Bickers of lying to the City of Atlanta about accepting bribes, which allowed her to keep her position and salary. During the bribery conspiracy in Count 1, Bickers earned $179,272 in salary

from the City of Atlanta. (PSR at ¶ 139). As a result, the Probation Officer calculated the loss amount for Counts 7 to 10 to be $179,272.

The Sentencing Guidelines state that when determining loss, any calculation "shall be reduced by … the fair market value of the property returned and the services rendered." U.S.S.G. § 2B1.1, cmt. 3(E)(i). Accordingly, as an alternative to using Bickers's entire salary as the loss figure, the Court could use a percentage of her total salary as the wire fraud loss figure. As discussed more fully below, case law supports using 20% of Bickers's salary (or $35,854.40) as the loss and restitution amounts for the wire fraud convictions.

Restitution "is not intended to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses." *United States v. Huff*, 609 F.3d 1240, 1249 (11th Cir. 2010) (internal quotation marks omitted); *accord United States v. Bowling*, 619 F.3d 1175, 1187 (10th Cir. 2010). For this reason, the "value of the services or items received by the victim … must be offset against the restitution order." *United States v. Bane*, 720 F.3d 818, 828-29 (11th Cir. 2013).

In this case, some evidence at trial suggests that Bickers provided services to the City of Atlanta. As a result, if the court finds that the wire fraud loss amount is $179,272, Bickers would be entitled to a restitution credit. *Bane*, 720 F.3d at 828-29. Currently, no consensus exists in the judiciary as how to calculate such a credit; however, under similar circumstances, courts have determined the value of services rendered by crediting defendants with a percentage of his or her salary. *United States v. Sapoznik*, 161 F.3d 1117, 1122 (7th Cir. 1998) ("Although this is an arbitrary fraction, it rather generously credits [the defendant] with being worth to

11

the employer three fourths of his salary even though he was corrupt. Given the difficulty of estimating the loss that he actually imposed … we think the district judge acted within the limits of her discretion."); *see United States v. Skowron*, 529 F. App'x 71, 74 (2d Cir. July 16, 2013) (restitution of 20% of salary); *United States v. Bahel*, 662 F.3d 610, 650 (2d Cir. 2011) ("[W]e … find that requiring [the defendant] to repay less than 10% of his total salary was a conservative estimate of the cost of the fraud with respect to his salary"); *contra United States v. Hunter*, 618 F.3d 1062, 1066 (9th Cir. 2010) (restitution amount was 100% of $12,500 earned). Accordingly, the United States submits that Bickers should pay $35,854.40 in restitution, which represents 20% of the $179,272 that she earned with the City of Atlanta.

## 2. High-Level Decision-Making or Sensitive Position

The Sentencing Guidelines provide that "if the offense involved … any public official in a high-level decision making or sensitive position, increase by 4 levels." U.S.S.G. § 2C1.1(b)(3). The Guidelines define "high-level decision-making or sensitive position" as "a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process." U.S.S.G. § 2C1.1, cmt. n.4(A). Even where the official's position is not high-level or sensitive, the enhancement is properly applied where the official exercised substantial influence over government decisions. *See United States v. Smith*, 429 F. App'x 840, 845 (11th Cir. 2011). Applying these standards, Bickers should receive a 4-level Guideline enhancement because the Director of Human Services for the City of Atlanta was a public official in a high-level decision-making position. As the Director of Human Services from 2010-2013, Bickers both

had "direct authority to make decisions … on behalf of" the City of Atlanta in her department, and she had "substantial influence" over the City's procurement of various contracts. *See* U.S.S.G. § 2C1.1, cmt. n.4(A).

In her position as the head of the Human Services department, Bickers oversaw the City's programs related to providing citizens with government services and homelessness. Witnesses at trial testified that Bickers was in an executive-level position, part of the mayor's cabinet, and reported directly to the mayor's Chief of Staff. In fact, Bickers was appointed to that position directly by the mayor and was assigned to the City's Executive Offices. On her financial disclosure forms, Bickers identified herself as a "Commissioner; Department Head; or its equivalent." And, though she had no formal power over procurement in public works, she did have the authority to make decisions, including contracting, on behalf of her department.[3]

More to the point, in addition to her formal position, Bickers's actual influence over public works contracting was substantial. In *Smith*, the official who received bribes did not have direct decision-making authority over contracts, but he provided confidential information about contracts and pricing specifications so that the bribing contractor could tailor its bids. 429 F. App'x at 842. The Eleventh Circuit confirmed the 4-level enhancement based on the defendant's actual influence, holding that "a defendant's position may be evaluated in terms of the influence that the defendant exercised." *Id.* at 845.

