```
 1              UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                     ATLANTA DIVISION

 3 UNITED STATES OF AMERICA, )
                             )
 4          PLAINTIFF,       )
                             )
 5  -VS-                     ) DOCKET NO. 1:18-CR-98-SCJ-LTW
                             ) VOLUME 1
 6 MITZI BICKERS,            )
                             )
 7          DEFENDANT.       )
   _____

 8
                    TRANSCRIPT OF JURY TRIAL
 9            BEFORE THE HONORABLE STEVE C. JONES
                 UNITED STATES DISTRICT JUDGE
10                WEDNESDAY, MARCH 9, 2022

11
   APPEARANCES:
12
   ON BEHALF OF THE GOVERNMENT:
13      JEFFREY W. DAVIS, AUSA
        NATHAN PARKER KITCHENS, AUSA
14      TIFFANY RENE DILLINGHAM, AUSA
        KELLY KATHLEEN CONNORS, AUSA
15      JACQUI ETIENNE, PARALEGAL
        JONATHAN ROSS, PARALEGAL
16      SPECIAL AGENT RICHARD GABRIEL

17 ON BEHALF OF THE DEFENDANT:
        DREW FINDLING, ESQ.
18      MARISSA HELEN GOLDBERG, ESQ.
        ZACHARY J. KELEHEAR, ESQ.
19      DENISE DELARUE, ESQ.
        ALEXIS AHLZADEH, ESQ.
20

21
            VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
22     Official Court Reporter TO THE HONORABLE STEVE C. JONES
                 United STATES District Court
23                    Atlanta, Georgia
                       404-215-1479
24          VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV

25
```

1                          I N D E X

2                                              <u>PAGE</u>

3   VOIR DIRE                                    7

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (HELD IN OPEN COURT AT 10 A.M.)
 2            THE COURT:  Good morning to everyone.  I want to thank
 3   everyone for being here on behalf of my colleagues and parties in
 4   this case.
 5            You noticed when I came in, I removed my mask.  I
 6   removed my mask because during the course of this trial, I'm
 7   constantly talking.  But each one of y'all are being asked to keep
 8   your mask on unless you're talking or responding to something I
 9   ask you or the lawyers ask you.  We do everything possible to make
10   sure everybody stays as safe as possible.  At any point in time
11   you don't feel comfortable with a situation, please let Mr. Rickey
12   know and he'll let me know, and we'll deal with it at that time.
13   I will have my mask on most of the time.  I ask everyone else to
14   keep your mask on.
15            The right to a jury trial is part of one of the most
16   important parts of our freedoms as an American.  You know, some of
17   the constitutions have said next to voting, it's probably the most
18   important right that an American or a person in America has.  But
19   in order with that right and freedom to exist everybody has a role
20   to play.  I have a role to play, the lawyers have a role to play,
21   and you as jurors have a role to play.  And in order for that to
22   work out, everybody has to make sure they meet their obligation.
23   And y'all have met the first part of it by being here this
24   morning.
25            Now, what's going to happen for the next hour or hour
```

1   and a half, or whatever time it takes, I'm going to be asking you

2   questions and the lawyers are going to be asking you questions.

3   It is very important that you answer all of the questions that we

4   ask you openly and honestly.  You know, in a lot of countries the

5   right to a jury trial does not exist.  There is somebody appointed

6   by somebody in a higher level to determine the property rights and

7   freedoms of people.  But here in America, you, the citizens, make

8   those decisions.  But in order to be in that situation, which

9   we're going to pick 12 jurors and 3 alternates in this case, I

10  need you to be as open with me and the lawyers as possible.  If

11  somebody asks you a question and you don't feel comfortable

12  answering from the jury box or from the audience, just raise your

13  hand and say, Judge, I would rather answer that privately.  No

14  problem whatsoever.  We're not here to embarrass you or put you on

15  the spot.  We're just trying to select -- find 12 jurors and 3

16  alternates to try this case.

17          Now, I anticipate this case is going to take roughly

18  three weeks to try from today.  Okay?  That means when I'm asking

19  you questions and the lawyers are asking you questions, if there

20  is something I need to know, if you have a nonrefundable airline

21  ticket for next Wednesday, I just told you it will probably take

22  three weeks to try, you need to tell me.  Let me give you an

23  example.

24          One month ago, Ms. Viola, Simone and Pamela and I had a

25  trial jury in the exact same jury room, Mr. Davis and Mr.

```
 1    Findling.  And what I just said to y'all I said to that jury, too.
 2    And I picked the jury, and I told them how long it's going to take
 3    for that case to try.  And I selected a jury.  And right after
 4    opening statements a gentleman raised his hand and he said, Judge,
 5    I am supposed to take my kids to Disneyland on Friday.  I said,
 6    okay.  And he said, I know you wouldn't make a man miss going to
 7    Disneyland with his kids.  And you know what I said?  Yes, I am.
 8    Something in the world was on his side because that case happened
 9    to finish in time for him to take his kids to Disney World.
10    However, if that case had not finished on time, he was going to
11    sit in that box.  And I fully expected him to pay attention and do
12    everything he is supposed to do.
13            Now, most people will tell you that Steve Jones is not a
14    hard guy to get along with, but if there is something you need to
15    tell us, you need to tell us.  You need to answer the questions
16    honestly that they ask you and completely.
17            Now, with that stated, again, I anticipate this case is
18    going to take about three weeks to try.  You keep that in mind as
19    you answer the questions from the lawyers.  But also keep in mind,
20    you have a role.  The freedom that we have in America means you
21    have a role.  And that role is to make sure that a jury trial is
22    available for everybody.  I have a role, the lawyers have a role,
23    and you have a role.
24            With that stated, Ms. Wright, call the case for today.
25            THE DEPUTY CLERK:  Yes, sir.  The Court calls for trial
```

 1  the matter of the United States of America v. Mitzi Bickers,

 2  Criminal Case No. 1:18-cr-98-SCJ.

 3          THE COURT:  How does the government announce, Mr. Davis?

 4          MR. DAVIS:  Your Honor, the United States is ready.

 5          THE COURT:  Thank you.  How does the defense announce?

 6          MR. FINDLING:  Your Honor, the defense is ready to

 7  proceed.

 8          THE COURT:  Okay.  Now, ladies and gentlemen, at this

 9  time I'll allow Mr. Davis to introduce himself and whoever is

10  working for him, and then I'll allow Mr. Findling to announce

11  himself and whoever works for him, and then I will proceed with

12  questions.

13          MR. DAVIS:  Going morning, everyone.  My name is Jeff

14  Davis.  I'm from the United States Attorney's office.  Along with

15  me is Tiffany Dillingham and Nathan Kitchens also from the U.S.

16  Attorney's Office.  Andrew Benjamin, he's from the FBI, and

17  assisting us today are Richard Gabriel and Jonathan Ross.

18          THE COURT:  Thank you, Mr. Davis.  Mr. Findling.

19          MR. FINDLING:  Thank you, Your Honor.

20          Good morning.  I'm Drew Findling.  Along with me today

21  are attorneys Marissa Goldberg, our client Pastor Mitzi Bickers,

22  attorneys Zachary Kelehear, Alexis Ahlzadeh, and attorney Denise

23  Delarue.

24          Thank you, Your Honor.

25          THE COURT:  Thank you, Mr. Findling.

1          Now, ladies and gentlemen of the jury, most of you all

2   came in last Thursday and today.  Anyone not receive an oath for

3   this week for trial?  Did you not receive an oath, please raise

4   your hand.

5          You didn't receive an oath?  Everybody who did not

6   receive an oath, please stand up.  Ms. Wright is going to

7   administer an oath to you.  I have it right here, Ms. Wright.

8   Please raise your right hand.

9          THE DEPUTY CLERK:  Do you solemnly swear to truthfully

10  answer all questions that shall be asked of you touching your

11  qualifications as a prospective juror in this case now called for

12  trial, so help you God?  If you so agree, please say I do.

13          (All confirmed.)

14          THE COURT:  Thank you all.  Thank you, Ms. Wright.

15          Now, ladies and gentlemen, I have some questions for all

16  of y'all.  If any of these questions pertain to you, I ask you to

17  raise your hand and keep your hand raised so I can acknowledge

18  you.

19          Does any member of the panel know the United States

20  Attorney Kurt R. Erskine?

21          There is no response.

22          Does any member of the panel know assistant United

23  States Attorneys Jeffrey Davis, Nathan Kitchens, Kelly Kathleen

24  Connors, Tiffany Renee Dillingham, Jacqui Etienne, Jonathan Ross,

25  Richard Gabriel -- and not -- all these people are not United

1  States attorneys, some of them are staff, or Special Agent Marc

2  Benjamin?   If so, please raise your hand.   Let the record reflect

3  no one raised their hand.

4           Does any member of the panel know any of the employees

5  of or has any member of the panel or their immediate family worked

6  for the United States Attorney's Office for the Northern District

7  of Georgia or for any United States Attorney's office?

8           There is no response.

9           Does any member of the panel know defense attorneys Drew

10 Findling, Marissa Goldberg, Alexis Ahlzadeh, Denise Delarue, and

11 Zachary J. Kelehear?

12          There is no response.

13          Does any member of the panel know any employees of or

14 has any member of the panel or their immediate family worked for

15 the Drew Findling law firm?

16          There is no response.

17          Does anyone know or has anyone ever met Pastor Mitzi

18 Bickers?

19          Pastor Bickers, stand up, please.

20          Thank you, ma'am.

21          There is no response.

22          Does anyone know any of the following individuals who

23 may be witnesses in this case?   Mr. Davis, I will ask you to read

24 out the case of potential witnesses.   Now, members of the jury,

25 the names that Mr. Davis will read now, it does not mean these

 1  people, all these people are going to be called as witnesses, but

 2  they are potential witnesses.

 3          MR. DAVIS:  Yes, Judge.  Jackie Anderson Woods, Michael

 4  Ayo, Andrew Marc Benjamin, Sabrina Black, Diedre Verdier, Thomas

 5  Weyandt, Kim Bracey, Keyla Jackson, Mark Stafford, Rita Braswell,

 6  Stephanie Coleman, Ralph Dahlgren, Kim Spell-Fowler, Matthew

 7  Davis, Kristy Fuentes, William Gant, Gail Hanscom, Nina Hickson,

 8  Sharon Hixon, Jon Keen, Jimmy Kirby, Richard Leary, Deborah Lanon,

 9  Cotena Alexander, Sean Barnes, Jordan Hillman, William Marshall,

10  Richard Mendoza, Elvin R. Mitchell, Sharon Patterson, Janene

11  Tillman, Greg Von Wynn, Danielle Nichols, Shedreka Poole, Melvin

12  Priester, Mike Winfrey, Tony Yarber, Rickey Williams, Jackie

13  Velardo, Tammy Willingham, Lisa Reed, Chana Tate, John Relyea,

14  Charles P. Richards, Adrienne Richardson, Andrew Jenkins, Anthony

15  Brister, Ashby Foote, Candice Byrd, Dana Sims, Albert Bantley,

16  Charles Davis, Robert Walker, or Robbi Jones?

17          THE COURT:  Thank you, Mr. Davis.

18          MR. DAVIS:  Yes, sir.

19          THE COURT:  May the record reflect -- yes, ma'am.

20          PROSPECTIVE JUROR:  I know a Sharon Patterson, but --

21          THE COURT:  Please stand up.  State your name.

22          PROSPECTIVE JUROR:  Lysa Moore.

23          THE COURT:  Who is the person you think you know?

24          PROSPECTIVE JUROR:  Sharon Patterson.

25          THE COURT:  How do you know Sharon Patterson?

 1              PROSPECTIVE JUROR:  Mother to a childhood friend.

 2              THE COURT:  At some point in time, the lawyers may ask

 3   you something more about it.

 4              PROSPECTIVE JUROR:  Okay.

 5              THE COURT:  Thank you, ma'am.

 6              Is there any member of the panel that has any special

 7   disability or problem that would make serving as a member of this

 8   jury difficult or impossible?

 9              There is no response.

10              Does any juror hold any belief, religious or otherwise,

11   which discourages or prevents jury service?

12              There is no response.

13              If you are selected to sit on this case, will you be

14   able to render a verdict solely on the evidence presented at the

15   trial and in the context of law as I will give you in my

16   instructions?  If not, please raise your hand.  There was no

17   response.

18              Mr. Davis, Mr. Findling, I place the first jurors upon

19   you.  You can proceed with your voir dire questions, Mr. Davis.

20              MR. DAVIS:  Yes, sir.

21              MR. KITCHENS:  Good morning, thank you all for being

22   here.  We truly do appreciate all your service.  And as Judge

23   Jones noted, we do have a few questions for you.

24              A number of you stated from your questionnaires that you

25   may have seen some possible news items regarding this case.  And

 1  some of you expressed some opinions based on your review of that,

 2  which we appreciate and I know the defense appreciates that as

 3  well.

 4          I do want to clarify a few things before I ask some

 5  questions to some of you individually.

 6          First, former Mayor Kasim Reed is not on trial here, and

 7  he will not be a witness in this case.  The only defendant in this

 8  case is Pastor Mitzi Bickers.

 9          Second, although you may have read some general news

10  articles or seen some TV news related to this case, you'll be

11  hearing actual evidence in this case.  And sometimes what the

12  evidence is may be much different from what you would have seen or

13  heard in the news.  If you have seen anything in the news that is

14  not evidence, the judge will instruct you not to consider it.

15          Third, in your questionnaires you were asked to express

16  some opinions about women being pastors, or pastors, you know,

17  being of a certain sexual orientation.  That will also not be an

18  issue in this case.  Given those statements, I want to ask some of

19  you some individual questions based on review of our

20  questionnaires.  Just given our time, I'm not going to have the

21  ability to ask questions to each of you.  I apologize about that.

22  Please do forgive me if I don't have a chance to reach out to

23  everyone.

24          Mr. Cassell, a few questions for you.  You indicated you

25  had some opinions about the IRS.  Would you please tell us a

1  little bit more about your opinions?

2          PROSPECTIVE JUROR:  Sure.  I've had some folks work for

3  them.  So I hear a lot of inner stories of what's going on.  I

4  don't have the most positive impression.  I wouldn't say it is

5  extremely negative, but it's not the most positive either.  I

6  think I start from the point of maybe there are some things that

7  have gone on that I may be concerned about.

8          MR. KITCHENS:  If someone were to testify that works for

9  the IRS, would that affect your ability -- would you judge that

10 person's credibility?

11         PROSPECTIVE JUROR:  I would say minimally, but slightly.

12 I think I would have a bias that I may not want to believe it, if

13 I'm being fully honest.

14         THE COURT:  Say that again?  I didn't hear you.  You

15 have what?

16         PROSPECTIVE JUROR:  I think I would have a little bit of

17 a bias and it would be difficult to believe them.  I might start

18 with that, if I'm being fully honest.  I would like to say that I

19 wouldn't, but I think I probably would.

20         MR. KITCHENS:  Thank you, sir.  Ms. Files, a few

21 questions for you.  We're on the same row.

22         PROSPECTIVE JUROR:  Brittany Files.

23         MR. KITCHENS:  Thank you, Ms. Files.  Ms. Files, on your

24 questionnaire you indicated some opinions about prosecutors and

25 your general views about prosecutors.  Can you tell us a little

1  bit more about your feelings about prosecutors?

2          PROSPECTIVE JUROR:  I have some -- like, a close family

3  friend who is in prison for murder over a self-defense case, and

4  there was a lot of -- kind of corruption going on with that case.

5  There was evidence covered up.  One of the victims, or victims I

6  say in quotes, because they attacked him who had a grandfather, I

7  believe, that worked for the DA and they covered up a lot of

8  evidence.  So I just kind of have -- I wouldn't say it's overall

9  negative, but I'm a little bit skeptical of a lot of stuff.  I do

10 think there is a lot of corruption that goes on in any kind of

11 government.  So, yeah, I don't think it's overly negative, but I

12 do think I'm skeptical of a lot of things.

13         MR. KITCHENS:  I appreciate you mentioning that case.

14 How long ago did that happen?

15         PROSPECTIVE JUROR:  So he's been in jail for about ten

16 years, maybe a little bit longer.  I was pretty young when it

17 happened.  But he's -- I think he was convicted when he was, like,

18 19 and he's in his 30s now.  So he has been in prison for that

19 long, and his family has been fighting it for now over a decade.

20 There is just, like, constant covering of stuff, and he hasn't

21 been able to get a fair trial.

22         MR. KITCHENS:  So I understand that would have been a

23 difficult experience, particularly when you're young to see

24 something like that.  Has that -- can you tell us a little bit

25 more about your feelings ten years after?  Do you still feel

1  fairly, you know -- have feelings about the prosecution and the

2  government based on how that case was handled?

3       PROSPECTIVE JUROR:  Yeah.  I mean, it's -- it's really

4  hard, because, like, his parents are close friends of my parents

5  and we see them -- I see them pretty frequently and they're always

6  talking about, like, how difficult it is and how -- they've been

7  in court -- it's just been constant.  And, like, it's just been --

8  I don't know.  I'm just very -- I think as I've gotten older and

9  I've understood more of what's going on, I think that I have been

10 more skeptical.  When it happened, I was, like, nine or ten.  I

11 kind of understood, but now that I've gotten older and my parents

12 have told me more and my family friends have told me more about

13 what goes on, and I think I just have a better understanding now.

14 So, yeah, I think, if anything, I'm definitely -- I feel more

15 strongly about it now then I did previously.

16      MR. KITCHENS:  Okay.  And given those stronger feelings

17 that have gotten stronger over time, do you feel that there may be

18 a case not involving the criminal justice system that may be more

19 appropriate for you?

20      PROSPECTIVE JUROR:  Like in terms of me being a juror?

21 I don't know.  I think it definitely depends on what the crime is.

22 But I think overall I just have kind of a scepticism of the

23 justice system in particular.  Like, I just think that, you

24 know -- I mean, a lot of it is stuff that I see on the news of

25 like cases.  And, obviously, I don't see all of the evidence, but

1    I get -- I have my own opinions about a lot of things that go on

2    in the justice system, and I think that a lot of times there's a

3    lot of bias that goes into things, especially against, like,

4    minorities and -- I don't know.  I think I just am skeptical, and

5    I think any case would be bringing a little bit of bias into it.

6                    MR. KITCHENS:  All right.  Well, thank you, Ms. Files.

7                    Ms. Nguyen, while we're own on the same row, just a few

8    questions for you.

9                    Based on the description of what this case may involve,

10   I think you had expressed some opinions.  Given my statement that

11   I made at the beginning, would you want to hear all of the

12   evidence before you would reach any sort of judgment in this case?

13                   PROSPECTIVE JUROR:  Yes, because I think it's kind of --

14                   THE COURT:  Take your mask off or you can keep it.

15                   PROSPECTIVE JUROR:  Can I keep it on?

16                   THE COURT:  Okay.

17                   PROSPECTIVE JUROR:  Thank you.  But, yeah, I think it's

18   important to hear all of the evidence, both sides before you come

19   to, like, a sound conclusion.

20                   MR. KITCHENS:  And the Judge in this case is going to

21   provide instructions about the law and the evidence.  Do you think

22   you could follow those instructions that are provided by the

23   Judge?

24                   PROSPECTIVE JUROR:  Yes.

25                   MR. KITCHENS:  Given the statements and the instructions

1  that the Judge may provide, do you feel that you could be a fair

2  and impartial juror in this case?

3          PROSPECTIVE JUROR:  Umm, probably.

4          THE COURT:  I didn't hear you.  What?

5          PROSPECTIVE JUROR:  Probably.

6          I don't really have like a solid answer for that,

7  because I don't know what is going to happen in the future.

8          THE COURT:  It's not a question of what is going to

9  happen.

10          PROSPECTIVE JUROR:  He's asking me if I believe I can

11  make a fair judgment, and I suppose I could.

12          THE COURT:  Here is the question:  Can you listen to the

13  evidence presented in this case and then the charge of the law I

14  will give you and render a verdict based on the evidence you hear

15  in this courtroom and the law I give you?  Can you do that?

16          PROSPECTIVE JUROR:  Yes.

17          MR. KITCHENS:  All right.  Thank you, Ms. Nguyen.

18          THE COURT:  Ms. Respress, I have a few questions for

19  you.

20          PROSPECTIVE JUROR:  Do I have to state my name?

21  Whyeethia Respress.

22          MR. KITCHENS:  Thank you.

23          PROSPECTIVE JUROR:  You're welcome.

24          MR. KITCHENS:  I think you noted that you have had a

25  past negative experience involving your family with the criminal

1  justice system.

2          PROSPECTIVE JUROR:  Yes.

3          MR. KITCHENS:  Can you tell us a little bit more about

4  your perspective based on that.

5          PROSPECTIVE JUROR:  Yes.  I start off by saying that my

6  family and I do believe in justice.  My brother committed murder.

7  And where my belief in the or my choice in the justice system

8  failed me and my family was because a lot of the evidence was

9  covered.  And my brother was -- he was pretty young, and we feel

10  like the book was being thrown at him.  And I am a pretty

11  inquisitive person.  So I researched some other related cases.

12  And what the judge rendered was because the deceased was not able

13  to defend herself, she would not allow certain evidence to be

14  heard in the courtroom.  So it was another case that I researched.

15  And I think it was Lorraine Scott, and she murdered her husband.

16  And that judge allowed a lot of evidence to be heard, although the

17  deceased was not able to defend himself.  So that's where my

18  distrust was in his case.  And I think it was because Lorraine

19  Scott was a Caucasian woman and my brother is an African-American

20  male.

21          MR. KITCHENS:  I can understand that, obviously, would

22  be a very difficult experience.  How long ago was that?

23          PROSPECTIVE JUROR:  To date, 14-and-a-half years ago.

24          MR. KITCHENS:  And how have your feelings about that --

25  can you tell us a little bit more about your feelings?

1          THE CLERK:  Yeah, my feelings still stay the same.  As I

2    said before, we still believe in justice.  And we did not expect

3    him to be released.  We expected him to serve his time, but just

4    with a fair trial.  Things were overturned.  So his sentence was

5    reduced, and we were grateful for that.  So I feel better, you

6    know, about the final outcome.  But just the initial trial.

7          MR. KITCHENS:  I think you expressed as part of the

8    distrust, I think you mentioned that you had the opinion that

9    prosecutors do whatever it takes to win.  Could you tell us a

10   little bit more about that opinion?

11         PROSPECTIVE JUROR:  Yes.  I think everyone has a job to

12   do.  And the prosecutor's job is to win their case, you know, and

13   that's my opinion.  You're going to take all of the evidence and

14   persuade, you know, people to hear from the side of the

15   prosecutor.  So it's a job.

16         MR. KITCHENS:  Given kind of your experiences and your

17   perspective, do you think that would impact how you may view the

18   government's case in this matter?

19         PROSPECTIVE JUROR:  It doesn't.  Because evidence is

20   evidence, you know.  I'm kind of a black and white person.  So you

21   know, evidence is evidence.  And I just believe in justice being

22   served on whichever side.

23         THE COURT:  Mr. Kitchens, I have a question.

24         When you say you have a distrust in the system, what

25   part do you distrust?

1          PROSPECTIVE JUROR:  The part that I distrust is will I

2  truly have all of the evidence that needs to be presented in order

3  for me to make a sound decision.  So that's the part that I

4  distrust.

5          THE COURT:  You understand during the course of a trial

6  in a criminal case, the burden of proof rests with the government

7  to prove beyond a reasonable doubt the charge or charges against

8  the defendant.

9          PROSPECTIVE JUROR:  I do.  However, I think it matters,

10  because it determines the sentence that will be rendered.  In my

11  brother's case, if I could just say, the jury had a choice to

12  charge him with malice murder versus manslaughter.  And given the

13  fact that some of the evidence was not presented and the judge did

14  not allow it, it was a matter of how much time he really would

15  have been able to serve -- and even added the death penalty, if

16  they chose to.  So that's where my mistrust comes in when I talk

17  about whether or not all of the evidence will be presented.

18          THE COURT:  How do you determine whether or not all of

19  the evidence has or will be presented?

20          PROSPECTIVE JUROR:  I can't determine, but I was present

21  every day of his trial.

22          THE COURT:  But if you're ask to sit as a juror in this

23  case -- in other words, I'm going to give you the confinements of

24  the law that you have to follow.

25          PROSPECTIVE JUROR:  Okay.

1          THE COURT:  My question is, are you going to move

2   outside of those confines of what I tell you and make decisions

3   based on what you think is right, or are you going to stay within

4   the confine of the laws that I give you?

5          PROSPECTIVE JUROR:  So with my personality, everything

6   must make sense and align.

7          THE COURT:  You would go outside of those confinements I

8   give you?

9          PROSPECTIVE JUROR:  Well, I'm going to do what is asked.

10         THE COURT:  Here is the question.

11         PROSPECTIVE JUROR:  Okay.

12         THE COURT:  I and I alone will tell the jury what the

13   law is.

14         PROSPECTIVE JUROR:  Okay.

15         THE COURT:  And that jury and juror is required to stay

16   within those confinements I give you.  It's nothing wrong if you

17   say I don't know if I can do that or I can't do that, but at this

18   point in time I need to know.

19         PROSPECTIVE JUROR:  Yes, I don't.  I mean, to be honest

20   with you, I don't know I can honestly do that.

21         THE COURT:  I appreciate your honesty.  That's why we do

22   that.  I respect you.  I appreciate your honesty.  Thank you,

23   ma'am.

24         MR. KITCHENS:  Thank you.

25         PROSPECTIVE JUROR:  You're welcome.

1          MR. KITCHENS:  Ms. Anderson.  I think over here.

2          PROSPECTIVE JUROR:  Sherry Anderson.

3          MR. KITCHENS:  Thank you, Ms. Anderson.  Ms. Anderson,

4   in your questionnaire you expressed some religious beliefs about

5   your ability to judge another person.  Could you tell us a little

6   bit more about that?

7          PROSPECTIVE JUROR:  With religion -- I am a minister.

8   So my thing is that God will judge everyone.  I can be truthful

9   about everything, if evidence is given, I can be truthful with it,

10  but me giving a verdict -- I mean, not a verdict, a decision, I

11  don't think I could.

12         MR. KITCHENS:  So if you were presented with the law

13  and/or instructed by Judge Jones to apply the law and the facts

14  and then render a verdict of guilty or not guilty, do you think

15  based on your religious beliefs you would be able to do that?

16         PROSPECTIVE JUROR:  No.

17         MR. KITCHENS:  Okay.  Thank you, again, for your

18  honesty, Ms. Anderson.

19         Mr. Gillis.

20         PROSPECTIVE JUROR:  I'm Joe Gillis.

21         MR. KITCHENS:  Mr. Gillis, I think you indicated in your

22  questionnaire that in the past or maybe currently you've done some

23  work with a company AECOM.

24         PROSPECTIVE JUROR:  Yes, I have been working at AECOM

25  for five years.

```
 1            MR. KITCHENS:  Would you tell us a little more about
 2    your work.
 3            PROSPECTIVE JUROR:  Sure.  I'm a project manager, and
 4    I'm currently on a project doing road projects and around Columbus
 5    around toward Valdosta, Tifton, Lake Cross.
 6            MR. KITCHENS:  In this case you may hear some evidence
 7    regarding AECOM and potentially evidence that Pastor Bickers was
 8    working with -- working with -- as part of a team with AECOM to
 9    try to get some work.  Would that impact in any way your ability
10    to be a juror?
11            PROSPECTIVE JUROR:  No, I'll follow the instructions of
12    the Court and do what I was supposed to do.
13            MR. KITCHENS:  Mr. -- is it Mr. Blount?
14            PROSPECTIVE JUROR:  Bobby Blount.
15            MR. KITCHENS:  Mr. Blount, good morning.
16            PROSPECTIVE JUROR:  Good morning.
17            MR. KITCHENS:  I think in your questionnaire you
18    expressed some opinion about your views about corruption in the
19    city and Mayor Reed as well.  Given the statement I made at the
20    beginning about Mayor Reed not being on trial, not being a
21    witness, do you think you would be able to keep an open mind in
22    this case?
23            PROSPECTIVE JUROR:  I would.
24            MR. KITCHENS:  Would your opinions about corruption in
25    the city or Mr. Reed in any way -- would it impact your ability to
```

1  be a fair and impartial juror in this case?

2          PROSPECTIVE JUROR:  It would not.  I would do my best to

3  be fair in that.

4          MR. KITCHENS:  May I speak with, Ms. Tucker.

5          PROSPECTIVE JUROR:  Susan Tucker.

6          MR. KITCHENS:  Ms. Tucker, in your questionnaire you

7  expressed an opinion about -- if public servants do things for

8  personal gain, that you may have to, you know, be convinced that

9  that's not the case.  As the judge will instruct you, it's the

10 government's burden to prove anything in this case.  It's not the

11 defense's burden to disprove anything.  They do not have to prove

12 anything in this case on the defense side.  Would you be able to

13 follow that instruction?

14         PROSPECTIVE JUROR:  I would.

15         MR. KITCHENS:  And would your -- given the statements

16 that I made in the beginning regarding, you know, opinions and the

17 fact that -- being a woman pastor or a pastor of a certain sexual

18 orientation is not going to be an issue in this case, would you be

19 able to be fair and impartial in this matter?

20         PROSPECTIVE JUROR:  I would.  It's not my place to

21 judge.

22         MR. KITCHENS:  Would that have an impact on how you

23 would view the government's evidence or any evidence presented by

24 the defendant?

25         PROSPECTIVE JUROR:  I would hope not.

1          MR. KITCHENS:  And Ms. Alsobrook.

2          PROSPECTIVE JUROR:  Lana Alsobrook.

3          MR. KITCHENS:  Ms. Alsobrook, given kind of, again, the

4    statements that I made at the beginning about this case and the

5    fact that anything you may have read is not evidence, not anything

6    that you can consider as part of your judgment, and given that you

7    have not yet heard any evidence in this case, would you be able to

8    keep an open mind in listening to the evidence that's presented?

9          PROSPECTIVE JUROR:  Yes.

10         MR. KITCHENS:  Would you be able to follow the judge's

11   instructions regarding the law?

12         PROSPECTIVE JUROR:  Absolutely.

13         MR. KITCHENS:  And would you be able to be a fair and

14   impartial juror applying the law to the evidence that's presented

15   in this case?

16         PROSPECTIVE JUROR:  Yes.

17         MR. KITCHENS:  I think my time is up, Your Honor.

18         THE COURT:  Thank you.

19         You have two minutes.  Ms. Wright is the official

20   timekeeper.  You can give up your two minutes, if you would like.

21         You have a minute-and-a-half now.  Thank you, Mr.

22   Kitchens.

23         MR. KITCHENS:  I think we'll yield our time.

24         THE COURT:  The clock on my left is the one for the

25   government, and the one on the right is for the defense.  But Ms.

1  Wright keeps up with it, and I assure you when your time is up,

2  you'll hear from her.

3         Also, when I'm questioning the jurors, she turns it off.

4         MR. KITCHENS:  I see.

5         THE COURT:  So that's why it went faster on your part.

6         MR. FINDLING:  Good morning.

7         As you can imagine right from the beginning, I'm going

8  to disagree with my colleagues from the government.  The issue of

9  somebody's sexual orientation and that role they may play,

10 perhaps, as being a pastor while being gay, some people just may

11 have an inclination to hold that against them.  And when you're

12 standing here and the case is before 12 people, it's always an

13 issue.  So I hope you understand that.

14         And so I don't mean to single anybody out, but I'm going

15 to follow up with my questions a little bit differently.  And I'm

16 going to start off with Ms. Kendrick.

17         So, Ms. Kendrick, you had indicated --

18         PROSPECTIVE JUROR:  Allexus Kendrick.

19         MR. FINDLING:  Thank you.  You had indicated that,

20 perhaps, if someone is a gay pastor, that they would answer to

21 God.  Can you tell me what you mean by that?

22         PROSPECTIVE JUROR:  I was just saying that I can't judge

23 anyone for being gay.  If she wants to be a pastor, and she wants

24 to tell everyone about God, or if she wanted to -- well, I can't

25 judge her at the end of the day.  If she wants to be a pastor, and

1  she decided that she wants to be a woman, that has nothing to do

2  with me or anybody else.  And God is the one that she will have to

3  answer to.

4          MR. FINDLING:  Thank you for expressing that.  And then

5  I'll follow-up -- thank you so much.

6          Ms. Tucker, you had indicated that being a gay pastor,

7  perhaps, violates biblical teaching.  Can you explain to me your

8  thought on that?

9          PROSPECTIVE JUROR:  I feel like the lifestyle defies

10  what I believe -- what Christians believe.  So that's it.

11          MR. FINDLING:  Okay.  I didn't hear that last part of

12  her answer.

13          PROSPECTIVE JUROR:  It just defies my Christian beliefs.

14  It goes totally against them.

15          THE COURT:  Well, would it affect you if were asked to

16  serve on this jury, to render a verdict based on the evidence that

17  you will hear and the exhibits admitted during the course of the

18  trial and the law I give you, and can you render a verdict based

19  on that?

20          PROSPECTIVE JUROR:  I would do my very best to do so.

21          THE COURT:  And can you be fair and impartial to the

22  defendant in this case?

23          PROSPECTIVE JUROR:  I would do my very best to do so.

24          THE COURT:  Can you put any beliefs you have aside if

25  you are asked to sit as a juror and render a fair and just verdict

1 based on the evidence and the law?

2          PROSPECTIVE JUROR:  As I say, I would do my very best to

3 do so.

4          MR. FINDLING:  Mr. Pelayo, I'm going to be pretty quick.

5          PROSPECTIVE JUROR:  Gabriel Pelayo.

6          MR. FINDLING:  Mr. Pelayo, you have indicated that you

7 are going to be on vacation from the 12th through the 24th?

8          PROSPECTIVE JUROR:  Yes, of this month.

9          MR. FINDLING:  And so that is a paid vacation?

10          PROSPECTIVE JUROR:  Yes.  I have a flight booked for

11 this Saturday, and it's through the 20th.

12          MR. FINDLING:  Well, as I indicated to my colleagues

13 from the government, my wife would love for me to take two weeks

14 off and join you in California.  I'll cease asking questions.  I

15 appreciate you sharing that information with us.

16          PROSPECTIVE JUROR:  Thank you.

17          MR. FINDLING:  Mr. Blount.

18          PROSPECTIVE JUROR:  Bobby Blount.

19          MR. FINDLING:  And you have indicated to us that you

20 have a lot of deadlines because of work.

21          PROSPECTIVE JUROR:  Yes.

22          MR. FINDLING:  Can you please explain that to us?

23          PROSPECTIVE JUROR:  I work for a school district, North

24 Georgia, and we are going what they call Cognia accreditation.

25 It's every five years.  The district goes through a review of the

1  practices, governance and things like that.  And I'm the CIO over

2  the technology department.  So I typically have to be there to

3  answer the questions with the rest of the cabinet, the members

4  that report directly to the superintendent.

5          MR. FINDLING:  And when is that supposed to take place?

6          PROSPECTIVE JUROR:  The process has already begun.

7  Cognia is actually reviewing the materials we've submitted.  They

8  will begin doing their online business with us March 28.  So we

9  are still curating resources and everything for them.  We're also

10  in the budgeting process.

11          So as of Friday, I'm presenting a $10 million budget to

12  my boss in theory, so...  But if not --

13          MR. FINDLING:  Realistically, would you be able to take

14  a three-week pause?

15          PROSPECTIVE JUROR:  It is going to be challenging.  It

16  would be very, very difficult, so...

17          MR. FINDLING:  Thank you.

18          Mr. Walbert.

19          PROSPECTIVE JUROR:  Donald Walbert.

20          MR. FINDLING:  Mr. Walbert, have you participated in

21  any -- I know you're a contractor, any government contract with

22  the state or local governments?

23          PROSPECTIVE JUROR:  No.

24          MR. FINDLING:  Okay.  And have you ever been in a

25  position where you've had to deal with competitive -- with

1  minority participation issues in contracting?

2          PROSPECTIVE JUROR:  No.  I'm a subcontractor.

3          MR. FINDLING:  Okay.

4          PROSPECTIVE JUROR:  I don't deal with any policies or

5  situations like that.

6          MR. FINDLING:  Okay.  So all of your work goes -- you

7  respond to the GC in a case?

8          PROSPECTIVE JUROR:  (Witness nods head.)

9          MR. FINDLING:  And I take it, you rely on the GC to

10 timely pay you and issues like that?

11         PROSPECTIVE JUROR:  Yes.

12         MR. FINDLING:  Thank you, sir.

13         Mr. Wright.

14         PROSPECTIVE JUROR:  Alfred Wright.

15         MR. FINDLING:  Mr. Wright, you had indicated that

16 minorities have less resources to defend themselves.  Can you

17 define what you mean by less resources?

18         PROSPECTIVE JUROR:  I just feel like minorities as a

19 whole -- when I say resources, I'm talking about finances to be

20 able to defend themselves.  So, you know, you get caught up in a

21 system that you can't even pay proper lawyers to take care of you

22 or to help you.  It goes wrong really fast.

23         MR. FINDLING:  Okay.  Thank you.  Thank you.  I

24 appreciate it.

25         Mr. Cassell.