---

[3] Notably, Mitchell received a 4-level enhancement for bribing Bickers, who is described as a being in a high-level decision-making or sensitive position as the Director of Human Services. *See United States v. Mitchell*, 1:17-cr-00015-SCJ (Doc. 18 (Sentencing Tr.) at 3:3-4:2).

Here, there was ample evidence of Bickers' actual substantial influence over public works contracting. Mitchell and Richards both testified that Bickers provided non-public information regarding bridge repair bids, including pricing information and the prices the City was willing to pay. Richards testified that, despite his history of good work for the City, he would not have been able to get the bridge contacts for the inflated prices he did without Bickers' influence. Mitchell testified that Bickers spread the bribe money around the City, and he received emergency debris removal work for the City without being an approved contractor as a result of Bickers' efforts and relationships with decision-makers in the Public Works department. Thus, though Bickers' formal position was high-level, she also exercised substantial influence outside her position to warrant the enhancement. *See, e.g., United States v. Hill*, 645 F.3d 900, 907 (7th Cir. 2011) (affirming 2C1.1(b)(3) enhancement where, despite not having formal authority to issue licenses, there was evidence that the defendant had actual influence over licensing based on his relationship with the mayor); *United States v. Palmieri*, 681 F. App'x 130, 133 (3d Cir. 2017) (affirming 2C1.1(b)(3) enhancement even though defendant "could not act officially on the Count's behalf" because "he exercised substantial influence through recommendations to his superiors").

### 3. Leadership Role in the Offense

Where a defendant acts as an organizer, leader, manager, or supervisor of criminal activity involving five or more participants, or was otherwise extensive, the Guidelines provide for a 3-level or 4-level enhancement. *See* U.S.S.G. § 3B1.1(b) and (c). Whether the defendant is deemed a "manager or supervisor" for purposes

of a 3-level enhancement or "an organizer or leader" for purposes of a 4-level enhancement depends on several factors:

- The exercise of decision-making authority;

- The nature of participation in the commission of the offense;

- The recruitment of accomplices;

- The claimed right to a larger share of the fruits of the crime;

- The degree of participation in planning or organizing the offense;

- The nature and scope of the illegal activity; and

- The degree of control and authority exercised over others.

*See* U.S.S.G. § 3B1.1, cmt. n.4. There can be more than one person who qualifies as a leader of a criminal conspiracy, so the roles of co-conspirators do not impact the analysis. *See United States v. Esquenazi*, 752 F.3d 912, 938 (11th Cir. 2014) (citing U.S.S.G. § 3B1.1, cmt n.4), *overruled on other grounds by United States v. Pon*, 963 F.3d 1207 (11th Cir. 2020). Considering these factors, Bickers was – at least – a manager or supervisor of the bribery conspiracy with Mitchell, Richards, and possibly other employees of the City of Atlanta, and that scheme was "otherwise extensive."

**a. Bickers was a leader in the bribery conspiracy.**

At the outset, Bickers's bribery scheme was "otherwise extensive" for purposes of U.S.S.G. §§ 3B1.1(a) and (b). "An 'otherwise extensive' operation does not require a set number of criminally responsible participants," and the Court may consider factors such as "the length and scope of the criminal activity," "the number of persons involved," and even use of "unknowing services of many outsiders." *United States v. Slaughter*, 298 F. App'x 876, 877 (11th Cir. 2008) (where the defendant caused a loss of over $5.5 million and involved many knowing and

unknowing individuals in his criminal activity, the district court properly determined the activity was extensive for purposes of a 4-level enhancement); *see also United States v. Gupta*, 463 F.3d 1182 (11th Cir. 2006) (district court clearly erred by not finding as extensive criminal activity that involved multiple corporations, a seven-year period, and Medicare reimbursements of over $15 million). Here, Bickers's bribery scheme, which resulted in losses of over $3 million to the City, involved Mitchell, Richards, three girlfriends, numerous companies and bank accounts, and involved regular bribe payments over the course of several years. Thus, Bickers's criminal bribery activity was extensive.