```
 1              PROSPECTIVE JUROR:  David Cassell.

 2              MR. FINDLING:  I'm sorry.  Mr. Cassell, you just heard

 3    that answer from Mr. Wright.  What's your response to his -- what

 4    he just shared with us about minorities having less resources in

 5    our system to defend themselves?

 6              PROSPECTIVE JUROR:  I think that's accurate.

 7              MR. FINDLING:  All right.  Thank you.

 8              Ms. Respress.  Did I pronounce that correctly?

 9              PROSPECTIVE JUROR:  Yes, you did.

10              MR. FINDLING:  Okay, thank you.

11              PROSPECTIVE JUROR:  Whyeethia Respress.

12              MR. FINDLING:  You had indicated that you had a

13    fraudulent tax preparer.

14              PROSPECTIVE JUROR:  Yes.

15              MR. FINDLING:  If you can -- was that an accountant or

16    just like a bookkeeper tax preparer?

17              PROSPECTIVE JUROR:  Like a bookkeeper, yes.

18              MR. FINDLING:  Not a CPA?

19              PROSPECTIVE JUROR:  I really don't know.

20              MR. FINDLING:  Okay.  And it seems like from looking at

21    your questions, you have a good comprehension of tax-related

22    issues?

23              PROSPECTIVE JUROR:  Yes.

24              MR. FINDLING:  Okay.  And I think you had indicated you

25    understood what a Form 8300 is?
```

```
 1              PROSPECTIVE JUROR:  Yes.

 2              MR. FINDLING:  Okay.  So you would understand cash

 3    reporting requirements?

 4              PROSPECTIVE JUROR:  Yes.

 5              MR. FINDLING:  Okay.  And so I take it that from your

 6    standpoint, it takes a level of sophistication and business acumen

 7    to understand that concept?

 8              PROSPECTIVE JUROR:  Absolutely.

 9              MR. FINDLING:  All right.  Thank you.  I appreciate

10    that.  Thank you.

11              Oh, I also have another question for you.  Sorry.

12              You have indicated that the department -- you think the

13    Department of Justice makes mistakes in cases at times.  Can you

14    elaborate on that for just a quick second?

15              PROSPECTIVE JUROR:  I'm sorry, can you repeat that?

16              MR. FINDLING:  You indicated that you think the

17    Department of Justice, DOJ, makes mistakes from time to time in

18    cases.

19              PROSPECTIVE JUROR:  I don't necessarily think they make

20    mistakes.  Maybe I was just referring to all the evidence being

21    presented.  But I believe -- and I'm sorry if I wrote that.

22              MR. FINDLING:  It's okay.

23              PROSPECTIVE JUROR:  I don't think they make mistakes.  I

24    just believe that some things can be

25    unintentional -- unintentionally or intentionally left out.
```

1          MR. FINDLING:  Okay.  Thank you.

2          PROSPECTIVE JUROR:  You're welcome.

3          MR. FINDLING:  Ms. Simmonds.

4          PROSPECTIVE JUROR:  Ashley Simmonds.

5          MR. FINDLING:  You had indicated that you at one point

6  saw a co-worker take something from a drawer and, in fact, follow

7  through and turned them in.

8          PROSPECTIVE JUROR:  Um-hum.

9          MR. FINDLING:  Did that lead to a prosecution?

10          PROSPECTIVE JUROR:  No.  It was just like a petty theft

11  kind of thing.

12          MR. FINDLING:  Okay.  But you apparently took the

13  initiative to observe it and let people know what you saw?

14          PROSPECTIVE JUROR:  Right, because at the end of the

15  day, we were responsible for the cash register.  So if I didn't

16  say something, it would have been both of us thrown under the bus.

17          MR. FINDLING:  Okay.  And you had also indicated,

18  similarly to Ms. Respress, that you're familiar with cash

19  reporting requirements?

20          PROSPECTIVE JUROR:  Um-hum.

21          MR. FINDLING:  And is that as a result of work?

22          PROSPECTIVE JUROR:  Yes.  That, and I also have my

23  associate's in accounting.

24          MR. FINDLING:  Okay.  Perfect.  Thank you so much.

25          Mr. Gillis.

```
 1              PROSPECTIVE JUROR:  Joe Gillis.

 2              MR. FINDLING:  Mr. Gillis, you had talked to us about

 3    your work with AECOM, but also indicated that you have done some

 4    work in Jackson, Mississippi.

 5              PROSPECTIVE JUROR:  I did.  I was a project manager for

 6    implementing a software system for transportation for Mississippi

 7    Department of Transportation.

 8              MR. FINDLING:  Okay.  And are you familiar with the

 9    consent decree or what is referred to in the newspapers as kind of

10    their ongoing water disaster for their citizens?  They have bad

11    water.

12              PROSPECTIVE JUROR:  The water quality?

13              MR. FINDLING:  Yes.

14              PROSPECTIVE JUROR:  Yes, I've heard of that.  Yes.  My

15    mother used to live in Pearl, Mississippi, right there in

16    Jackson --

17              MR. FINDLING:  Exactly.

18              PROSPECTIVE JUROR:  -- and I would visit her, and I

19    would see TV stuff.  I also had other family that lived in and

20    around Jackson, in some of the suburbs, and I would hear about the

21    water quality.  And I've tasted the water there, too.

22              MR. FINDLING:  And it's bad?

23              PROSPECTIVE JUROR:  It tasted funny, yeah.

24              MR. FINDLING:  Thank you.  All right.  I appreciate it.

25              Actually, Mr. Gillis, I'm going to follow up to a
```

1   question I asked earlier.

2           Again, what impact would the sexual orientation of

3   Pastor Bickers have you on in trying to fairly decide this case?

4           PROSPECTIVE JUROR:  I would just listen to the evidence

5   and base it on that, and the instructions of the Court.  That's

6   not what I'm here -- I'm not here to judge.  I'm here to listen to

7   the evidence.

8           MR. FINDLING:  Okay.  So the position you took as far as

9   opposing same sex marriage --

10          PROSPECTIVE JUROR:  Right.

11          MR. FINDLING:  -- would that impact you?

12          PROSPECTIVE JUROR:  It would be the same thing.  I'd

13  listen to the evidence.

14          MR. FINDLING:  And would you let that in any way --

15          PROSPECTIVE JUROR:  I would not consciously try to do

16  that, no.

17          MR. FINDLING:  Would it stay with you at all?

18          PROSPECTIVE JUROR:  What do you mean by stay?

19          MR. FINDLING:  Would the feelings, the sentiment you

20  have about that subject stay with you in any degree?

21          PROSPECTIVE JUROR:  I would hope not.  I can't guarantee

22  it wouldn't.  But I would hope not.  I would rather focus on the

23  evidence and do my job.

24          MR. FINDLING:  Thank you.

25          How is my official timekeeper?  How am I doing?

1           THE DEPUTY CLERK:  The clock on the right, you're a

2  little bit past ten minutes.

3           MR. FINDLING:  Okay.  Thank you.

4           Ms. Files.

5           PROSPECTIVE JUROR:  Brittany Files.

6           MR. FINDLING:  I believe that you are concerned about

7  this case lasting three weeks as it might impact you for work.

8  Can you tell us about that?

9           PROSPECTIVE JUROR:  Yes.  So I started a new job last

10  week, and I've been unemployed for three months.  So financially

11  I'm struggling a little bit, and I'm still on my training period

12  through next week.

13           Additionally, I'm freelance from the company, and I am

14  trying to be full-time.  So I want to make sure I'm there and

15  putting in the work so they will consider me for a full-time

16  position.  But I also work in news, so I think that -- I mean, I

17  don't know if they're going to cover it, but, you know, I think

18  that it could potentially be a conflict of interest.  But I

19  definitely -- the financial situation is my biggest concern.

20           MR. FINDLING:  Okay.  And is there anything -- we talked

21  about a bunch of things with you, but is there anything about

22  Pastor Bickers being a pastor that might adversely impact you in

23  just sitting and listening to this case and fairly deciding it?

24           PROSPECTIVE JUROR:  No, I'm not religious, and I have

25  had lots of negative experiences with religious people being

1  judgmental, but I do not extend that judgment myself to religious

2  people as long as they're not judging me for not being religious.

3  So I don't think I have much of a bias in that sense.  Like, I

4  think that I just judge someone based on their character and

5  whether or not they go to church.

6           MR. FINDLING:  Okay.  I appreciate that.  Thank you.

7  And that's a good segue for me to you, Ms. Nguyen.

8           The issue of Pastor Bickers being a pastor, how does

9  that kind of impact you that a pastor is sitting there charged

10  with a federal crime?

11          PROSPECTIVE JUROR:  I'm not religious or anything, so it

12  doesn't really bother me.  Like, people can commit crimes.  They

13  can be affiliated with a church.  They can be anybody.  Anyone can

14  commit a crime.  So it doesn't really impact me if she's a pastor

15  or not.

16          MR. FINDLING:  And do you also believe that anybody can

17  be falsely accused of a crime and be a pastor?

18          PROSPECTIVE JUROR:  Yes, I believe anyone can be falsely

19  accused of a crime.

20          MR. FINDLING:  Thank you.

21          Ms. Tucker, I believe you have some travel planned?

22          PROSPECTIVE JUROR:  Susan Tucker.  I travel for my work.

23  That's just my normal routine.

24          MR. FINDLING:  Okay.

25          PROSPECTIVE JUROR:  And so I would be delaying some

 1  travel.

 2          MR. FINDLING:  Okay.  And let me go back to Mr. Walden.

 3          Again, any issue -- this is for Mr. Walden.  No. 14.

 4          PROSPECTIVE JUROR:  I'm Roy Walden.

 5          MR. FINDLING:  Mr. Walden, any issue -- you expressed

 6  that you do not agree with anybody that is gay serving in a

 7  pastoral role.  How would that impact you in sitting and listening

 8  to this case?

 9          PROSPECTIVE JUROR:  It would not impact me at all.

10  That's two different issues.  I actually have a brother-in-law

11  that's gay.  So I am familiar with it.  Just -- I just don't do

12  it.  I don't agree with it.

13          MR. FINDLING:  But what about -- I understand about your

14  brother-in-law.  What about the role of someone that is gay

15  leading a house of worship?

16          PROSPECTIVE JUROR:  That's fine.  Whatever people want.

17          MR. FINDLING:  All right.

18          THE COURT:  Mr. Findling, can I ask a question right

19  here?

20          MR. FINDLING:  Yes, of course.

21          THE COURT:  You indicated it would not impact you at all

22  in the trial.  You indicated I think in the questionnaire that you

23  didn't think a person that is gay should be a pastor.  Are you

24  telling me that you can set that aside and render a verdict based

25  on the evidence you hear in this case and the law as I will give

1  you, and be fair and impartial to the defendant in this case,

2  Pastor Bickers?

3          PROSPECTIVE JUROR:  Yes, sir.

4          THE COURT:  Thank you.

5          MR. FINDLING:  No. 18, Ms. Alsobrook.

6          PROSPECTIVE JUROR:  Lana Alsobrook.

7          MR. FINDLING:  Thank you.  You had indicated this kind

8  of globally.  I understand that Kasim Reed is not a witness here,

9  but, however, there is going to be reference to the years of -- he

10 is in the administration.  So it is an important issue.  And you

11 indicated that Atlanta government is just full of corruption.

12 How -- can you express your thoughts about that, and how it may

13 impact us over the next few weeks?

14         PROSPECTIVE JUROR:  I think the question was something,

15 like, do you believe that there was more or less corruption in

16 Mayor Reed's administration versus any other one, and I said no.

17 I believe that there is in politics a lot of corruption.  I don't

18 believe that means anybody is individually corrupt.  I just think

19 that things happen and sometimes things happen to get jobs done.

20         As far as this case goes, would those beliefs impact my

21 ability?  I don't think so, because I'm going to follow what the

22 judge says the law is and look at the evidence that is presented.

23         MR. FINDLING:  Okay.  Thank you.

24         Ms. Anderson.

25         PROSPECTIVE JUROR:  Sherry Anderson.

1          MR. FINDLING:  Ms. Anderson, I'm kind of revisiting an

2     issue.  I've been doing this a long time, and I've heard this

3     sincere answer many times before.  I know you've indicated that

4     your inclination because of your role as minister is not to judge

5     others.  We're asking for a here -- excuse me -- here as a

6     different type of judgment.  I think His Honor eloquently stated

7     the role of jurors in our system.

8          Would you be able to, however, if you're selected and

9     you're sitting there, would you be able to listen to the law and

10    use that sincerity and honesty that you shared with all of us

11    today, listen to the law and set aside any other inclinations you

12    have based on what the law is as described by His Honor, not by

13    the lawyers, thereafter and make a decision one way or the other

14    in this case?

15          PROSPECTIVE JUROR:  It would probably be hard for me,

16    but I probably could listen but I couldn't say I would give it --

17          MR. FINDLING:  So I understand it's hard.  Trust me,

18    after three decades of doing this, it's going to be hard.  But

19    even though it's hard, would you be able to at crunch time set

20    aside that difficulty and as a citizen be -- under that oath, that

21    same oath, be able to make a fair decision based on the law as

22    Judge Jones describes it to you and explains it to you?

23          PROSPECTIVE JUROR:  I don't think so.

24          MR. FINDLING:  I'm sorry?

25          PROSPECTIVE JUROR:  I don't think so.

1        MR. FINDLING:  Okay.  I appreciate your honesty.

2        Mr. Blount.

3        PROSPECTIVE JUROR:  Bobby Blount.

4        MR. FINDLING:  You had indicated in one of your answers,

5   but -- you believe that minority businesses are scrutinized to a

6   greater degree.  Can you explain that?

7        PROSPECTIVE JUROR:  Just, you know, just being 57 years

8   old and trying to experience --

9        THE COURT:  Mr. Findling, I'll allow this juror to

10  finish answering the question, and then your time will be up.

11       MR. FINDLING:  Thank you, Your Honor.

12       PROSPECTIVE JUROR:  I'm sorry.

13       MR. FINDLING:  Go ahead.

14       PROSPECTIVE JUROR:  It was just an opinion.  I saw the

15  question, and I just -- it's my -- it's just my thought that some

16  of the minority-owned business -- it's not based on any direct

17  experience or anything, just conversation with friends and talking

18  to people who have tried to, you know, get one up on -- you know,

19  some success in their lives and everything, the struggles that

20  minorities may have in establishing businesses.  So...

21       MR. FINDLING:  Thank you, sir.

22       Your Honor, thank you.

23       THE COURT:  Thank you, Mr. Findling.  Ms. Wright is

24  going to give you instructions.  Please follow her instructions.

25       THE DEPUTY CLERK:  Okay.  Go back up to the jury

1   assembly room up on 22 and wait for us there.

2         (Whereupon, the juror panel was excused at 10:56 a.m.)

3         THE COURT:  One of the things, Mr. Davis, Mr. Findling,

4   that I thought about last night, is that we can, if you-all want

5   to, wait until I question all of the jurors, or after each panel I

6   can entertain challenges for cause.  It doesn't matter which way

7   you-all want to do it.  I thought about it last night.  I said,

8   well, it may be fresh on their minds after each panel.  But if

9   not, usually the way I do it is after we question everybody.  But

10  it doesn't matter to me.  I just thought about that.

11        MR. FINDLING:  And we did briefly discuss it earlier.

12  Probably one of us noticed, we stayed away from some bombshell

13  questions.

14        THE COURT:  Thank you.

15        MR. FINDLING:  And so we can take it up panel by panel.

16  I do have a request from Pastor Bickers to use the bathroom.

17        THE COURT:  Okay, she has to waive her right to be in

18  here -- if we take the challenge for cause -- I'll tell you what,

19  let's just wait -- she can go use the restroom and come back.

20        MR. FINDLING:  I think we should do it panel by panel.

21        THE COURT:  Mr. Davis, let's let Pastor Bickers use the

22  restroom, come back.  And Ms. Wright, before we bring in the next

23  panel, and I'll hear the challenges for cause.  Let's take a

24  ten-minute break, and we'll be back here at 5 after 11.

25        (Whereupon, a break was taken at 11 a.m.)

 1              THE COURT:  Mr. Kitchens, any challenges for cause from

 2     this first panel?

 3              MR. KITCHENS:  Yes, Your Honor, there are.

 4              THE COURT:  All right.

 5              MR. KITCHENS:  First, I believe Juror No. 6,

 6     Ms. Respress, I think she responded in response to your own

 7     questions that she doesn't know if she may even go outside of the

 8     evidence that will be presented because she's got to, you know,

 9     make her own and feel right for what she's doing.  She expressed

10     certainly some strongly-held opinions based on a 14-year-old

11     trial.  So I think she expressed she could not be able to follow

12     your instructions and be a juror in this case.

13              THE COURT:  All right.  Mr. Findling, any objection for

14     that juror being removed for cause?

15              MR. FINDLING:  No, Your Honor, I think counsel

16     summarized it accurately.

17              THE COURT:  All right.  Juror No. 6 has been removed for

18     cause.

19              Who is next, Mr. Kitchen?

20              MR. KITCHENS:  I'm not sure if you would like us to

21     address hardship separately, but --

22              THE COURT:  Let me tell you about hardships.  I'm not

23     going to remove any juror for hardship unless both sides agree.  I

24     understand there's a vacation, there's somebody with a $10 million

25     budget, I've got 79 jurors.  Out of 79 jurors everybody has been

1  affected some way by their jobs.  If I let one go, why shouldn't I

2  let another go?  So unless the government and the defense agree a

3  person has a hardship and y'all want to take them off, I'm not

4  going to take them off.

5        MR. FINDLING:  The 14 day --

6        MR. DAVIS:  I think that Juror No. 7 is the same one --

7  I think we would agree.

8        THE COURT:  No. 7 -- okay, No. 7, Mr. Pelayo, he has a

9  vacation.  Both sides agree he should be removed.  Correct,

10  Mr. Kitchens?

11        MR. KITCHENS:  Correct, Your Honor.

12        THE COURT:  And correct, Mr. Findling?

13        MR. FINDLING:  I agree.

14        THE COURT:  All right, No. 7 is removed.

15        MR. KITCHENS:  Your Honor, the next one, Juror No. 11,

16  she repeatedly -- she also had this negative experience from a

17  trial from about ten years ago.  She expressed that her opinions

18  got strongly in terms of her concerns that the government was

19  covering up evidence in that particular matter.

20        She expressed that she would be biased.  I think she

21  used that word several times.

22        She also has expressed kind of a hardship concern.  I

23  haven't had a chance to talk about this with Mr. Findling, but

24  expressed concern that given her financial state, she would really

25  be concerned about being a juror in this case since she just got a

1  new job.  So I think the combination of the two, it's important to

2  remove her as well.

3          THE COURT:  Mr. Findling?

4          MR. FINDLING:  I just don't think she went to the cause

5  level.  I just --

6          THE COURT:  She never said she would be biased.  She was

7  asked three times.  And as a matter of fact, the only reason why I

8  did not -- you noticed there were certain times when I intervened,

9  I didn't intervene on her and one other, because I thought they

10  were pretty solid, you know.

11          If you still want her, I'll note your objection.

12          Also, she said -- Mr. Kitchens pointed out she may be

13  just starting a job, you know.  Which position do you want to

14  take?  Do you want to take the position that you object to having

15  her removed, or do you want to agree with Mr. Kitchens that she

16  should be removed because of a hardship?

17          MR. FINDLING:  I just don't think she raised anything

18  that would require her to be removed for cause or for hardship.

19          THE COURT:  Okay.  Then I'm going to overrule your

20  objection, and I'm going to remove her.

21          Who's next?

22          MR. KITCHENS:  Okay, our last one, Your Honor, Juror No.

23  19, she had in response to questions from both us and Mr. Findling

24  expressed because of her religious belief, she would not be able

25  to render a verdict.  We asked multiple times, and she was clear

 1  she would not be able to do that.

 2          THE COURT:  That's Ms. Anderson, Mr. Findling.

 3          MR. FINDLING:  Nothing we can say about that.  Counsel

 4  is correct.

 5          THE COURT:  All right.  So removed right now is No. 6,

 6  No. 7, No. 11 is removed over objections, and No. 19.  Mr.

 7  Findling, who do you challenge for cause?

 8          MR. FINDLING:  Thank you.

 9          Your Honor, I informed counsel earlier, I was not going

10  to ask Juror No. 10 about one of his questions, although we're

11  inclined to make it a new moniker for our law firm, defendant law

12  firm, human filth.  He describes criminal defense attorneys as

13  human filth in a questionnaire.  I just wasn't going to question

14  that.

15          THE COURT:  If he said that, he's off.

16          MR. FINDLING:  Yeah.  And in fairness, we did talk about

17  that with counsel.

18          THE COURT:  Do you object?

19          MR. KITCHENS:  We don't object, Your Honor.

20          THE COURT:  You can't say stuff like that.

21          MR. KITCHENS:  We were joking about a juror that

22  expressed these kind of opinions about us as well.

23          MR. FINDLING:  Get ready.

24          THE COURT:  I hope they don't express that same feeling

25  about the judge.

1            All right, No. 10 is off.

2            Who else, Mr. Findling?

3            MR. FINDLING:  One second, Your Honor.

4            THE COURT:  I hate to rush you, but we need to move on,

5    Mr. Findling.  The defense has no further --

6            MR. FINDLING:  No.

7            THE COURT:  All right.  Then Ms. Wright can bring in the

8    next 20.

9            Let me say this, Mr. Davis and Mr. Findling.  I'm not

10   going to ask you are you're ready again.  I only ask that one time

11   for the record.  So we just go right in to introducing you.  But I

12   won't ask you if you're ready.

13           MR. KITCHENS:  Yes, Judge.  Thank you.

14           (The second jury panel it seated at 11:20 a.m.)

15           THE COURT:  Well, let me say good morning to each one

16   y'all.  My name is Steve Jones.  I'm the judge presiding over this

17   case.  On behalf of my colleges here at the Northern District of

18   Georgia, I want to welcome you this morning and also thank you for

19   being here this morning.

20           You know, in America the right to a jury trial is a very

21   important right.  It's a right that ties into our freedom as

22   Americans.  And the right to a jury trial exists, because each one

23   of us has a role to play.  I have a role to play; the lawyers have

24   a role to play; and you as jurors have a role to play.  And unless

25   each one of us do our jobs, that freedom, that right to a jury

1    trial can diminish and go away.

2         There are a lot of countries in this world that do not

3    give people right to jury trials.  But here in America, it's not

4    someone appointed by a higher authority that decides people's

5    freedoms and custody rights and property rights, it is you as

6    jurors.

7         But as jurors you have a responsibility this morning,

8    first of all, of being here.  And you've met that first

9    responsibility.  And the next responsibility is that you're going

10   to be asked questions of me and by the lawyers.  And we need you

11   to answer openly and as honestly as possible, because in order to

12   select 12 jurors and 3 alternates for this case, there are certain

13   things that I need to know and the lawyers need to know.

14        Let me tell you this.  Don't hold back on answering the

15   questions.  I will give you an example I gave the panel before

16   you.  About one month ago I tried a jury trial in a case with a

17   jury sitting in the same box you're sitting in, and I told them

18   the same thing, don't hold back.  If you have a nonrefundable

19   airplane ticket, let me know about it.  If you have a surgery, let

20   me know about it before you're seated as a juror.  And we had one

21   juror that didn't tell us.  And he got seated in the jury box, and

22   then he raised his hand after opening statements and he said,

23   Judge, I'm scheduled to take my family to Disney World at the end

24   of this week, and you wouldn't keep a father from taking his kids

25   to Disney World, would you?  And guess what I said, yes, I will.

1          Don't wait until we select you as one of the jurors to

2   tell us something like that.  I try to be easy to get along with,

3   but there are certain points where I draw the line.  And he

4   served.  And he just got fortunate.  The case ended before the

5   time that he was scheduled to go to Disney World.  Because if not,

6   he would not have been going.

7          If a lawyer or I ask you a question and you don't feel

8   comfortable answering from the audience, just raise your hand and

9   say, Judge, I would rather answer that privately.  No problem

10  whatsoever.  We're not here to embarrass you or put you on the

11  spot.  There are certain things I need to know and the lawyers

12  need to know in order to select the jury.

13         Now, with that stated, I'm going to allow Ms. Wright to

14  call the case for today.

15         Now, let me say this.  This case, I anticipate, will

16  last approximately three weeks; three weeks and a day, maybe a

17  little bit longer.  So as you answer these questions, I told you

18  what we anticipate.

19         Ms. Wright, call the case for today.

20         THE DEPUTY CLERK:  Yes.  The Court calls for trial the

21  matter of the United States of America v. Mitzi Bickers, criminal

22  case number 1:18-cr-98-SCJ.

23         THE COURT:  Mr. Davis, you can introduce yourself and

24  anybody with you.

25         MR. DAVIS:  Yes, sir.  Thank you.

1              Good morning, everyone.  My name is Jeffrey Davis.  And

2    I'm part of the Department of Justice.  Along with me is Tiffany

3    Dillingham and Nathan Kitchens.  Andrew Marc Benjamin from the FBI

4    is joining us, and today we have Jonathan Ross and Richard

5    Gabriel.  Thank you.

6              THE COURT:  Thank you, Mr. Davis.  Thank you.

7              Mr. Findling.

8              MR. FINDLING:  Good morning, ladies and gentlemen, my

9    name is Drew Findling.  I represent Pastor Mitzi Bickers.  Along

10   with me representing her are attorneys Marissa Goldberg, Zachary

11   Kelehear, Alexis Ahlzadeh all from our office, and Denise Delarue.

12   Thank you.

13             THE COURT:  Thank you, Mr. Findling.

14             Ladies and gentlemen of the jury, I have some questions

15   to ask the 20 of you-all.  If any of these question pertain to any

16   of you-all, please raise your hand and keep your hand raised until

17   I acknowledge you.

18             Does anyone in the panel know the United States

19   Attorney, Kurt R. Erskine?

20             There is no response.

21             Does any member of the panel know Assistant United

22   States Attorneys Jeffrey Davis, Nathan Kitchens, Kelly Kathleen

23   Connors, Tiffany Renee Dillingham, Jacqui Etienne, Jonathan Ross,

24   Richard Gabriel, or Special Agent Marc Benjamin?

25             There's no response.

1              Does any member of the panel know any employees of or

2    has any member of the panel or their immediate family worked for

3    the United States Attorney's Office for the Northern District of

4    Georgia or for any United States Attorney's office?

5              There's no response.

6              Does any member of the panel know defendant's attorney

7    Drew Findling, Marissa Goldberg, Alexis Ahlzadeh, Denise Delarue,

8    or Zachary J. Kelehear?

9              There is no response.

10             Does any member of the panel know any employees of or

11   any member of the panel or their immediate family worked for the

12   Drew Findling law firm?

13             There is no response.

14             Does anyone know or has anyone ever met Pastor Mitzi

15   Bickers?  Pastor Mitzi Bickers, stand up, please.  Thank you,

16   ma'am.

17             There is no response.

18             Does anyone know any of the following individuals that

19   may be witnesses in this case?  Mr. Davis is going to read out the

20   name of potential witnesses.  The person's name may not be called,

21   but they are potentially witnesses.

22             MR. DAVIS:  Jackie Anderson Woods, Michael Ayo, Marc

23   Benjamin, Sabrina Black, Diedre Verdier, Thomas Weyandt, Kim

24   Bracey, Keyla Jackson, Mark Stafford, Rita Braswell, Stephanie

25   Coleman, Ralph Dahlgren, Kim Spell-Fowler, Matthew Davis, Kristy

1   Fuentes, William Gant, Gail Hanscom, Nina Hickson, Sharon Hixon,

2   Jon Keen, Jimmy Kirby, Richard Leary, Deborah Lonon, Cotena

3   Alexander, Sean Barnes, Jordan Hillman, William Marshall, Richard

4   Mendoza, Elvin R. Mitchell, Sharon Patterson, Janene Tillman,

5   Greg Von Wynn, Daniel Nichols -- sorry, Danielle Nichols, Shedreka

6   Poole, Melvin Priester, Mike Winfrey, Tony Yarber, Rickey

7   Williams, Jackie Velardo, Tammy Willingham, Lisa Reed, Chana Tate,

8   John Relyea, Charles P. Richards, Adrienne Richardson, Andrew

9   Jenkins, Anthony Brister, Ashby Foote, Candace Byrd, Dana Sims,

10  Albert Bantley, Charles Davis, Robert Walker, or Robbi Jones?

11          THE COURT:  There is no response.

12          Thank you, Mr. Davis.

13          MR. DAVIS:  Yes, sir.

14          THE COURT:  Is there any member of the panel who has any

15  special disability or problem that would make serving as a member

16  of this jury difficult or impossible?

17          Yes, sir.

18          PROSPECTIVE JUROR:  I have recently had a stroke on my

19  brain, and a blood clot is still up there.

20          THE COURT:  Okay.  Do you feel trying to serve as

21  juror --

22          PROSPECTIVE JUROR:  I'm having a problem trying to

23  function here today without falling flat on my face.

24          THE COURT:  All right.  Just have a seat, sir.  Just

25  have a seat.  Mr. Davis and Mr. Findley.

1          (At sidebar.)

2          THE COURT:  When you speak, speak into the mic.

3          I think this gentlemen qualifies for challenge for

4  cause.

5          MS. GOLDBERG:  I couldn't understand what he said in

6  response.

7          THE COURT:  He had a stroke in his brain, and he's

8  having a hard time just standing up and talking.

9          MS. GOLDBERG:  I would agree with that.

10          MR. DAVIS:  Yes, sir.  We noticed that in his

11  questionnaire.

12          THE COURT:  Just don't ask him any questions.  We'll let

13  him sit there, and then we will let him go at the end.

14          MS. GOLDBERG:  That's fine.  Thank you, sir.

15          (End of discussion at sidebar.)

16          THE COURT:  Anyone else?  I'll ask that question again.

17          Any member of the panel that has any special disability

18  or problem that would make serving as a member of this jury

19  difficult or impossible?

20          Yes, ma'am.

21          PROSPECTIVE JUROR:  Chihade is my last name.

22          Are you talking about physical disabilities or

23  circumstantial disabilities?

24          THE COURT:  I'm really kind of referring to physical

25  disabilities.  But since you're standing up there, and if it is a

1  hardship disability, I'll hear it.

2          PROSPECTIVE JUROR:  Okay.  Is this the time that I tell

3  you I have a trip planned?

4          THE COURT:  Yes, this is the time.

5          Now, let me say this.  I forgot to put the caveat in

6  there.  Just because you have one planned doesn't mean I'm going

7  to excuse you, but I need to know about it.

8          PROSPECTIVE JUROR:  I know.  Okay.  I planned a trip two

9  years ago to Peru in the beginning of April.

10          THE COURT:  When in April?

11          PROSPECTIVE JUROR:  I think it's 2nd to the 8th or the

12  10th.  I have to look at a calendar.

13          THE COURT:  Look at it.  If it's the 10th --

14          PROSPECTIVE JUROR:  I'm good?

15          THE COURT:  Yes, I think you're good.

16          PROSPECTIVE JUROR:  Okay.  Also, I'm the sole

17  transportation for my daughter for school.

18          THE COURT:  All right.  The lawyers hear that, and they

19  may ask you more questions about that later.

20          PROSPECTIVE JUROR:  Okay.  That's fine.

21          THE COURT:  Thank you.

22          Anyone else?

23          Does any juror hold any belief, religious or otherwise,

24  that discourages or prevents you from jury service?

25          Yes.

1            PROSPECTIVE JUROR:  Doug Perrin.  I don't know if this

2    works, but my wife is 34 weeks pregnant with our first child.  And

3    she's kind of freaking out that I'm going to miss it if she comes

4    early, if our first child comes early.

5            THE COURT:  Well, let me put it this way.  You won't be

6    missing it if your first child comes early, I'll assure you of

7    that.  Let me ask you one question.  You know, let's put it this

8    way.  Jury service is important.  Your first child, you won't miss

9    that.  I'll guarantee you that.

10           PROSPECTIVE JUROR:  Yes.

11           THE COURT:  Anyone else?

12           If you're selected to sit on this case, will you be able

13   to render a verdict solely on the evidence presented at the trial

14   and in the context of the law as I will give you in my

15   instructions?  If not, raise your hand.

16           No one raised their hand.

17           Mr. Kitchens, you may proceed with your voir dire

18   questions.

19           MR. KITCHENS:  Thank you, Your Honor.

20           THE COURT:  Let me ask them one other question.

21           Did anyone not receive an oath last week when you came

22   in or today?  If you did not receive an oath, raise your hand.  If

23   you did not receive an oath, please stand up and raise your right

24   hand and Ms. Wright is going to administer an oath to you.

25           (Prospective jurors are sworn.)

1          THE COURT:  Mr. Kitchens, you may proceed, sir.

2          MR. KITCHENS:  Thank you, Your Honor.

3          Good morning.  Thank y'all for being here.

4          A number of you -- of course, we appreciate everyone

5    filling out the questionnaires in advance.  And a number of you in

6    those expressed that you had seen some possible news items that

7    may be somewhat related to this and had expressed some opinions in

8    that questionnaire based on your review.  So we appreciate you

9    letting us know, and I know the defense appreciates that as well.

10   I may clarify a few things before I will have some specific

11   questions for some of you individually.

12         First, to be clear, former Mayor Kasim Reed is not on

13   trial here.  He will not be a witness in this case.  The only

14   defendant in this case is Pastor Mitzi Bickers.

15         Second, you may have read some new articles, you may

16   have seen some TV stories, or heard something on radio, seen

17   something on the Internet, but you will be hearing actual evidence

18   in this case.  And sometimes what you will see in terms of actual

19   evidence is very different from what you may have seen in the

20   news.  The judge will, of course, instruct you that your job as a

21   juror is to follow the evidence that is actually presented in this

22   case, and not to consider anything you may have seen or read in

23   the news before.

24         Lastly, of course in the questionnaire there were

25   questions asked about your opinions about Pastor Bickers being a

1   woman pastor and her sexual orientation.  And there will not be

2   issues presented in this case regarding those questions.

3          Given that I want to ask some of you some individual

4   questions based on your responses.  Probably given the limited

5   time, I won't have the ability to talk with each of you.  So

6   please forgive me for that, but I'll try to make as much progress

7   as I can.

8          First, Ms. Parker, a few questions for you.

9          PROSPECTIVE JUROR:  Lillian Parker.

10         MR. KITCHENS:  Thank you, Ms. Parker.

11         You mentioned that you had an experience about -- with a

12  criminal justice system in your family before that you've noted in

13  your questionnaire.  Could you tell us a little bit more

14  about -- I think you described the process as questionable.  Can

15  you tell us a little bit more about your feelings in that matter?

16         PROSPECTIVE JUROR:  Mixed.  Mixed.  And I don't think it

17  was on the criminal justice part.  My husband was -- had a charge,

18  a felony charge of Medicaid fraud.  He was in private practice,

19  and probably didn't know what he was doing.  But the outcome was

20  actually okay.  He did make some mistakes, and he, you know -- he

21  admitted that he did in terms of billing -- he should have done

22  some things differently.

23         MR. KITCHENS:  And how long ago did this happen?

24         PROSPECTIVE JUROR:  Oh, my God, 15 years ago.

25         MR. KITCHENS:  Did you have any -- do you carry, I

1  guess, any sort of negative feelings based on how that criminal

2  justice case proceeded?

3          PROSPECTIVE JUROR:  No.  No negative feelings as far as

4  how the case proceeded.  Unfortunately for him, he just wasn't

5  able to pull himself back together afterwards.  But you can't

6  really blame anybody for that.

7          MR. KITCHENS:  Is there anything about that matter that

8  would affect your ability to be a juror in this case?

9          PROSPECTIVE JUROR:  I don't think so, no.

10          MR. KITCHENS:  Now, I think you also indicated that you

11  have an uncle that may still work or may have worked for the City?

12          PROSPECTIVE JUROR:  Oh, my one uncle that worked for the

13  City is diseased.

14          MR. KITCHENS:  I see.  Okay.  What did -- what did that

15  uncle do for the City?

16          PROSPECTIVE JUROR:  I think he worked in sanitation or

17  the water works and stuff like that.

18          MR. KITCHENS:  And, Ms. Parker, would anything about

19  that affect your ability to serve as a juror in this case?

20          PROSPECTIVE JUROR:  No.

21          MR. KITCHENS:  Thank you, Ms. Parker.

22          Next, some questions for Mr. Ramey.

23          PROSPECTIVE JUROR:  John Ramey.

24          MR. KITCHENS:  Thank you, Mr. Ramey.

25          You also, I think, described an experience that you had

1  with the criminal justice system.  Can you tell us a little bit

2  more about your feelings of the government from -- in that matter?

3          PROSPECTIVE JUROR:  Well, the reason I listed it is

4  because it was a negative experience that lasted for over two

5  years.  Because the prosecution failed to procure a video in a DUI

6  stop in which I wasn't drinking, and it just drug (sic) on and on

7  and on.  And I felt, like, if you can't procure the evidence, then

8  I shouldn't have to go through this.  This is -- how long do I

9  have to sit here and go through this before you can, you know,

10 tell your story.  So...

11          MR. KITCHENS:  I know that must have been a frustrating

12 experience.  How long ago did that take place?

13          PROSPECTIVE JUROR:  Probably 15 years ago.

14          MR. KITCHENS:  Is that -- can you tell us a little bit

15 more about your feelings based on what happened and the

16 prosecution's inability to come up with the evidence in that case?

17          PROSPECTIVE JUROR:  Well, I felt more like it was a case

18 of guilty until proven innocent rather than innocent until proven

19 guilty.  And it cost a lot of money to have my lawyers drag that

20 out over two plus years, and I'm just going to sit around.  So it

21 kind of felt manipulative.  It felt, you know, irresponsible.  If

22 you can't procure the evidence in a certain amount of time, then

23 you should let me go.  That's how I feel.

24          MR. KITCHENS:  After going through that experience,

25 would anything about that -- would it impact the way you may view