Considering each of the factors outlined in the Guidelines, Bickers's leadership and organizational role in the offense is evident. First, Bickers was the primary recruiter of participants – both willing and unknowing. She brought the bribery scheme to Mitchell and gave him instructions to accomplish the bribery scheme. Bickers convinced her girlfriends, Deidra Haynes and Shedreka Poole, to establish companies like Chateau Land Company and open joint bank accounts so that she could deposit bribe proceeds across several banks and accounts. After Bickers became involved with Keyla Jackson, Jackson changed the name of her dance company, added Bickers to the company's bank account, and Bickers used the Pirouette Companies and its bank accounts to deposit bribe proceeds from Mitchell. Bickers also "spread" the bribe proceeds "around the City" to effectuate the award of contracts to Mitchell and Richards, despite their bids being high.

Second, throughout the scheme, Bickers consistently acted as both the planner and ultimate decision-maker. Bickers not only told Michell which City of Atlanta projects to bid on, but she provided the insider information from the City that was

necessary to give Mitchell and Richards an advantage in the bid process. Richards testified that, despite his history of good work for the City, he would not have been able to get contracts with the City with the inflated prices and large profits he achieved without Bickers's influence. Bickers expressly demanded that she receive either an upfront payment for the contracts or a specific percentage of the contract once awarded, and Mitchell testified that the numbers in his and Richards's bids were inflated by the amounts demanded by Bickers. Bickers also directed Mitchell to pay her in cash, and she told Mitchell, Haynes, and Poole they could not make large cash deposits to avoid bank reporting requirements. Mitchell testified that he was making so many cash withdrawals for Bickers that he started to feel "like a drug dealer or something."

Third, Bickers exercised considerable control over Mitchell.[4] Not only did Bickers demand a percentage of the contracts awarded to Mitchell and Richards and instruct Mitchell how to pay her to avoid detection, but she required Mitchell to keep her involved even once the contracts were awarded. Mitchell testified that he was supposed to keep Bickers apprised of everything he did with the City, so he forwarded his emails to her, blind copied her on emails, printed emails to show her, and spoke with her on the phone "probably daily." Even the City believed that Bickers had some form of control over Mitchell – as Rita Braswell testified, Public Works employees knew that they could reach Mitchell through Bickers.

Finally, Bickers's leadership is established by her superior knowledge of the mechanics of her scheme and everyone else's reliance on her. Mitchell testified that

---

[4] Mitchell received a 2-level enhancement for his role in the offense. *See United States v. Mitchell*, 1:17-cr-00015-SCJ (Doc. 18 at 3:3-4:2).

17

Bickers told him throughout the scheme that she was using the proceeds for herself and to pay other City officials. Mitchell had no role in directly paying these City officials – he relied on what Bickers told him. Mitchell and Richards relied on what Bickers told them about which contracts to bid on and what prices the City was willing to pay. Haynes and Poole relied on what Bickers told them about deposits into their bank accounts and how their companies would be used. Ultimately, the scheme could not have been effectuated without Bickers' leadership, organization, and control over the flow of information.

Applying a 3-level leadership enhancement under these facts is consistent with precedent in this Circuit and nationwide. In *Esquenazi*, the Eleventh Circuit affirmed a 4-level leadership enhancement for a defendant who instructed others to pay bribes and formed a shell company to pay additional bribes. *Esquenazi*, 752 F.3d at 917-920. Though other members of the conspiracy acted independently at times, the court reasoned that "more than one person" can qualify as leader of a conspiracy, and the defendant was involved "in each step of the scheme." *Id.* at 938. In *United States v. Spencer*, the Third Circuit affirmed the same enhancement for a bribery defendant who, despite being described as "clueless, naïve, and stupid," "directed his coconspirators, set the goals of the conspiracy, and ultimately approved the group's actions." 799 F. App'x 120, 123 (3d Cir. 2020); *see also United States v. Bras*, 483 F.3d 103 (D.C. Cir. 2007) (where defendant stepped into an existing bribery scheme to pay public employees to accept false asphalt tickets that had never been delivered, a 4-level leadership enhancement was warranted because he had to organize multiple individuals to make the scheme work). Here, Bickers came up with the scheme, found her participants, directed

18

the participants, used others to effectuate the scheme, and set the goals of the conspiracy. This scheme does not happen without Bickers's leadership, and a 3-level should be applied.