```
 1  a government presenting a criminal case here?
 2            PROSPECTIVE JUROR:  I don't think so.
 3            MR. KITCHENS:  Do you think -- would you be able to put
 4  aside those feelings that you had about that negative experience
 5  because you're judging the evidence in this case?
 6            PROSPECTIVE JUROR:  Well, I mean, I didn't really bring
 7  anything like that with me.  You're the one that asked the
 8  question.
 9            MR. KITCHENS:  Fair.  Exactly right.  All right,
10  Mr. Ramey.  Thank you.
11            Ms. Robinson.
12            PROSPECTIVE JUROR:  Allyn Robinson.
13            MR. KITCHENS:  Good morning, Ms. Robinson.  I think you,
14  in response to one of the questions, indicated that you, you know,
15  had an opinion regarding the way that minorities are treated in
16  the justice system.  Could you just tell us a little bit more
17  about your thinking on that opinion?
18            PROSPECTIVE JUROR:  I just feel like sometimes there's
19  not a fair chance.  That's all.
20            MR. KITCHENS:  Is there anything -- could you tell us a
21  little bit more what, in particular, leads you to think that
22  minorities may not get a fair chance.
23            PROSPECTIVE JUROR:  Just the system, the way it's set
24  up.  That's all I feel.
25            MR. KITCHENS:  Is there --
```

1              PROSPECTIVE JUROR:  Economical --

2              THE COURT:  Ma'am, could you --

3              MR. KITCHENS:  I'm sorry, I couldn't hear you.

4              PROSPECTIVE JUROR:  Socio economical resources is more

5    where I was leading with that.  Because of the resource that they

6    lack, it's set up to fail for them.

7              MR. KITCHENS:  Okay.  So if I'm trying to understand a

8    little more, is it more of -- is it a resource issue that causes

9    you to think that minorities are not getting a fair shake in the

10   justice system?

11             PROSPECTIVE JUROR:  Yes, that's correct.

12             MR. KITCHENS:  Are there any other concerns aside from

13   sort of that resource issue?

14             PROSPECTIVE JUROR:  No.

15             MR. KITCHENS:  You also expressed some opinions

16   regarding corruption.  Tell us your feelings.  I think you

17   indicated in your questionnaire that people were not held

18   accountable.  Given kind of the instructions or the statements I

19   made at the beginning about the need to really judge the evidence

20   in this case, the fact that Mayor Reed is not on trial, would your

21   opinions regarding corruption, would it impact your ability to

22   judge this case?

23             PROSPECTIVE JUROR:  No, the question was directed

24   towards that situation or the question was asked more about could

25   it lead to -- I don't think it would impact my judgment here.

1          MR. KITCHENS:  And you wouldn't prejudge this case in

2  any way?  Would you be able to be a fair and impartial juror?

3          PROSPECTIVE JUROR:  Yes, for sure.

4          MR. KITCHENS:  All right.  Thank you, Ms. Robinson.

5          Let me see.  Mr. Stamps.

6          PROSPECTIVE JUROR:  Randy Stamps.

7          MR. KITCHENS:  Mr. Stamps, good morning.

8          I think you indicated in your questionnaire that you're

9  not sure that you could trust sources from the IRS.  Would you

10 please tell us a little bit more about that.

11         PROSPECTIVE JUROR:  I think a lot of that is based on

12 the media.  You hear negative things, and in my mind they remain

13 negative.

14         MR. KITCHENS:  And if you had or heard testimony from a

15 witness from the IRS, would your beliefs or opinions about the

16 IRS, would that influence how you would view the credibility of

17 that witness?

18         PROSPECTIVE JUROR:  I don't think so.

19         MR. KITCHENS:  What were some of the -- can you tell us

20 a little bit more about the negative things you heard from the

21 media about the IRS?

22         PROSPECTIVE JUROR:  I guess -- let me back up from

23 media.  Maybe sources of friends that said they were done wrong by

24 the IRS.  I don't have specifics, just hearsay talk.

25         MR. KITCHENS:  And, sir, given kind of statements I made

1  in the beginning regarding Mayor Reed, you expressed some opinion

2  regarding him.  Would -- knowing that he is not a defendant in

3  this case, he's not going to be a witness, would those opinions

4  affect your ability to be a juror in this case?

5          PROSPECTIVE JUROR:  No, what I had heard was media

6  again.  And those things stick in my mind, but I'm not a big media

7  follower.  I just heard more negative than I heard positive.

8          MR. KITCHENS:  Thank you, Mr. Stamps.

9          Ms. Young.

10          PROSPECTIVE JUROR:  Tynua Young.

11          MR. KITCHENS:  Thank you, Ms. Young.  Good morning.  A

12  couple of questions for you.

13          I think, you also in response to a question about the

14  way that minorities are treated in the justice system, noted some

15  concerns about defendants that may have -- not have the ability to

16  pay.  Could you tell us a little bit more about your views?

17          PROSPECTIVE JUROR:  So, like, you don't have the money

18  you need but you're trying, you know, to get the proper help from

19  someone.  Something like that.  They're just automatically going

20  to come down on you.  And it's, like, you will never have a fair

21  trial, because everything to me says it's more about money than

22  anything.

23          MR. KITCHENS:  Ms. Young, aside from those concerns

24  about, you know, defendants who may not have the resources to

25  defend themselves, is there anything about the justice system that

1   you think causes it to treat minorities unfairly?

2           PROSPECTIVE JUROR:  No.  It's just something that is not

3   there for us, you know, for the minorities.

4           MR. KITCHENS:  I want to make sure I heard you.  You

5   said it seems it's not -- it's not there for minorities?

6           PROSPECTIVE JUROR:  Yes.  The court system.

7           MR. KITCHENS:  I'm sorry, I'm just having a hard time

8   hearing, because we are far away.

9           PROSPECTIVE JUROR:  I'm sorry.  For the court system.

10  It seems like it's not there.  It's always about money in order to

11  try to get help.  And if you don't have the money, or, you know,

12  something like that, they don't care.  They just do you any kind

13  of way.  They just go ahead and bring you down like they just

14  don't care.  But if you have the money to be able to pay out,

15  and -- you know, it seems like it's just about money.  But if you

16  have the money to pay out, then it's like you can get help, you

17  know.

18          THE COURT:  Who do you hold responsible for not being

19  fair because of the lack of money?  You said the system.  Who in

20  the system do you hold responsible?

21          PROSPECTIVE JUROR:  I was just saying if you try to go

22  out and get any type of resource or help.  So you can be able to

23  have money, be able to pay, you know, to get help.  If you are not

24  making this amount or if you don't have this, then you can't

25  receive the help or the assistance.

1          THE COURT:  I guess what I'm trying to determine, do you

2   hold it against the government?  Do you hold it against the

3   defense?  Do you hold it against the judge and the courts, or just

4   society?

5          PROSPECTIVE JUROR:  I guess just society in general,

6   yeah.

7          THE COURT:  All right.  Thank you.

8          MR. KITCHENS:  Ms. Young, I think you indicated, also,

9   that you may have a medical condition?

10          PROSPECTIVE JUROR:  Yes.

11          MR. KITCHENS:  Could you tell us a little bit more about

12   that.

13          PROSPECTIVE JUROR:  It's my respiratory would cause me

14   to keep coughing numerous times.

15          MR. KITCHENS:  All right.  And how -- as Judge Jones

16   noted that generally the jurors will be wearing masks really for

17   the entirety of the day, is that going to present any issues for

18   you?

19          PROSPECTIVE JUROR:  Yes.  It's flaring my breathing,

20   like I'm talking now.  You see how I'm stuttering talking a little

21   bit now?  That's because my breathing -- I'm wearing the mask over

22   my face, it shortens my breath some.

23          MR. KITCHENS:  Would you have the ability to wear a mask

24   for any extended period of time if you were serving on the jury?

25          PROSPECTIVE JUROR:  No.  If I have to sit through the

1  whole time, no.

2          THE COURT:  So wearing a mask for more than -- like an

3  hour straight would cause you medical difficulties?

4          PROSPECTIVE JUROR:  Yes.  Even at my job, I don't have

5  to wear it.  If I'm in my station, I don't have to wear it,

6  period.  Now we don't have to wear it at all, whether you're

7  vaccinated or not.  It helps me breathing better.

8          THE COURT:  Thank you.  I needed to know that.  Thank

9  you.

10         MR. KITCHENS:  Is it Ms. Chihade?

11         PROSPECTIVE JUROR:  Chihade.

12         MR. KITCHENS:  Chihade, I'm sorry.

13         PROSPECTIVE JUROR:  Chia Chihade.

14         MR. KITCHENS:  Thank you.  You mentioned when you spoke

15  with the judge, that you were the sole source of transportation

16  for your daughter.  Could you tell us a little bit more.

17         PROSPECTIVE JUROR:  Her school, it's a 20 minute -- 20-

18  to 30-minute drive in the morning, and in the afternoon, too, and

19  back.  So, like, an hour in the morning and an hour in the

20  afternoon.  There's no buses.  And my husband could cover certain

21  days, but he can't do it every day.

22         MR. KITCHENS:  Do you have any other family or

23  transportation options if there are days that your husband is not

24  able to --

25         PROSPECTIVE JUROR:  Umm, my family is my in-laws, but I

 1  don't trust their driving.  They're in their 80s.  They're driving

 2  from Emory area every day to Potts and it's just busy.  And I

 3  suppose I could ask neighbors or friends, but -- I could really.

 4  Yeah.  But it will be scrambling, like, piecing everything

 5  together.

 6          MR. KITCHENS:  Okay.  Thank you.  Just another question.

 7          I think you -- based on just the description that was

 8  provided about what the case may be about, I think you, you know,

 9  expressed maybe an opinion if, you know, the facts were proven.

10  But based on what I noted about the need to listen to the evidence

11  and what would be presented, do you think you would be able to

12  listen to the evidence, apply the law to that evidence, and be a

13  fair and impartial juror?

14          PROSPECTIVE JUROR:  Yes.

15          MR. KITCHENS:  Thank you.  Mr. Owen.

16          PROSPECTIVE JUROR:  Anthony Owen.

17          MR. KITCHENS:  Hi, Mr. Owen.  I believe you also

18  expressed an opinion about Mayor Reed.  Given the statement I made

19  at the front regarding Mayor Reed not being, of course, a

20  defendant, not being a witness in this case, would you be able to

21  fairly and impartially judge the evidence in this case?

22          PROSPECTIVE JUROR:  Yes.

23          MR. KITCHENS:  Thank you, Mr. Owen.

24          And let's see, Mr. Partain.

25          PROSPECTIVE JUROR:  Jackson Partain.

1            MR. KITCHENS:  Mr. Partain, I want to make sure -- I

2  think in response to one of the questions, you had indicated -- I

3  may have misread your handwriting -- that there were some bank

4  problems, I think you put in response to a question?  Do you know

5  what --

6            PROSPECTIVE JUROR:  Not that I know of --

7            MR. KITCHENS:  Okay.

8            PROSPECTIVE JUROR:  -- or remember.

9            MR. KITCHENS:  Okay.  It may have just been a

10  handwriting issue.  Thank you.

11            THE COURT:  I think it was shaking after Georgia winning

12  at Athens.

13            MR. KITCHENS:  That may be it.

14            Ms. Vaszquez.

15            PROSPECTIVE JUROR:  Kimberly Vaszquez.

16            MR. KITCHENS:  Ms. Vasquez, in your questionnaire, I

17  think you provided a description regarding what -- how you view

18  prosecutors, how you view defense counsel and the job that defense

19  counsel needs to do to prove their client's innocence.  I just

20  want to be clear on this.  It's, of course, the government's job

21  to present all of the evidence and to prove the case.  The

22  defendant does not have to prove anything.  They don't have to

23  disprove anything.  They don't have any burden of proof.  It rests

24  entirely with the government.

25            With that understanding and knowledge that the

1  government has the burden of proof, the government -- the defense

2  is not required to prove anything, would you have the ability to

3  follow the law and the evidence and be a fair and impartial juror

4  in this case?

5          PROSPECTIVE JUROR:  Yes.

6          MR. KITCHENS:  You wouldn't hold it against the defense

7  counsel if they presented no evidence at all?

8          PROSPECTIVE JUROR:  No.

9          MR. KITCHENS:  Thank you, Ms. Vasquez.

10         THE COURT:  Well, you understand the defense does not

11 have to present any evidence?

12         PROSPECTIVE JUROR:  I'm sorry?

13         THE COURT:  Do you understand, ma'am --

14         PROSPECTIVE JUROR:  Can you repeat that again?

15         THE COURT:  Mr. Kitchens pointed out that the government

16 has the burden of proof to present witnesses and evidence.  The

17 defense is not required to present any evidence.  They have no

18 burden.  Do you understand that?

19         PROSPECTIVE JUROR:  Yes, sir.

20         THE COURT:  If they don't present any evidence, you

21 cannot, and I will instruct you and all of the jurors, you cannot

22 hold that against them in any way.

23         Can you and will you follow those instructions?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Thank you.

1          MR. KITCHENS:  If I can, if I can go back to Mr.

2  Partain.  I apologize about this.  But I think I pulled up the

3  questionnaire, so I will try to see if this prompts -- maybe we

4  can figure out the handwriting issue.

5          PROSPECTIVE JUROR:  Jackson Partain.

6          MR. KITCHENS:  All right.  Thank you, again.

7          I think the question was, if you have a close friend or

8  relative that was involved in any sort of claim or dispute or

9  lawsuit.  And it looked to us like you wrote "bank problems" in

10 response.

11         PROSPECTIVE JUROR:  I would rather talk about that in

12 private.  It's about my mom.

13         MR. KITCHENS:  Okay.  Anything about that experience

14 affect your views of, you know, the government or anything in this

15 case?

16         PROSPECTIVE JUROR:  Not at all.

17         MR. KITCHENS:  Would anything about that affect your

18 ability to be a juror in this case?

19         PROSPECTIVE JUROR:  No, sir.

20         MR. KITCHENS:  Okay.  Can you tell us -- I don't want to

21 get into too many details, would you mind telling us a little bit

22 about what that may involve?  I just want to make sure I

23 understand.

24         PROSPECTIVE JUROR:  Yeah, I'm good.

25         THE COURT:  Well, you don't have to talk about it in

1   front of the jury box.

2           PROSPECTIVE JUROR:  Yeah, yeah.  I don't want to talk

3   about it in front of anybody.

4           MR. KITCHENS:  Okay.  Fair.

5           I don't think I have any more questions.  I appreciate

6   it.

7           THE COURT:  Thank you, Mr. Kitchens.

8           Ms. Goldberg.

9           MS. GOLDBERG:  Thank you, Your Honor.

10          Good morning.  As you heard, I'm Melissa Goldberg.  We

11  have the honor of representing Pastor Mitzi Bickers in this

12  matter.

13          As you all were so gracious in filling out the jury

14  questionnaire prior to coming back today, I feel like I know some

15  of y'all.  So I've got some information.  I just want to follow up

16  just as Mr. Kitchens did based on questions I had based on the

17  questionnaires.  I'm a very linear person, so I think I'm going to

18  go in order, if that makes everybody feel comfortable, too.  So

19  Ms. Chihade.

20          PROSPECTIVE JUROR:  Chia Chihade.

21          MS. GOLDBERG:  So you mentioned when Judge Jones started

22  today about a trip you had planned I think to Peru.  Can you give

23  us the dates of that again?

24          PROSPECTIVE JUROR:  It's the first full week of April.

25  I have to look at the specific dates.

 1          THE COURT:  First full week of April is April the 4th

 2   through the 8th.

 3          PROSPECTIVE JUROR:  Yes.  So we would leave, like, the

 4   Friday.

 5          THE COURT:  April the 8th?

 6          PROSPECTIVE JUROR:  No, before that.

 7          THE COURT:  The first Friday in April is April the 1st.

 8   The first full week in April is April the 8th.

 9          PROSPECTIVE JUROR:  So we would leave April the 2nd and

10   come back the 10th.

11          MS. GOLDBERG:  Okay.  As Judge Jones indicated, this may

12   take three weeks.  There is never a guarantee one way or another;

13   it could be less or it could be more.  And so, you know,

14   obviously, we take that into consideration today.

15          PROSPECTIVE JUROR:  Thank you.

16          MS. GOLDBERG:  And that's a prepaid vacation, I assume?

17          PROSPECTIVE JUROR:  Yes.

18          MS. GOLDBERG:  And Mr. Kitchens asked you a little bit,

19   I just want to follow up, too.

20          Based on your questionnaire, you mentioned specifically

21   just kind of hearing news about cases from the City of Atlanta and

22   alleged corruption and things like that.  I think the words you

23   kind of used were kind of sick of cases involving bribery and

24   misuse of taxpayer dollars and things like that.

25          There are allegations in this case -- you will hear if

1   you're sitting on the jury -- there are allegations in this case

2   that this involves bribery.  So based on your opinion, as you

3   expressed in the questionnaire, how would that make you feel?

4            PROSPECTIVE JUROR:  I would just listen to the evidence

5   and take it -- take that into consideration when I make my

6   decision.

7            MS. GOLDBERG:  Okay.  Would you bring in any of those

8   feelings that you had previously into this case?

9            PROSPECTIVE JUROR:  I think I cannot do that.  I will

10  not bring in my previous impressions.

11           MS. GOLDBERG:  Okay.  And your concerns about your

12  children and taking them to and from school, do you think that

13  would affect you and your ability to serve on a jury?

14           PROSPECTIVE JUROR:  I mean, I'll be honest.  I've been

15  stressed for the last week waiting for today to figure out

16  everything, and if it starts tomorrow, I have to scramble tomorrow

17  and figure everything out for the next three weeks.

18           MS. GOLDBERG:  And would that be a hardship for you or

19  do you think you would be able to figure it out?

20           PROSPECTIVE JUROR:  It would be a hardship for sure,

21  yes.

22           MS. GOLDBERG:  Thank you.  Ms. Dale.

23           PROSPECTIVE JUROR:  I'm Tonya Dale.

24           MS. GOLDBERG:  On your questionnaire you mentioned

25  something in response to a question about whether you think

```
1   minorities are treated unfairly.  I think you had a question --
2   your answer was something about that it appears to be improving
3   year by year.  Can you explain that to us?
4            PROSPECTIVE JUROR:  Well, I mean, obviously, over the
5   years I think things have begun to improve.  But I think there is
6   still a lot of work to be done depending on the forum, whether it
7   be legal or, you know, the workplace or whatever.  I still think
8   that there is, you know, a good bit of discrimination against
9   minorities, women, you know.  But I think it is a case-by-case
10  basis, and I do think it has seemed to improve as in -- like the
11  case of George Floyd being, you know, prosecuted correctly.  I
12  guess that's it.
13           MS. GOLDBERG:  All right.  Thank you.
14           Mr. Hamilton, I'm going to skip over you today and go to
15  Ms. Howard.
16           PROSPECTIVE JUROR:  Isha Howard.
17           MS. GOLDBERG:  Hi.
18           PROSPECTIVE JUROR:  Hi.
19           MS. GOLDBERG:  You mentioned in your questionnaire
20  something about the importance of keeping an open mind if you were
21  to sit on the jury.  Can you explain that answer to us a little
22  bit?
23           PROSPECTIVE JUROR:  Yes, I am an adjuster and adjuster
24  by trade.  So I have to keep an open mind when I'm investigating
25  claims.  I also feel that as facts present themselves, I take
```

1  those into consideration more so than what my personal feelings

2  might be on something.  So I try to look at things from both sides

3  and keep an open mind.

4          MS. GOLDBERG:  And as His Honor indicated, obviously,

5  the defense does not have a burden in this case.  It is solely up

6  to the government.  How do you feel about that?

7          PROSPECTIVE JUROR:  I'm perfectly fine using the

8  information that I have to make decisions.  Sometimes I don't get

9  everything that I want, but I use what I have before me to make

10  the best decision that I can.

11          MS. GOLDBERG:  Thank you, Ms. Howard.

12          And I'm going to skip over Ms. Howell right now and go

13  to Ms. Nave.  And I apologize, I'm not going to ask everybody

14  questions.  There are a few things that I wanted to follow up on.

15          PROSPECTIVE JUROR:  Angela Nave.

16          MS. GOLDBERG:  Ms. Nave, when Mr. Kitchens mentioned

17  when he spoke with you first, the question of sexual orientation

18  is not on trial in this case, however, it may become an issue as

19  it relates to certain witnesses and Pastor Bickers herself.  You

20  expressed some views regarding same sex marriage and people who

21  are in a position of religious leadership identifying as gay.  Can

22  you explain that and how your feelings about that are?

23          PROSPECTIVE JUROR:  Well, I just personally oppose same

24  sex marriage.  That's a personal belief, religious belief of mine.

25  As far as a lady or a women being a pastor of a church, I don't

1   really have an opinion on that.

2          MS. GOLDBERG:  Okay.  And the fact that Pastor Bickers

3   is a woman and she does identify as gay, how would that affect

4   your thoughts regarding this?

5          PROSPECTIVE JUROR:  That's her choice.  I mean, the

6   opposing is my opinion for myself.  Whatever, you know, anyone

7   else chooses, that's their opinion.  I mean, that's their right to

8   do what they wish.  But personally for me, I oppose.

9          THE COURT:  Well, now are you going to be able to take

10  the fact that you oppose same sex marriage and someone being

11  gay --

12         PROSPECTIVE JUROR:  I don't hold it against anyone.

13         THE COURT:  Here is my concern.  Are you going to be

14  able to listen to the evidence in this case and the law as I give

15  you and render a verdict based on the evidence and the law and

16  disregard anything about anyone being gay or same sex marriage and

17  base your verdict solely on the evidence and the law I give you?

18         PROSPECTIVE JUROR:  Based on the evidence, yes, and not

19  on the personal opinion -- decisions.

20         THE COURT:  And will you be fair and impartial in this

21  case?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Thank you.

24         MS. GOLDBERG:  And, Ms. Nave, you also mentioned

25  something about your husband having disability and it may be a

1  hardship in your life.  Can you talk about that a little bit?

2          PROSPECTIVE JUROR:  Yes.  He's a disabled -- I don't

3  drive in Atlanta.  So he's actually sitting down in the parking

4  lot waiting on me.  So...

5          MS. GOLDBERG:  So are you a caretaker for him?

6          PROSPECTIVE JUROR:  He's able to still care for his self

7  (sic).  I mean, he still drives and he still -- he has a lot of

8  joint, back pain.  I personally don't drive in Atlanta.  So he

9  -- I live in a small town of Covington.  I work two miles from my

10 home.  I've worked there since I was 15.  So I have no reason to

11 come to Atlanta.  I don't drive in Atlanta.  It gives me anxiety.

12 And he's sitting out in the parking lot watching Netflix on his

13 phone.

14         MS. GOLDBERG:  You understand this trial may take three

15 weeks.

16         PROSPECTIVE JUROR:  He's concerned.  Yeah, he told me

17 today I better pay attention to where I'm going, because he won't

18 be able to bring me.

19         MS. GOLDBERG:  Well, would that be a hardship for you or

20 is that something that you could --

21         PROSPECTIVE JUROR:  I would try to do the drive.  I

22 would like to say too, though, at my job I am the only person that

23 does my job.  I think I sent in a letter from my administer.  I'm

24 a financial counselor at a nursing home.  And for three weeks,

25 that would put a hardship on the facility.

1          MS. GOLDBERG:  And someone from your job sent a letter?

2          PROSPECTIVE JUROR:  I sent it to the in-box e-mail.  And

3   I do have a copy of it with me.

4          MS. GOLDBERG:  Thank you.  Thank you, Ms. Nave.

5          Mr. Owen.

6          PROSPECTIVE JUROR.  Anthony Owen.

7          MS. GOLDBERG:  Good morning, Mr. Owen.  You expressed

8   some relatively strong views in your questionnaire related to

9   religion, and I guess maybe not -- no longer having a belief in

10  certain religions.

11          Now, as we indicated, Pastor Bickers is a pastor in a

12  Baptist church.  Can you tell us how your thoughts may have an

13  impact on that.

14          PROSPECTIVE JUROR:  I used to have very conservative

15  Christian theological views.  I had theological training in the

16  past.  My views have changed.  And I no longer view the bible as

17  spiritually authoritative.  So I'm now a non-religious person.  So

18  I don't have the views I had in the past.

19          MS. GOLDBERG:  Okay.  And would that and the fact that

20  there may be testimony related to the fact that Pastor Bickers is

21  a pastor and may be even related to a church, or people -- members

22  of a church, how would that affect you?

23          PROSPECTIVE JUROR:  I don't think it would affect me.  I

24  think I could be fair and impartial.

25          MS. GOLDBERG:  Okay.  Thank you.

1          And, Ms. Parker, I think you already explained some

2 stuff, so I'm going to skip over you and go to Mr. Partain.  And

3 just briefly, I think you mentioned something about a work

4 hardship.  Can you talk to us a little bit about that?

5          PROSPECTIVE JUROR:  Jackson Partain.  And my job is

6 pretty serious.  I've always got to be there.  So that's about it.

7          MS. GOLDBERG:  Okay.  Now, people do have serious jobs.

8 Do you get paid if you're not there?

9          PROSPECTIVE JUROR:  No.

10          MS. GOLDBERG:  And so would that be a hardship for you

11 being on a trial for three weeks?

12          PROSPECTIVE JUROR:  Yes and no.  I mean, I could do it.

13 I could work with it, but I would rather be there.

14          MS. GOLDBERG:  All right.  Thank you, Mr. Partain.

15          Mr. Perrin.

16          PROSPECTIVE JUROR:  Doug Perrin.

17          MS. GOLDBERG:  I may have a couple of questions for you

18 based on your questionnaire that we may want to do separately.  I

19 think there is a couple of you-all.

20          But I just want to go back to the issue with your wife

21 and being pregnant.

22          Would that be in the back of your mind at all times if

23 you were to serve on a jury?

24          PROSPECTIVE JUROR:  Yes, if she comes up under

25 any -- needing help or anything, I definitely will be thinking

1   about that during the case.

2           MS. GOLDBERG:  Okay.  Do you think that would affect you

3   and your ability to serve on this jury?

4           PROSPECTIVE JUROR:  I'll try, but we just have many

5   friends that have come early, even to the week that she is right

6   now.  It's just -- it's top of mind.

7           MS. GOLDBERG:  Okay.  Would you still be able to listen

8   to the evidence or do you think that's something you would always

9   be thinking about?

10          PROSPECTIVE JUROR:  I'll still listen to the evidence

11  the best I can and judge the way I feel, but besides that, I -- it

12  is in the back of my mind, obviously.

13          THE COURT:  Can I ask a question here, Ms. Goldberg?

14          MS. GOLDBERG:  Yes.

15          THE COURT:  This is your first child?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  And more or less what you're telling

18  Ms. Goldberg and the Court is that you'll be sitting there but

19  your mind may not be there?

20          PROSPECTIVE JUROR:  If I -- if my child would come, I

21  want to go to the birth.  I know there is a big -- this is a big

22  important case, but...

23          THE COURT:  Well, my question was -- obviously, you're

24  going to be there.  But it's important that the 12 jurors and 3

25  alternates that are hearing this case pay close attention to

1  whatever the witness says, what the lawyers say, and what I say,

2  because missing one sentence could change the whole aspect of how

3  that juror sees the case.  I am very conscientious of the fact

4  that this is your first child and that's -- that is, again, more

5  important than that.  But what I need to know then, are you

6  telling me that it's going to be impossible for you to pay

7  attention during this trial?

8         PROSPECTIVE JUROR:  If I'm here, I'll be here -- if

9  that's the question.  My focus is going to be here and listening

10 to the case, if I'm here.

11        MS. GOLDBERG:  Okay.  I appreciate that.  I want to

12 follow up on one other thing.

13        I think you said something in your questionnaire about

14 you needed to see some proof that if someone is charged with a

15 crime that they didn't do it.  Now, you heard, I think, earlier

16 about the burden.  Can you talk to us a little bit about that?

17        PROSPECTIVE JUROR:  The judge did make it -- say it

18 correctly, that the burden of proof is on the prosecutors, not on

19 the defense.

20        MS. GOLDBERG:  And you understand that there is no

21 burden whatsoever on the defense?

22        PROSPECTIVE JUROR:  Yes.

23        MS. GOLDBERG:  All right.  Thank you.

24        Ms. Pye.

25        PROSPECTIVE JUROR:  Margie Pye.

1          MS. GOLDBERG:  Good morning.  You expressed some

2   relatively strong opinions related to the Reed administration.

3   Can you talk to us a little bit about that?

4          PROSPECTIVE JUROR:  Well, I watch a lot of news, and

5   I've seen all of the administrations and all of the bribery case

6   charges and they've all been convicted and gone to prison for it.

7          MS. GOLDBERG:  Now, you understand, as they indicated,

8   that former Mayor Reed is not part of this case?

9          PROSPECTIVE JUROR:  Right.

10          MS. GOLDBERG:  Do you think that those opinions that you

11   have and this being completely different from any of that and no

12   evidence having been presented in this, how would you feel

13   about -- if there were people or evidence related to that

14   administration?

15          PROSPECTIVE JUROR:  Well, it would be -- you know, each

16   case is different, and for me, I could judge by whatever is

17   presented before me.  It wouldn't -- it wouldn't color anything.

18          MS. GOLDBERG:  So those opinions wouldn't come into this

19   or would they?

20          PROSPECTIVE JUROR:  No.  Just what I've seen on the news

21   is how I formed my opinion.  But whatever is before me would be a

22   different thing.

23          MS. GOLDBERG:  Okay.  Thank you, Ms. Pye.  And I'm

24   sorry, Ms. Pye, did you mention something about a hardship as

25   well?

1              PROSPECTIVE JUROR:  Well, I'm the caretaker of my

2    grandchild.  Both his parents are employed.  His mother is a

3    school teacher, and my son works for the Department of Health and

4    Human Services.  So they don't have a babysitter.  He's not in any

5    daycare.

6              MS. GOLDBERG:  Is that something you do daily?

7              PROSPECTIVE JUROR:  Yes, Monday through Friday.

8              MS. GOLDBERG:  Is there anybody that can cover that for

9    you?

10             PROSPECTIVE JUROR:  Not at the moment.

11             THE COURT:  Who is doing it for you today?

12             PROSPECTIVE JUROR:  My son took off today.

13             MS. GOLDBERG:  Thank you, Ms. Pye.

14             Go back, I'm sorry, to Ms. Nave.

15             Related to your work hardship.  Do you get paid if

16   you're not there or is it --

17             PROSPECTIVE JUROR:  The company provides jury pay.  They

18   will minus what I get paid for here, so...

19             MS. GOLDBERG:  Okay.  Thank you.  Mr. Ramey.

20             PROSPECTIVE JUROR:  John Ramey.

21             MS. GOLDBERG:  You mentioned something about, you know,

22   a prior issue that you had related to, I guess, an alleged DUI.

23             Now, you understand that that was not the federal court,

24   it was the state court -- very different from the circumstances we

25   have here; correct?