### b. The same leadership enhancement should apply to the money laundering offense.

For many of the same reasons discussed above, the Court should apply the same leadership enhancement applied to the underlying bribery offense to the money laundering offense. Like the bribery scheme, Bickers directed and managed others in laundering the bribe proceeds. Specifically, in April 2014, Bickers instructed Mitchell to deposit funds into her personal savings account, her Bickers Group bank account, and the Pirouette account by writing out the deposit instructions, and then she accompanied him to the bank to oversee the deposit of funds. A month later, after she organized $110,000 in criminal proceeds being deposited in the Bickers Group account, she purchased the GMC Denali and two wave runners using checks drawn on the Bickers Group. She later purchased two more wave runners using the Bickers Group. Her leadership in the bribery scheme is intertwined with the money laundering offense, and the same enhancement should be applied.

### 4. Grouping of Bribery and Money Laundering Counts

"All counts involving substantially the same harm shall be grouped together into a single Group." U.S.S.G. § 3D1.2. Counts involve substantially the same harm when (a) they have the same victim or the same act; (b) they involve two or more acts connected by a common criminal objection or scheme; (c) one of the counts involves conduct that is treated as a specific offense characteristic applicable to another of the counts; and (d) the offense level is determined largely on the basis

of the total amount of harm or loss. *Id.* Under the rule, both bribery and money laundering are listed as offenses that "are to be grouped under this subsection." *See* U.S.S.G. § 3D1.2(d).

Bickers's objection to the grouping of her conviction for conspiracy to commit bribery and the three money laundering counts relies exclusively on the language of the Superseding Indictment, which contains explicit reference to Count 2 within the money laundering charge. (*See* PSR at ¶ 122.) But, the language of the charging document is not dispositive. Here, Probation applied U.S.S.G. § 3D1.2(b) because there was a common bribery scheme between Bickers, Mitchell, and Richards, and the funds from that scheme are the basis of the money laundering counts. Bickers's purchases were a continuance of her overall bribery scheme. All three purchases were made using her Bickers Group bank accounts, which Bickers used to avoid the appearance that funds were going directly to her or were for a legitimate business purpose. And, the jet skis and cars were part of an overall effort to "wine and dine" public officials and exert her influence at numerous parties at her lake house. The jury's verdict supports this grouping – despite finding Bickers not guilty of bribery in 2014, the jury concluded that she committed money laundering in 2014. And, both offenses involve harm to societal interests. *See* U.S.S.G. § 3D1.2, cmt. n.2; *see also United States v. Shelton*, 99 F. App'x 136, 143 (9th Cir. 2004) (affirming grouping of bribery, wire fraud, and money laundering counts because those counts "relate to an interest involving the right to honest services from officials").

More fundamentally, there is no question that, if Bickers was convicted of the bribery alleged in Count 2, that count would group with the money laundering

count. *See* U.S.S.G. § 2S1.1 cmt. n.6 (requiring grouping of money laundering with the count for the underlying offense from which the laundered funds were derived). And, the bribery alleged in Count 2 is substantially similar to the bribery conspiracy alleged in Count 1, such that they would also group. Given the common victim, the ongoing scheme, and generally the same conduct across Counts 1 and 2, there is no basis for not grouping the bribery conspiracy with the money laundering counts. For these reasons, the Court should group these offenses.[5]

---

[5] The government notes that grouping Count 1 with Counts 4-6 may be more beneficial to Bickers than not. Because  the ongoing bribery scheme is relevant conduct to the money laundering and the source of the proceeds, the offense level for money laundering is the same as the bribery offense. Because they are of equal seriousness, money laundering would be assigned 1 unit, which would be added to the 1 unit assigned to bribery and would result in increasing the total offense level by 2 levels. *See* U.S.S.G. § 3D1.4(a).

## CONCLUSION

For the foregoing reasons, the Court should apply the enhancements and grouping contained in the PSR.


Respectfully submitted,

RYAN K. BUCHANAN
*United States Attorney*


/s/TIFFANY R. DILLINGHAM
*Assistant United States Attorney*
Georgia Bar No. 638051


/s/JEFFREY W. DAVIS
*Assistant United States Attorney*
Georgia Bar No. 426418


/s/NATHAN P. KITCHENS
*Assistant United States Attorney*
Georgia Bar No. 263930


600 U.S. Courthouse ▪ 75 Ted Turner Drive, SW
Atlanta, GA 30303 ▪ 404-581-6000

## CERTIFICATE OF SERVICE

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Dated: September 7, 2022.

/s/ TIFFANY R. DILLINGHAM
*Assistant United States Attorney*