```
 1              PROSPECTIVE JUROR:  Yes, yes.

 2              MS. GOLDBERG:  Okay.  And would any of that, given the

 3    fact that it is very different circumstances and these are not the

 4    prosecutor who were involved in your case, would that color your

 5    opinion at all --

 6              PROSPECTIVE JUROR:  No.

 7              MR. GOLDBERG:  -- and your ability to be a juror?

 8              PROSPECTIVE JUROR:  Not at all.

 9              MS. GOLDBERG:  Okay.  Thank you, Mr. Ramey.

10              I'm going to go to Ms. Robinson.

11              PROSPECTIVE JUROR:  Allyn Robinson.

12              MS. GOLDBERG:  And I think Mr. Kitchens asked you a

13    little bit about it, related to your thoughts about the Reed

14    administration.  If there is some evidence or people who may have

15    worked within that administration, how would you feel about that?

16              PROSPECTIVE JUROR:  I'll judge based on the evidence as

17    presented before me.

18              MS. GOLDBERG:  Okay.  Thank you.

19              Mr. Stamps.

20              PROSPECTIVE JUROR:  Randy Stamps.

21              MS. GOLDBERG:  You expressed some opinions in your

22    questionnaire related to religious leaders and maybe -- the

23    relationship between religious leaders and money.  Can you explain

24    a little bit to us what you meant by that?

25              PROSPECTIVE JUROR:  In my experience, I have seen church
```

1  pastors that -- based a lot on the money, the receiving of money

2  and how they were treated.  And they may have been treated better

3  than some other parishioners were.

4          MS. GOLDBERG:  Okay.  So you're saying the people, in

5  your experience, treated their parishioners differently based on

6  money, donations, and things like that?

7          PROSPECTIVE JUROR:  Yes.

8          MS. GOLDBERG:  Okay.  Again, as I indicated,

9  Pastor Bickers is a pastor of a church.  How would you feel about

10  that given those thoughts?

11          PROSPECTIVE JUROR:  As long as there was no wrongdoing,

12  I wouldn't have a problem with it.

13          MS. GOLDBERG:  But again, given the evidence presented,

14  would your beliefs related to that, would that color your opinion

15  or the way that you would view the evidence or lack thereof in

16  this case?

17          PROSPECTIVE JUROR:  No.

18          MS. GOLDBERG:  And similarly, I think you mentioned

19  something about not thinking that women should hold positions of

20  power.  Can you explain that?

21          PROSPECTIVE JUROR:  That was more, I guess, the way I

22  was raised to believe as far as -- I guess I'm saying, church

23  pastor, I was raised -- now, I don't hold that against anybody.

24  There are a lot of females that are good pastors.

25          MS. GOLDBERG:  Okay.  Would that color your opinion in

1   how you see things and how you view the evidence here?

2           PROSPECTIVE JUROR:  I don't think so.

3           MS. GOLDBERG:  And you also expressed some concerns

4   about, you know, if you were to serve as juror, the impact that a

5   verdict one way or the other would have.  Can you explain that a

6   little bit.

7           PROSPECTIVE JUROR:  I'm sorry, I'm not understanding.

8           MS. GOLDBERG:  So I think there was a question about

9   would you have a concern if you were called to serve on this jury,

10  about the impact of rendering a verdict one way or the other that

11  could have on your life.  I think you mentioned something about

12  you were concerned about it and related it specifically to racial

13  bias.  Can you -- if that helps.

14          PROSPECTIVE JUROR:  I'm sorry, I'm lost.

15          MS. GOLDBERG:  Okay.  Would you have any concerns about

16  serving on the jury?

17          PROSPECTIVE JUROR:  No.

18          MS. GOLDBERG:  Okay.  Would you have any concerns about,

19  you know, being able to render a verdict or the impact of a

20  verdict on your life one way or the other?

21          PROSPECTIVE JUROR:  No.

22          MS. GOLDBERG:  All right.  Thank you, Mr. Stamps.

23          Ms. Taylor.

24          PROSPECTIVE JUROR:  Jennifer Taylor.

25          MS. GOLDBERG:  Okay.  Thank you, Ms. Taylor.

1           You expressed some concerns about the City of Atlanta

2   and corruption within the City of Atlanta.  Do you have any

3   thoughts about that?

4           PROSPECTIVE JUROR:  The only thing that I recall is the

5   APS, the public school scandal.  That's the only thing that I can

6   reference that to.

7           MS. GOLDBERG:  Okay.  And you're aware -- that has

8   nothing to do --

9           PROSPECTIVE JUROR:  Correct.

10          MS. GOLDBERG:  -- with anything that we're here for.

11          PROSPECTIVE JUROR:  Correct.

12          MS. GOLDBERG:  So how would you feel, related to your

13  thoughts on that, serving as a potential juror in this case?

14          PROSPECTIVE JUROR:  It could have no bearing whatsoever.

15          MS. GOLDBERG:  Okay.  I think that's all I have.  Thank

16  you.

17          THE COURT:  Thank you, Ms. Goldberg.

18          Ladies and gentlemen of the jury, Ms. Wright is going to

19  give you-all some instructions in a few minutes.  Let me just say

20  this to you.  We're going to be taking a lunch break, and y'all

21  are going to be in the building.  You may see some of the lawyers

22  in the building.  They can't talk to you.  None of the parties

23  involved in either one of these sides can talk to you in any way.

24  They can say hello and they literally may not even say that.  Do

25  not hold that against them.  That's my instructions to them.

1  They're not allowed to talk to you.

2          So if you see them in the cafeteria or in the

3  elevator -- if you're in the elevator and it opens up and they

4  don't step on, it's nothing against you.  They're not allowed to

5  have any contact or communication with you.

6          Again, it's possible that you may see them in the

7  cafeteria.  They will not be talking to you.  Please don't go up

8  to them and try to have a conversation with them as well.

9          Ms. Wright will now give you-all instructions.

10         THE DEPUTY CLERK:  Yes.  You can all head back up to the

11 jury assembly room.  And when we need you again, we'll call you

12 and ask you to come back down.  You can be at ease, and go to

13 lunch.

14         (Whereupon, the jury panel was excused as 12:17 p.m.)

15         THE COURT:  Do you need assistance, sir?

16         PROSPECTIVE JUROR:  Did I misunderstand?  Are we allowed

17 to take lunch after we go --

18         THE COURT:  Go up to the 22nd floor, and they'll

19 probably let you go on a lunch break.

20         Okay.  Mr. Kitchens, let me say first, Mr. Hamilton is

21 off.  His medical condition, in the Court's opinion, renders him

22 unable to be a part of this jury.  Mr. Davis and Mr. Kitchens, any

23 objection to that?

24         MR. KITCHENS:  No, Your Honor.

25         THE COURT:  Mr. Findling -- excuse me, Ms. Goldberg, any

1  objection to that?

2         MS. GOLDBERG:  No, Your Honor.

3         THE COURT:  Mr. Hamilton is off.  Mr. Kitchens, any

4  challenges for cause?

5         MR. KITCHENS:  Your Honor, I understand there may be

6  three jurors that we wanted to speak with separately.  Leaving

7  that aside, I think -- I don't think any for cause.  I think the

8  one hardship issue came up, in our view.  That was with Juror 41.

9  She was having the difficulty, the respiratory problem with the

10  mask.  She said even wearing it for an hour at a time --

11         THE COURT:  I think, Ms. Goldberg, we need to take her

12  off.  Two reasons:  She's going to have to keep the mask on, and

13  if she's having breathing problems -- that's Juror No. 41,

14  Ms. Young.  I'm concerned.  I don't want to put anybody in a

15  medical problem.  But I'll hear from you, if you oppose.

16         MS. GOLDBERG:  Your Honor, again, I don't want to put

17  anyone in a medical problem either.  Obviously, it's uncomfortable

18  for everyone.  But if there is a substantial medical issue with

19  breathing involved, we would not object to that.

20         THE COURT:  Okay, Juror 41 is removed.

21         Let me ask you this, Mr. Kitchens and Ms. Goldberg, you

22  know having your first child is probably one of the most important

23  events in your life.  And his wife is 34 weeks pregnant.  Let me

24  hear -- I'm kind of probably -- that's Juror No. 30.  I'm kind of

25  leaning toward removing him, but let me hear from y'all.  I would

1   imagine sitting there and you're not going to have your cell

2   phone -- and to be quite frank with you-all, this case is very,

3   very important, but to him it's secondary to the birth of his

4   child.

5           Mr. Kitchens?

6           MR. KITCHENS:  That's certainly true, Your Honor.  I

7   think that was one of the jurors that we were going to bring in

8   and question separately as well.  We avoided asking any questions

9   as a result of that.  I certainly understand that concern.

10          Could we maybe just have an opportunity just with the

11  other two jurors to speak with them to get a little bit more sense

12  of that?

13          THE COURT:  Ms. Goldberg?

14          MS. GOLDBERG:  Your Honor, I would agree.  I do think he

15  probably has a substantial hardship given what he's already

16  expressed.  He is one of those individuals we wanted to talk to

17  anyway.  So...

18          THE COURT:  Was there a need to talk to him if both

19  y'all are saying the hardship of his child's birth is -- or is the

20  government still saying, no, we want to talk to him?

21          MR. KITCHENS:  I think I definitely understand,

22  obviously, the concern.  I think we would be interested in at

23  least hearing from him.  He did, and I know you asked point-blank

24  if --

25          THE COURT:  What did he say in the questionnaire that

1  have you-all concerned?

2         MR. KITCHENS:  I don't think there was anything in the

3  questionnaire.  I think there was a concern about his views of

4  this particular case.

5         THE COURT:  What is it he said about the case?

6         MS. GOLDBERG:  Here it is.  Your Honor, I believe he had

7  some indication that he had formed an opinion related to some

8  things that he had seen in the media, and that's why we wanted to

9  talk to him outside the presence of the other jurors.

10         THE COURT:  I don't mind bringing him in with the other

11  two.  What I'm saying is, if both of y'all agree that he should be

12  removed because of the birth of his child, there is no need to

13  bring him in.  But if I heard Mr. Kitchens correctly, he still

14  wants to bring him in.  So we'll bring him in.  We'll let them all

15  go to lunch, and then we'll bring them in before our next panel.

16         Who else is a challenge for cause, Mr. Kitchens?

17         MR. KITCHENS:  We have no other challenges, Your Honor.

18         THE COURT:  Thank you.  Ms. Goldberg.

19         MS. GOLDBERG:  Your Honor, the only two I think may be

20  hardship related to Juror No. 22.  The trip that she had planned.

21  I know it is a question mark whether or not we'll actually get to

22  that trip, but, you know, as Your Honor knows, you never know what

23  is going to happen.  Jurors are deliberating or things like that,

24  it is a possibility it could extend.  Plus that in conjunction

25  with her concern about her children may create a hardship.

```
 1            THE COURT:  What is your position, Mr. Kitchens?

 2            MR. KITCHENS:  Based on her travel, it's fairly far off.

 3   It would take, I think, the trial taking longer than any of us

 4   would anticipate for it to be an impediment to travel.  She

 5   expressed certainly concerns about it.  It certainly would be

 6   inconvenient regarding the transportation with her daughter, but

 7   it did sound like she had the ability between her husband and

 8   friends to be able to take care of that transportation as well.

 9   There are, obviously, a good number of jurors that their service

10   on the jury is going to affect transportation plans for them and

11   their family.  So I don't know that it rises to a level of a

12   hardship.

13            THE COURT:  Ms. Goldberg, the Court's position is always

14   in a situation like this, I want both sides to agree before I

15   remove a person.  The government is not agreeing.  It does not

16   meet the cause requirement.  So she'll stay on.

17            MS. GOLDBERG:  I understand, Your Honor.

18            THE COURT:  Who else, Ms. Goldberg?

19            MS. GOLDBERG:  I believe Juror 32, Ms. Pye, had a

20   hardship as being the caregiver for her grandchild, that no one

21   else could cover, and that was our concern.

22            THE COURT:  Mr. Kitchens?

23            MR. KITCHENS:  That was another juror I think we were

24   hoping to speak to separately.  We did not ask any questions as a

25   result of that.  I think we would like the opportunity to speak
```

1    with that juror before we make any determination about hardship.

2            THE COURT:  All right.  What else, Ms. Goldberg?

3            MS. GOLDBERG:  Just one more, Your Honor.  I don't

4    know -- Juror No. 30, led to his work and not getting paid.  I

5    know that may be an issue that most of the jurors share.

6            THE COURT:  Yes, that's not a hardship.  Out of 79 of

7    them, probably 30 of them work for minimum wage and they only get

8    paid, what, $40 a day -- 45 -- 50.  Okay, they got a raise.  I

9    sympathize with people in that situation, but if I let him go, it

10   opens up the door for a lot of other people.

11           MS. GOLDBERG:  Understood, Your Honor.  So we'll reserve

12   for No. 31 and 32 which we wanted to speak to, anyway.

13           THE COURT:  All right.  The three that we have is 31 and

14   32, and who is the third one?

15           MR. KITCHENS:  38 I think you indicated as well, Your

16   Honor.

17           THE COURT:  38?  I didn't have anything down -- well,

18   38.

19           MS. GOLDBERG:  Based on the questionnaire, Your Honor.

20           THE COURT:  31, 32, and 38.  What we will do, we'll take

21   a lunch break and then we'll come back.  Before we bring in the

22   third panel, we're going to bring those three in, and then y'all

23   can question those three.  Then I'll let y'all determine whether

24   you want to challenge any of those three for cause.

25           Mr. Findling?

 1          MR. FINDLING:  Your Honor, I also raised to you and the

 2   government, but we did not ask No. 20 in the first panel --

 3          THE COURT:  We'll bring No. 20.

 4          MR. FINDLING:  -- his position towards guilt.

 5          THE COURT:  We'll bring 20 back also after lunch.

 6          MR. FINDLING:  Thank you, Your Honor.

 7          THE COURT:  What we'll do, Mr. Findling and Mr. Davis,

 8   20, 31, 32, 38 we'll bring them in one at a time, put them in the

 9   jury box, the others will reside in the hall, we'll let you-all

10   ask them what y'all want to ask them.

11          Is seven minutes -- ten minutes per side enough time to

12   question these four people?

13          MR. FINDLING:  Yes, Your Honor.

14          THE COURT:  And then y'all want to challenge for cause?

15   I hear that.  And once we do that, then we'll bring in the panel

16   of 20 and go from there.  Any questions?

17          MR. DAVIS:  Judge, I have one brief question.  Sorry.

18   If the number of jurors is made by the third panel, is it --

19          THE COURT:  Yes.  I think -- I know if we have 40 jurors

20   qualified, we won't need to go into the fourth panel, because all

21   we need is 12 jurors and three alternates.  And we can -- with 6

22   strikes, we can pick the 12 jurors and 3 alternates from 40

23   jurors.  I'm thinking the way it is looking, we may not need to

24   get into the fourth panel.

25          MR. FINDLING:  Just, Your Honor, so I can be clear.  The

```
 1   four that we will bring back, we will question each of them
 2   separate from the three?
 3           THE COURT:  Exactly.  Exactly.
 4           MR. FINDLING:  Okay, perfect.  Thank you so much.
 5           THE COURT:  Let me just say this to all of you-all.
 6   There's not a whole lot of places around here you can go and eat
 7   your lunch in an hour and be back here and properly digest it.
 8   Okay?  So I highly recommend the cafeteria or bring you lunch
 9   tomorrow.  But if you think you can do it, fine.  See y'all at
10   1:30.
11           (Recess at 12:35 p.m.)
12           (On the record at 1:35 p.m.)
13           THE COURT:  Mr. Davis and Mr. Findling, at the lunch
14   break one of the jurors was -- I think Ms. Wright told you, Juror
15   No. 13 went to her car and received a very upsetting message.  So
16   we're going to bring her in first and find out what the message
17   was, and that might change whether she stays or not.
18           All right.  Bring Juror No. 13 in.
19           Have her sit right there.  Please have a seat right
20   there, ma'am.
21           PROSPECTIVE JUROR:  Would it be okay if I spoke to you
22   in private?
23           THE COURT:  Yes.  Do you have any objection to that?
24           MR. DAVIS:  No, sir.
25           MR. FINDLING:  No, sir.
```

1          THE COURT:  I'll talk to her in the jury room privately,

2     and then I'll report back to you.

3              (Juror No. 13 speaks to the judge privately.)

4              (At side bar.)

5          THE COURT:  Juror No. 13, I can't remember her name, is

6     pregnant.  She went to the car today and found out that there's

7     something wrong with the pregnancy, and she has to go see the

8     doctor and they will take extra tests next week.  I tried not to

9     get too personal, but the problem may be affecting -- it is

10    affecting the pregnancy.  I don't think she would be good.  I just

11    told her she is excused.  If you-all are upset, I'll bring her

12    back.

13         MR. DAVIS:  We figured out, based on her

14    questionnaire -- we already knew she was going to tell you that,

15    because she indicated something like that in her questionnaire.

16         THE COURT:  Well, she found out today she has a problem.

17         MR. FINDLING:  Okay.

18         Your Honor, while we're here, I've identified five -- I

19    don't know if we're going to make it through this panel, but five

20    people indicated things that probably should be done outside of

21    the presence.  I can go on the record and give those to you.

22         THE COURT:  Give me those numbers.  The way I counted, I

23    have 28 qualified.

24         MR. FINDLING:  Yes, we have 28 qualified.

25         THE COURT:  So I'm going to qualify 40.  So my thinking,

1  when we hit the number -- we'll go through this panel.  I think

2  we'll get what we need.  If we get what we need outside of those

3  five, I don't see the need to talk to them.  If you don't, we will

4  talk to these other three first.

5          MR. FINDLING:  Okay.

6          THE COURT:  If any of these other three count, we may be

7  closer to the number.

8          MR. FINDLING:  Okay.  At the appropriate time --

9          THE COURT:  I have no problem talking to five.

10         Yes, sir.

11         MR. DAVIS:  Yeah, I guess we just want to make sure that

12 those five don't get removed from the panel before we know even

13 who we're talking about.

14         THE COURT:  No, no.

15         MR. DAVIS:  Okay.

16         THE COURT:  I'll wait until y'all tell me.

17         MR. DAVIS:  Okay.

18         (On the record at 1:44 p.m.)

19         THE COURT:  For the record, Ms. Viola, Juror 13 has been

20 excused by the Court.

21         THE DEPUTY CLERK:  No. 20?

22         THE COURT:  Yes, 20.

23         THE DEPUTY CLERK:  Have a seat right there in the first

24 chair.

25         THE COURT:  This is Juror No. 20, Bobby Maurice Blount.

1           Mr. Blount, the lawyers indicated they may have a couple

2 of additional questions for you.  Any from the government?

3           MR. KITCHENS:  A few short ones, Your Honor.

4           THE COURT:  All right.

5           MR. KITCHENS:  Mr. Blount, thanks for your time again.

6           PROSPECTIVE JUROR:  Thank you.

7           MR. KITCHENS:  A handful of additional questions.  I

8 think we touched on some of your views a little bit before.

9           I think one thing on your questionnaire I just wanted to

10 make sure we have some clarity on.  I think you indicated that you

11 may be inclined to believe the allegations based on the

12 description that was provided in the questionnaire.  I just wanted

13 to see -- and I know we talked about it a little bit this morning

14 regarding, again, the need to look at the evidence.  And we

15 appreciate your candor in the questionnaire for putting that down.

16 But, of course, you haven't heard any evidence in the case yet.

17           Would you be able to hear all of the evidence in the

18 case before making any sort of decision?

19           PROSPECTIVE JUROR:  I believe I would.

20           MR. KITCHENS:  The Court -- again, Judge Jones will

21 provide you instructions about how to apply the law to the

22 evidence.

23           Do you think you would be able to follow the judge's

24 instructions?

25           PROSPECTIVE JUROR:  I believe I would.

1          MR. KITCHENS:  And throughout the trial you will be

2    given instructions about what is permissible to consider and

3    what's not permissible to consider.

4          Would you be able to follow those instructions?

5          PROSPECTIVE JUROR:  Yes.

6          MR. KITCHENS:  Are there certain times where, you know,

7    you may come in with a certain belief or opinion about where

8    things may lead and then it turns out once you hear the facts it

9    goes in a different direction?

10         PROSPECTIVE JUROR:  It's possible.  In the nature of

11   what I do, I work with politicians and government officials.  And

12   working on the inside of it in recent years, I've gotten a

13   completely different picture of how things truly work sometimes.

14   And so it jades you after many, many years working in this sector,

15   the government sector.  You just -- you're a little bit more

16   skeptical, you know, on things.  But I think in this process --

17   you know, I've learned to, you know, to look at the facts and try

18   to assimilate my opinions and things based on the facts that are

19   presented.

20         MR. KITCHENS:  So just to be clear, even taking into

21   account I understand those opinions, would you base your decision

22   purely on the instructions provided by the judge and the law and

23   evidence as presented in this case?

24         PROSPECTIVE JUROR:  I will do my absolute best to do

25   that, yes.

1          THE COURT:  And will you follow those instructions?

2          PROSPECTIVE JUROR:  Yes.

3          MR. KITCHENS:  No more questions.

4          THE COURT:  Ms. Goldberg or Mr. Findling?

5          MR. FINDLING:  Mr. Blount, thanks for coming back.

6          PROSPECTIVE JUROR:  Thank you.

7          MR. FINDLING:  It's correct the -- as was stated to you,

8   there was a summary, a very short summary, a three- or

9   four-sentence -- and I appreciate your honesty.  You indicated an

10  inclination just upon reading that to believe that Pastor Bickers

11  is guilty.  So what about that caused an inclination?  What about

12  that description?

13         PROSPECTIVE JUROR:  It's hard to categorize -- again,

14  working in the sector that I work in, K-12 government,

15  kindergarten through 12th grade, I come across a lot of colleagues

16  and politicians in my job.  And as a chief information officer, I

17  have access to information sometimes that kind of shows that

18  people can be a little bit disingenuous when they are presenting

19  something to the public or to constituents or to even staff

20  sometimes.  And so, you know, it's -- it's kind of the nature

21  of -- of the beast.

22         When you are watching TV and reading the paper and

23  looking at your iPad to catch the latest greatest, you know,

24  stories that are coming out, you have a tendency to go, yup, I

25  believe it.  You know, it's one of those things that I see in my

1   own organization and in other organizations.

2          And, you know, when you're selected for jury duty, you

3   know, I always want to think that I'm going to be fair to the

4   person that's on trial.  And so...

5          MR. FINDLING:  You've been everything but disingenuous,

6   because I appreciate you being genuine about this.  And you're

7   saying that you believe that you can be.

8          PROSPECTIVE JUROR:  I believe I can, yes.

9          MR. FINDLING:  But we really can't believe -- believe in

10  does not suffice here, to be honest with you.

11         PROSPECTIVE JUROR:  I understand.

12         MR. FINDLING:  It needs to be an absolute, I can be

13  fair.  And it appears that you're bringing in your interaction

14  with the political beast, so to speak, as you said.

15         Are you going to be able to separate out -- if you

16  can't, you can't.  You're in a different position than other

17  people.  The fact that you interact with politicians because of

18  your job, are you going to have a difficult time severing that

19  from your ability to sit here over three weeks?

20         PROSPECTIVE JUROR:  I know you want an absolute yes or

21  no answer.

22         MR. FINDLING:  If you can.

23         PROSPECTIVE JUROR:  I'm going to be honest and say, I

24  will listen to the evidence.

25         THE COURT:  Here is the key question.

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Mr. Findling is right.

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  I need to know right now, though.  I can't

5   wait until later.  Will you be fair and impartial?  That's the

6   first part.

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Can you take the things you dealt with,

9   politicians, elected officials and put it to the side?

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  And listen to the evidence in this case, the

12  law I give you, and render a verdict based on the evidence and the

13  law you hear in this case?

14         PROSPECTIVE JUROR:  Yes, I can, Your Honor.

15         THE COURT:  And lastly I need to know, Mr. Findling

16  needs to know is will you -- can you tell us right now, can you

17  tell Mr. Findling right now absolutely you're going to be fair and

18  impartial?

19         PROSPECTIVE JUROR:  I will be fair and impartial.  Thank

20  you.

21         MR. FINDLING:  That's all, Your Honor.

22         THE COURT:  Thank you, sir.  You can step back outside.

23         Juror 31, Mr. Perrin.

24         Mr. Perrin, the lawyers have a couple of additional

25  questions that they wanted to ask.  We'll start with Mr. Kitchens.

1          MR. KITCHENS:  Thank you, Your Honor.

2          Hello again, Mr. Perrin.  Thanks for coming back up.

3          I want to talk first just so -- in some of the responses

4   you gave on the questionnaire and dig in just a little bit more.

5          I think the questionnaire asked, based on a brief

6   description of the case, you know, kind of your opinions or

7   impressions of it.  And I think you indicated that, you know,

8   based on the description, the defendant most likely did it, unless

9   you heard proof otherwise that you would lean toward guilty.  And

10  I want to try to ask you a little bit more about that.  We

11  appreciate very much your honesty in that questionnaire.

12         I think from the instructions and what you heard this

13  morning about the need to consider just the evidence that is

14  presented to you -- and, of course, you haven't heard about the

15  case itself -- would you wait until hearing the evidence before

16  making a decision in this case?

17         PROSPECTIVE JUROR:  I'll do my best.  I,

18  obviously -- you read and -- media and news you always read and

19  assume what you're reading is correct.  But, obviously, if there's

20  evidence and everything, I'm going to go into any case with an

21  open mindset, how it should be, as best as I can.

22         MR. KITCHENS:  I want to be clear here when you say I'll

23  do my best.  Will you be able to set aside what you may have read

24  or heard about the case, what you may have seen in the media, and

25  just render a decision based on the law and evidence that's

1  provided to you in the case?

2       PROSPECTIVE JUROR:  To the best of my ability, I will

3  be.  I know you can't -- everyone always has underlying thoughts

4  in the back of their head.  I come into anything and in any case,

5  whether you're walking down the street or you're dealing with a

6  customer or whatnot, you go in with preconceived notions and you

7  try to start neutral.  And I will try to start as neutral as I

8  can.

9       MR. KITCHENS:  Now, Judge Jones at various points, he is

10 going to give you instructions about what you can consider and

11 what you can't consider.  As we noted this morning, you won't be

12 able to consider anything that you may have previously read in the

13 media.  And there are cases where the evidence may be much

14 different than what you may have seen in the media.

15      Would you follow just the evidence that you were told

16 you were permitted to consider and apply the law to that evidence?

17      PROSPECTIVE JUROR:  To my very best that I can, I will.

18      MR. KITCHENS:  Let me ask you a little bit more about

19 your -- and congratulations, of course, with your wife.  But I

20 just want to get a little bit more about that as well.

21      I think you noted when you were asked about that this

22 morning, that if you're here, you're here.  Can you tell us a

23 little bit more what you meant by that?

24      PROSPECTIVE JUROR:  My mindset will be here when I'm

25 here.  My wife's 34 weeks now.  If the case goes as long as it is,

1   I would be up to 37 weeks, 38 weeks, and I'm just -- the baby will

2   have a mind of its own whenever it does decide to come, and

3   whether -- and how happy my wife will be that I'm away during the

4   day without my phone or anything.

5           MR. KITCHENS:  Understood.  And that was going to be one

6   of my questions.  If you did have occasional access to your phone,

7   is that something --

8           THE COURT:  Mr. Kitchens, he's not going to have any

9   access to his phone.

10          MR. KITCHENS:  I appreciate it, Judge Jones.  I was just

11  trying to figure out -- given everything, is that going just in

12  the back -- and please be as honest as you can.  Is that something

13  that is going to be in the back of your mind?

14          PROSPECTIVE JUROR:  I mean, yeah.  I'm a millennial.

15  I'm used to having my phone on me at all times.  That would be

16  something different.

17          MR. KITCHENS:  Okay.  We appreciate it.  Thank you, Mr.

18  Perrin.

19          THE COURT:  Ms. Goldberg.

20          MS. GOLDBERG:  Thank you, Your Honor.

21          So, Mr. Perrin, just kind of going off of what you just

22  said, since you won't have your phone on you, would you be

23  inclined to be racing back to get your phone seeing if there were

24  any messages or anything like that?  Would that be a concern to

25  you?

1          PROSPECTIVE JUROR:  I don't know that -- I can't go

2    anywhere while I'm here.  I've got to do what I've got to do.  I

3    probably -- once at the end of the day, I'll go back and do

4    everything I usually do on my phone.  But when I'm here, I'll be

5    here to the best I can.

6          THE COURT:  Let me add this.  We will give you a number

7    to give your wife if you are on this jury to call in my office.

8    Whereas you won't have access to a phone, it's not like your wife

9    won't be able to get in contact with you.

10          PROSPECTIVE JUROR:  Yeah.

11          MS. GOLDBERG:  Okay.  I want to go back to some of the

12    stuff that was on your questionnaire, also.  That's kind of why we

13    had you by yourself here.

14          So you said you kind of heard about, you know, things in

15    the media.  Can you tell us what you've heard?

16          PROSPECTIVE JUROR:  Just that it was a -- from her case,

17    and nothing that I can pinpoint.  I just remember specially the

18    previous mayor, there being some investigations into him and

19    that -- something that, you know, just reading on the news.  I

20    don't really -- it wasn't a topic I dove into, just more the first

21    couple of paragraphs and onto the next thing.

22          MS. GOLDBERG:  Okay.

23          PROSPECTIVE JUROR:  So any particulars, I can't come up

24    with anything from...

25          MS. GOLDBERG:  Okay.  So I'm curious, you know, what

1  caused you on your questionnaire -- you wrote some stuff, like,

2  that you might be leaning towards guilty.  What was your mindset

3  when you were kind of filling those things out?

4           PROSPECTIVE JUROR:  I'm just -- I don't want to say

5  anything one way or another.  I'm somewhat -- I'm -- I believe and

6  go by a lot of times what I read.  Now, if I come in here I'll

7  keep an open mind, and, obviously, someone's life is much more on

8  a balance on what you just knee -- knee jerk thing of what you

9  read on something.

10          MS. GOLDBERG:  And that's fair.  So would there have to

11  be -- since you have some of these thought about something you've

12  already read, would there have to be something different for it to

13  -- would you start having those in your mind and thinking about

14  those things?

15          PROSPECTIVE JUROR:  I mean, obviously, if it's a he

16  said, she said, then it's not going to be something that I would

17  be willing to destroy someone's life over just -- like, if I went

18  up on the trial and I said, well, I read this in the newspaper,

19  and this must be that, it's not something I would destroy

20  someone's life over.

21          MS. GOLDBERG:  I understand that.  But, I mean, do you

22  think that that would -- would you have that prior knowledge,

23  would that come into play in any way?  And it's okay if we're just

24  having a discussion about it, but do you think that would factor

25  into your thought process at all?

1         PROSPECTIVE JUROR:  I don't believe so.  Like I said, I

2    don't remember -- I think I might have read something about her,

3    but nothing that I -- nothing that I can say that someone said

4    this on a thing would be any...

5         MS. GOLDBERG:  Okay.  And so when you indicate things

6    like, you know, based on what you read that she likely did it, are

7    you operating from a position of, you know, having to get moved

8    from that position or understanding that there's nothing that you

9    know about this case yet?  Where do you fall on that?

10        PROSPECTIVE JUROR:  Obviously, everything I see in the

11   case will be something brand-new to me.  I don't remember anything

12   particular from anything I read.  It was just, you know, maybe one

13   sentence and on to the next thing, next thing I read.

14        MS. GOLDBERG:  And nothing, in particular, that you

15   remember that you recall from reading about it?

16        PROSPECTIVE JUROR:  No.

17        MS. GOLDBERG:  Nothing stands out to you at all?

18        PROSPECTIVE JUROR:  No.

19        MS. GOLDBERG:  Okay.

20        THE COURT:  I have a couple of questions.

21        Something you said to Mr. Kitchens that concerns me.

22        You said you will put those preconceived ideas in the

23   back of your mind.  It can't be in the back of your mind.  They've

24   got to be completely out of your mind.  In other words, can you do

25   that?

1          The people that write articles in the newspaper, they're

2  just doing their job.  All right?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  But you can't base your verdict on what you

5  read in the newspaper or saw on the television.

6          Can you take what you heard on the television or read in

7  the newspaper and take it out of -- perceived things out of your

8  mind, and render a verdict based on the evidence and the law?

9          In the back of your mind, it may come in the front of

10 your mind while you're in that chair.  And I need to know that

11 you're going to put that out of your mind.

12         PROSPECTIVE JUROR:  Yeah.  I misspoke in that way.  When

13 I said the back of my mind, I meant it's a clean sheet of paper.

14         THE COURT:  Okay.

15         MS. GOLDBERG:  One moment, Your Honor.

16         Just briefly, Your Honor.

17         Mr. Perrin, I think in your question it also indicates

18 that you had conversations with other people about it.  Can you

19 tell us about that, what you recall about that?

20         PROSPECTIVE JUROR:  Not in this particular case, I

21 didn't have conversation -- maybe I talked to my family after

22 reading things.  I work in a family business.  We were just jaw

23 jacking whatever we read or talked about.

24         MS. GOLDBERG:  Can you tell us the content of what you

25 all talked about that?

1              PROSPECTIVE JUROR:  It's more that.  Just -- we're in

2     the business -- I'm in the car business.  In Chicago, the

3     government sometimes is a little bit tougher to deal with in

4     Chicago.  Someone's husband comes in and wants a free oil change

5     or something because of who they know type thing.  That's kind of

6     in the distance, just kind of talking back and forth.

7              MS. GOLDBERG:  Okay.  Because you indicated that you

8     talked about maybe how crazy the situation was in the

9     questionnaire.  So what did you mean by that?

10             PROSPECTIVE JUROR:  That I'm not quite sure.  Just --

11    I'm -- you know, talking back and forth.  Again, if we talked

12    anything, I -- specific about this case and what it -- was more

13    about Kasim Reed or something like that.  It had nothing to do

14    with -- about her.  Just like I said, based -- I skimmed at most,

15    and I don't really pay any attention to any names or anything.

16             MS. GOLDBERG:  Okay.  Thank you.

17             THE COURT:  Thank you, sir.  You can step back out.

18             Ms. Pye, the lawyers had a few -- you can be seated,

19    ma'am.  You don't have to stand.  The lawyers have a couple of

20    questions they want to ask you, ma'am.

21             We'll start with Mr. Kitchens.

22             PROSPECTIVE JUROR:  Margie Pye.

23             MR. KITCHENS:  Thank you, Ms. Pye.

24             Just a few others questions about things you indicated

25    on your questionnaire.  I think you were given a brief description

1   of the case and asked if you had any sort of opinions based on

2   that brief description that's provided.  And you provided a

3   description of -- an opinion regarding Mayor Reed.

4          Based on what we discussed this morning that Mayor Reed,

5   of course, is not a defendant in this case, he's not going to be a

6   witness in this case, is that going to be something that is going

7   to affect how you view -- if you were to serve as a juror, how you

8   would view the evidence in this case?

9          PROSPECTIVE JUROR:  No.

10         MR. KITCHENS:  I think we discussed this morning as

11  well, that, of course, the judge will give instructions to you

12  about what -- you know, give you some guidance as the case goes

13  along in terms of the types of things that you are permitted to

14  consider and things that you should not.  Do you think that you

15  would follow those instructions?

16         PROSPECTIVE JUROR:  Yes.

17         MR. KITCHENS:  Do you -- have you read any media reports

18  about this particular case?

19         PROSPECTIVE JUROR:  No, I haven't heard anything since

20  it was on the news, what, a couple -- few years ago, a few years

21  ago.

22         MR. KITCHENS:  What do you mean when you saw the news a

23  few years ago?

24         PROSPECTIVE JUROR:  Oh, just fraud charges, taking

25  bribes.  That's about it.  I don't remember much about it, just

1   that.

2          MR. KITCHENS:  And do you understand that anything you

3   may have seen in the media or in the news are things that you

4   cannot consider for purposes of this case, and you would have to

5   consider only the evidence that's presented and apply the law to

6   those facts?

7          PROSPECTIVE JUROR:  Yes.

8          MR. KITCHENS:  Would, you know, your recollection of

9   seeing those news stories from a few years ago, would you be able

10  to put that out of your mind and only base your decision on the

11  evidence that's presented and the law that's provided and

12  instructed from Judge Jones?

13         PROSPECTIVE JUROR:  Yes.

14         MR. KITCHENS:  Do you think you would be able to be a

15  fair and impartial juror that would consider only the evidence

16  presented in this case?

17         PROSPECTIVE JUROR:  Yes.

18         MR. KITCHENS:  Thank you, Ms. Pye.

19         THE COURT:  Ms. Goldberg.

20         MS. GOLDBERG:  Thank you, Your Honor.

21         Good afternoon, Ms. Pye.  Just following up on some of

22  those -- some of the questions that Mr. Kitchens just asked you.

23         You put on the questionnaire something about the Kasim

24  Reed administration are crooks.  Can you tell us about that and

25  what kind of caused you to write that?

1          PROSPECTIVE JUROR:  From what I saw on the news about

2    the whole case, the administration being charged of bribery

3    charges, and most of them went to jail.

4          MS. GOLDBERG:  Okay.  And specifically, do you remember

5    any particular cases or what was your thought process when you saw

6    that?

7          PROSPECTIVE JUROR:  I can't remember, but my thought

8    process when I seen it was they're crooks.

9          THE COURT:  Ma'am, I can't quite hear you.  Can you say

10   that last part again?

11         PROSPECTIVE JUROR:  I'm sorry.

12         THE COURT:  Could you pull the mic up a little bit

13   closer.  What did you say?  That last part.  Can you repeat your

14   answer?

15         PROSPECTIVE JUROR:  Just from what I saw on the news,

16   that they were crooked.  They all were convicted and went to jail.

17         THE COURT:  You came to that conclusion?  You didn't

18   actually read that in the news?

19         PROSPECTIVE JUROR:  No.  Just by watching it on the

20   news.

21         MS. GOLDBERG:  So you indicated you formed an opinion.

22   Can you tell us what that opinion was?

23         PROSPECTIVE JUROR:  That was the opinion.

24         MS. GOLDBERG:  That was your opinion, that they were

25   crooked?

1            PROSPECTIVE JUROR:  Um-hum.

2            MS. GOLDBERG:  And specifically with this case, you said

3   you indicated you read some news or media about this case?

4            PROSPECTIVE JUROR:  I didn't read anything.  Just what I

5   saw on the news.

6            MS. GOLDBERG:  Okay.  And what did that make you think?

7            PROSPECTIVE JUROR:  That they were doing stuff they

8   shouldn't have been doing.

9            MS. GOLDBERG:  Okay.  Does that extend to Ms. Bickers as

10  well?

11           PROSPECTIVE JUROR:  Part of the administration.

12           MS. GOLDBERG:  Yes?

13           PROSPECTIVE JUROR:  Yes.

14           MS. GOLDBERG:  No further questions.

15           THE COURT:  I'm not quite following what you're saying.

16  It's sort of contradicting.  You indicated to Mr. Kitchens that

17  you could be more or less fair and impartial.  But the answers I'm

18  hearing now, you're saying that the administration was crooked?

19           PROSPECTIVE JUROR:  That was the opinion I formed while

20  watching the news.

21           THE COURT:  Is that still the opinion you have now?

22           PROSPECTIVE JUROR:  I don't -- actually, I don't think

23  about it.  I haven't thought about it until this came up.

24           THE COURT:  We need to know now what you're thinking

25  now.  Because I can't wait until you're one of those 12 and find

1  out what you're really thinking.  Here's the question.  If I'm

2  hearing you correctly, you read something in the newspaper or

3  heard something on television about the case and some of the

4  people in the Reed administration; right?

5          PROSPECTIVE JUROR:  Right.

6          THE COURT:  What I need to know now is you understand

7  that Pastor Bickers comes to this trial with a presumption of

8  innocence?

9          PROSPECTIVE JUROR:  Correct.

10          THE COURT:  And that presumption of innocence remains

11  with her until the government proves beyond a reasonable doubt the

12  charges in this indictment.  And if they fail to do that, then you

13  find her not guilty.  The question is, can you do that?

14          PROSPECTIVE JUROR:  I can.

15          THE COURT:  Will you listen to the evidence in this

16  case --

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  -- and the law I will give you and apply

19  that and render a verdict?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Can you take what you read in the newspaper

22  and what you heard on the television and disregard that and base

23  your verdict on what you hear in this courtroom only?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  I can hold you to that; right?

```
 1              PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  This is serious.  This is serious.

 3              PROSPECTIVE JUROR:  I understand.

 4              THE COURT:  Can and will you do that?

 5              PROSPECTIVE JUROR:  Yes.

 6              MS. GOLDBERG:  And just to, you know -- Judge Jones is

 7     pretty direct about it, but I just want to make sure, those

 8     thoughts that you have are pretty strong thoughts.  Would they

 9     factor in, even considering you understand your role as a juror,

10     would they factor in as you were to sit on a jury and eventually

11     render a decision, would that factor into your thought process,

12     these opinions that you already have?

13              PROSPECTIVE JUROR:  I wouldn't think so, because the

14     opinion was from years ago from what I saw on the news.  What I

15     see -- what I have before me would not -- it would just be what

16     I'm looking at.

17              MS. GOLDBERG:  Okay.  Thank you.

18              THE COURT:  Thank you, ma'am.  You can step back

19     outside.

20              Good afternoon, Ms. Taylor.

21              PROSPECTIVE JUROR:  Good afternoon.

22              THE COURT:  The lawyers have a few extra questions for

23     you.

24              PROSPECTIVE JUROR:  All right.

25              THE COURT:  We'll start with Mr. Kitchens.
```

1          MR. KITCHENS:  Thank you Your Honor.

2          PROSPECTIVE JUROR:  Do you want me to state my name

3    again?

4          THE COURT:  No.

5          MR. KITCHENS:  Thanks, Ms. Taylor.  A few brief

6    questions.

7          You may remember on the questionnaire you were asked if

8    you had ever seen any news reports that may relate to this case or

9    anything like that, and I think you indicated that you had seen

10   some TV news.  Could you tell us --

11         PROSPECTIVE JUROR:  I thought I had seen some TV news,

12   but I think it was a different case.  I don't think it was this

13   one.

14         MR. KITCHENS:  That's what I was going to ask.  I think

15   in the questions this morning you indicated you knew something

16   about the Atlanta Public Schools' case.

17         PROSPECTIVE JUROR:  Yes, that was just based upon media

18   reports and that there was a school scandal.  Honestly, I don't

19   really watch the news, and I put that on my questionnaire.  And I

20   indicated, too, that the only news that I really get is what my

21   husband insists on telling me, to be completely honest.

22         MR. KITCHENS:  Fair.  We appreciate, as always, your

23   candor on it.

24         So from what you remember, do you think you've seen or

25   read any news about this particular case?

1                PROSPECTIVE JUROR:  No.  Definitely not.

2                MR. KITCHENS:  I think you indicated that based, you

3    know, perhaps, on the description that's provided in the

4    questionnaire, that you -- you know, expressed an opinion that if

5    she's fired and living well on taxpayer dollars -- that could be

6    the circumstance here.

7                Do you understand, of course, that there hasn't been any

8    sort of evidence or any facts presented in this case?

9                PROSPECTIVE JUROR:  Correct.

10               MR. KITCHENS:  Would you wait to hear all of the

11   evidence that's presented before rendering a decision in this

12   case?

13               PROSPECTIVE JUROR:  Of course.

14               MR. KITCHENS:  Judge Jones, of course, as we've

15   discussed, he's going to provide throughout the case descriptions

16   about, you know, the types of evidence that you can consider and

17   what you may not consider.  That would certainly include, as we

18   discussed this morning, certainly could not consider any news

19   story or any news reports you may have seen or read or heard about

20   from your husband.

21               Do you think you would follow those instructions to

22   render a verdict just based on the evidence and the law?

23               PROSPECTIVE JUROR:  Most definitely.

24               MR. KITCHENS:  Based on everything, and maybe that

25   opinion in kind of an unrelated matter, would that be something

1 | that you would be able to flush out of your mind and just listen
2 | to the evidence in this case?

3 | PROSPECTIVE JUROR:  Of course.

4 | MR. KITCHENS:  And do you think you would be able to be
5 | a fair and impartial juror --

6 | PROSPECTIVE JUROR:  Most definitely.

7 | MR. KITCHENS:  -- based on the evidence?

8 | PROSPECTIVE JUROR:  Most definitely.

9 | MR. KITCHENS:  Thank you.

10 | PROSPECTIVE JUROR:  You're very welcome.

11 | THE COURT:  Mr. Goldberg.

12 | PROSPECTIVE JUROR:  Also, the news that my husband gives
13 | me is worldly news, not local.  He's always pushing that to me.

14 | MS. GOLDBERG:  Good afternoon, Ms. Taylor.

15 | PROSPECTIVE JUROR:  Good afternoon.

16 | MS. GOLDBERG:  Just really briefly.  Same type of
17 | question, because I think we noticed the same thing on the
18 | questionnaire.

19 | So I'm just curious, and Mr. Kitchens kind of read the
20 | quote that, obviously, kind of stuck out to us, that you had heard
21 | something about she got fired and was living very well on taxpayer
22 | dollars.

23 | PROSPECTIVE JUROR:  Right.

24 | MS. GOLDBERG:  I just ask you where that came from and
25 | what caused you to write that.

1          PROSPECTIVE JUROR:  If I recall, she was a Caucasian

2   lady and they had gone into her home and there was lots of lavish

3   things, cars, TVs, purses, money -- there was a lot.  And I cannot

4   remember her name.  But I know she worked for the government, I

5   believe.  And I don't know if it was Atlanta or the state.

6          THE COURT:  She's talking about another case I know,

7   Ms. Goldberg.

8          MS. GOLDBERG:  And so you don't remember anything

9   specifically about Pastor Bickers or this case?

10          PROSPECTIVE JUROR:  Honestly, I know nothing about her.

11   I didn't even know who she was.

12          MS. GOLDBERG:  Okay.  Thank you.

13          THE COURT:  Thank you, ma'am.  You can step out.

14          PROSPECTIVE JUROR:  Thank you.

15          THE COURT:  Ms. Goldberg, Mr. Kitchens, the case that

16   this juror is talking about is the case -- the lady worked for the

17   GBI.  Mr. Davis handled that case.  They went into her house and

18   she had some fine purses, let's put it that way.  It's not in this

19   case.

20          Okay.  Any challenges for cause from Mr. Kitchens?

21          MR. KITCHENS:  Not from the government, Your Honor.

22          THE COURT:  Ms. Goldberg or Mr. Findling?

23          MS. GOLDBERG:  Your Honor, we do challenge Juror No. 31,

24   Mr. Perrin.  I mean, from his questionnaire, he indicated on

25   multiple occasions that he was leaning towards guilty.  He had

1  already formed an opinion.  His answers today, although coming

2  over a little bit, were not convincing.  He continually brought up

3  the fact that, you know, he would struggle with it.

4           THE COURT:  How do you overcome his answers to my

5  questions, emphatically, absolutely, I would be fair and

6  impartial?  I would not have any preconceived ideas in the back of

7  my mind.  How do I overcome those answers?

8           MS. GOLDBERG:  I think, Your Honor, he did -- I mean,

9  from having him here, it took many questions for him to get to

10 that point.  He struggled with it.  The questionnaire, multiple

11 times, he wrote that he believes she was guilty.  He also has the

12 situation with his pregnant wife.  I think in conjunction --

13          THE COURT:  That's a different -- that's another issue

14 we'll look at.  The first issue I'm looking at is the challenge

15 for cause.  His wife is pregnant, that's just a hardship.  My

16 question is that, and I made a point of questioning him after you

17 questioned him, about he told Mr. Kitchens that he might have some

18 preconceived ideas in the back of his mind.  But on questioning he

19 said he misspoke, he doesn't have any preconceived ideas,

20 disregard them, he could be fair and impartial.  I was trying to

21 write down what he said.  And I asked him just absolute, and he

22 said yes.  I'm going to tell you -- I why should not believe what

23 he's said, is what I'm saying to you.

24          MS. GOLDBERG:  What he said, how long it took him to get

25 there, the answers on his questionnaire, and to be honest, some of

1  his body language today, he appears to be struggling with those

2  answers.  So I think based on all of that together, I would ask

3  that we dismiss him for cause.

4         THE COURT:  Do you want to respond?

5         MR. KITCHENS:  I think he was pretty transparent and

6  open with both the -- with everyone's questions.

7         THE COURT:  She makes a good point, though.  He did

8  say -- I didn't read it -- but Ms. Goldberg pointed out what he

9  said about -- that he thought she was guilty.

10         MR. KITCHENS:  He said something about leaning towards,

11  you know, guilty based on --

12         THE COURT:  Of course, we have a couple of other jurors

13  that nobody is challenging that said something not quite the same,

14  and nobody is challenging them.

15         MR. KITCHENS:  He already stated that he would keep an

16  open mind and that he would judge the case based on the evidence

17  and the law that is presented.  He said specifically that he

18  didn't read anything about this case, really didn't know about it.

19  That he would not -- I think when he was asked would you base your

20  decision -- at any part, based on preconceived notions, and he

21  said no.

22         THE COURT:  Let me say this, Mr. Kitchens.  A judge told

23  me one time when I was trying a case, he said you know, Steve, we

24  have plenty of jurors and sometimes losing one might be a wise

25  thing to do.

 1          MR. KITCHENS:  Fair.  I think the concern, which I think

 2    you noted, is a different issue, is the hardship.  I don't think

 3    it reaches the cause standard.  I think the hardship is certainly

 4    a closer question because, of course, it is a significant life

 5    event.

 6          THE COURT:  Let's do this, Mr. Kitchens and Ms.

 7    Goldberg.  I think in this case, I'm going to excuse this juror

 8    over the hardship.  I can't say, Ms. Goldberg, I should excuse him

 9    based on his answers, because I have to take them as being

10    truthful when they tell me something.  But I want to be

11    consistent, and I just kind of excused someone because of a

12    pregnancy -- not the same thing, but I think in this case, Mr.

13    Kitchens, I think it is probably wise to excuse this juror.

14          So what I have, I have 32, 38 and 20 -- 20 has already

15    been counted, 32 and 38.  So I have 30 jurors right now qualified,

16    and I want to qualify 40.  And we've got 20 out there.  So I think

17    after 20, we probably need to get ten more.  I may be wrong.  Once

18    we get to 40, then we probably need to question the next panel.

19          31 I struck.  31 is removed for cause.

20          Yes, sir.

21          MR. FINDLING:  Your Honor, do you want me to identify

22    those five in open court or would you like us to approach and talk

23    about it?

24          THE COURT:  Let's do it now before we bring them in

25    here.  Who are the five?  Give me the numbers, and I'll put names

1  to them.

2          MR. FINDLING:  Your Honor, we have told the government

3  we will not question 45.  That was the -- we got the dagger from

4  one panel.  They got the slimy prosecutors.  We will not question

5  45.  What goes around comes around, and both sides have taken a

6  position.

7          THE COURT:  As long as they don't stick a dagger in the

8  judge.

9          MR. FINDLING:  Your Honor, we are not going to question

10  47 about one of his questions, unless we have to do it, unless

11  there is an agreement to let him go.  That says that criminal

12  defense attorneys do it for the money.  We would rather do that

13  privately, unless they're going to be excused.  That's number 47,

14  that says my colleagues and I are doing this for the money.

15          50, Pastor Bickers is a bad person.

16          And 55, I think both parties, the government and the

17  defense, are not going to question about the private reason that

18  she wants to share with the Court -- he or she, I can't

19  remember -- why they can't serve on the jury.  55 has a private

20  reason.

21          And 60 has already jumped to sentencing.

22          THE COURT:  Has what?

23          MR. FINDLING:  60 has already jumped to sentencing and

24  believes that Pastor Bickers should go to jail.  And I'm sorry,

25  Your Honor, both parties have a problem with one of the jurors.

1  44 says that they live out of district.

2          THE COURT:  Okay.  Let's do this.  First of all,

3  Mr. Kitchens and Mr. Davis, I have 44, 45, 47, 50, 55, and 60.

4  Are any of these ones where you-all are going to kind of say,

5  Judge, we already feel they should be excused for cause?

6          MR. KITCHENS:  45, that was the one he indicated -- yes,

7  we would agree with that based on the comment from the

8  prosecution.

9          THE COURT:  Mr. Findling, I assume you would agree that

10  this person should be excused?

11          MR. FINDLING:  Yes.

12          THE COURT:  Who else?  Mr. Findling has already

13  indicated -- before I go to Mr. Findling, the only one I probably

14  need to question is 44 and 50, but I don't know if the government

15  agrees with that?

16          MR. KITCHENS:  I think we need to question 44 just to

17  confirm, one question.

18          THE COURT:  Yes.  What I'm going to do before I bring

19  the 20 in, I'm going to bring in 44 and 50.  I need to know if I

20  need to bring anybody else in while I'm doing it one by one.

21          MR. KITCHENS:  I think it is 55, Your Honor, that had

22  the private hardship matter.  I believe that was the one.

23          THE COURT:  44 and 55.  What about 50?  I thought I may

24  need to bring in 50 to question?

25          MR. KITCHENS:  I think for 47 and 50 we probably want to

1  bring them in separately for questions, I think, based on Mr.

2  Findley's request.

3          THE COURT:  Okay.  I'm bringing in 44, I'm bringing in

4  47, 50, 55, and what about 60?

5          MR. KITCHENS:  Your Honor, I wasn't -- I'm not sure if

6  we saw the same question on the questionnaire that the defense

7  did.

8          THE COURT:  This is the one that thought Ms. Bickers

9  should already be sentenced.

10          I think what we need to do is probably bring in 60 for

11  questioning.  60 -- you know, sometimes people -- I'm learning

12  from just some of the ones that we've already questioned, they're

13  saying things in the questionnaire and then when we talk to them,

14  it kind of changes a little bit.  As Ms. Goldberg points out,

15  sometimes it changes enough to let them stay.

16          MR. FINDLING:  Your Honor, let me explain my logic for

17  60, someone that's expressed if Pastor Bickers is found guilty she

18  should go to jail.  Because sentencing is not within the province

19  of this jury, we can't question her in front of other jurors

20  because then there is a presumption of guilt.

21          THE COURT:  That's why I say let's bring 60 in.

22          MR. FINDLING:  Yes.

23          THE COURT:  So the one I am automatically excusing for

24  cause is just 45?

25          MR. KITCHENS:  Correct, Your Honor.

```
 1          THE COURT:  Let's do this before we bring all 20 in.
 2  Let's bring these four in right now while we're in this setting,
 3  and then question them and then let's go from there.
 4          Wait a minute.  Hold on, hold on.  I need to explain
 5  things to them like I explained to everybody else, and I don't
 6  want to do that seven times.  If I bring in 44, 47, 50, 55, and
 7  60, then I have to explain all the same things about telling the
 8  truth.
 9          Let's just bring them in and then I'll poll them later.
10  Just don't question them.  Just bring the whole panel in.
11          (Jury in at 2:38 p.m.)
12          THE COURT:  First off, good afternoon, ladies and
13  gentlemen.  On behalf of my colleagues and the parties in this
14  case, we want to welcome you to the Northern District of Georgia
15  for a jury trial.  We also want to thank you for being here today.
16          You know, in America we have a lot of freedoms, more
17  than everybody in the world, to be quite honest with you.  But to
18  have those freedoms, there are responsibilities and obligations
19  that come with that.  And one of the things that we have that
20  makes our freedom great is the right to a jury trial.  There's not
21  someone higher up that points to somebody else to make the
22  decision about people's freedoms or property rights.  It is jurors
23  out in the community that weigh in on those decisions.  And
24  probably one of the few countries in the world that allow jurors,
25  citizens of our community to make those decisions.
```

1          And, again, I've read a lot of constitutional articles,

2   probably a jury trial, next to the right to vote, is probably one

3   of the highest things we have that make up our freedoms.  But in

4   order to have these freedoms, everybody has a role.  I have a role

5   as judge, the lawyers have a role, and you as jurors have a role.

6          And the first part of your role was to be here today,

7   which you have met.  But the second aspect of that role is that

8   I'll be asking you questions, the lawyers will be asking you

9   questions, and we need for you to be as honest and truthful and

10  open to us as possible.

11         We're not going to ask you any questions or try to ask

12  you any questions that will embarrass you or put you on the spot.

13  But if anybody asks you a question -- I ask you a question that

14  you don't feel like answering publicly, you have the right to

15  raise your hand and say, Judge, I would rather answer that

16  question privately or those questions privately.  No problem

17  whatsoever.  Again, we're not here to embarrass you.

18         There are certain things we need to know in order to

19  select a jury.  There are certain things about you as jurors you

20  need to tell us.  Certain things about your life you need to tell

21  us.  For example, if you have a nonrefundable airplane ticket for

22  next Wednesday -- I am expecting this case to take, roughly, three

23  weeks to try.  If you have a nonrefundable airplane ticket for

24  next Wednesday, that means if you're picked for this jury, you're

25  probably not going to be ale to make that airplane.  Don't wait

1   until you're selected to be one of the 12 jurors -- we're going to

2   select 12 jurors and 3 alternates.  Don't wait until you're one of

3   those 15 people that says, by the way, Judge, I've got this

4   nonrefundable airplane ticket next Wednesday, because there is a

5   good possibility that you won't be taking that airplane flight.

6          I told the other two panels, I had a situation where I

7   had a juror just last month -- he's not the only juror where he

8   said I'm going on vacation.  He waited until he was picked to be a

9   juror to tell me he had plans to go to Disney World or Disneyland

10  with his wife and kids.  And he said to me, I know, Judge, you

11  won't keep me from disappointing my kids.  And what did I say?

12  Oh, yes, I will.  He served.  And he was fortunate the case ended

13  in time for him to make the trip.

14         The point I'm trying to make to you, let us decide

15  whether it's important or not.  Don't sit there and do like he

16  did.  When I asked him, I said why didn't you tell us earlier?  He

17  said, well, I didn't think they were going to pick me anyway.

18         Let us make the decision.  Tell us and be open and

19  honest with us in all of your answers to the questions.

20         Now, with that stated, I'll allow Mr. Davis to introduce

21  himself and his associates followed by Mr. Findling.

22         MR. DAVIS:  Good afternoon, everyone.  My name is

23  Jeffrey Davis.  I'm from the United States Attorney's Office.

24  Along with me is Tiffany Dillingham and Nathan Kitchens.  Also

25  with us is Mark Benjamin from the FBI, and assisting us today is

 1  Jonathan Ross and Richard Gabriel.  Thank you.

 2          THE COURT:  Mr. Findling.

 3          MR. FINDLING:  Thank you, Your Honor.

 4          Good afternoon.  I'm Drew Findling, and it is my honor

 5  to represent Pastor Mitzi Bickers.  Along with me from my firm is

 6  attorney Marissa Goldberg, attorney Zachary Kelehear, attorney

 7  Alexis Ahlzadeh, and also with us is attorney Denise Delarue.

 8          Thank you, Your Honor.

 9          THE COURT:  Thank you, Mr. Findling.

10          Now, ladies and gentlemen of the jury, I have some

11  questions for you.  If any of these question pertain to you, I ask

12  you to raise your hand and keep your hand raised until I

13  acknowledge you.

14          My first question, did anyone not receive an oath when

15  you came last Thursday or this morning upstairs?  If you did not

16  receive an oath, please raise your hand.

17          Will you stand up, ma'am.

18          Anyone else?

19          (Prospective jurors are sworn.)

20          THE COURT:  All right.  Does any member of the panel

21  know United States Attorney Kurt R. Erskine?  If so, please raise

22  your hand.

23          No response.

24          Does any member of the panel know Assistant United

25  States Attorney Jeffrey Davis, Nathan Kitchens, Kelly Kathleen

1  Connors, Tiffany Rene Dillingham, Jacqui Etienne, Jonathan Ross,

2  Richard Gabriel, or Special Agent Marc Benjamin?

3          There is no response.

4          Does any member of the panel know any employees of or

5  has any member of the panel or their immediate family worked for

6  the United States Attorney's Office for the Northern District of

7  Georgia or for any United States Attorney's office?

8          There's no response.

9          Does any member of the panel know --

10          PROSPECTIVE JUROR:  That's at the federal level, not the

11  state level?

12          THE COURT:  This is the federal.  United States

13  Attorney's office, not the District Attorney's office.

14          Does any member of the panel know defense attorneys Drew

15  Findling, Marissa Goldberg, Alexis Ahlzadeh, Denise Delarue, or

16  Zachary J. Kelehear?

17          There's no response.

18          Does any member of the panel know any employees of or

19  has any member of the panel or their immediate family worked for

20  the Drew Findling law firm?

21          There is no response.

22          Does anyone know or has anyone ever met Pastor Mitzi

23  Bickers?  Pastor, would you stand up briefly, please.  Thank you,

24  ma'am.

25          There is no response.

```
 1            Does anyone know any of the following individuals who
 2   may be witnesses in this case?  These are potential witnesses.  It
 3   doesn't mean they're going to be called as witnesses.
 4            Mr. Davis, will you read those names.
 5            MR. DAVIS:  Yes, sir.
 6            Jackie Anderson Woods, Michael Ayo, Marc Benjamin,
 7   Sabrina Black, Diedre Verdier, Thomas Weyandt, Kimberly Bracey,
 8   Keyla Jackson, Mark Stafford, Rita Braswell, Stephanie Coleman,
 9   Ralph Dahlgren, Kim Spell-Fowler, Matthew Davis, Kristy Fuentes,
10   William Gant, Gail Hanscom, Nina Hickson, Sharon Hixon, Jon Keen,
11   Jimmy Kirby, Richard Leary, Deborah Lonon, Cotena Alexander,
12   Shanddarick Sean Barnes, Jordan Hillman, William Marshall, Richard
13   Mendoza, E. R. Mitchell -- Elvin R. Mitchell, Sharon Patterson,
14   Janene Tillman, Greg Von Wynn, Danielle Nichols, Shedreka Poole,
15   Melvin Priester, Mike Winfrey, Tony Yarber, Rickey Williams,
16   Jackie Velardo, Tammy Willingham, Lisa Reed, Chana Tate, John
17   Relyea, Charles P. Richards, Adrienne Richardson, Andrew Jenkins,
18   Anthony Brister, Ashby Foote, Candace Byrd, Dana Sims, Albert
19   Bantley, Charles Davis, Robert Walker, or Robbi Jones.
20            THE COURT:  Let the record reflect no one responded.
21            Thank you, Mr. Davis.
22            MR. DAVIS:  Yes, sir.
23            THE COURT:  Is there any member of the panel who has any
24   special disability or problem that would make serving as a member
25   of this jury difficult or impossible?
```

1          There is no response.

2          Does any juror hold any belief, religious or otherwise,

3     which discourages or prevents jury service?

4          There is no response.

5          If you are selected to sit on this case, will you be

6     able to render a verdict solely on the evidence presented at trial

7     and in the context of the law as I will give you in my

8     instructions?  If not, please raise your hand.

9          There's no response.

10         Mr. Kitchens, I place the jurors upon you.

11         MR. KITCHENS:  Thank you, Your Honor.

12         Good afternoon.  Thank y'all for being here.

13         Now, we appreciate everyone coming in and filling out

14    these questionnaires.  That was very helpful both for us and for

15    the defense, and we're going to have some follow up questions

16    based on those questionnaires that you filled out.

17         Before we get to those, I know that some of you

18    indicated on this questionnaire that you may have seen news

19    stories that you think may relate to this case or seen them on the

20    news or read stories about it.  And I want to clarify a few things

21    before we get started with some individual questions.

22         But first, the former Mayor Kasim Reed is not on trial

23    here, and he is also not going to be a witness.  The only

24    defendant in this case is Pastor Mitzi Bickers.

25         Second, even though some of you may have read news

1  stories or you may have seen TV news or read something on the

2  Internet that you think may relate to this case, you will be

3  hearing actual evidence if you serve as a juror on this case.

4  Sometimes that evidence is very different than what you think you

5  may have read or heard in the news.  And you will be asked and

6  instructed by the judge that anything you may have seen or read in

7  the news is something that you have to cast aside, you have to

8  flush it out of your mind, and only render a verdict based on the

9  evidence that is presented in this case.

10       Lastly, the questionnaire, you may remember, asked some

11  questions about your views of Pastor Bickers based on her being a

12  woman pastor, as well as based on her sexual orientation.  I

13  wanted to note that those also will not be issues in this case.

14       Given those statements, there's a few follow-up

15  questions that I have for some of the jurors individually.  I do

16  have limited time to do this.  So please forgive me if I don't

17  have to a chance to follow-up with each and everyone of you.  I'm

18  going to try to be as focused with my questions as I can.

19       First, Ms. Hendel.  Ms. Hendel, good afternoon.

20       I think in your questionnaire you explained and

21  described some of your views about the criminal justice system and

22  the treatment of minorities in the criminal justice system.  Could

23  you tell us a little bit more about your beliefs.

24       PROSPECTIVE JUROR:  Well, I would consider myself

25  politically on the left, and I don't always trust the criminal

1 justice system and its treatment of people of color in this

2 country.  And I'm not really sure how to sum it up or what would

3 be relevant in my answer.

4         MR. KITCHENS:  Sure.  Let me try to see if we can, you

5 know, just get a little bit more details about it.

6         This case, of course, involves a defendant who's an

7 African-American.  Is anything about that fact, do you think your

8 views of the criminal justice system would come into play as

9 you're considering the evidence that is presented in this case?

10         PROSPECTIVE JUROR:  Not when considering the evidence.

11         MR. KITCHENS:  Would your views about the criminal

12 justice system, would it be something that you would consider as

13 part of your -- the need to ultimately reach a verdict in this

14 case?

15         PROSPECTIVE JUROR:  No.  No, I don't think so.

16         MR. KITCHENS:  You mentioned, I think, that you had some

17 views about the federal investigators and the FBI.  And I think it

18 may have been, you know, based on some past history.

19         What about your -- can you tell us a little bit more

20 about your current views about federal investigators?

21         PROSPECTIVE JUROR:  I don't really have any views as

22 regards to the current FBI.

23         MR. KITCHENS:  I think you also expressed some opinions

24 about some -- about elected officials and whether they're held

25 accountable in certain instances.  Can you tell us a little bit

1  more about those beliefs?

2          PROSPECTIVE JUROR:  Yeah.  When I said elected

3  officials, I meant more on a national or federal level, not local,

4  I would say.  I don't think the same standards are held to,

5  perhaps, like national politicians.

6          MR. KITCHENS:  Okay.  Based on, you know, kind of the

7  statements I gave at the beginning, do you think you would be able

8  to satisfy any sort of beliefs, opinions that you have about the

9  criminal justice system, and follow the instructions from Judge

10 Jones and look just at the evidence in this case?

11         PROSPECTIVE JUROR:  Yes.

12         MR. KITCHENS:  Thank you, Ms. Hendel.

13         Can I speak with Ms. Moreland?

14         Thank you, Ms. Moreland.  Just a couple of questions.

15         I note you expressed some opinions in your questionnaire

16 regarding religious leaders and matters about the city as well.

17         Do you think given the statement that I made at the

18 beginning regarding the need to keep out any sort of memory or,

19 you know, whatever you may think based on news stories, do you

20 think you would be able to set that aside and keep an open mind

21 regarding the evidence that is actually presented in this case?

22         PROSPECTIVE JUROR:  No, I don't think so.

23         MR. KITCHENS:  You do not think you would be able to set

24 it aside?

25         PROSPECTIVE JUROR:  No.

1          MR. KITCHENS:  And what would cause you -- what

2    specifically do you think you would take in -- into account as

3    you're considering this case?

4          PROSPECTIVE JUROR:  Sometimes when I see things or I

5    remember things, I just can't forget them.  So I don't think I

6    would be able to.

7          MR. KITCHENS:  So is it your view that things that

8    you -- I guess preconceived ideas that you may already have, that

9    even if you are instructed by the judge that you have to set that

10   aside, that it may creep in and be part of your decision-making?

11         PROSPECTIVE JUROR:  Yes.

12         MR. KITCHENS:  And so is that just something you would

13   not be able to follow, an instruction from the judge if he tells

14   you only listen to the evidence in this case?

15         PROSPECTIVE JUROR:  Well, if he tells me to, I would do

16   it, I guess.

17         THE COURT:  I couldn't hear you.  What did you say?

18         PROSPECTIVE JUROR:  I said yes, if you would tell me to,

19   I would do it, I guess.

20         MR. KITCHENS:  Okay.  Would those beliefs, would they be

21   something that would come into play as you're hearing the evidence

22   in this case?

23         PROSPECTIVE JUROR:  I don't -- I don't think so.

24         MR. KITCHENS:  Let me ask -- let's see.  Let me speak

25   with Ms. Null.

1              Good afternoon, Ms. Null.

2              I think you mentioned in your questionnaire some

3     negative experiences you had or family members have had with

4     attorneys and with law enforcement.  Could you tell us a little

5     bit more about your feelings based on those experiences.

6              PROSPECTIVE JUROR:  Yes.  So it's really before I was

7     old enough to form my own opinions.

8              When I was a child, my mother was injured during

9     childbirth and there was a malpractice suit that turned into --

10    again, I was five years old.  But there was some stealing of

11    evidence allegedly from my father's car allegedly by an attorney.

12    So there's always been very negative talks surrounding attorneys

13    in my family.  But I've got -- it's something that is in my

14    history, but I do have adult friends who are attorneys.

15             MR. KITCHENS:  Okay.  So that's obviously something that

16    has been with you for a while if that happened when you were a

17    child.  Is that something that -- those views of attorneys -- you

18    would regularly discuss with your family?

19             PROSPECTIVE JUROR:  No, it's something in my history,

20    but it's not something that has shaped my views.

21             MR. KITCHENS:  Would anything about those experiences

22    and what happened when you were young, would it impact in any way

23    what you heard from attorneys in this case, either the prosecution

24    or from the defense counsel?

25             PROSPECTIVE JUROR:  No.

─────UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT─────

1          MR. KITCHENS:  Do you think you'd be able to be fair to

2     both sides based on -- and set aside kind of your beliefs about

3     attorneys from when you were young?

4          PROSPECTIVE JUROR:  Yes.  And to clarify, it's more of a

5     family belief.  I don't so much own it as my personal belief.  I

6     absolutely think I could be impartial.

7          MR. KITCHENS:  I think you also indicated that -- that

8     you had some negative experiences with law enforcement or had some

9     views about that as well.  Can you tell us a little bit more about

10    that?

11         PROSPECTIVE JUROR:  Yes, so this again is a family

12    situation.

13         I lost my youngest sister to a drug overdose in 2018,

14    and at the time she lived in Massachusetts.  And at the time there

15    was a law in Massachusetts which allowed persecution of drug

16    dealers that provided substances that led to fatal overdose.  And

17    our case was first handled by the Massachusetts State Police, and

18    later by the Drug Enforcement Agency, and led to a lot of

19    emotional turmoil for especially my other sister and I.  And both

20    of those cases were dropped because of a change in Massachusetts

21    law about the requirement for evidence.  And so, yes, I do have

22    that personal experience, but specifically with the DEA in a

23    specific incident.

24         MR. KITCHENS:  Okay.  And I know it had to be a

25    difficult experience going through that.  Is there anything from

1  that experience that you think would affect your views of law

2  enforcement in this case?

3          PROSPECTIVE JUROR:  No.  In fact, although I had that

4  experience, it was reassuring to know that there were levels of

5  government trying to -- trying to help.  As frustrating as it was,

6  it would not affect my judgment.

7          MR. KITCHENS:  And do you think ultimately that you

8  would be able to be fair and impartial and listen to the evidence

9  and applying the law to the evidence in this case?

10          PROSPECTIVE JUROR:  I do.

11          MR. KITCHENS:  Thank you, Ms. Null.

12          All right, let me speak with Mr. Hatney.

13          Mr. Hatney, I think you described a past experience with

14  law enforcement as well.  Based on that experience, can you tell

15  us about any sort of feelings that you may have resulting from

16  that?

17          PROSPECTIVE JUROR:  The only feelings I really have

18  towards it is -- my experience has been that law enforcement can

19  be unfair towards people of color.  That's just my experience.

20          MR. KITCHENS:  All right.  Are there particular

21  circumstances that you think apply when law enforcement may be

22  unfair to people of color?

23          PROSPECTIVE JUROR:  It depends on your area.  It depends

24  on the crime rate.  It depends on just different factors as far as

25  your environment.

1          MR. KITCHENS:  And would those beliefs, would it impact,

2   do you think, your consideration of evidence presented by the

3   government in this case?

4          PROSPECTIVE JUROR:  I don't believe so.

5          MR. KITCHENS:  And just to make sure, because you kind

6   of hesitated.  If it occurred -- let's say a law enforcement

7   witness testified, would you question that witness more or think

8   that they may be a little less credible given your experience?

9          PROSPECTIVE JUROR:  Well, I wouldn't be able to, because

10  a judge told me not to.  So I would have to follow what he said.

11         MR. KITCHENS:  So would you follow the judge's

12  instructions?  Would you then be able to completely flush out any

13  view or opinion you may have about law enforcement?

14         PROSPECTIVE JUROR:  I would have to.

15         MR. KITCHENS:  And you would do so?

16         PROSPECTIVE JUROR:  Yeah, I would have to.

17         MR. KITCHENS:  Thank you.  And again, just from the

18  statements I made at the beginning, given that we haven't

19  presented any evidence at all in this case, would you wait until

20  you heard all of the evidence before reaching a decision in this

21  case?

22         PROSPECTIVE JUROR:  I'm very faction (sic) oriented, so

23  yes.

24         MR. KITCHENS:  And would you apply the law to the

25  evidence as instructed by the judge in rendering your decision?

1          PROSPECTIVE JUROR:  I would have to.

2          MR. KITCHENS:  And you wouldn't base it on anything

3   else?

4          PROSPECTIVE JUROR:  Can you be more specific?

5          MR. KITCHENS:  Sure.  Any sort of -- anything you may

6   have seen in the news or anything you may have formed an opinion

7   about regarding either the city or the government or anything?

8   Are those things that you would keep entirely out of mind and just

9   be able to listen only to the evidence and the law?

10          PROSPECTIVE JUROR:  I would have to, so yeah.

11          MR. KITCHENS:  Let's see.  If we could speak with

12   Ms. Pope.

13          Ms. Pope, based on the statements I made at the

14   beginning about, again, we haven't presented any evidence, you

15   could only consider the evidence, not anything you may have seen

16   or read or heard before, do you think you'd be able to keep an

17   open mind and just consider the evidence that's presented in this

18   case?

19          PROSPECTIVE JUROR:  I do.

20          MR. KITCHENS:  And do you think you would just apply the

21   evidence that's presented -- apply the law that is instructed by

22   Judge Jones to that evidence in reaching your decision?

23          PROSPECTIVE JUROR:  I do.

24          MR. KITCHENS:  And would you be able to keep everything

25   else outside as you're reaching that decision and focus just on

1  the evidence and law?

2          PROSPECTIVE JUROR:  I'm sure I could.

3          MR. KITCHENS:  Thank you.

4          Then I think Mr. Frye.  No, I'm sorry.  Mr. Alexander

5  Frye.  Did I misstate your name?

6          PROSPECTIVE JUROR:  Frye.

7          MR. KITCHENS:  Frye, I'm sorry.  I have a typo.  My

8  apologies, Mr. Frye.

9          Same type of questions.  Just given the statements I

10  made in the beginning, do you think you'd be able to set aside

11  anything that you may have read or heard or opinions that you may

12  have and focus just on and render a decision just on the evidence

13  that is presented in this case?

14          PROSPECTIVE JUROR:  Yes, sir.

15          MR. KITCHENS:  And would you be able to follow the

16  judge's instructions regarding that evidence and just apply that

17  law to the evidence in this case?

18          PROSPECTIVE JUROR:  Yes, sir.

19          MR. KITCHENS:  One question, and I apologize about this,

20  but I think -- you remember on the questionnaire you were asked

21  kind of opinions on counsel and attorneys, and I think one thing

22  you noted is -- I think this applied equally for all attorneys,

23  that you could -- given, I think, your introspective nature, that

24  you could feel threatened by the inquisitive nature of attorneys

25  sometimes.

1          PROSPECTIVE JUROR:  Yeah.

2          MR. KITCHENS:  So I apologize for even inquiring about

3  this further, but I do have to ask, can you tell us just a little

4  bit more about that?

5          PROSPECTIVE JUROR:  Yes.  So I know for myself -- this

6  is more so personal than actual experiences or anybody doing

7  anything to me, per se.  But it's, like, sometimes I can feel like

8  it will be an open (sic) -- I can feel like I deal with imposture

9  syndrome a lot, and when asked questions, it can almost feel

10  like -- it can start to bring up my insecurities, you know, like

11  in a very big way.  It's to not something -- it's not something I

12  like putting on the spot a lot, so...

13          MR. KITCHENS:  Do you think in view of the attorneys, of

14  course, from the government and I'm sure from the defense, you'll

15  have multiple witnesses that will come up, and we will all, of

16  course, as part of our job, have to ask those witnesses questions.

17  Is that something where you'll, you know, view that as -- in any

18  way negatively?

19          PROSPECTIVE JUROR:  I wouldn't think so, no.

20          MR. KITCHENS:  And in viewing that, is that going to

21  pose any problems with your ability to judge the case just on the

22  evidence and the law?

23          PROSPECTIVE JUROR:  I don't believe so.

24          MR. KITCHENS:  Do you think there is anything about

25  those beliefs that would prevent you from being fair and impartial

1  as a juror?

2          PROSPECTIVE JUROR:  No, sir.

3          MR. KITCHENS:  Well, thank you.  I think that's it,

4  Mr. Frye.  Thank you very much.

5          THE COURT:  Thank you, Mr. Kitchens.

6          Mr. Findling.

7          MR. FINDLING:  Good afternoon, again.  You can surrender

8  the mic, but I'll get to you in a second.

9          So I'm going to have the mask down.  When I question

10 you, if you want, His Honor will permit you to take it down.

11         So I am going to naturally disagree with my colleagues

12 from the government about a couple of facts real quick.

13         One, while they have indicated to you that former Mayor

14 Kasim Reed will not be a witness, if you serve on this jury you'll

15 hear from probably multiple people that served in his

16 administration.  So if you have feelings about that administration

17 and you indicated that, I'm going to question you about it because

18 it is important.

19         In like fashion, you have been asked questions in the

20 questionnaire, and so many of you -- I appreciate your honesty

21 about the issues about Pastor Bickers being gay, being a pastor

22 while gay and have expressed opinions about that.  And if you have

23 an opinion about that, as His Honor has been very clear, when you

24 sit in that box, what you bring in is just as important as what

25 you'll hear.  So it's very important that we talk about these

1  issues.  Okay?

2          So I'm going to start off with Mr. Hatney.

3          So, Mr. Hatney, I believe you indicated that while this

4  is going on you might have a distraction out of here -- your own

5  case going on.  Is that something you do not want to talk about in

6  the open, that's cool.  You can let me know.  If not, just tell me

7  now.  Because we'll need to know if you can't focus over three

8  weeks.  Is there something else you've got going on?

9          PROSPECTIVE JUROR:  It's a parental case.

10         MR. FINDLING:  Okay.

11         PROSPECTIVE JUROR:  I don't know when it's going to be

12  scheduled for.  They just want me to be ready.

13         MR. FINDLING:  Okay.  So you have some kind of civil

14  litigation going on right now?

15         PROSPECTIVE JUROR:  Yes.

16         MR. FINDLING:  And do you think you have a court

17  appearance coming that you know for sure?

18         PROSPECTIVE JUROR:  I don't know for sure.

19         MR. FINDLING:  Okay.  Now, you -- okay.  Understood.

20         Now, you'd indicated, also, on the question about what

21  you read about the case -- now, what you indicated is, well, if

22  the facts that you've heard are true, then she'd be guilty; but if

23  not, she'll be innocent.  Okay.  Which if you're not doing what we

24  do for a living, most people would say that.  His Honor, if you

25  serve on the jury, will talk to you about the burden of proof.  Do

1  you -- going in, do you understand that it's a little bit

2  different in this setting?  Because in this setting,

3  Pastor Bickers and her defense attorneys, we don't have to do a

4  single thing.  We can sit on our hands and be quiet for three

5  weeks.  And the United States of America has to prove her guilty

6  beyond a reasonable doubt.  Do you have that appreciation?

7           PROSPECTIVE JUROR:  Yes.

8           MR. FINDLING:  Okay.  So the opinion you had earlier, I

9  take it you'll kind of set that aside and listen to what His Honor

10 tells you?  Is that fair?

11          PROSPECTIVE JUROR:  Um-hum.

12          MR. FINDLING:  Okay.  You also had an opinion about the

13 FBI and their success rate.  Where -- does that just come from the

14 news or where does that come from?

15          PROSPECTIVE JUROR:  News outlets, common knowledge.

16 I'll research.

17          MR. FINDLING:  So you've done some of our own research

18 as to FBI statistics?

19          PROSPECTIVE JUROR:  Yes.

20          MR. FINDLING:  And is that because you were summoned to

21 be a potential juror in this case?

22          PROSPECTIVE JUROR:  No, I was just inquisitive.

23          MR. FINDLING:  Okay.  And what about the FBI success

24 ratio, did you find kind of something to deal with Google button

25 about?

1          PROSPECTIVE JUROR:  They have almost 97 percent

2    conviction rate, so they don't usually take you to trial unless

3    they for sure got something.

4          MR. FINDLING:  You're talking about the FBI taking a

5    case to trial?

6          PROSPECTIVE JUROR:  Yeah.

7          MR. FINDLING:  Okay.  All right.  Thank you.

8          Mr. Frye.

9          Let me go back to you one second, Mr. Hatney.

10         Did you indicate in your questionnaire that you are a

11   single parent and you're responsible for your child?

12         PROSPECTIVE JUROR:  No, I didn't.

13         MR. FINDLING:  Okay, my mistake.  Thank you.

14         Mr. Frye, you in a couple of questions that talked about

15   church affiliation, you indicated that you heard about controlling

16   the congregation can be -- were you talking specifically about

17   Pastor Bickers and Emmanuel Baptist Church?

18         PROSPECTIVE JUROR:  No, sir.

19         MR. FINDLING:  I'm sorry?

20         PROSPECTIVE JUROR:  No, sir.

21         MR. FINDLING:  Okay.  Just some other type of house of

22   worship?

23         PROSPECTIVE JUROR:  Correct.

24         MR. FINDLING:  Okay.  Thank you.

25         And so going to what I opened with, you did respond to

1  some questions about same sex marriage.  And you said that you

2  oppose same sex marriage.

3          PROSPECTIVE JUROR:  I do.

4          MR. FINDLING:  Okay.  And you said that you oppose gay

5  pastors.

6          PROSPECTIVE JUROR:  Correct.

7          MR. FINDLING:  Okay.  And that you oppose women serving

8  as pastors; is that correct?

9          PROSPECTIVE JUROR:  Well, I also stated that if the

10 leadership -- if the male leadership said it was okay, then I'm

11 not opposed.

12          MR. FINDLING:  Okay.  So if the male leadership says

13 it's okay for a woman to be a pastor, then it's okay with you?

14          PROSPECTIVE JUROR:  It's okay.

15          MR. FINDLING:  So I'm sure that folks are going to

16 mention, as I am right now in the trial of this case, that Pastor

17 Bickers is gay.  Pastor Bickers is the reverend of her church, and

18 whether or not it was approved by men, she is the pastor and she

19 is married to a woman.  Is that going to impact you in -- you

20 know, we need fair folks now.

21          PROSPECTIVE JUROR:  Right.

22          MR. FINDLING:  This is important stuff.  Will that have

23 any impact on you whatsoever?  Because it's really important for

24 us to know.

25          PROSPECTIVE JUROR:  No, sir.

1          MR. FINDLING:  So you are going to set aside those

2    opinions that you just shared with us?

3          PROSPECTIVE JUROR:  Absolutely.

4          MR. FINDLING:  Okay.  Thank you.

5          Hayley Simmons.  There you are.  Just so you know, you

6    had the greatest quote of all of the jurors.  Okay?  I think

7    everybody would agree with that.  I lead a simple life, and I like

8    it that way.  We're going to get T-shirts made up, and I'm going

9    to make millions.  But I'm not going to give you any credit.

10          But explain to me, explain to me the thought behind

11    that.  Because there is a complexity to spending three weeks here

12    listening to the case.  It's not a simple life.

13          PROSPECTIVE JUROR:  It's very simple.  I was answering

14    the questions.  I am a teacher, and I'm a special ed teacher.  The

15    questions asked a lot about who is the mayor, who is the this, who

16    is the that, and who is the other, and I was kind of embarrassed.

17    I don't know, and I don't care.  I'm sorry, I don't need that for

18    school.  I don't need it to live my life.  So I felt kind of

19    embarrassed.  So I was explaining why I didn't know anything.

20          MR. FINDLING:  So, Ms. Simmons, it sounds like what

21    you're saying is, you're coming in here not listening to any

22    outside noise, whether on the Internet, TV, or anything?

23          PROSPECTIVE JUROR:  Yeah, I kind of ignore it.

24          MR. FINDLING:  Okay.  And could you just give us two to

25    three weeks of just focusing on what you hear here?  We'll make

1   life simple for you.

2            PROSPECTIVE JUROR:  Yes, it's my duty.

3            THE COURT:  There you go.

4            MR. FINDLING:  Thank you, ma'am.  I appreciate that.

5            Mr. Fan.

6            PROSPECTIVE JUROR:  Yes.

7            MR. FINDLING:  We're going to come back to you.  Thank

8   you.

9            Ms. Hendel.  Thank you.

10           Actually, Ms. Hendel, I'm back on time and you have

11  spoken a lot.  And I think I'm good.  Thank you.

12           Mr. Isenhood.  Now, you had a friend that ran for mayor

13  in Jackson, Mississippi; am I correct?

14           PROSPECTIVE JUROR:  Correct.

15           MR. FINDLING:  Okay.  And what was that individual's

16  name?

17           PROSPECTIVE JUROR:  He was on a gymnastics team with me

18  on the '80s, Ronnie Crudup.

19           MR. FINDLING:  Okay.

20           PROSPECTIVE JUROR:  And he ran for mayor in 2017.

21           MR. FINDLING:  Okay.  All right.

22           PROSPECTIVE JUROR:  And he was on the House of

23  Representatives 2018.

24           MR. FINDLING:  And so if I do my math correctly, a

25  potential witness in this case is the guy he lost to, Tony Yarber.

1   So would that impact you at all, that your friend lost to one of

2   the people that's mentioned in this case in a somewhat significant

3   way?

4            PROSPECTIVE JUROR:  I don't -- I feel like I'm more

5   objective than that.  I would say the current mayor -- my dad has

6   been an attorney opposite his father.

7            MR. FINDLING:  Okay.  So one of the things that will be

8   addressed here, even though we're hundreds of miles from Jackson,

9   Mississippi, is a consent judgment about the water disaster in

10  Jackson, which still remains a disaster.  I can see you shaking

11  your head.  You know.  Do you bring this knowledge to this, that

12  Jackson has had a perennial, consistent problem with bad drinking

13  water?

14           PROSPECTIVE JUROR:  Yeah, I do.  I do know.  I'm well

15  aware of that, yeah.  Every other month it seems to break down.

16           MR. FINDLING:  Okay.  And I'm going to switch over.

17           You also indicated that you oppose same sex marriage?

18           PROSPECTIVE JUROR:  Correct.

19           MR. FINDLING:  Okay.  And that gay folks should not be

20  in religious leadership.

21           PROSPECTIVE JUROR:  I didn't -- I didn't put that.

22           MR. FINDLING:  Okay, you did not.

23           So would that in any way adversely impact you in sitting

24  with us that Pastor Bickers is married to a woman?

25           PROSPECTIVE JUROR:  No.  I feel like I'm objective.

1              MR. FINDLING:  Okay.  All right.

2              You have some knowledge of, generally speaking -- not

3       this case -- of corruption in the City of Atlanta.  You indicated

4       that you've heard of corruption cases in the City of Atlanta?

5              PROSPECTIVE JUROR:  I think government in general.

6              MR. FINDLING:  Okay.  So nothing specifically about

7       Atlanta?

8              PROSPECTIVE JUROR:  Yeah, I don't -- I don't recall

9       putting things specifically about Atlanta, regarding examples.

10             MR. FINDLING:  And you also indicated your concern about

11      serving three weeks from a work standpoint.  If you could briefly

12      just tell me about that.

13             PROSPECTIVE JUROR:  So, I mean, I didn't -- I didn't put

14      I had any hardships in serving for three weeks.  It was more

15      about -- what I didn't put down is, yeah, if it goes to four

16      weeks, it would be difficult.  But I -- I am working remote for a

17      company in Colorado, been with for one year.  But, you know, I

18      didn't list any hardships.  I respect the court and the need to

19      serve, so...

20             MR. FINDLING:  Okay.  All right.  Thank you.

21             Andrea Pope.

22             Actually, Ms. Pope, I'm going to go back to Ms. Moreland

23      for a second.

24             Now, you also indicated you oppose same sex marriage; is

25      that correct?

1          PROSPECTIVE JUROR:  Well, I grew up as -- a regular

2    marriage.  I don't really believe.

3          THE COURT:  Can you speak up louder, please?

4          MR. FINDLING:  Yes, we can't hear you.

5          PROSPECTIVE JUROR:  I would say no.

6          MR. FINDLING:  You oppose same sex marriage?

7          PROSPECTIVE JUROR:  Yes.

8          MR. FINDLING:  Okay.  And that gay folks should not be

9    in religious leadership?

10          PROSPECTIVE JUROR:  Yes.

11          MR. FINDLING:  Okay.  Those kind of fit the bill here,

12   because Pastor Bickers, the pastor of Emmanuel Baptist Church in

13   Atlanta, is gay and is married to a woman and, it's important that

14   she have -- seat 12 folks that are going to treat her as fairly as

15   possible, 100 percent fair.  Will that belief system impact you

16   even one percentile in being fair during the course of these few

17   weeks?  It's very important that we know that.  No one is going to

18   get mad at you for your answer.

19          PROSPECTIVE JUROR:  Umm, no.

20          MR. FINDLING:  Okay.  And are you going to be impacted

21   in terms of workwise if you are here for three weeks?  Is it going

22   to financially impact you?

23          PROSPECTIVE JUROR:  Probably so, because if I don't

24   work, I don't pay my bills, so...

25          MR. FINDLING:  Okay.  And what kind of work is it that

1  will prevent you from possibly missing up to 15 work days?

2          PROSPECTIVE JUROR:  Because of the work that I do at my

3  job.

4          MR. FINDLING:  Okay.  What kind of work?

5          PROSPECTIVE JUROR:  As far as, like, custodial-type

6  work.

7          MR. FINDLING:  So will you not get paid like some folks?

8  Some jobs will pay you if you're on jury duty.

9          PROSPECTIVE JUROR:  I will not get paid.

10          MR. FINDLING:  You will not get paid?

11          PROSPECTIVE JUROR:  Right.

12          MR. FINDLING:  And are you indicating that you need this

13  daily wage and weekly wage in order to pay the bills that you

14  have?

15          PROSPECTIVE JUROR:  Yes, correct.

16          MR. FINDLING:  Thank you.

17          Ms. Pope, thank you.  Ms. Pope, I think you indicated

18  that you have to care for your 96-year-old mother.

19          PROSPECTIVE JUROR:  Yes.

20          MR. FINDLING:  And are you her primary caretaker?

21          PROSPECTIVE JUROR:  Pretty much.  I have a sister that

22  works full-time that comes in.

23          MR. FINDLING:  So does your 96-year-old parent, does she

24  reside with you?

25          PROSPECTIVE JUROR:  No, she does not.  She lives in a

1   retirement center, but not in assisted living.  So she kind of

2   depends on me to fill in the gaps.

3        MR. FINDLING:  Okay.  All right.  So to distinguish,

4   it's not a place that is providing daily care.  You have to go

5   there?

6        PROSPECTIVE JUROR:  Right.

7        MR. FINDLING:  I'm familiar with this on a personal

8   level.  So you have to go there and take care of things during the

9   ten-hour day during the day?

10       PROSPECTIVE JUROR:  Yes, or whatever she needs, whatever

11  it is.  Yeah.

12       MR. FINDLING:  And will you be able to -- for three

13  weeks, are we going to lose your attention if you're worried about

14  getting somebody to take your place during the day to make sure

15  that her needs are met at 96 years old?

16       PROSPECTIVE JUROR:  She's been sick for the last three

17  weeks.  We almost went to the emergency room a couple of times,

18  but they didn't want her in the emergency room because of her age.

19  If she stays well, I think it would be fine.  She's not quite well

20  yet.

21       MR. FINDLING:  Okay.  So at this point right now, on

22  this day, it's a distraction to you?

23       PROSPECTIVE JUROR:  It is a little bit, yeah.

24       MR. FINDLING:  Mr. Miklos, you had indicated that you

25  are not of the belief that minority -- you indicated that you

1  recognize systemic racism in the country, but don't think that

2  minority businesses are necessarily targeted. Can you explain

3  that?

4          PROSPECTIVE JUROR:  Oh, I mean, I guess I don't have any

5  personal experience with it.  It's just what I get off of news

6  sources and stuff, and, I guess, you tend to hear less about that.

7  So I don't have as strong opinions about that.

8          MR. FINDLING:  Okay.  All right.

9          PROSPECTIVE JUROR:  But, you know, it could be.

10         MR. FINDLING:  Okay.  Thank you.  Mr. Rafiquzzaman, you

11 had indicated that you're not okay with some gay serving as a

12 pastor in a religious setting.  Can you explain?

13         PROSPECTIVE JUROR:  Yeah, I don't accept gay or -- I

14 don't accept gay and pastor.

15         MR. FINDLING:  And explain how that might impact you

16 listening to the facts of the case.

17         PROSPECTIVE JUROR:  I don't have an idea about this.

18         MR. FINDLING:  All right.  Your Honor, one second.

19 Thank you.  Ms. Neely?

20         PROSPECTIVE JUROR:  Me?  Really?

21         MR. FINDLING:  I'm sorry -- no, we're skipping.

22         Ms. Sparks.  Are you in the middle of some kind of

23 full-time externship or something right now?

24         PROSPECTIVE JUROR:  I am.

25         MR. FINDLING:  Okay.  And is that, like, a full-time

1  thing?  Like we're keeping you from an eight-hour day?

2           PROSPECTIVE JUROR:  No.  It's only maybe four hours a

3  day.

4           MR. FINDLING:  All right.  And would you be able to

5  explain to whomever is supervising you, that you have been

6  selected to, as Your Honor perfectly said, do your civic duty and

7  be on a jury, would they be the type of supervising folks that

8  would understand?

9           PROSPECTIVE JUROR:  For now, yes.  I'm just in class.

10 The externship hasn't started yet.

11          MR. FINDLING:  When will that externship start?

12          PROSPECTIVE JUROR:  Three weeks from now.

13          MR. FINDLING:  So if you're a couple of days late, I

14 imagine you can just let them know you're just finishing up on

15 jury duty then?

16          PROSPECTIVE JUROR:  Yes.

17          MR. FINDLING:  Okay.  You had a really long answer about

18 minorities being treated unfairly, and then you scratched it out.

19          PROSPECTIVE JUROR:  I did.

20          MR. FINDLING:  Okay.  Do you remember the reasoning for

21 that?

22          PROSPECTIVE JUROR:  I just felt uncomfortable

23 explaining.

24          MR. FINDLING:  Is that something you would like to just

25 do privately away from everybody?

1           PROSPECTIVE JUROR:  Yes, I guess.

2           MR. FINDLING:  Okay.  Thank you.  Mr. Casaccia -- man,

3  you're going to have to tell me.

4           PROSPECTIVE JUROR:  Casaccia.

5           MR. FINDLING:  Mr. Casaccia, I believe you have an event

6  coming up in the next couple of weeks, March 24.

7           PROSPECTIVE JUROR:  Yes.

8           MR. FINDLING:  And that's a funeral that is planned?

9           PROSPECTIVE JUROR:  Celebration of life, yes.

10          MR. FINDLING:  A celebration of life.

11          So it looks like that's in the middle of a week?

12          PROSPECTIVE JUROR:  Yes.

13          MR. FINDLING:  And that has been planned for some time?

14          PROSPECTIVE JUROR:  Not for some time.  He passed away

15  two weeks ago Friday.

16          MR. FINDLING:  All right.  And I would take it if you

17  served with us, you would be asking His Honor to have that day

18  away from the Court?

19          PROSPECTIVE JUROR:  Absolutely, yes.

20          MR. FINDLING:  And this is your father-in-law?

21          PROSPECTIVE JUROR:  Yes, sir.

22          MR. FINDLING:  Okay.  Ms. Winokur.  Hey.

23          PROSPECTIVE JUROR:  Hello.

24          MR. FINDLING:  How are you doing?

25          PROSPECTIVE JUROR:  Good.

1          MR. FINDLING:  It looks like you're in full-time school?

2          PROSPECTIVE JUROR:  Correct.

3          MR. FINDLING:  And do you think you would be able to

4   kind of juggle a little bit over the next few weeks if you served

5   with us on the jury?

6          PROSPECTIVE JUROR:  I'm already juggling.  I have a

7   full-time job, a part-time job, and full-time school.  So school

8   is kind of on a pause until I get permission to start my

9   externship.  I've been waiting for permission for two-and-a-half

10  months now.  So, hopefully, the paperwork will finally go through.

11  But I still have a full-time job and a part-time job that I also

12  juggle.

13         MR. FINDLING:  All right.  Thank you.

14         Ms. Pham, I think you've also indicated -- well, let me

15  ask you this.  You also have a lot of friends in Jackson.

16         PROSPECTIVE JUROR:  Yes.  I went to the University of

17  Mississippi.

18         MR. FINDLING:  Okay.

19         PROSPECTIVE JUROR:  I graduated in 2016.

20         MR. FINDLING:  Okay.  So given your experience, you,

21  obviously, saw a lot of folks in Jackson.

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Sorry to interrupt, Mr. Findling.  Your time

24  is up.

25         MR. FINDLING:  Okay.  All right.  Thank you, Your Honor.

1   Thank you, ma'am.

2            THE COURT:  Before I let you-all go, I have two

3   questions for two jurors.

4            Mr. Hatney, you indicated to one of the lawyers that you

5   had done research on the FBI.  And I think you said it had 97

6   percent conviction rate.  You understand the FBI is involved in

7   this case?  Are you going to be able to put that aside regarding,

8   you know, the statistics that you found in your research regarding

9   the FBI and render your verdict based on the evidence in this

10  case?  Are you coming in thinking that automatically that the

11  defendant in this case is guilty because the FBI is involved?

12           You think -- give him the mic.  Do you think the

13  defendant is guilty automatically because the FBI is involved in

14  this case?

15           PROSPECTIVE JUROR:  No.

16           THE COURT:  Are you going to be able to render your

17  verdict based on the evidence you hear and the charge of law that

18  I give you?

19           PROSPECTIVE JUROR:  The ones that you give me, yeah.

20           THE COURT:  And you're going to disregard that 97

21  percent that you researched?

22           PROSPECTIVE JUROR:  I would.

23           THE COURT:  You hesitated.

24           PROSPECTIVE JUROR:  Because it's something I know.

25           THE COURT:  So you're telling me you can't put it aside?

1          PROSPECTIVE JUROR:  I can put it aside because you told

2    me to and I have to listen to what you say.

3          THE COURT:  Well, what I need to know, though, I don't

4    need to have you as one of the 12 sitting in that box and all of a

5    sudden, well, the FBI is involved and 97 percent -- I'm not

6    questioning what you researched.  What I'm saying is that that's

7    not the way the law operates.

8          PROSPECTIVE JUROR:  Um-hum.

9          THE COURT:  The government has the burden of proof, has

10   to prove the charges of this indictment beyond a reasonable doubt,

11   regardless if the FBI is involved, if they fail to do that, it's

12   not guilty.

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  I'm not saying how it's going to go, but

15   you're going to be able to disregard this 97 percent and weigh it

16   based on the evidence and the law?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  Ms. Moreland, in questioning you first said

19   you cannot put it behind you what you read, and then you were

20   asked by Mr. Kitchens twice and you said twice you weren't able to

21   put it behind you.  But later you said, well, no, I could listen

22   to what the judge says and follow what the judge says.  Which one

23   is it?

24         PROSPECTIVE JUROR:  Well, I can listen to -- follow what

25   the judge says.

1          THE COURT:  But can you put it out of your mind and

2    disregard what you read in the newspaper or heard on the

3    television?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  You hesitated.  It's not -- there is no

6    right or wrong answer here.

7          PROSPECTIVE JUROR:  Okay.

8          THE COURT:  Like I told you, we need to know up front

9    truthful and honest answers.  There's nothing wrong if you have an

10   opinion, but I heard two different answers from you, and I didn't

11   know -- I need to basically know, can you disregard what you read

12   in the newspaper or saw on the television and base and render a

13   verdict based on the evidence and the charge of law that I give

14   you?  The latter part of your answer you told Mr. Kitchens you

15   would listen to what I told you, the charge.  But I need to know

16   the first part.  You told me twice you couldn't put it behind you.

17   Can you put it behind you?

18         PROSPECTIVE JUROR:  Yes.  Yes.

19         THE COURT:  Yes?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  All right.  That's all I have.

22         I need Juror 44 to remain seated, and everybody else

23   step out in the hall.  But I need juror 47, 50 --

24         THE DEPUTY CLERK:  44 is Llandro Sebastian.

25         THE COURT:  Mr. Sebastian, remain seated.

1          THE DEPUTY CLERK:  47, Mr. Fan.

2          THE COURT:  Mr. Fan, you have a seat out in the hall.

3          THE DEPUTY CLERK:  50.

4          THE COURT:  50.

5          THE DEPUTY CLERK:  Mr. Isenhood.

6          THE COURT:  You also remain seated in the hall.

7          THE DEPUTY CLERK:  Ms. Neely.

8          THE COURT:  55, you remain seated in the hall.

9          THE DEPUTY CLERK:  And Ms. Jackson.

10         THE COURT:  I think also 56, Ms. Sparks, remain in the

11    hall.  Everybody else will go back upstairs -- well, Ms. Wright

12    will tell you what to do.

13         THE DEPUTY CLERK:  You can head back up to the jury

14    assembly room on 22nd.

15              (At side bar.)

16         MR. FINDLING:  Your Honor, you'll probably notice I

17    stopped questioning No. 54, because he couldn't understand English

18    too well.  I turned to Jeff.  Yes, exactly.  I didn't want to

19    embarrass the gentleman.  I don't think Mr. Davis, he didn't want

20    me to embarrass him either.  We just wanted to let you know.

21         THE COURT:  I appreciate you not putting him on the

22    spot.

23              (End of side bar.)

24         THE COURT:  Mr. Sebastian, the lawyers have a few extra

25    questions they wanted to ask you privately, and I think Mr.

1  Kitchens will begin.

2          MR. KITCHENS:  Thank you, Your Honor.

3          Mr. Sebastian, I appreciate, again, you filling out the

4  questionnaire.

5          Can you tell us, we're just trying to figure out where

6  do you currently live?

7          PROSPECTIVE JUROR:  I live, like, Douglasville, Powder

8  Springs, around there.

9          MR. KITCHENS:  Okay.  So we wanted to make sure we're

10 clear on this.  I think in the questionnaire you may have

11 indicated that you lived in Dallas, Texas, perhaps?

12         PROSPECTIVE JUROR:  Yes, that is where I was born.

13         MR. KITCHENS:  That is where you were born.  Okay.  So

14 how long have you been living in Douglasville, that area?

15         PROSPECTIVE JUROR:  I live in Marietta for -- I'm not

16 really sure, but I think I then moved into (sic) Powder Springs

17 for about six or seven years.

18         MR. KITCHENS:  You've been in the Powder Springs area

19 for about six or seven years?

20         PROSPECTIVE JUROR:  Yes.

21         MR. KITCHENS:  I think that was all we needed to clarify

22 on our end.  Thank you, Mr. Sebastian.

23         THE COURT:  Anything else, Mr. Findling?

24         MR. FINDLING:  One minute, Your Honor.  Let me see his

25 questionnaire for one second.

1        Sir, what kind of business are you in?

2        PROSPECTIVE JUROR:  I do landscaping.

3        MR. FINDLING:  Okay.  Are you self-employed?

4        PROSPECTIVE JUROR:  No.

5        MR. FINDLING:  Okay.  Will you get paid while you're on

6   jury duty?

7        PROSPECTIVE JUROR:  No.

8        MR. FINDLING:  So are you on a daily wage?

9        PROSPECTIVE JUROR:  I have to work all my hours every

10  day so I can pay all my bills.  Like my sister recently got

11  surgery.  So I've got to help --

12        MR. FINDLING:  I can't hear you.

13        PROSPECTIVE JUROR:  My sister got surgery, and I have to

14  help my sister, too, with payments since she can't work right now.

15        MR. FINDLING:  Okay.  And are you financially

16  responsible to help her with that bill?

17        PROSPECTIVE JUROR:  Yeah.

18        MR. FINDLING:  Okay.  And so you indicated that you get

19  paid -- wherever you work does not give you a payment while you're

20  on jury service?

21        PROSPECTIVE JUROR:  No.

22        MR. FINDLING:  Okay.

23        That's all I have, Your Honor.

24        THE COURT:  Sir, I ask you to go back upstairs to the

25  22nd floor.  And then we're going to ask Juror No. 27 to come in.

1          THE DEPUTY CLERK:  Mr. Fan.

2          MR. FINDLING:  Your Honor, just so you don't think the

3   government and the defense are crazy, this is the exact opposite

4   here.  We all saw the same thing, that he lives in Dallas, Texas.

5          THE COURT:  Sometimes it happens.  I never think y'all

6   are crazy.

7          Come up here and have a seat in this first chair right

8   here, sir.

9          Sir, the lawyers have a few extra questions they want to

10  ask you privately.  Mr. Kitchens will start off.

11         MR. KITCHENS:  Thank you, Your Honor.

12         Mr. Fan, good afternoon.  Just a couple of brief

13  questions.

14         You may remember on the questionnaire you were asked for

15  any sort of opinions you had about prosecutors and defense

16  counsel.  And do you remember, I think you put the comment for

17  criminal defense attorneys, a lot of them do it for the money.

18  And so trying to get a better sense of that comment, do you view

19  criminal defense attorneys negatively?

20         PROSPECTIVE JUROR:  Not necessarily.  What I meant is, I

21  couldn't think of any other reason other than the compensation for

22  accepting the case.  But it doesn't really play in the judge's

23  role of, you know, fairly or not.  So that's not --

24         MR. KITCHENS:  Is that -- I think you're kind of already

25  a step ahead of my question.  But with that view about, you know,

 1  about certain defense counsel, does it -- would it be something

 2  that would come into play in terms of how you would view the

 3  evidence in this case?

 4          PROSPECTIVE JUROR:  Can you -- can you --

 5          MR. KITCHENS:  Yes, I'll try to rephrase.

 6          Is that something that you would consider when you're

 7  listening to the evidence and you're listening to the judge's

 8  instructions in the case?

 9          PROSPECTIVE JUROR:  No.

10          MR. KITCHENS:  Based on the judge's instructions, and

11  Judge Jones will tell you this is the evidence you can consider

12  and this is the evidence you can't consider, would you be able to

13  follow those instructions?

14          PROSPECTIVE JUROR:  Yes, of course.

15          MR. KITCHENS:  And would, you know, any sort of views

16  you may have about prosecutors or defense counsel, would it affect

17  your ability to be a fair and impartial juror in this case?

18          PROSPECTIVE JUROR:  Not at all.

19          MR. KITCHENS:  Thank you, Mr. Fan.

20          THE COURT:  Mr. Findling?

21          MR. FINDLING:  Thank you.  Hi, Mr. Fan.

22          PROSPECTIVE JUROR:  Yes, sir.

23          MR. FINDLING:  How are you doing?

24          PROSPECTIVE JUROR:  Good.

25          MR. FINDLING:  So I'm going to disagree with my

1  colleague from the prosecution.  You didn't say certain defense

2  counsel, you said defense counsel.  And so what you -- what you

3  said was that you did not necessarily know any other reason -- and

4  by the way, I appreciate your honesty.  We all appreciate you

5  being honest.  You could not necessarily know any other reason why

6  someone, a defense attorney, an attorney would take a case other

7  than to make the money.

8           PROSPECTIVE JUROR:  Right.

9           MR. FINDLING:  And what do you mean by that?

10           PROSPECTIVE JUROR:  Okay.  So -- well, I don't know how

11  to --

12           THE COURT:  Just say it.  You don't have to say any

13  special words.  Just tell the truth.

14           PROSPECTIVE JUROR:  I'm sorry?

15           THE COURT:  Just say it.  You don't have to say any

16  special words, just tell us.

17           PROSPECTIVE JUROR:  Okay.  What I meant by what I said

18  on the answer?  Well, I truly just can't think of any other reason

19  why a defense attorney is involved in a case other than getting

20  paid to defend.

21           MR. FINDLING:  So if I understand what you're saying,

22  not just in the paper but what you said in the answers a few

23  minutes ago, you can't see any other reason why someone would

24  defend somebody charged with a crime other than to get paid?

25           PROSPECTIVE JUROR:  Well, because I've never played a

1  role in this, so I don't know how much a defense attorney would

2  know the case before accepting it.  So I don't know if they do.

3  Sometimes for justice, it could play a role.  But before you asked

4  me this question, I was thinking about just the money as the only

5  reason it could play a role in this case.  Yeah.

6       MR. FINDLING:  Okay.  Let me put it to you another way,

7  because -- so I can understand where you are on this, because the

8  question was to -- regardless of the last question before Mr.

9  Kitchens sat down was, regardless of any position you have for the

10  prosecution or the defense, but you really didn't say anything

11  about the prosecution.  So what would be the motivation for these

12  folks prosecuting a case, would it be to make money?

13       PROSPECTIVE JUROR:  It could be -- money could be one

14  reason, yes.

15       MR. FINDLING:  Okay.  And so how do you -- the

16  perception that you have of -- because we're defense attorneys.

17  And so the perception that you have of us, how does that impact

18  you and, perhaps, sitting and listening to this case?

19       PROSPECTIVE JUROR:  It doesn't impact me.  Yeah.  Well,

20  I don't -- I don't know if you -- if you get what I meant by the

21  money thing.  It's not necessarily negatively.  Because we -- we

22  work.  That's our -- that is your job to work as an attorney,

23  right, as a lawyer.  So there's nothing wrong with that.  But I do

24  believe in seeing evidence and following instructions.  So...

25       MR. FINDLING:  So I'm going to -- I know what this judge

 1  is going to do, and I'm just asking first, do you understand that
 2  part of what we do is because of what His Honor will be speaking a
 3  lot about to potential jurors, and that is the United States
 4  Constitution, the Constitution is the main motivation for us
 5  sitting at that table with Pastor Bickers.  Do you understand that
 6  or is that something that you will need to be educated -- which is
 7  fair -- by His Honor?

 8       PROSPECTIVE JUROR:  That might be something that I need
 9  to be educated on.

10       THE COURT:  Well, let me just say this.  I'm probably
11  the oldest person in this courtroom, and I've been a lawyer and
12  judge for 37 years.  And I have found criminal defense lawyers and
13  prosecutors do these job because they believe in the United States
14  Constitution.  They believe in justice.  That the system -- we
15  don't have freedom unless somebody steps up there and enforces and
16  believes in the Constitution.  And if you don't have criminal
17  defense lawyers believing in that, the system does not work.  If
18  you don't have prosecutors believing in that, the system does not
19  work.  And I also found out a lot of times, criminal defense
20  lawyers and prosecutors can go somewhere and make a whole lot more
21  money than what they're making now.  But they believe in the
22  system.

23       You're able to come here right now and sit in that chair
24  and say what you want to say without any worry of somebody taking
25  you to a gulag or some cold place or putting you in the jail

1  because people like Mr. Findling and Ms. Goldberg and Mr. Kitchens

2  and Mr. Dillingham and Mr. Davis believe in a system called the

3  Constitution.

4          Now, if you don't believe that, you need to tell me that

5  now.  Because Mr. Findling is right, when it comes to this kind of

6  stuff, I feel strongly about it.  So it's not -- I won't be

7  offended.  I won't have anybody to arrest you or walk you out of

8  here if you say you have a problem with that, but I need to know.

9          PROSPECTIVE JUROR:  I don't have any problem.

10         THE COURT:  Mr. Findling needs to know this and Mr.

11  Kitchens needs to know absolutely right now, that you're not

12  saying this to please me.  You're saying it because you believe

13  it.

14         PROSPECTIVE JUROR:  I'm sorry, can you --

15         THE COURT:  Do you believe -- are you being straight up

16  honest with me or are you just saying something that you think I

17  want to hear?  Are you going to be fair and impartial in this

18  case?

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Can I trust you, can Mr. Findling trust you,

21  can Mr. Davis and Mr. Kitchens and Ms. Goldberg trust you to be

22  fair and impartial and to render a verdict based on the evidence

23  that you hear and the law that you hear and that I charge you in

24  this case?

25         PROSPECTIVE JUROR:  Yes.

1            MR. FINDLING:  Thank you, Your Honor.

2            THE COURT:  Sir, you can go back upstairs to the 22nd

3  floor.

4            Next will be 50, Mr. Isenhood.

5            Sir, come up and have a seat right up over here.

6            Sir, a few questions the lawyers want to ask you

7  privately.  We'll start off with Mr. Kitchens.

8            MR. KITCHENS:  Thank you, Your Honor.  Good afternoon

9  again, Mr. Isenhood.  Just a couple of more questions.

10            I think in one section of the questionnaire you were

11  presented with sort of a description, a rough description of what

12  was alleged in this case.  And you were asked if you had seen any

13  sort of news about it, and you indicated no.  I just want to make

14  sure, is that correct?

15            PROSPECTIVE JUROR:  That's correct.

16            MR. KITCHENS:  And in further response you were asked,

17  you know, based on what you've read, including that description,

18  have you formed any opinions.  And you stated that Mitzi Bickers

19  sounds like a bad person with poor ethics and values and that

20  profit over people is the choice.  And then you further elaborated

21  and you said to the question of regardless of what you've read,

22  seen, or heard, is any reason you would fail to be fair and

23  impartial, and you said no.  I think the evidence will help

24  support or refute the charges.

25            I just want to focus on that statement about, you know,

1   sounding like a bad person.  Was that based just on that

2   description of what may be alleged in the case?

3           PROSPECTIVE JUROR:  The way it was written.

4           MR. KITCHENS:  And have you -- of course, in this case

5   we haven't yet provided any evidence one way or another about the

6   case, and you haven't heard anything.

7           Would you wait until hearing the evidence and

8   considering the evidence before reaching a decision in this case?

9           PROSPECTIVE JUROR:  Yes, sir.

10          MR. KITCHENS:  Would you -- you'll receive, of course,

11  instructions from the judge about the type of evidence you may

12  consider and the type of evidence you may not.  Would you be able

13  to follow those instructions and basing your decision only on the

14  evidence that's presented and the law that is instructed?

15          PROSPECTIVE JUROR:  Yes.

16          MR. KITCHENS:  And the evidence as presented, of course,

17  may turn out to be very different from what was described in that

18  brief paragraph you saw on the questionnaire.

19          Do you think you'd be able to keep an open mind despite

20  reading that paragraph in the questionnaire?

21          PROSPECTIVE JUROR:  Yes.

22          MR. KITCHENS:  And do you think based on everything you

23  heard, would you keep out of mind just that description and be

24  able to be a fair and impartial juror that would base your opinion

25  just on the law and the evidence presented in this case?

1          PROSPECTIVE JUROR:  Yes.

2          MR. KITCHENS:  Thank you, Mr. Isenhood.

3          THE COURT:  Mr. Findling.

4          MR. FINDLING:  Mr. Isenhood, I'm going to let you

5    explain yourself, and so -- because I need to hear what you have

6    to say, not what I have to say.

7          PROSPECTIVE JUROR:  Right.

8          MR. FINDLING:  So when you said in the questionnaire --

9    I don't really care how it was raised, the question, that

10   Pastor Bickers sounds like a bad person with poor ethics, what did

11   you mean?

12         PROSPECTIVE JUROR:  You know, exactly the way it was

13   written and the allegations presented and how they were presented

14   throughout the two or three paragraphs there, it painted her in a

15   bad light, and I reflected that in my answer.

16         MR. FINDLING:  Okay.  And I ask you that, the reason I

17   need you to share with us your thoughts is if you're selected to

18   be on a jury, what will be published to you at some point, the

19   reason we're here, is an indictment.  It's 26 pages.  And Pastor

20   Bickers would not be sitting there next to us if it said glowing

21   things about her.  So a little paragraph made you think that

22   before there was any evidence, and we need to be concerned that

23   when you hear 26 pages, okay, you're going to have the same

24   reaction and not listen to the evidence.

25         And so tell me your thoughts about that, you know, how

1    that so impacted you, those few sentences.

2           PROSPECTIVE JUROR:  I feel like entitlement, abuse of

3    power, and nepotism, they really get on my nerves, and, you know,

4    just from -- from, like, core values and just how I was raised,

5    and my beliefs and those things.

6           MR. FINDLING:  So when you read those four or five

7    sentences in the questionnaire, it made you think of an immediate

8    abuse of power?

9           PROSPECTIVE JUROR:  Right.  Yeah, I would agree.

10           MR. FINDLING:  Which impacts you at your core?

11           PROSPECTIVE JUROR:  Right.

12           MR. FINDLING:  Okay.  And you understand, we can't erase

13    your core, like, when you come here?

14           PROSPECTIVE JUROR:  Right, right.  I would add, too,

15    like, the -- when you asked about hardship and work and stuff, you

16    know, I tried to kind of hint towards I've been with a company for

17    a year, but -- you know, this pharmaceutical company, we make a

18    breast cancer, prostate cancer drug.  I'm just kind of hitting the

19    end of my line curve and pushing a lot of things through that we

20    are, you know, preparing for FDA audits and things coming, and

21    so...

22           MR. FINDLING:  You also -- and I appreciate you sharing

23    that with us.  Thank you.  I'm sure both sides do.

24           You said that -- you also indicated in that answer that

25    the government and I are referring to, that profit over people is

1  the choice.  And so I take it that something about that impacted

2  you to think that Pastor Bickers selected profit over what was

3  best for the people?

4          PROSPECTIVE JUROR:  Right.

5          MR. FINDLING:  Can you explain that?

6          PROSPECTIVE JUROR:  You know, I just think within my

7  family, we always talk about, you know, people within the

8  government lining their pockets with -- with tax dollars and, you

9  know, hiding funds and moving things, and, you know.  So it really

10  just triggers a nerve with that.  I mean, you know -- and doesn't

11  even have to be on that level.  My father talked to me about the

12  other -- the other attorney, like, I was kind of alluding to, and

13  the State of Mississippi saying that, you know, he's like only

14  charged 8 to $10,000, but one of his clients come over and say

15  they were charged, like, 36 or $46,000 for the same service, you

16  know.  So in his mind, like, that makes him a crook, you know --

17  almost.  So I kind of tend to hold the same opinions around things

18  like that.

19          You know, you work -- you work for yourself, you know,

20  for your team and the people you represent, you follow the law,

21  the rules of law, the Ten Commandments, all those things in life.

22  I'm very --

23          MR. FINDLING:  Okay.

24          PROSPECTIVE JUROR:  -- strong values.

25          MR. FINDLING:  Okay.  And so do you believe -- and we

1  just need a straight answer, because we've got to invest three

2  weeks.  It's a long time.  And it sounds, like, what you're saying

3  is, those core values, right, the right and wrong that you talked

4  about, the despising nepotism and things like that, and your

5  adhering to the Ten Commandments, these are things that it sounds

6  like are going to impact you going into this event if you become

7  part of it; is that fair to say?

8          PROSPECTIVE JUROR:  I guess this will be a first for me.

9  So I like to think I'm impartial, but, you know, I think -- I

10  think the arguments and the evidence is supported in those -- it's

11  on those things with strong evidence, I do feel like it would

12  impact that.

13          MR. FINDLING:  So the strong evidence --

14          PROSPECTIVE JUROR:  It's kind of like ancillary data,

15  right.  It is not the data or the facts, it's the supporting facts

16  and data that elude to those -- you know, to the overall frame,

17  you know, the full story, if you will.

18          MR. FINDLING:  Okay.  And is that -- is that supporting

19  data, what you're referencing, in terms of, like, what you've

20  heard already combined with the conviction that you have on a

21  personal level?

22          PROSPECTIVE JUROR:  Yeah.  So I guess it's kind of like

23  my father saying you make your -- you base your decision on what

24  you know at the time; right?  And I presented decisions on --

25  based on what I was presented at the time.  So I think you involve

1  your -- I think you involve those -- well, not your values and

2  beliefs, but you involve your -- at least the full story or the

3  thoroughness of the story as the evidence is presented.

4         MR. FINDLING:  So our dilemma is that -- both sides, we

5  have three weeks.

6         PROSPECTIVE JUROR:  Right.

7         MR. FINDLING:  And it's a lot to ask of you to say that

8  you're going to put all these things -- what your dad shares with

9  you --

10        PROSPECTIVE JUROR:  Right.

11        MR. FINDLING:  Apparently, you're reflecting on what

12  your dad tells you, you're reflecting on the Ten Commandments,

13  you're referencing important values that you have that led you to

14  write those couple of sentences that we keep on questioning you

15  about.  If those are going to impact you even one degree, it's

16  okay, but we just need to know before we decide to keep you with

17  us for three weeks.  So do you think, to some degree, whether it's

18  one-tenth of a percent, that they'll impact you?

19        PROSPECTIVE JUROR:  Yeah, I think to some degree.

20        MR. FINDLING:  That's all I have, Your Honor.

21        THE COURT:  Thank you, sir.

22        You can go back to the 22nd floor.

23        No. 55.  Ms. Neely.

24        Ma'am, come up and have a seat right here.  The lawyers

25  have a few extra questions they want to ask you privately.

1          PROSPECTIVE JUROR:  Yes, sir.

2          THE COURT:  Mr. Kitchens, you may proceed.

3          MR. KITCHENS:  Good afternoon, Ms. Neely.

4          You indicated on your questionnaire that you had some

5   form of hardship in your belief, and you indicated, I think, that

6   it was -- I think you wrote private.  I don't want to put you in a

7   position if you're uncomfortable at all, and would like to address

8   the Court and let the Court know what that matter may be.  You are

9   certainly welcome to do that.  But the Court does need to know the

10  nature of what your hardship may be.

11         PROSPECTIVE JUROR:  Well, I would rather say it

12  privately.

13         MR. KITCHENS:  Excuse me, ma'am?  I'm sorry.

14         THE COURT:  Mr. Kitchens, Mr. Davis, Mr. Findling, Ms.

15  Goldberg, do you have a problem with me stepping into the jury

16  room and communicating with you-all later about it?

17         MR. FINDLING:  We have no objection, your Honor.

18         MR. DAVIS:  No objection.

19         THE COURT:  If y'all will give us five minutes.

20         Let's take a ten-minute break right here.  Come back at

21  4:10.

22         (A recess was taken.)

23         THE COURT:  Y'all can be seated.  Mr. Kitchens and Mr.

24  Findling, the question that y'all are referring to, question

25  No. 59, the juror did not understand the question.  And once I

1  explained the question to her -- Ms. Neely did not understand the

2  question.  Question No. 59 says, "This trial is expected to take

3  up to three weeks.  Do you have any personal, professional, or

4  financial obligations that you would like the Court to consider

5  that might make it difficult for you to serve on a trial of this

6  duration."  And she did not understand the question.  That's why

7  she said privately.  She is now prepared to answer that question

8  to you-all here in open court.

9          MR. KITCHENS:  Okay.  Thank you, Your Honor.

10         So thank you, again.  Just a simple question.  Is there

11  any hardship you would see in serving on this jury for three

12  weeks?

13         PROSPECTIVE JUROR:  It's because my husband passed, I

14  get my kids to take me where I need to go.  And usually for me to

15  do it, I would have to get someone to take off from their job to

16  bring me.  I don't feel comfortable riding Uber and things like

17  that.  And so that's my answer to that question, and I apologize

18  that I didn't understand you.

19         MR. KITCHENS:  No problem.  That's helpful.  I think

20  that's all the questions I have.  Thank you.

21         THE COURT:  Mr. Findling.

22         MR. FINDLING:  Hi, Ms. Neely.

23         PROSPECTIVE JUROR:  Hello.

24         MR. FINDLING:  So it just seems that this would be a

25  real problem for you on a personal level?

1           PROSPECTIVE JUROR:  Yes.

2           MR. FINDLING:  Three weeks is a long time.

3           PROSPECTIVE JUROR:  Yes.

4           MR. FINDLING:  And you have no -- you literally have no

5    way to get here other than asking people to take you?

6           PROSPECTIVE JUROR:  Yes.

7           MR. FINDLING:  You don't do Uber or anything like that?

8           PROSPECTIVE JUROR:  I don't do Uber.  No, I don't.

9           MR. FINDLING:  You don't feel safe taking a taxi.

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Is her microphone on?

12          Let's see if we can finish it.  Go ahead.  Speak up a

13   little bit louder, ma'am.

14          PROSPECTIVE JUROR:  Okay.

15          MR. FINDLING:  So it -- it seems that this would just be

16   a very bad hardship on you on a personal level?

17          PROSPECTIVE JUROR:  Yes.

18          MR. FINDLING:  Okay.  If I could sum it up then, for

19   three weeks you would need to be asking other folks to drive you?

20          PROSPECTIVE JUROR:  Yes.

21          MR. FINDLING:  You don't do Uber?

22          PROSPECTIVE JUROR:  I don't Uber.

23          MR. FINDLING:  And you don't do taxis?

24          PROSPECTIVE JUROR:  And I don't do taxis.  But my

25   husband passed, and he was the one -- before my husband passed, he

 1  was the one that would take me places, and since he passed, I ask

 2  my children to do it.

 3          MR. FINDLING:  So, ma'am, you don't drive?

 4          PROSPECTIVE JUROR:  I do drive.  I do not drive

 5  downtown.

 6          MR. FINDLING:  Okay.

 7          PROSPECTIVE JUROR:  And right now my car isn't working.

 8          MR. FINDLING:  Okay.

 9          PROSPECTIVE JUROR:  Yes.

10          MR. FINDLING:  So you have no way to get here?

11          PROSPECTIVE JUROR:  I have no way to get here.

12          MR. FINDLING:  All right.

13          Your Honor, that's all I have.

14          THE COURT:  Thank you.  Thank you, ma'am.  You can go

15  back upstairs.  It's a pleasure.  Good to talk to you.

16          PROSPECTIVE JUROR:  Thank you.

17          THE COURT:  No. 60.

18          THE DEPUTY CLERK:  56.

19          THE COURT:  56 is Ms. Sparks.  Hold on a second.

20          Ma'am, you can go upstairs.

21          You probably have enough to qualify.

22          MR. DAVIS:  I was just going to say --

23          THE COURT:  The problem I have, I can't say that until I

24  hear whether you have challenges for cause.  If you don't have

25  challenges for cause, neither one of you-all, we don't need to

1  question anyone else.  But I can't say that, because I don't know

2  how many challenges for cause.

3        MR. KITCHENS:  I think even if there are some cause

4  challenges and there may be a couple of hardships from what we

5  looked at as well, I still think we are --

6        THE COURT:  Well, let's just let Ms. Wright count how

7  many we have right now before we have challenges for cause.

8        THE DEPUTY CLERK:  At the end of the last group, we have

9  31 qualified.

10       THE COURT:  And that's not counting these 20?

11       THE DEPUTY CLERK:  That's right.

12       THE COURT:  Okay.  I think you do it again.  I can't say

13  without knowing how many you-all will challenge for cause.  Let's

14  stop it right there.

15       Does the government have any challenges for cause out of

16  the ones we've already questioned?

17       MR. KITCHENS:  We do not, Your Honor.  I think there is

18  maybe one or two hardships, but that's it.

19       THE COURT:  All right.  We'll come back to hardships.

20       Any challenges for cause, Mr. Findling?

21       MR. FINDLING:  Yes, Your Honor.  We're going to

22  challenge No. 42 with his 97 percent research.  You know, Your

23  Honor, when you questioned him, the first couple of questions he

24  then cleaned up.  Like, when he gave himself -- he just, to me,

25  with a lot of people that we have, it's too much of a roll of the

1  dice.  I don't want to question the guy's honesty, but he's, like,

2  doing research coming in, and --

3           THE COURT:  I understand where you're coming from.  Let

4  me hear from Mr. Kitchens on it.

5           MR. KITCHENS:  I think Mr. Findling raises a fair point.

6  I think it was a little unclear.  We tried to ask him where he --

7  I think we would stipulate to cause.

8           THE COURT:  You are a wise man, Mr. Kitchens.

9           42 is off.

10          MR. FINDLING:  One second, Your Honor.

11          Your Honor, we would move for cause for No. 50, Mr.

12  Isenhood.

13          THE COURT:  Let me say this, Mr. Kitchens.  Mr.

14  Isenhood -- I want to say this in a respectful way.  It concerned

15  the Court how you he tried or how he answered the questions,

16  particularly to Mr. Findling.  Now, he said the right things with

17  you, but...

18          MR. KITCHENS:  I'm with you, Your Honor.  It struck me

19  in hearing him -- while I think when I asked him questions he

20  seemed generally fine.  I think he was equivocal, he said some

21  things about his father and how those opinions would play -- we

22  would stipulate to cause.

23          THE COURT:  I would agree.  He's off.  Thank you, Mr.

24  Kitchens.

25          Who else is a challenge for cause?

1          MR. FINDLING:  One second, Your Honor.

2          Your Honor, the defense would move for 51, Demetra

3    Moreland.  When she was asked to set aside her predisposition as

4    to corruption, she had a lengthy pregnant pause and seemed to be

5    vacillating on whether or not she would be able to set aside her

6    predispositions coming in.

7          MR. KITCHENS:  In our view, I think we had a concern

8    similarly.  I think when Your Honor asked questions, there were, I

9    think, two pregnant pauses -- I think that's an accurate

10   description of it -- before she agreed.  I had that same confusion

11   that you hit on where it seems she was very reluctant.  She said,

12   no, I need to take this into account, and then she gave some

13   conflicting answers.

14         I think she also had a bit of a hardship that she

15   explained as well.  We were going to raise her as a potential

16   hardship given what she explained about her finances and needing

17   the money to live.

18         THE COURT:  I think you're right.  All right.  She's

19   off.

20         MR. FINDLING:  And I think we've agreed to let 54 go,

21   Your Honor.

22         THE COURT:  Yes.  We already agreed to take 54 off.

23         MR. FINDLING:  And, Your Honor, the last juror that I

24   had --

25         THE COURT:  Let's get to the hardship.  I want to find

1  out how many jurors I've got and don't fall under hardship.  So

2  let me count them.  Here's the ones that I find don't fall into

3  the hardship:  No. 43, 46, 47, 48, 49.

4           Let's start again.  I'm sorry.

5           43, 44, 46, 47, 49, 53, 56, 58, 59, 60, 61.  I don't see

6  where they had hardships.  The ones I thought may have a

7  possibility of a hardship -- 44 might fall into that, but I don't

8  think so.  He says he helps his sister, he has to work, but that

9  affects everybody.  I'm not going to count him.

10          I think No. 52, she says her moms needs her and she

11  doesn't have anyone else.  55, she says she needs someone to bring

12  her.  57, the father-in-law -- March 24, we probably will be done

13  with this case by March 24.  He's going to be out all day, and I

14  really don't want to get into that.

15          Those are the ones that had possible hardships.  Did

16  y'all have anyone else?

17          MR. KITCHENS:  No, Your Honor.

18          MR. FINDLING:  No, Your Honor.  Those are exact.

19          THE COURT:  I think we can let those go, because we have

20  enough I think.  Let's have Ms. Wright count them first.  I think

21  we have 40.

22          THE DEPUTY CLERK:  Including the entire group, that

23  gives us 42 qualified.

24          THE COURT:  Ms. Wright, if you don't mind starting with

25  No. 1, let's go through them and y'all check it off.  Ms. Wright

1    is going to start with No. 2 and go through them on who's

2    qualified, who has been disqualified, all the way through.  And

3    then stop her if she says something that disagrees with your

4    recollection.

5              THE DEPUTY CLERK.  Please.

6              THE COURT:  Ready?  All right, go.

7              THE DEPUTY CLERK:  No. 1 was deferred previously.

8              No. 2 is qualified.

9              No. 3 is qualified.

10             No. 4 is qualified.

11             No. 5 is qualified.

12             No. 6 stricken for cause.

13             No. 7 stricken for cause.

14             No. 8 qualified.

15             No. 9 qualified.

16             No. 10 stricken for cause.

17             No. 11 stricken for cause.

18             No. 12 qualified.

19             No. 13 stricken for cause.

20             No. 14 qualified.

21             No. 15 qualified.

22             No. 16 qualified.

23             No. 17 qualified.

24             No. 18 qualified.

25             No. 19 stricken for cause.

1              No. 20 qualified.

2              No. 21 qualified.

3              No. 22 qualified.

4              No. 23 qualified.  24 stricken for cause.

5              No. 25 qualified.

6              No. 26 qualified.

7              No. 27 qualified.

8              No. 28 qualified.

9              No. 29 qualified.

10             No. 30 qualified.

11             No. 31 stricken for cause.

12             No. 32 qualified.

13             No. 33 qualified.

14             No. 34 qualified.

15             No. 35 qualified.

16             No. 36 qualified.

17             No. 37 qualified.

18             No. 38 qualified.

19             No. 39 qualified.

20             No. 40 qualified.

21             No. 41 stricken for cause.

22             No. 42 stricken for cause.

23             No. 43 qualified.

24             No. 44 qualified.

25             No. 45 stricken for cause.

```
1                  No. 46 qualified.

2                  No. 47 qualified.

3                  No. 48 deferred due to illness.

4                  No. 49 qualified.

5                  No. 50 stricken for cause.

6                  No. 51 stricken for cause.

7                  No. 52 stricken for cause.

8                  No. 53 qualified.

9                  No. 54 stricken for cause.

10                 No. 55 stricken for cause.

11                 No. 56 qualified.

12                 No. 57 stricken for cause.

13                 No. 58 qualified.

14                 No. 59 qualified.

15                 No. 60 qualified.

16                 No. 61 qualified.

17                 And No. 62 qualified.

18                 THE COURT:  Okay.  We will select 12 jurors and 3
```
alternates of those 42.  Now, Ms. Wright is going to explain to
y'all how we are going to proceed.
```
21                 Do y'all need 15 minutes to look over your notes?  How
```
much time do you need, Mr. Davis?  Do you need more than 15
minutes to look over your notes before you select a jury?
```
24                 MR. DAVIS:  That works, Judge.

25                 THE COURT:  What about y'all?
```

1          MR. FINDLING:  Your Honor, can we get about 20 minutes?

2     Is that okay?

3          THE COURT:  20 minutes.  Ms. Wright is going to explain

4     how the jury selection is going to go once we come back in here.

5     Just sit tight.  The clock has not started.

6          MR. FINDLING:  What are the number of the strikes and

7     the alternates again?

8          THE COURT:  10/6.  The alternates one each.  For each

9     alternate, one each.

10          THE DEPUTY CLERK:  Okay.  So for the 12 jurors, you'll

11     be selecting from the first 28 qualified, which takes you through

12     panel No. 37.  Of course, exclusive of those that have been

13     stricken for various reasons.  And so the strikes will come for

14     the three alternates -- will be in the range of No. 38 through No.

15     44.  Then the remainder will not be included in the strike zone,

16     so to speak.

17          THE COURT:  Any questions, Mr. Davis, about jury

18     selection?

19          MR. DAVIS:  No, sir.  Thank you.

20          THE COURT:  Any question about jury selection?

21          MS. GOLDBERG:  Yes, Your Honor.  So are we -- I guess

22     can we jump around within those?

23          THE DEPUTY CLERK:  As long as it's within those two zone

24     areas, we'll select the jurors.  I'll hand the paper back and

25     forth to you.  We'll start with the government; they'll take one

1  strike and defense will take two.  And if you'd indicated G1, D2,

2  and so forth.  Then once the 12 are selected, then we will move

3  into the zone for the alternates, which is 38 to 44.

4          MS. GOLDBERG:  Okay, so we're going to do one, two, one,

5  two?

6          THE DEPUTY CLERK:  One, two -- yeah, exactly.  And then

7  one strike on each side for the alternate.

8          MS. GOLDBERG:  Thank you.

9          MR. FINDLING:  Your Honor, I believe that under Rule 24

10  when we jump up to the third alternate, both sides get an

11  additional strike.

12          THE COURT:  I'll give you an additional strike, if you

13  want it.  I don't know what to say.  I don't have the rule -- I

14  guess I can pull Rule 24 out.

15          Before we go through this, what's the government's

16  position?  Do y'all want an additional strike?

17          MR. DAVIS:  We're just doing research, sir.  Give us a

18  quick minute.

19          THE COURT:  All right.  It's two strikes per side if we

20  move up.  So you get that additional.

21          THE DEPUTY CLERK:  So that will take the -- will alter

22  the range for the alternates from 38 through 47.

23          MS. GOLDBERG:  Okay.

24          THE COURT:  All right.  Okay.  It is now 4:35.  At 4:55

25  I will be back in here and we will -- Ms. Wright, here is what you

 1  need to do.  We can't get all of the jurors in here, 42 of them,

 2  without them being shoulder to shoulder.  We can't put them in the

 3  box.

 4          Does anybody have any objection of me not bringing all

 5  42 back down for y'all to look at, and then if we bring down the

 6  15 that is selected?

 7          MR. DAVIS:  No objection.

 8          MS. GOLDBERG:  No objection.

 9          THE COURT:  All right.  Then at 4:55 Ms. Wright will

10  start passing the papers between the two of y'all.

11          Thank you, y'all.

12          (A recess was taken.)

13          THE COURT:  Mr. Davis, is the government prepared for

14  jury selection?

15          MR. DAVIS:  Yes, sir.

16          THE COURT:  Mr. Findling, is the defense ready for jury

17  selection?

18          MR. FINDLING:  We are ready, Your Honor.

19          THE COURT:  Ms. Wright, we will proceed.

20          THE DEPUTY CLERK:  Judge, the government has declined to

21  take their second strike.  So the last eligible juror is up to

22  No. 46.

23          THE COURT:  Is that correct, Mr. Davis?

24          MR. DAVIS:  That's correct.  Thank you, sir.

25          THE COURT:  Thank you.

1          All right.  Is there any challenges to the jury

2  selection coming from the government?

3          MR. DAVIS:  No, sir.

4          THE COURT:  Any challenges of the jury selection coming

5  from the defense?

6          MR. FINDLING:  No, Your Honor.

7          THE COURT:  What's going to happen, Ms. Wright is going

8  to go get the 15 jurors.  Some are in Judge Boulee's courtroom and

9  some are upstairs.  It's probably going to take 10 or 15

10  minutes -- about 10 minutes.  So if y'all want to leave -- I just

11  don't want y'all to mingle with the jurors as they're coming in.

12  I prefer if y'all sit in your seat, if you don't mind, so we don't

13  have jurors intermingling when they're coming in.

14          MR. DAVIS:  Judge, can we address two small matters?

15          THE COURT:  Yes.

16          MR. DAVIS:  First, Judge, given sort of the length of

17  the case and the complexity of the indictment, we were going to

18  ask for an extra five minutes for openings.

19          THE COURT:  That's fine.

20          MR. DAVIS:  I don't think there is an objection from the

21  defense.

22          THE COURT:  That's fine.

23          MR. FINDLING:  No objection.

24          THE COURT:  That's fine.

25          MR. DAVIS:  Second, Judge, at the pretrial conference

1  you asked Pastor Bickers how she wanted to be addressed, and she

2  decided to be addressed -- or she appropriately decided to be

3  addressed by Pastor Bickers.  And we want to be respectful during

4  the trial, but some of our witnesses do not know that Ms. Bickers

5  is a pastor.  They're not going to address her as pastor.  They're

6  going to address her as Ms. Bickers.  And, Judge, we were going to

7  ask that you instruct the jury that during this trial -- in this

8  courtroom people are going to refer to Ms. Bickers both as

9  Pastor Bickers and Ms. Bickers, and that there is no disrespect or

10 additional deference from either way that she's addressed.

11          THE COURT:  I will do that.  Let me also say, my main

12 question is how the Court will address her.  And I didn't want to

13 say Reverend Bickers or Ms. Bickers and she indicated Pastor

14 Bickers.  But I will instruct the jury there may be some witnesses

15 that may refer to Pastor Bickers as Reverend Bickers or

16 Ms. Bickers, and that's not meant to show disrespect.

17          MR. FINDLING:  So, Your Honor, here's my take.  My take

18 is if we draw attention to it, then they'll draw attention to it.

19 I don't think it's going to be that big of a deal.  I think if we

20 let them know, it's letting them know that some people are going

21 to regard her in a different way.  I know she's not offended by

22 it, by people calling her alternatively.

23          THE COURT:  Hold on.  We have jurors coming in.

24          I see Mr. Davis' point.  Mainly why I said it, I didn't

25 want to show disrespect myself as the Court to Pastor Bickers.

 1  But there are some people who will be offended if a person calls

 2  her Ms. Bickers.

 3          I've been in Georgia all my life, and there are some

 4  people, Mr. Findling, that are offended when you say, well, you

 5  know this person is a minister and you're still calling them miss

 6  or mister.

 7          MR. FINDLING:  I think it -- okay.  You know, it's quite

 8  often we hear people on the stand and they're testifying and they

 9  call somebody the defendant and nobody says anything then; right?

10  And so I'm sure that, you know, there will be people that are

11  going to say that, and --

12          THE COURT:  It's a little different, though.

13          MR. FINDLING:  I'm sorry?

14          THE COURT:  It's a little different.  These jurors know

15  that Pastor Bickers is a minister.

16          Again, I see y'all's point.  I understand what Mr. Davis

17  is saying.  Can we tell all of the witnesses she's a pastor?  I

18  don't want -- I think -- I think it wouldn't hurt just to tell

19  them, look, some people don't know that Pastor Bickers is a pastor

20  or a minister and they may refer to her as Ms. Bickers.  You do

21  have witnesses that don't know that?

22          MR. DAVIS:  That's correct, Judge.  In addition, you

23  know, if you're constantly referring to her as Pastor Bickers and

24  someone refers to her as Ms. Bickers, we don't want to seem like

25  we're doing anything disrespectful.

1          MR. FINDLING:  And in a like fashion, I don't want these

2  jurors to think there are witnesses that are being -- by calling

3  her that, we're bringing attention to -- well, I didn't even know

4  she was a pastor.  What is this pastor thing about?  I just think

5  it accentuates something that is better left off not said.

6          THE COURT:  Hold on.  Right now, Mr. Findling, I plan on

7  telling them, but I'm not going to address it until the morning.

8  If I change my mind, I'll tell you.  I can see where people would

9  be offended.  But, you know, right now I'm going to tell them.  If

10  I change my mind, I'll tell you tomorrow.  I'm going to tell them.

11  Is there anything else?  Thank you.

12          Bring them in.

13          (The jury is seated at 5:20 p.m.)

14          THE COURT:  Y'all come have a seat in the jury box.

15          Come have a seat in the jury box, please.

16          As soon as Ms. Wright comes in, we will start.

17          When your name is called, to make sure we have the right

18  15 jurors, just raise your hand.  Okay?

19          THE COURT:  All right.

20          THE DEPUTY CLERK:  Don Walbert, Samuel Howell,

21  Afi Simmons, Reginald Smith, Allexus Kendrick, Clinton Bush,

22  Tonya Dale, Chilmus Hamilton, Tenesha Howell, Angela Nave,

23  Gary Reissner, Joel Ross, Ruby Williams, Llandro Sebastian, and

24  Hayley Simmons.

25          THE COURT:  Okay.  Will all 15 of you please stand and

1  raise your right hand.  Ms. Wright is going to administer an oath

2  to you.

3            (The jury is sworn.)

4            THE COURT:  You can be seated.

5            Now, members of the jury, I have some preliminary

6  instructions for y'all to start the trial, and then I'll give you

7  some other instructions at the end of the trial.

8            But the instructions I'm going to give you now is very

9  important.  It is like a guideline or map on how you should

10 conduct yourself as jurors on this trial, and how the trial will

11 proceed and certain aspects about the trial.

12           Members of the jury, now you've been sworn, I need to

13 explain some basic principles about a criminal trial and your duty

14 as jurors.

15           These are preliminary instructions.  At the end of the

16 trial, I will give you more detailed instructions.

17           First thing I want to talk about is the duty of the

18 jury.  It is your duty to decide what happens so you can determine

19 whether the defendant is guilty or not guilty of the crime charged

20 in the indictment.  At the end of the trial, I will explain the

21 law that you must follow to reach your verdict.  You must follow

22 the law as I explain it to you, even if you do not agree with the

23 law.

24           Now, what is evidence?  You must decide the case solely

25 on the evidence presented here in the courtroom.  Evidence can

1   come in many forms.  It can be testimony about what someone saw or

2   heard or smelled.  It can an exhibit admitted into evidence.  It

3   can be someone's opinion.

4            Some evidence proves a fact indirectly, such as a

5   witness who saw wet grass outside and people walking into the

6   courthouse carrying wet umbrellas.

7            Indirect evidence, sometimes called circumstantial

8   evidence, is simply a chain of circumstances that proves a fact.

9            Now, members of the jury, as far as the law is

10  concerned, it makes no difference whether the evidence is direct

11  or indirect.  You may choose to believe or disbelieve either kind

12  and should give every piece of evidence whatever weight you think

13  it deserves.

14           Now, what is evidence?  Excuse me.  What is not

15  evidence?  Certain things are not evidence and must not be

16  considered, and I will list them for you now:  Statements and

17  arguments of the lawyers.  In their opening statements and closing

18  arguments, the lawyers will discuss the case, but their remarks

19  are not evidence.  Questions and objections of the lawyers.  The

20  lawyers' questions are not evidence.  Only the witness' answers

21  are evidence.  You should not think that something is true just

22  because a lawyer questions or suggests that it is.  For instance,

23  if a lawyer asks a witness, you saw the defendant hit his sister,

24  didn't you, that question is no evidence whatsoever of what the

25  witness saw or what the defendant did, unless the defendant agrees

1   with it.

2         Now, ladies and gentlemen, there are rules of evidence

3   that control what can be received into evidence.  When a lawyer

4   asks a question or offers an exhibit and the lawyer on the other

5   side thinks it's not permitted by the rules of evidence, that

6   lawyer may object.  If I overrule the objection, then the question

7   may be answered or the exhibit received.  If I sustain the

8   objection, then the question cannot be answered and the exhibit

9   cannot be received.  Whenever I sustain an objection to a

10  question, you must ignore the question and not try to guess what

11  the answer would have been.

12        Sometimes I may order the evidence be stricken and that

13  you disregard or ignore it.  That means that when you're deciding

14  the case, you must not consider that evidence.

15        Some evidence is admitted only for a limited purpose.

16  When I instruct you that an item of evidence has been admitted for

17  a limited purpose, you must consider it only for that limited

18  purpose and no other.

19        Now let's talk now about credibility of witnesses.

20        In reaching your verdict, you may have to decide what

21  testimony to believe and what testimony not to believe.  You may

22  believe everything a witness says or part of it or none of it.  In

23  considering the testimony of any witness, you may take into

24  account the following:  The opportunity and ability of the witness

25  to see or hear or know the things testified to; the witness'

1   memory; the witness' manner while testifying; the witness'

2   interest in the outcome of the case and any bias or prejudice;

3   whether other evidence contradicts the witness' testimony; the

4   reasonableness of the witness' testimony in light of all of the

5   evidence; and any other factors that bear on believability.

6          Members of the jury, I will give you additional

7   guidelines to determine credibility of the witnesses at the end of

8   the case.

9          Now, rules for criminal cases.  As you know, this is a

10  criminal case.  There are three basic rules about a criminal case

11  that you must keep in mind.

12         First, the defendant is presumed innocent until proven

13  guilty.  The indictment against the defendant brought by the

14  government is only an accusation and nothing more.  It is not

15  proof of guilty or anything else.  The defendant, therefore,

16  starts out with a clean slate.

17         Second, the burden of proof is on the government until

18  the very end of the case.  Defendant has no burden to prove her

19  innocence or to present any evidence or to testify.  Since the

20  defendant has the right to remain silent and may choose whether to

21  testify, you cannot legally put any weight on the defendant's

22  choice not to testify.  It is not evidence.

23         Third, the government must prove the defendant's guilt

24  beyond a reasonable doubt.  I will give you further instruction on

25  this point later, but bear in mind, the level of proof required is

1  high.

2          Now, let's talk about the conduct of the jury.

3          Our law requires that jurors follow certain instructions

4  regarding their personal conduct in order to help assure a just

5  and fair trial.  I will now give you those instructions.

6          Do not talk either among yourself or with anyone else

7  about anything related to the case.  You may tell people with whom

8  you live and your employer that you are a juror and give them

9  information about when you will be required to be in court, but

10  you may not discuss with them or anyone else anything related to

11  the case.  Do not at any time during the trial request, accept,

12  agree to accept, or discuss with any person any type of payment or

13  benefit in return to supplying any information about the trial.

14  You must promptly tell me about any incident you know of involving

15  an attempt by any person to improperly influence you or any member

16  of the jury.

17          Do not visit or view the premises or place where the

18  charged crime is allegedly committed or any other premise or place

19  involved in the case.  And you must not use Internet maps or

20  Google Earth or any other program or device to search for and view

21  any location discussed in the testimony.

22          Do not read, watch, or listen to any accounts or

23  discussions related to the case which may be reported by the

24  newspapers, television, radio, the Internet, or any other news

25  media.

1          Do not attempt to research any fact, issue, or law

2    related to this case, or by discussions with others, by the

3    library, or Internet research, or any other means or source.

4          Now, members of the jury, in this age of instant

5    electronic communication and research, I want to emphasize that in

6    addition to not talking face-to-face with anyone about the case,

7    you must not communicate with anyone about the case by any other

8    means, including by telephone, text messages, e-mail, Internet

9    chat, chat rooms, blogs, or social network or websites and apps

10   such as Facebook, Instagram, Snapchat, YouTube, or Twitter.  In

11   other words, do not talk about the case until I tell you to begin

12   your deliberations.  Don't talk about it with anyone or look up

13   anything about it, period.

14         You may not use any similar technology or social media,

15   even if I don't specifically mention it here.  You must not

16   provide any information about the case to anyone by any means

17   whatsoever, and that includes post information about the case or

18   what you were doing in the case or any device or Internet site,

19   including blogs, chat rooms, social websites, or any other means.

20         Now, members of the jury, you also must not use Google

21   or otherwise search for any information about the case or the law

22   that applies to the case or the people involved in the case,

23   including the defendant, the witnesses, the lawyers, or the judge.

24         It is important that you understand why these rules

25   exist and why they are so important.  Our law does not permit the

1  jurors to talk to anyone else about the case or to permit anyone

2  to talk to them about the case, because only the jurors are

3  authorized to render a verdict.  Only you have been found to be

4  fair and only you have promised to be fair, and no one else is so

5  qualified.

6           Our laws also do not permit the jurors to talk among

7  themselves about the case until the Court tells them to begin

8  deliberations.  Because premature discussions can lead to a

9  premature final decision.

10          Our laws also does not permit you to visit the place

11  discussed in the testimony.  First, you can't be sure that the

12  place is in the same condition as it was on the day in question.

13          Second, even if it were in the same condition, once you

14  go to a place discussed in the testimony to evaluate the evidence

15  in light of what you see, you become a witness and not a juror.

16  As a witness, you may now have a mistaken view of the scene that

17  neither party may have a chance to correct, and that is not fair.

18          Finally, our law requires you not to read or listen to

19  any news accounts of the case, and that you not attempt to

20  research any fact, issue, or law related to the case.  Your

21  decision must be based solely on the testimony and other evidence

22  presented in this courtroom.

23          Also, the law often uses words and phrases in such ways,

24  so it's important that any definitions you hear come only from me

25  and not from any other source.  It wouldn't be fair to the parties

1  for you to base your decision on some reporter's view or opinion,

2  or upon other information you acquire outside of the courtroom.

3        Now, members of the jury, these rules are designed to

4  help guarantee a fair trial.  And our law accordingly sets serious

5  consequences if the rules are not followed.  I trust that you

6  understand and appreciate the importance of following these rules;

7  and according to your oath and promise, I know you will do so.

8        Now, ladies and gentlemen, as far as taking notes, if

9  you wish you may take notes to help you remember what witnesses

10  said.  If you do take notes, please keep them to yourself until

11  you and your fellow jurors go to the jury room to decide the case.

12  Do not let note taking distract you so that you do not hear other

13  answers by witnesses.  When you leave the courtroom, your notes

14  should be left in the jury room.  Whether or not you take notes,

15  you should rely on your own memory of what was said.  Notes are to

16  assist your memory only.  They're not entitled to any greater

17  weight than your memory or impression about the testimony.

18        So, ladies and gentlemen of the jury, we're going to

19  give you note pads and pencils.  If you want to take notes, that's

20  fine.  But when you leave, don't ever leave your notes sitting in

21  your seat.  When you leave for breaks, when you leave at the end

22  of the day, take your notes with you, but don't take your notes

23  home, leave them in the jury room.

24        Now, let's talk about the course of the trial.  The

25  trial will begin -- first, the government will make an opening

1  statement, which is simply an outline to help you understand the

2  evidence as it comes in.

3       Next, the defendant's attorney may, but does not have

4  to, make an opening statement.  Opening statements are neither

5  evidence nor argument.  The government will then present its

6  witnesses, and counsel for the defendant may cross-examine them.

7  As far as the government's case, the defendant may, if she wishes,

8  present witnesses for whom the government may cross-examine.

9  After all of the evidence is in, the attorneys will present their

10  closing arguments to summarize and interpret the evidence for you.

11  And I will then finally instruct you on the law.  After that you

12  will go to the jury room to decide your verdict.

13       Now, members of the jury, sometimes criminal trials

14  attract the attention of the media and the public.  The level of

15  interest is unpredictable and not within my control.

16       This case involves one defendant and may continue for

17  some time.  We estimate three weeks.  It may attract an unusual

18  amount of attention.  So that may be curiosity about the

19  participants, lawyers, witnesses, defendants, judge, perhaps even

20  the jurors.  People will ask questions to learn more about the

21  case.  Even though these questions may be well-intentioned, they

22  may still distract you from your duties as a jurors.  These

23  questions can be awkward or inconvenient for you and your family

24  and friends.  They can be part of an unwanted improper approach

25  towards you from outside of the courtroom.  During your service as

1  a juror, you must not discuss this case with anyone, and even

2  after the case is finished, you will not be required to explain

3  your verdict -- explain your verdict or jury service to anyone.

4  Your names and personal information will be known only to the

5  court personnel and the parties, and will not be disclosed.

6          To discourage unwarranted publicity, telephone calls,

7  letters, and questions, you will be referred to only by your jury

8  number.  This is not intentional to be offensive for you, but

9  again, it's for your own privacy.

10          Now, those instructions I'm giving you, but I would like

11  to just add a few more instructions for you.  We'll start each day

12  at 9 o'clock, except for Monday.  Monday we'll start at 9:30.

13  We'll start at 9 each day, and we'll break for lunch at 12:30.

14  Between 9 and 12:30, we'll probably take a break between 10:15,

15  10:30.  However, at some point in time you need to take a break

16  before we stop to take a break, just raise your hand and I'll

17  acknowledge you as quick as I can unless we're in the middle of a

18  question or something.  The lunch break is one hour.

19          As I indicated to you-all earlier today, there is not

20  any restaurants or places close to this courthouse that you can

21  leave here, go order lunch, properly digest it, and get back here

22  in one hour.  If you think you can, more power to you.  I highly

23  recommend that you either bring your lunch and leave it upstairs

24  in the refrigerator on the 22nd floor and get it at lunchtime.

25  You can eat it on the 22nd floor, or you can bring it back down

1  here in the jury room, or you can take it to the cafeteria and

2  eat, or you can order your lunch in the cafeteria.

3       I eat there, the lawyers eat there.  It meets the

4  purpose needed to get you through a full day.  Okay?

5       We will go to 5 each day except for tomorrow.  We'll

6  stop tomorrow at 4.  But the rest of the time, 9 to 5.  We may go

7  past 5 if we have a witness on the stand that I want to complete

8  and the lawyers say, Judge, can I complete him because they have

9  to go somewhere and can't come back.  But most days at 5 we'll be

10 stopping.  Okay.

11      Now, as far as your time, we will start opening

12 statements at 9 in the morning and start again just about every

13 day at 9.  I prefer having you in the jury room at 8:45 so that

14 way we can start at 9.  If you -- every once in a while in metro

15 Atlanta, believe it or not, there are traffic problems.  If you

16 run into one of those traffic problems, there's a number in that

17 jury room you need to write down tonight and you need to call us.

18 If you don't call us and at 9 o'clock you're not back there, we

19 can only think the worst, and we then have to contact the Marshals

20 and say, Juror Steve Jones, it's five after nine, he's not here,

21 find out why.  Call us.  Okay?

22      Anything that comes up, you'll let one of the CSOs know,

23 and they'll let me know.  The lawyers can't answer questions for

24 you.  The only person you can confer with if you have a question

25 is the CSO.  The CSO is not going to answer the question.  If

1  you'll give the question to the CSO, they'll direct it to me, and

2  I'll respond back to you as quick as possible.  Okay.

3            Any questions about anything?  All right.

4            Then y'all can be adjourned for today, and I will see

5  y'all in the morning at 9 o'clock.  Thank you.

6            Hold on, hold on.  Take the mask off.

7            A JUROR:  Do we call Monday through Friday?

8            THE COURT:  Monday through Friday, 9 to 5.

9            We estimate three weeks.  Good question.  You need to

10  let employers know, the estimate is three weeks, and today is

11  March 9.  So somewhere around the 31st or the 1st we might be

12  finished.  I'm not going to guarantee it's going to be done in

13  three weeks.  I'm not guaranteeing it's going to take three weeks.

14  I'm just trying to give you an estimate so you can arrange your

15  life for the next three weeks.  Everybody has a life.  So you need

16  to go back and tell your family.  And if you have certain things

17  you have to do in the afternoon, you better have somebody start

18  doing it.  We don't meet on Saturday and Sunday.  All right?  But

19  for the next three weeks, you need to arrange your life Monday

20  through Friday to be here.  Good question.

21            Any other questions?  All right.  Thank you.  Show them

22  how to get out and get back.

23            (Jury is excused at 5:46 p.m.)

24            THE COURT:  There's one issue I was going to talk to you

25  about today, but because of the lateness of the day I won't get

1  into it.

2        As far as witness Elvin R. Mitchell, there is an issue

3  that came up that I did not rule on regarding the attempted

4  impeachment of him if he is called as a witness.  I think the

5  government opposed questioning him or attempting to question him

6  about any civil matters.  And I think the defense had

7  certain -- the defense's position was that at this time they

8  really couldn't say anything more about how they were going to

9  proceed.  And I'm not trying to ask you-all now how you are going

10 to proceed if he is called as a witness.  What I'm trying to do is

11 give you some direction on what I will allow and not allow.  I

12 don't know when he's going to be called.  Again, it's already 5:45

13 and you-all already had a full day, but before he is called as a

14 witness -- if he's your first witness, then we probably should

15 talk about it right now.  But before he's called as a witness, I

16 need to tell y'all how I view, in particular, the defense on

17 cross-examination, what I'm planning on allowing and what I'm not

18 planning on allowing.  But I couldn't really answer that from the

19 motion that was made by the government because, you know, the

20 defense made a good point.  Y'all were arguing, I think, something

21 along the lines, at this point, Judge, we can't really say what

22 we're going to do, and the government is not specific enough.

23 Well, we're reaching that point now where if you -- I always like

24 to let the lawyers know up front before a witness takes the stand

25 what I'm going to allow or not so we don't have a situation like

 1  this.

 2          So don't talk about any of those things that came up in

 3  that motion in your opening statements until y'all -- and we may

 4  not be able to resolve it until he takes the stand.  If that's

 5  your wish, we'll proceed that way.  But again, the government

 6  raised the issue about certain things they thought would be

 7  improper impeachment questions, and y'all had every right to say,

 8  Judge, at this time we don't want to get into this.

 9          MR. FINDLING:  And I'll just say, too, that -- two

10  responses that I think impact one another.

11          One, we did resolve an issue from the pretrial

12  conference.  I think I asked for a witness list for the following

13  day, and Mr. Davis said that we would resolve that.  We did, in

14  fact, that evening resolve that.

15          THE COURT:  Good.

16          MR. FINDLING:  So the agreement is the government will

17  give us each day the next day's witness list.  If we elect to put

18  up witnesses, we will in like fashion do the same.

19          THE COURT:  All right.

20          MR. FINDLING:  Second, at the appropriate time, we will

21  address that.  I can say that -- as you can, I'm sure, fathom,

22  there's been so much discovery since that motion was filed, that

23  we have reformulated our response countless times and we just need

24  to -- when we have appropriate notice from the government -- think

25  about how we're going to address that.  Literally, we're in a

1  different world than we were.

2          THE COURT:  Good.  That's good news to me.  And excuse

3  me, I cut you off.

4          MR. FINDLING:  No, no.  It's completely different -- at

5  this point, we've seen a lot more since then and have reformulated

6  our approach.  But I think you can probably imagine, we've added

7  to our approach.  We haven't edited our approach.

8          THE COURT:  I've tried enough cases where I kind of

9  figured that point out.

10          But again, my main concern is that I like for you and

11 Mr. Davis to know somewhat -- I can't be specific, because I don't

12 know exactly what you're going to ask, and I'm not asking you what

13 you're going to ask, but I need to give you-all some idea of what

14 I'm thinking so we won't have one of these situations I'm going to

15 be sending the jury out -- no, Mr. Davis.  You jump up and say I

16 object to that, and then you say, no, that's not right.  And then

17 I send the jury out, and then we do two questions and Mr. Davis

18 jumps in again.  I don't want that.  I want y'all to accept -- I

19 want to say, do you agree or do you disagree?  Here's what I'm

20 going to allow and here's what I'm not going to allow so we don't

21 get into that.

22          I anticipate that particular witness is going to take a

23 while, and so I don't want to have a situation where I'm sending

24 the jury out seven times within one hour.

25          MR. FINDLING:  That's incredibly appreciated by the

1   defense.

2          THE COURT:  So at the appropriate time, I may try to

3   give y'all some idea through a written order tonight.  But at the

4   appropriate time when y'all think you want to talk about it some

5   more, let me know and I'll deal with it then.

6          MR. DAVIS:  Thank you, sir.

7          MR. FINDLING:  Thank you.

8          THE COURT:  If there is nothing else, have a good

9   evening.  I'll see you tomorrow morning at 9.

10          THE DEPUTY CLERK:  All rise.  This Court will stand in

11   recess until 9 o'clock tomorrow morning.

12             (The trial concluded at 5:50 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT

4   NORTHERN DISTRICT OF GEORGIA

5

6      I do hereby certify that the foregoing pages are a true and

7   correct transcript of the proceedings taken down by me in the case

8   aforesaid.

9      This the 9th day of March, 2022.

10

11

12

13

14                    /s/Viola S. Zborowski _____
                      VIOLA S. ZBOROWSKI,
15                    RDR, FAPR, CMR, CRR, RPR, CRC
                      OFFICIAL COURT REPORTER TO
16                    THE HONORABLE STEVE C. JONES

17

18

19

20

21

22

23

24

25

────────UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT────────