```
1                    UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION

3

4    UNITED STATES OF AMERICA, )
                               )
5             PLAINTIFF,       )
                               )
6     -VS-                     ) DOCKET NO. 1:18-CR-98-SCJ-LTW
                               ) VOLUME 2
7    MITZI BICKERS,            )
                               )
8             DEFENDANT.       )
     _____

9

                        TRANSCRIPT OF JURY TRIAL
10                 BEFORE THE HONORABLE STEVE C. JONES
                     UNITED STATES DISTRICT JUDGE
11                    THURSDAY, MARCH 10, 2022

12

13   APPEARANCES:

14   ON BEHALF OF THE GOVERNMENT:
            JEFFREY W. DAVIS, AUSA
15          NATHAN PARKER KITCHENS, AUSA
            TIFFANY RENE DILLINGHAM, AUSA
16          KELLY KATHLEEN CONNORS, AUSA
            JACQUI ETIENNE, PARALEGAL
17          JONATHAN ROSS, PARALEGAL
            SPECIAL AGENT RICHARD GABRIEL
18
     ON BEHALF OF THE DEFENDANT:
19          DREW FINDLING, ESQ.
            MARISSA HELEN GOLDBERG, ESQ.
20          ZACHARY J. KELEHEAR, ESQ.
            DENISE DELARUE, ESQ.
21          ALEXIS AHLZADEH, ESQ.

22
                  VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
23       Official Court Reporter TO THE HONORABLE STEVE C. JONES
                       United STATES District Court
24                         Atlanta, Georgia
                            404-215-1479
25               VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV
```

```
 1                              I N D E X

 2    WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

 3    OPENING STATEMENT BY
      MR. DAVIS                226
 4
      OPENING STATEMENT BY
 5    MS. GOLDBERG             245

 6    JOHN RELYEA              252

 7    DANIELLE NICHOLS         290     296      298

 8    NINA HICKSON             299     323      337

 9    KIMBERLY SPELL-FOWLER    338

10    JIMMY KIRBY              354

11    DEBORAH LONON            359

12    CHARLES P. RICHARDS, JR.  368

13

14

15

16

17

18

19

20

21

22

23

24

25
```

——UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT——

1                (HELD IN OPEN COURT AT 9:10 A.M.)

2          THE COURT:  Two matters I want to take up with y'all

3    before we get started this morning.  Yesterday, Mr. Davis, you

4    asked the Court to instruct the jurors not to hold it against any

5    witness that did not refer to Pastor Bickers as Pastor Bickers,

6    because they may not know she's a minister.

7          I thought about it last night and looked at some things.

8    I don't think it would be appropriate for me to do that for the

9    following reasons:  First of all, at the pretrial conference when

10   I asked Pastor Bickers how she wanted me to refer to her and she

11   indicated Pastor Bickers, that is not saying how any of y'all can

12   refer to her.

13         Second of all, when I charge the jury, when we get to

14   that point, I'll tell the jury the charge of credibility.  One of

15   those charges says they consider the manner in which the witness

16   testifies, how they testify, what they said.  That can fall under

17   manners.  So I think I would be crossing into that province, and I

18   don't want to take that risk.

19         I think the best way to do it is tell your witnesses

20   she's a minister and how they want to refer to her, it's up to

21   them.  If someone referred to Pastor Bickers as Reverend Bickers,

22   I don't think that's being disrespectful, but as far as telling

23   the jury not to hold it against them, or not to refer to her that

24   way, I think I would be crossing over the province of credibility

25   and that is for the jurors to determine on that.  So I'm not going

 1  to go that way again.  But, again, it's just how I will refer to

 2  her.  It's not how any of y'all will refer to her.

 3         I've had defense counsel, who have no burden of proof to

 4  call anybody that's testifying, even the defendant, have put

 5  defendants on the stand and referred to them by their first name

 6  because they have a close relationship with them.

 7         And so that question last week was just for me, how I

 8  will refer to her.  How anybody else refers to Pastor Bickers is

 9  entirely up to them.  You just tell all your witnesses she is a

10  minister and we go from there.

11         Now, we have another matter.  I went to great extent, I

12  thought I did, to explain to all of the jurors they need to tell

13  us anything they had to deal with before we put them in the jury

14  box.  And I don't know what else I could have said or how I could

15  have said it.  But we have one of the juror -- I'm not going to

16  call out the juror's name -- they indicate -- I'll just read the

17  note, without referring to the juror's name.

18         "Good morning, Judge.  My name is blank.  I want to

19  speak to you about being selected as a juror in this case.  As I

20  went home yesterday, I put my daughter to sleep and I had time to

21  think about the case and I became overwhelmed.  It is my belief

22  that God is the judge over all and I honestly don't believe I can

23  determine the fate of another individual.  I do apologize to the

24  Court."

25         At this point in time, I don't want to make a statement

 1  on this.  I want to take this under advisement.  Let's let both of

 2  the lawyers take a look at this.

 3          Okay.  It's Juror 2.

 4          Let me say to the individuals in the media and with the

 5  press.  I informed the jurors yesterday that I would not refer to

 6  them by their names in order to give them privacy.  I'm not trying

 7  to block y'all from knowing anything.  It's just that I've told

 8  them I'll refer to them as juror whatever.  And that's so -- I

 9  don't want y'all to think I'm trying to hide something from y'all,

10  but to be fair to the jurors, I'm not going to refer to them by

11  their names.  I'm going to refer to them as Juror 1, Juror 2,

12  whatever.  Again, it's not meant to do anything, it's to give them

13  the privacy.

14          At this point in time, Mr. Davis, Mr. Findling, I didn't

15  think about this.  It's appropriate -- again, I go to great extent

16  with every panel to say, tell us, tell us, tell us before we make

17  you one of the 12 jurors and three alternates.  I need to think

18  about it, but, Mr. Davis, if you have any comments, I'll hear from

19  you.

20          Mr. Findling, I'll hear from you.

21          MR. FINDLING:  Your Honor, I'd rather make this argument

22  at side bar.

23          THE COURT:  Fine.

24          (At sidebar.)

25          MR. FINDLING:  I don't want to run the risk, Your Honor,

1  that the juror will find out my position.

2          You know, you stated something yesterday that resonated

3  with me, which is the whole vacation thing.  And, you know, you've

4  heard so many jurors come up with things.  I've been doing this a

5  long time.  I've seen this so many times and it starts growing and

6  the cavalcade will begin once one person leaves.

7          We have selected the jury.  Your Honor gave us an

8  unbelievable opportunity in a federal case to spend a full workday

9  on picking a jury, a full workday, really unheard of.  My

10  colleagues have already reached out to me about it.

11          We've picked a jury.  This is going to start something

12  that we're all going to regret.  I think we need to keep Juror

13  No. 2.

14          MR. DAVIS:  Judge, I am more of your view.  I think we

15  need some time to really think about it.  At this point it's not a

16  particularly pressing matter, because if the juror stays, so

17  stays; if the juror is excused, then -- but I would like to give

18  it some time to think about it and do a bit of research on it.

19          THE COURT:  At this point in time, I'm not removing the

20  juror.  I will take what you have to say and what you have said.

21  I got the note about ten minutes ago.  At this point in time,

22  Juror No. 2 is on this jury.

23          MR. FINDLING:  Of course.

24          THE COURT:  I think I will just point that out.  We're

25  not hiding anything about it.  At this point in time as far as I

1 am concerned, the juror is on this jury.

2          My only concern would be, to keep this person on there,

3 I don't want somebody to get to the point in deliberation, get in

4 the deliberation room and it becomes a problem.  So I might -- I'm

5 not saying what I'm going to do, but I might make the decision at

6 the time of deliberation.  If I make the decision before then,

7 what you said might be a point.

8          MR. FINDLING:  Sure.

9          My issue with that is I agree with what you're saying to

10 the extent that we never know who is going to be a problem on

11 there.  He just happens to be somebody who put something on paper.

12 Somebody else may be harboring some ill will to us, me, who knows,

13 you know.

14          THE COURT:  At this point in time, I'm not taking the

15 juror off.  The juror is on there.  It may take me three weeks to

16 change my mind.

17          MR. FINDLING:  Your Honor, also while we're here, both

18 sides have agreed for the Court to invoke the rule of

19 sequestration at this time.  And I think, while we're up here,

20 taking the opportunity.

21          THE COURT:  Do you agree?

22          MR. DAVIS:  Yes.

23          MR. FINDLING:  I think the government is going to come

24 with a witness with records.  We've noted to them objections we

25 have.  Both sides have talked about it.  It might be a good

1    opportunity, before the witness takes the stand, for us to kind of

2    explain to you, because we don't want to distract from the

3    government's role by jumping up and down.

4             So just to kind of preview for you the position.

5             THE COURT:  I will accept that.

6             MR. FINDLING:  Thank you.

7             (End of discussion at side bar.)

8             THE COURT:  Here's what I'm saying.  The Court has

9    decided at this point in time that Juror No. 2 is going to remain

10   on the jury.  The Court is taking it under advisement.  The

11   lawyer's position under advisement.  But Juror No. 2, at this

12   point in time, is going to remain on the jury.

13            Now, Mr. Findling, Mr. Kitchens, Mr. Davis, there's a

14   matter y'all want to bring up before we start opening statements.

15            MR. KITCHENS:  One issue, Your Honor.  I think your

16   instructions, of course, covered the fact that the jury should not

17   review anything in the media, avoid any sort of stories and that

18   sort of thing.  We were discussing and noted that, you know, based

19   on a -- a case, of course, came to mind about a few weeks ago,

20   there was an issue with push notifications that kind of

21   involuntarily came out where there were news alerts.  If jurors

22   had subscribed to breaking news alerts where they popped up on

23   their phone and they were informed of stories and saw these

24   headlines, by no, you know, effort on their part to see them.

25            It occurred to us that that may be something that may be

1  worth, Judge, noting to the jurors.  That if they have any sort of

2  breaking news alerts that they've signed up for, any push

3  notifications, that if they can turn those off while the trial is

4  going on --

5       THE COURT:  Well, they don't have their phones during

6  the trial.

7       MR. KITCHENS:  Even when they come back from the day,

8  presumably they will have their phones with them.  If something

9  has popped up on their phone as a breaking news alert, they may

10  see it accidentally.

11       MR. FINDLING:  Mr. Kitchens is right.  It's a case out

12  of the Southern District of New York.  It's created a whole new

13  problem of trying cases.  He's correct.

14       THE COURT:  I don't have any problem telling them that.

15  Just disregard that, delete it.

16       MR. FINDLING:  And I did tell Mr. Kitchens, as I

17  mentioned to the Court on side bar, before the first witness, we

18  just need a few seconds to talk to Your Honor.

19       THE COURT:  All right.  At the side bar, you said

20  something about records.

21       MR. KITCHENS:  Your Honor, for the first witness we're

22  going to call a summary witness.  We really -- we are only going

23  to publish one exhibit through them, but our effort is to try to

24  put in as efficiently as possible a number of records that are all

25  essentially certified business records.  And I -- we, of course,

1  have addressed the authenticity issue.  We understand that for

2  some of those exhibits there may be evidentiary issues, that

3  objections may be raised by the defense.  In particular, we have

4  some bank records.  These are, again, all certified bank records.

5  On those disks, we have prepared disks for each individual bank.

6  Some of those accounts, I think the parties agree that there is

7  nothing objectionable about them.  There are other accounts where

8  the defense has indicated that they may have objections to them.

9        What we would plan on doing is addressing those disks

10 containing the bank records at the end of the witness' testimony,

11 have them essentially describe, you know, what is contained on

12 those disks, just review.  And, you know, at that point, we

13 essentially, you know, offer them.

14        What I think -- we think would be the most efficient way

15 to address it is what evidentiary objections I think we can do

16 outside of the presence of the jury.  Again, we would not be using

17 any of the records at that point with that witness, we would not

18 be publishing anything.  So we could address any objections after

19 the witness' testimony with the Court.

20        THE COURT:  That's fine with me.

21        MR. FINDLING:  That's what we agreed to, Your Honor.

22        THE COURT:  All right.  Okay.  If there is nothing else,

23 and I hope not, I'm going to bring the jury out, I'm going to

24 address them.  And then who will do the opening statements for the

25 government?

1          MR. DAVIS:  I will.

2          THE COURT:  Mr. Davis?

3          And then who is going to do the opening statements for

4    the defense?

5          MS. GOLDBERG:  I will.

6          THE COURT:  Okay.

7          MR. FINDLING:  Your Honor, can we invoke the rule?

8          THE COURT:  Yes.  The rule of sequestration is being

9    invoked by both the government and the defense in this case.  Both

10   sides are responsible for keeping all the witnesses outside of the

11   courtroom and instruct them not to discuss the case other than the

12   lawyers.

13         (The jury is seated at 9:21 a.m..)

14         THE SECURITY DEPUTY:  Please be seated and come to

15   order.

16         THE COURT:  Good morning, ladies and gentlemen of the

17   jury.  It's good to see y'all this morning.  Thank you for your

18   time yesterday.

19         We're getting ready to start the trial today.  There's a

20   couple things I want to tell you before we start the trial and

21   opening statements.

22         Some of y'all may have on your phones what we call

23   push-ups, which is news alerts, which is great to have.  But as I

24   told y'all yesterday, for the next three weeks, or as long as this

25   case is pending, you cannot read anything about this case, watch

1    anything on television about this case or listen on the radio

2    about this case or discuss this case with anyone in any manner

3    whatsoever.

4           So if you have one of those news alerts on your phone,

5    if you don't have your phone with you now, if it's in your car or

6    downstairs with the CSO, when you receive your phone back, if it

7    has a push-up alert about this case, delete it.  Because again

8    that falls on the line of you reading something about the case.

9    So if you get there and you turn your phone on like I do and

10   there's something there, delete it.  Don't read it.  Any questions

11   about that?

12          Now, ladies and gentlemen of the jury, the opening

13   statements is a very, very important part of a jury trial.

14   Because during the opening statements, the lawyers will paint a

15   picture for you about what they think the case is about.  It's

16   like drawing a map for you to follow the case and it helps you

17   follow the case easier as you go through it.  And that's what

18   makes it very important.

19          However, what the lawyers say in opening statements is

20   not evidence.  The evidence will come from the witnesses that take

21   the witness stand and the exhibits I allow in during the course of

22   the trial.  But again, I want to stress to you, you should pay

23   close attention to what the lawyers say in the opening statements.

24   Even take notes if you think it's important because it will help

25   you follow the case easier.

1          Now, the first attorney you'll hear from is Mr. Jeffrey
2    Davis.
3          MR. DAVIS:  Thank you, Judge.
4          Ladies and gentlemen of the jury, may it please the
5    Court.
6          This is a case about money and this is a case about
7    manipulation.  This is a case about how Mitzi Bickers manipulated
8    her friends, manipulated her clients, and manipulated the system
9    to line her bank account.
10          Mitzi Bickers is a formidable person.  She's a skilled
11   political consultant.  She's a long-time pastor and she's a
12   strategic thinker.  And with those gifts, Ms. Bickers has been
13   able to find people who will follow her.  She's been able to find
14   people who will trust her and trust her blindly.  And she's been
15   able to find people who she can manipulate.
16          And because of that, we are here today in court.  At its
17   core, Mitzi Bickers is charged with accepting and paying bribes to
18   get contracts in the City of Atlanta and the City of Jackson,
19   Mississippi.  Over the course of about five years, bank records
20   will show literary millions of dollars of bribe money went from
21   City of Atlanta contractors into Pastor Bickers' bank accounts.
22   And bank records will show that over $80,000 of benefits were paid
23   by Pastor Bickers to the former mayor of the City of Jackson to
24   get contracts in Mississippi.
25          Now, let's back up.  Let's set the stage.  Let's start

 1  with 2009.  In 2009, Pastor Bickers was running a political

 2  consulting group.  The group was called The Bickers Group.

 3          Now, Ms. Bickers has several different companies that

 4  you will hear about during this trial.  Pastor Bickers had The

 5  Bickers Group, she had Chateau Land Company, she had Mississippi

 6  Developers.  But for now I want to focus on Bickers Group.

 7          The Bickers Group helped candidates get elected.  And

 8  Mitzi Bickers was good at her job.  In fact, in late 2009, Mitzi

 9  Bickers helped Kasim Reed get elected as the 59th mayor of the

10  City of Atlanta.  And in return, Mayor Reed, when he took office

11  in 2010, appointed Mitzi Bickers to be the Director of Human

12  Services for the City of Atlanta.

13          The Director of Human Services was an executive level

14  position.  And Ms. Bickers, Pastor Bickers, reported directly to

15  the mayor's office.  To be clear, the Director of Human Services

16  was a position that helped provide citizens with access to

17  government services.  And from 2010 to 2013, Pastor Bickers served

18  as the Director of Human Services.

19          And while in office from that official position, Pastor

20  Bickers accepted millions of dollars in bribe payments.  And

21  later, when she left office, she paid bribe payments to other city

22  official to make sure that contracts were awarded to two Atlanta

23  businessmen, E.R. Mitchell, Jr., and C.P. Richards, Jr.

24          Now, E.R. Mitchell and Pastor Bickers were long-time

25  friends.  They are also long-time business associates.

1    Mr. Mitchell is a bright man with a degree from Harvard Business

2    School.  And for a time, Mr. Mitchell ran a very successful

3    construction company.  In fact, at one point in time, Mitchell's

4    company, Cascade Building Systems, was doing about $100 million a

5    year in business.  But in the late 2000s, business had become

6    lean.  America was in the midst of the Great Recession and

7    Mitchell's company was not spared.

8          And Pastor Bickers knew this.  She knew that Mitchell

9    was desperate.  She knew that Mitchell had gone to Harvard but

10   wasn't particularly street savvy.  And she knew that Mitchell

11   trusted her.  And I don't mean Mitchell trusted her like a friend.

12   I mean that Mitchell trusted Pastor Bickers like she could do no

13   wrong, like Pastor Bickers had hung the moon.  And she -- he

14   followed Pastor Bickers with blind faith.  As a strategic thinker,

15   Pastor Bickers manipulated Mr. Mitchell and she manipulated that

16   situation.

17         Pastor Bickers told Mitchell that if he paid her, she

18   could get him city contracts.  And guess what?  Mitchell paid her.

19   And guess what?  Pastor Bickers delivered city contracts.  Pastor

20   Bickers delivered millions of dollars in city contracts to

21   Mr. Mitchell and C.P. Richards.

22         Let's discuss C.P. Richards for a moment.  Like

23   Mitchell, C.P. Richards was a businessman in Atlanta and he owned

24   a construction business.  In fact, Mitchell and Richards had been

25   friends for decades.  And like Mitchell, Richards' company had

1  been beaten down by the Great Recession.

2          So when Mitchell proposed paying bribe payments to get

3  government work, Richards consented.  He paid bribes and kickbacks

4  to get City of Atlanta contracts.  And typically the way it worked

5  was Richards would pay Mitchell and Mitchell would pay Bickers,

6  but that's not always the case.  There were times when Richards

7  would pay Mitchell -- sorry -- when Richards would pay Pastor

8  Bickers directly.  And the bank records are going to show all this

9  clear as day.

10          Those payments, those payments from Mitchell and

11  Richards, were for three types of contracts.  Mitchell and

12  Richards paid for the emergency bridge repair contract, they paid

13  for the annual sidewalk contract, and Mitchell and Mitchell alone

14  paid for emergency snow removal.  And we're going to talk about

15  all of these, but let's start with the bridge contract.

16          In 2010, Mitchell and Richards paid Pastor Bickers to

17  get contracts to repair two City of Atlanta bridges.  The first

18  bridge was the Martin Luther King bridge, actually just right

19  outside.  And the second bridge is the Park Drive bridge.

20          Now, the dates on this are critical.  In late 2010,

21  Pastor Bickers gave Mitchell a City of Atlanta document, a draft

22  document.  The document was internal and it contained non-public

23  information.

24          And if there were any doubts as to whether this was a

25  draft document or an internal document, those can be resolved,

1  because the document is stamped with the word "draft" on it.  And

2  even though Ms. Bickers gave the document to Mitchell in late

3  2010, the city did not release the bridge contract until April

4  2011.  So Richards and Mitchell had an extra four months to work

5  on their bids.  In addition, the draft document had information

6  about the bridge repairs that was never publicly disclosed.

7        So overall, Richards and Mitchell were able to use that

8  extra time and they were able to use that extra information from

9  Pastor Bickers to get more than $2 million in work on the bridge

10  contract.  And, of course, Pastor Bickers got her cut, because

11  after Richards and Mitchell were paid, they gave a percent of what

12  they got from the city back to Pastor Bickers.

13        So we said that there were three contracts.  We just

14  talked about one, which is the bridge contract.  Let's talk about

15  the sidewalk contract.

16        Mitchell and Richards also paid for the City of

17  Atlanta's annual sidewalk contract.  As you might expect from the

18  title of the contract, the annual sidewalk contract focused on

19  building and repairing sidewalks around the City of Atlanta.  And

20  over time, this contract was worth millions of dollars.  And it

21  was worth millions of dollars for two reasons.

22        The first was, it's because it's an annual contract.

23  And as an annual contract, the contract was available for

24  additional work every single year.  And second, the sidewalk

25  contract was subject to amendments.  And what that means is, the

1  city could add work to the contract without it being rebid.

2  Meaning, they could give work directly to Mitchell and Richards.

3       And this sidewalk contract was amended like 13 times for

4  additional work.  But these amendments weren't free.  These

5  amendments came with a price.  And the price was, a payoff back to

6  Pastor Bickers.

7       Over the course of about five years, Richards and

8  Mitchell made over $3 million on the sidewalk contract and the

9  amendments.  And you know who else made a lot of money on the

10 sidewalk contract and the amendments?  Pastor Bickers.  Because

11 over the course of those same five years, Mitchell and Richards

12 would pay a percent of what they got from the city back to Pastor

13 Bickers.

14      So we've talked bridges.  We've talked sidewalks.  Let's

15 talk about snow.

16      And there's two pieces to the snow contract, there's the

17 2011 piece and then there's the 2014 piece.  For those who are in

18 Atlanta, you may remember in January 2011 Atlanta was hit with a

19 significant snowstorm.  Not snowmageddon, and we're going to talk

20 about that, but a big storm nonetheless.  The storm started with

21 freezing rain, then snow, then another layer of freezing rain.

22 And it basically covered the City of Atlanta streets in a thick

23 sheet of ice.

24      And at the time, Atlanta did not have the right

25 equipment to clear the streets, so they hired private companies,

1  private contractors to do that.  Using her influence and money,

2  Ms. Bickers -- Pastor Bickers -- was able to get E.R. Mitchell

3  part of that emergency contract, and not just part, $1.2 million

4  worth of work.

5         Point of clarity here.  Although Richards did a small

6  amount of work on the 2011 snow contract, most of that was done by

7  E.R. Mitchell.  That was his contract.

8         For the 2011 snow, like most of the sidewalk and most of

9  the bridge work, Mitchell paid Pastor Bickers a kickback.  And so

10 the way that works is, Mitchell charges the City of Atlanta more

11 than it actually cost to perform the work.  Then, with the extra

12 money, Mitchell is able to give a kickback to Pastor Bickers.  And

13 the bank records for 2011 tell the story and they tell this story

14 with precision.

15        On January 16, 2011, just after the snowstorm, the city

16 paid E.R. Mitchell about $1.2 million.  Over the next two weeks,

17 Mitchell pays Pastor Bickers almost $300,000.  That's $300,000 in

18 two weeks.

19        Now, as we discussed, Pastor Bickers is smart and Pastor

20 Bickers is savvy.  Pastor Bickers doesn't want a paper trail of

21 money going from a city contractor to her while she's working at

22 the city.  So you're not going to see a wire transfer from E.R.

23 Mitchell to Pastor Bickers.  You're not going to see a $300,000

24 check be written from E.R. Mitchell to Pastor Bickers.  But what

25 you are going to see is just as powerful and it's just as

1   convincing.

2          What you're going to see is a series of cash

3   transactions from Mitchell to Pastor Bickers.  And why cash?

4   Because that's what Mitzi Bickers told E.R. Mitchell to do.  Mr.

5   Mitchell is going to tell you that he didn't like going to the

6   bank and taking out $100,000 at once, because the bank looked at

7   him like he was a drug dealer.  But he did it because that's what

8   he was told to do.

9          So let's walk through this.  January 26, 2011, the city

10  pays Mr. Mitchell $1.2 million.  The very next day, Mr. Mitchell

11  takes out $140,000 in cash.  And by February 1st, six days after

12  getting paid, Mitchell had taken out a total of $390,000 in cash.

13         At the same time, from January 27th to February 11th,

14  about a two-week time frame, over $290,000 is deposited into

15  Pastor Bickers' accounts or accounts for her benefit.  And here's

16  what that looks like.

17         Now, from this chart you can see that all of the

18  transactions into Pastor Bickers' bank account were for $10,000 or

19  less.  That's not an accident and that's not a coincidence.  Those

20  deposits were for $10,000 or less because if you put in more than

21  $10,000, $10,000 and a penny, the bank is required to file a

22  report.  They are required to file what's called a currency

23  transaction report, or CTR, with the federal government.

24         Remember, 2011, Ms. Bickers is working for the City of

25  Atlanta in a full-time job.  That full-time job pays $60,000 a

1  year.  Ms. Bickers -- Pastor Bickers -- doesn't want a report to

2  the IRS about $90,000 of cash going into her account.

3       And you might be wondering, well, four of those

4  transactions are for more than $10,000, they're for $50,000 each.

5  And you're right.  But those transactions, those deposits, did not

6  go into Mitzi Bickers' account.  They went into an account for a

7  real estate company called Southern Horizon Real Estate.  And

8  that's because, right in the middle of these payments, on January

9  31st, 2011, Pastor Bickers agreed to buy a house for $775,000.

10  And it was a lake house and it was a house that she had been

11  living in.

12       Just days after signing the agreement to actually close

13  on the house, Pastor Bickers puts $200,000 in cash into the real

14  estate company's account, like a down payment.

15       But remember the timing here.  Pastor Bickers had been

16  living in that house for 18 months.  And five days after the city

17  pays E.R. Mitchell $1.2 million, Pastor Bickers agrees to buy the

18  house in less than five months.  And why?  Because she knows the

19  bribe money is coming from E.R. Mitchell.

20       The money didn't stop with January and February of 2011.

21  Because just before the closing, Pastor Bickers was still about

22  $300,000 short.  So what did she do?  She got more money from E.R.

23  Mitchell and C.P. Richards during late 2000 -- sorry -- during

24  late June 2011, just two weeks before the closing, Mitchell and

25  Richards sent over another $234,000.  So in total, in about a

1  five-month period, Pastor Bickers received more than $400,000 from

2  Mitchell for snow and Richards for other projects.

3       Now, getting that much money into a bank account, it's

4  difficult.  And Pastor Bickers spread those transactions over five

5  banks, over 11 different bank accounts, and about 95 separate

6  transactions.  And that doesn't even count the $200,000 that she

7  deposited directly into the real estate account.

8       Now, let's not forget, all of this is happening while

9  Pastor Bickers is working with the City of Atlanta as an employee

10 at $60,000 a year.  So not only did Pastor Bickers make $60,000 a

11 year, that's also what she claimed her income was on her taxes.

12      So in 2011, Pastor Bickers buys a $775,000 home.  She

13 has more than $400,000 deposited directly into her account.  She

14 puts $200,000 in cash into a real estate account.  All the while

15 she's claiming she only made $60,000 on her income tax.  Ladies

16 and gentlemen of the jury, there is no magic here.

17      As you probably expect, the grand jury has also charged

18 Ms. Bickers with filing a false tax return.  And while we're on

19 the subject of false statements, let's talk for a moment about the

20 four wire fraud counts.

21      The City of Atlanta requires some of its employees,

22 certain employees to complete what's called an annual financial

23 disclosure form every year.  The form is designed to promote

24 transparency in government, and it's designed to make sure that

25 government employees don't have a conflict of interest.  The form

1  asks questions like, in 2011, were you employed outside the city?

2  Or, in 2011, did you make more than $5,000 from some outside

3  source?

4          Now, we've already discussed that, in 2011, Pastor

5  Bickers had gotten hundreds of thousands of dollars from E.R.

6  Mitchell.  We've also discussed that she got more than $50,000

7  directly from C.P. Richards.  Both of whom are contractors with

8  the City of Atlanta.  Obviously, Pastor Bickers cannot disclose on

9  this form to the city that she got $500,000 in money from the City

10  of Atlanta contractors.  That's like ten times her salary.  And as

11  you can see, she didn't.  On the form, Pastor Bickers did not

12  disclose that she had outside employment and she did not disclose

13  that she had made more than $5,000 in income.

14          Which makes sense.  Because if the City of Atlanta knew

15  that Pastor Bickers had received more than $500,000 from city

16  contractors, they would have fired her.  But because Ms. -- Pastor

17  Bickers did not disclose that on the form, the city didn't know

18  about it and the city didn't fire her.

19          So Pastor Bickers was able to keep her job, she was able

20  to keep her salary, and the city kept paying her.  In fact, the

21  city paid her until May 2013 when media reports surfaced that

22  Pastor Bickers had lied on another one of her financial disclosure

23  forms.  At that point, Pastor Bickers resigned from the city.

24          But the bottom line here is this:  If Pastor Bickers had

25  been truthful on her form in 2011, she would never have gotten

1  paid by the city all the way in 2013.  And based on those false

2  statements, that's why the City of Atlanta continued to pay her

3  salary and those salary payments are the basis for the four wire

4  fraud counts.

5        So let's move now from the 2011 snowstorms to the 2014

6  snowstorms.  In 2014, the City of Atlanta was hit with two major

7  snowstorms in a very short period of time.  In January 2014,

8  Atlanta was struck by snowmageddon or snowpocalypse.  And in

9  February of 2014, the City of Atlanta was hit by another

10  significant storm.

11        Looking back on 2011, Atlanta had gotten caught, the

12  City of Atlanta had gotten caught because they did not have any

13  contractors who could help them clear the snow.  And as we

14  discussed in 2011, the city had to scramble to find contractors,

15  private businesses, who could help them in the middle of the

16  snowstorm.

17        But Atlanta learned from that experience.  So what did

18  Atlanta do?  They bid a contract to have a group of reserve,

19  on-call contractors that they could call whenever there was a snow

20  emergency.  These were pre-approved contractors, they could be

21  called to help whenever the city needs it.  So the city bids the

22  contract.  And ultimately five different companies, five private

23  companies are selected to be on call, available if needed.

24        What's important to remember here is that E.R.

25  Mitchell's company, Cascade Building Systems, was not one of those

```
 1    five companies.  And what that means is, E.R. Mitchell should not
 2    have gotten any work for the 2014 snow unless all five on-call
 3    contractors were unavailable.
 4           But that's not what happened.  Not only did Mitchell's
 5    company get work, Mitchell's company got the most work.  And it
 6    wasn't because the actual on-call contractors were busy, to the
 7    contracting -- to the contrary.  Those contractors were ready to
 8    work, they were willing to work and they were able to work.
 9           So how did it happen?  It happened because Pastor
10    Bickers paid bribes to get E.R. Mitchell that emergency contract
11    work.  Now, remember, 2014, Pastor Bickers is no longer with the
12    City of Atlanta.  But she still had influence, she still had
13    friends, and she still knew how to get work.
14           Importantly, Mitzi Bickers knew Cotena Alexander.  And
15    in 2014, Cotena Alexander worked for the City of Atlanta's Public
16    Works Department as its operations manager.  And what's
17    significant about that position is the operations manager decided
18    which contractors got emergency work for the 2014 snow.  And
19    Cotena Alexander chose E.R. Mitchell.  She chose Mitchell over the
20    on-call contractors.  She chose Mitchell despite that its prices
21    were higher.  And she chose Mitchell even though there was already
22    a group of contractors that had been preselected to do this exact
23    work.
24           And why?  Because Pastor Bickers was bribing her to do
25    so.  The city paid Mitchell, Mitchell paid Ms. Bickers, and then
```

1  Pastor Bickers paid Cotena Alexander.

2          And just like in 2011, the money trail tells the 2014

3  story.  In 2014, Mitchell received more than $5.5 million from the

4  city for snow removal services.  And over the course of, like,

5  three months, Mitchell gives Pastor Bickers and her companies

6  about $900,000, which, if you do the math, is almost exactly 15

7  percent.

8          Now, because at the time Pastor Bickers is not working

9  for the city, there's an extra step.  The money has to get to the

10 public official, and that public official is Cotena Alexander.

11 Remember how we discussed the 2011 snowstorm, when Pastor Bickers

12 was working with the City of Atlanta?  At that time, she didn't

13 want a paper trail.

14         Well, in 2014, neither did Cotena Alexander.  So Pastor

15 Bickers paid Alexander in cash.  And then what Cotena Alexander

16 did with that cash was she went to different stores around the

17 City of Atlanta and she bought money orders and then she mailed

18 those money orders to credit card companies to pay off her credit

19 card debt.  Even though Ms. Alexander almost always paid her

20 credit card off just using her bank account.  In total, in 2014,

21 Ms. Alexander bought almost $30,000 in money orders from monies

22 paid by Pastor Bickers.

23         So what did Pastor Bickers do with her money?  We know

24 in 2011 what she did.  She bought a $775,000 lake house.  But how

25 did she spend her money in 2014 now that she owned her house?

1    First, Pastor Bickers spent about $415,000 on travel, on shopping

2    and on hotels in 2014.  She also bought a GMC Denali for about

3    $46,000.  She also bought four jet skis, also for about $45,000.

4         Now, the Denali and the jet skis are important because

5    those purchases form the basis of why Pastor Bickers has been

6    charged with money laundering.  Now, it's common to think of money

7    laundering as offshore accounts and really complicated financial

8    transactions.  And that is definitely a form of money laundering.

9    But that's not the form of money laundering that Ms. Bickers is

10   charged with.  She's charged with violating what's called the

11   spending statute.

12        And that charge is very simple.  If someone spends more

13   than $10,000 and the money is derived from criminal enterprise,

14   then that person has violated the spending statute.  So, here,

15   Ms. Bickers bought the jet skis and she bought the Denali with

16   money that she had received from the bribery scheme and that's why

17   Ms. Bickers has been charged with money laundering.

18        It's important to note that both E.R. Mitchell and C.P.

19   Richards are going to come in here and talk to you.  It's also

20   important to note they're going to stand before you as convicted

21   felons.  In this very courtroom they both pled guilty to bribing

22   Pastor Bickers to get city contracts.  They both went to federal

23   prison.  And they both also agreed to cooperate with the

24   government.  And just because they agreed to cooperate with the

25   government doesn't mean they immediately confessed to the

1  government when they were approached.

2          When the FBI first approached C.P. Richards, he did

3  admit what he had done.  But when the FBI first approached Mr.

4  Mitchell, he didn't.  In late 2015, when the FBI went to speak to

5  Mr. Mitchell about all these cash transactions, all this money

6  going in and out of his account, Mr. Mitchell didn't have an

7  attorney, he tried to protect himself and he told a story.  He

8  made up a story about how the cash withdrawals were for other

9  things.  He made up a story that the money he -- that -- sorry.

10 He made up a story about what he had paid Ms. Bickers and told the

11 FBI that he never made any bribe payments to Pastor Bickers.

12          Just a few week later, after Mitchell got an attorney,

13 he came back to the FBI and he admitted what he had done.  He told

14 the FBI that for years he and C.P. Richards had been paying Mitzi

15 Bickers bribes to get contracts.

16          So after that very same meeting, that first meeting

17 between the FBI and E.R. Mitchell in July of 2015, Mitchell was

18 shaken and Mitchell went to someone he trusted.  Directly after

19 that meeting, he drove to Mitzi Bickers' lake house and he told

20 her what happened.  He told her that federal agents were looking

21 at them.  And true to form, Pastor Bickers does what she always

22 does.  She tried to manipulate Mr. Mitchell.  She tried to

23 obstruct the federal investigation.

24          During the summer of 2015, Bickers and Mitchell met

25 several times.  And each time Pastor Bickers would say things

1  like, you need to keep your mouth shut.  You need to fall on the

2  sword.  You just need to go to prison for tax fraud.  And for this

3  conduct, Ms. Bickers has been charged with tampering with the

4  witness.

5          Now, let's get to the final chapter of our story.  In

6  Atlanta, Pastor Bickers learned a formula.  Get into a local

7  government, get contracts, get paid.  And in 2014, Ms. Bickers --

8  Pastor Bickers -- saw an opportunity to use this same formula.

9  Only this time she focused her attention on Jackson, Mississippi.

10         In the spring of 2014, the mayor of Jackson,

11  Mississippi, passed away, and the City of Jackson held a special

12  election in April of 2014.  One of the candidates for mayor was

13  Tony Yarber.  Like Mr. Mitchell, Tony Yarber is a bright man.  In

14  fact, at the time, in the spring of '14, he was serving as a

15  councilman in the City of Jackson.  But also like Mitchell, he was

16  a bit naive and he could not handle Ms. Bickers.

17         Now remember, at the time, Pastor Bickers is no longer

18  working for the City of Atlanta.  And she's doing consulting work,

19  but not really through her own company, The Bickers Group anymore.

20  A few years earlier Pastor Bickers met and started dating a woman

21  named Keyla Jackson.  At the time, Ms. Jackson owned a company

22  called Pirouette Dance Company.  And Pirouette Dance Company was a

23  company that, as you might guess, offered dance lessons.

24         After the two started dating, Keyla Jackson changed the

25  name of her company from Pirouette Dance to Pirouette Strategies.

1    Pirouette Dance Company had transformed from a company that taught

2    dance lessons to a company that did political consulting work.

3           Now, most people you're going to hear from thought that

4    Pirouette Strategies was actually owned by Ms. Bickers, Pastor

5    Bickers.  But, technically, it was owned by Keyla Jackson.

6           Now, Pastor Bickers offered Pirouette services to

7    candidate for mayor Tony Yarber.  And even though Pirouette is in

8    the business of selling political consulting services, Pirouette

9    and Pastor Bickers gave all of those services to Tony Yarber for

10   free.  And to be clear, Pastor Bickers provided lots of services,

11   polling data, donations.  She even bussed a group of people all

12   the way from Atlanta to Jackson, Mississippi, on election day to

13   help during the election.

14          But Pastor Bickers did not charge Mayor Yarber a dime.

15   And why?  It's not because these were gifts.  It's not because

16   they were donations.  They were bribes.  And what were they for?

17   Mitzi Bickers wanted City of Jackson contracts.

18          For context, in 2014, the City of Jackson was under

19   what's called an EPA consent agreement.  Basically, the City of

20   Jackson had to fix its sewer system.  And Pastor Bickers wanted

21   part of that contract, a $16 million contract.  Also at the same

22   time the City of Jackson was looking to build a convention center

23   hotel.  And Pastor Bickers wanted part of that contract.  A $70

24   million contract.

25          And like we discussed, Pastor Bickers is good at her job

1  and she got Tony Yarber elected mayor.  And once elected, Mitzi

2  Bickers pressed for those contracts.  She hosted fundraisers for

3  Mayor Yarber.  She even got her old friends, Richards and

4  Mitchell, to donate to Mr. Yarber.  She also flew Mr. Yarber and

5  his staff up to Atlanta first class.  She put them up at the Ritz.

6  And had a limousine drive them around.  She spared no expense in

7  her efforts to get contracts in the City of Jackson.

8          And we're not talking about one trip.  There were

9  several trips.  During this trial, you're going to hear about

10  those trips in detail.  But the bottom line is this:  All in all,

11  Pastor Bickers gave about $80,000 worth of services to Mayor

12  Yarber.  Campaign services, flights, hotel rooms, drinks, dinner.

13  All of it her attempt to get contracts with the City of Atlanta.

14          Now, I said the word in her attempts to because Pastor

15  Bickers never got the EPA contract and she never got the hotel

16  contract.  But the grand jury has still charged with -- still

17  charged Pastor Bickers with bribery.  And the reason is because a

18  bribe does not have to be successful in order for it to be a

19  bribe.  All that matters is someone pays the bribe, pays the

20  money, gives the gift, with the intent to influence the public

21  official.  And that's exactly what happened here.  Pastor Bickers

22  gave these benefits to Mayor Yarber in an attempt to influence him

23  to get contracts.

24          THE COURT:  Mr. Davis, I'm sorry, but your 35 minutes is

25  up.

```
1              MR. DAVIS:  Okay.

2              THE COURT:  I'll let you finish that statement.

3              MR. DAVIS:  Can I have about 30 seconds, Judge?

4              THE COURT:  30 seconds.

5              MR. DAVIS:  Ladies and gentlemen, you're going to hear

6    from people who worked at the City of Jackson.  You're going to

7    hear from the people who worked at the City of Atlanta.  You're

8    going to get to see the bank records.  And you're going to get to

9    review these contracts.  And when you see all of the pieces

10   together, when you see all of the evidence together, you're going

11   to know that Mitzi Bickers is guilty beyond a reasonable doubt.

12   Thank you.

13             THE COURT:  Thank you, Mr. Davis.

14             Ladies and gentlemen of the jury, you're now going to

15   get to hear from Attorney Ms. Marissa Goldberg.

16             MS. GOLDBERG:  Thank you, Your Honor.

17             Good morning.  When you put blinders on a horse in a

18   race, it narrows its focus.  It eliminates distractions.  It

19   blocks out the outside world.  It blocks out reality.

20             But when the federal government puts blinders on in a

21   criminal prosecution, that can have dangerous and dire

22   consequences, serious consequences for an individual accused under

23   its wake.

24             What you will hear in this case is that the federal

25   government instituted a massive, extensive, and expensive
```

1   investigation over the course of the past about a decade into

2   people who worked in the City of Atlanta.  They spared no expense.

3   They traveled around the country.  They brought agents from

4   various agencies.  They talked to anybody and everyone that they

5   could get their hands on.  They were relentless.

6         You will hear that some people felt the weight of the

7   federal government and cooperated with them and pled guilty.  You

8   might hear from some of those folks in the trial who are still

9   bound by those cooperation agreements with the federal government.

10        At some point those blinders went on and the federal

11  government narrowed their focus to Pastor Mitzi Bickers.  You

12  might hear her referred to as pastor or reverend or some other

13  similar name, but who is Pastor Mitzi Bickers?  She's a child of

14  Atlanta and her parents, Benjamin and Ethyl Bickers.  She was

15  raised in the church.  Her father was a pastor at Emmanuel Baptist

16  Church.  She grew up attending that church.  Her father had been

17  active in the Civil Rights Movement.  And through her father, she

18  learned about the cross-section between politicians and preaching,

19  which was common in the African-American community.  She learned

20  about this from her father.

21        And she attended Spelman.  She graduated from Spelman.

22  And when her father passed away, she took over the pulpit from him

23  and started preaching at Emmanuel Baptist Church.  She found

24  success, personal and spiritual success in the church, but also in

25  the political sphere.  She had a knack.  She had an expertise.

1  She was good at "Get out the Vote," grass roots efforts,

2  campaigning, polling, before those were even political buzz words.

3  She began to have a reputation for that success.  People would

4  come from all over, seeking her out to help with campaigns.

5          And Pastor Mitzi Bickers held positions within politics

6  herself.  She had previously been on the Atlanta School Board, the

7  youngest person to hold that position.

8          It is true that Pastor Mitzi Bickers started working for

9  the city in 2010.  She had helped former Mayor Kasim Reed with his

10  campaign and she was offered a position in the city.  That's not

11  unusual.  That's par for the course in politics.  One

12  administration leaves, another comes in, people bring their own

13  people with them.  That's the normal course.

14          She was offered a position in the human services

15  department.  It was a good fit for her, given her past in the

16  preaching world.  She was dealing with homelessness projects and

17  the elderly, kind of, people interaction.

18          She was not really shy about telling people that she

19  wanted that position because she wanted a pension and health

20  benefits.  She had a child with health issues.  She worked in that

21  position and she got good performance reviews.  You will see,

22  perhaps, on the indictment they note her salary, but it does

23  decrease.  And that's because she let her supervisors know and

24  took a leave of absence without pay when she went to go work on

25  campaigns.

1                But what you will unequivocally not hear in this case is
2       that in her role in the human services department, that Pastor
3       Mitzi Bickers had any authority, any ability to steer, grant, or
4       award any government contract.  That just didn't exist.
5                She worked in the city for three years and she retired
6       in May 2013.  The plan was to work there for three years.  And
7       after she left the city, she continued to work on political
8       campaigns.  She went back to preaching.  And she took business
9       opportunities as they presented to her.  She went to Slidell,
10      Louisiana.  She went to Jackson, Mississippi.
11               She was good in business development.  She used her
12      skills as a preacher, because she was good at relating to people.
13      She is a skilled conversationalist.  She was successful in
14      business and she's a quick learner.  She was passionate about
15      local and minority participation.  If she found someone who had
16      potential, she would lift them up with her.
17               But that's not to say that everything that Pastor Mitzi
18      Bickers did was selfless.  At this point in her life, she was
19      middle-aged and she had been working for the past three decades,
20      very hard, many different jobs, wore many different hats.  And she
21      wanted to live and enjoy her success with her loved ones.  The
22      government may try to paint that as a luxurious lifestyle, as if
23      she's not the type of person that should be enjoying that
24      lifestyle, but what you will see is that those allegations are
25      overblown and, honestly, a little offensive.

1          So how is it that Pastor Mitzi Bickers found herself

2     sitting over here at counsel table facing a federal criminal

3     indictment?  It is because the federal government had put those

4     blinders on and they bet on the wrong horse in this race.  They

5     bet all their money on a man named E.R. Mitchell, Elvin Mitchell,

6     E.R. Mitchell.

7          This man has zero credibility.  He is a hustler and a

8     swindler.  He was a Harvard MBA graduate, and because of that, he

9     has an ability to smooth talk with folks.  People believed that he

10    was a successful businessman.  He put on those airs.

11         But underneath it all was nothing but lies, deceit, and

12    manipulations.  He was able to convince others, even those closest

13    to him, that things were great, things were going good for him,

14    but his skills in manipulations knew no bounds.  That man was even

15    willing to meet with the government, plead guilty and cooperate,

16    because he was more worried about what could come to him if the

17    truth really came out.

18         E.R. Mitchell and Pastor Mitzi Bickers did have a prior

19    friend and professional relationship.  Their fathers actually knew

20    each other.  E.R. Mitchell had a construction company he inherited

21    from his father.  His father had a good reputation in the

22    community and kind of piggybacked off that reputation.  But he was

23    not like his father at all.

24         He had money problems.  And he was constantly trying to

25    cover up those money problems.  He was very good at doing that.

1   And while he was doing that, he was still able to convince

2   everyone around him that he was a person to bet on.

3          His focus on obtaining government contracts started long

4   before anything you will hear about in this case.  And his

5   problems obtaining those government contracts started long before

6   anything you'll hear about in this case.  And the federal

7   government knew about it all along.  They had those blinders on

8   real strong.

9          You will hear that there are some money the government

10  moved around.  That's true.  Some of those were large amounts.

11  But the explanation that you will hear from the prosecutors is

12  inaccurate and untrue and wholly insufficient.

13         As you hear the evidence in this case over the next

14  couple of weeks, I just want you to focus on a few things.  Just

15  because something looks different or maybe isn't something that --

16  behaves -- someone behaves in a way that you don't think is

17  something you would do, doesn't make them guilty.  If you don't

18  like the actions of a person or maybe you don't even like that

19  person themselves, they're not guilty.  The old adage if there is

20  smoke there's fire doesn't apply in a criminal case.  Everything

21  must be proven.

22         His Honor will tell you about the burden that the

23  government has in this case.  It's a very strong burden.  They

24  have to prove to you each and every element of each and every

25  charge in this very long and overdone criminal indictment.  They

1   won't be able to do that.

2          At the end of the evidence, if you have any concerns in

3   your mind, if you think there's anything -- there's any holes,

4   anything missing, any missing puzzle pieces, any missing people,

5   those are all reasonable doubts and all of that is not guilty.

6          The justice system is supposed to be blind in this

7   country.  But the federal government was willfully blind in this

8   criminal prosecution.  They are not supposed to accept lies and

9   keep on moving forward.  They're not supposed to accept lies from

10  people cooperating with them and keep on moving forward.  His

11  Honor will tell you that, as jurors, it is your responsibility to

12  determine the credibility of any witness.  It is your

13  responsibility to determine if those people are believable.  That

14  is your duty.  It is your duty to take those blinders off and see

15  through.

16         There are massive holes in this case.  You will see that

17  at the end of the evidence.  And I'm confident that when you're

18  done, when this case is over and you go back to the jury room and

19  you take this indictment, you'll find Pastor Mitzi Bickers not

20  guilty on each and every count.

21         THE COURT:  Thank you, Ms. Goldberg.

22         The government can call its first witness.

23         MR. KITCHENS:  Your Honor, the government calls Special

24  Agent John Relyea.

25         THE COURT:  All right.  Mr. Kitchens, remember you can

```
 1  take your mask off when you're talking or questioning.
 2            MR. KITCHENS:  Thank you, Your Honor.
 3            THE COURT:  You as well in your testimony, you can keep
 4  your mask on or take it off when you testify.
 5            THE WITNESS:  Thank you, Your Honor.
 6                          ******
 7                        JOHN RELYEA,
 8            having been duly sworn, testified as follows:
 9                          ******
10            THE DEPUTY CLERK:  Have a seat.  If you could please
11  state and spell your name for the record.
12            THE WITNESS:  Yes.  My name is John Relyea.  J-O-H-N,
13  R-E-L-Y-E-A.
14  DIRECT EXAMINATION
15  BY MR. KITCHENS:
16  Q.  Good morning, Special Agent Relyea.
17      Where are you from?
18  A.  I'm from Tampa, Florida.
19  Q.  And where do you work?
20  A.  I work with the Internal Revenue Service, Criminal
21  Investigations.
22  Q.  What is your title with the Internal Revenue Service?
23  A.  I'm currently a supervisory special agent.
24  Q.  And what type of investigations do you work on as a
25  supervisory special agent?
```

1   **A.**  We primarily investigate potential criminal violations of the

2   Internal Revenue Code, such as tax evasion, tax fraud, and also

3   related financial investigations, such as money laundering, wire

4   fraud, bank fraud, identity theft.

5   **Q.**  And in 2014 and 2015 what office were you working in at the

6   time?

7   **A.**  I was working in Atlanta, Georgia.

8   **Q.**  And what type of investigations were you doing at that time?

9   **A.**  Tax fraud, narcotics trafficking, public corruption.

10  **Q.**  As part of your role when you were working in Atlanta, were

11  you familiar with an investigation of Pastor Mitzi Bickers?

12  **A.**  Yes, I was.

13  **Q.**  And how did you become familiar with that investigation?

14  **A.**  In mid to late 2014, I received a call from the FBI and the

15  U.S. Attorney's office, and they presented me with a case.  They

16  had received some information from a bank about a City of Atlanta

17  contractor who was withdrawing large sums of money, depositing

18  that money into a City of Atlanta employee's bank account, and

19  they wanted to know if there were any tax ramifications --

20          MR. FINDLING:  Objection, Your Honor, hearsay.

21          MR. KITCHENS:  I think we're just doing basic

22  background, Your Honor, about --

23          THE COURT:  It's not offered for the truthfulness of the

24  matter, it's offered just to show why he did what he did.  So,

25  ladies and gentlemen, this is not offered for the truthfulness of

1  the matter.  It's offered to show why he did what he did in that

2  circumstance, so I will rule in that case.

3  BY MR. KITCHENS:

4  **Q.**  And, Agent Relyea, what was your role in that investigation?

5  **A.**  I was the lead case agent at the beginning of the

6  investigation.

7  **Q.**  And in the course of your role as a lead case agent in that

8  investigation, did you learn about several key figures in that

9  investigation?

10  **A.**  Yes, I did.

11  **Q.**  And who was it that was the focus of the investigation?

12  **A.**  Pastor Mitzi Bickers.

13  **Q.**  Let me show you a document.  It's been marked as Government's

14  Exhibit 193.

15          THE COURT:  Is that 103?

16          MR. KITCHENS:  193, Your Honor.

17          THE COURT:  Okay, thank you.

18  BY MR. KITCHENS:

19  **Q.**  Agent Relyea, do you recognize what this is?

20  **A.**  I do, yes.

21  **Q.**  And what is it?

22  **A.**  This is a driver's license photo of Mitzi Bickers.

23  **Q.**  Does that fairly and accurately depict Pastor Bickers?

24  **A.**  Yes, it does.

25          MR. KITCHENS:  I'll publish this briefly, Your Honor.

1          THE COURT:  Are you offering that?

2          MR. KITCHENS:  I'm sorry.  I am offering it.  I

3  apologize, Your Honor.

4          THE COURT:  Any objection?

5          MR. FINDLING:  No objection.

6          THE COURT:  193 is admitted without objection.

7          (Government's Exhibit 193 was received and marked into

8  evidence.)

9          MR. KITCHENS:  This is Government's Exhibit 193.  Let me

10 see if I can move it down a little.

11 BY MR. KITCHENS:

12 Q.  Okay.  Now, who was Pastor Bickers?

13 A.  She was the pastor at Emmanuel Baptist Church.  She was also

14 a -- at that point she was a previous City of Atlanta employee and

15 she was also a political consultant.

16 Q.  When did she work with the City of Atlanta?

17 A.  From 2010 till 2013.

18 Q.  And what was her position with the city?

19 A.  She was the Director of Human Services.

20 Q.  Did she have any companies that were associated with her?

21 A.  She did, yes.

22 Q.  And what were some of those companies?

23 A.  The main company that I remember was The Bickers Group.  There

24 was also Chateau Land Company, Cora Music Group (phonetic), and

25 she was also associated with Pirouette Dance Company, which later

1  became Pirouette Company or Pirouette Strategies.

2  **Q.**  As part of your investigation, did you also look at certain

3  contractors for the City of Atlanta?

4  **A.**  Yes.

5  **Q.**  And who were the contractors that you focused on?

6  **A.**  E.R. Mitchell and Charles Richards or C.P. Richards.

7  **Q.**  I'm going to show you what has been marked as Government

8  Exhibits 194 and 195.

9          MR. KITCHENS:  Your Honor, may I approach?

10          THE COURT:  Yes.

11  BY MR. KITCHENS:

12  **Q.**  Do you recognize what those documents are?

13  **A.**  I do, yes.

14  **Q.**  And what are they?

15  **A.**  These are driver's licenses, driver's license photos, I should

16  say.  Exhibit 194 is a photo of E.R. Mitchell, and 195 is Charles

17  Richards.

18          MR. KITCHENS:  The government offers for admission 194

19  and 195.

20          THE COURT:  Any objections?

21          MR. FINDLING:  No objection.

22          THE COURT:  They are admitted without objection.  You

23  may publish, if you so desire.

24          (Government's Exhibit 194 and 195 were received and

25  marked into evidence.)

1          MR. KITCHENS:  Let me publish Exhibit 194.

2   BY MR. KITCHENS:

3   **Q.**  Agent Relyea, who was E.R. Mitchell?

4   **A.**  He was a general contractor.  Typically receiving -- bidding

5   for and receiving contracts with the government.

6   **Q.**  And did he have any companies that were associated with him?

7   **A.**  He did, he had several companies, yes.

8   **Q.**  What were some of the companies associated with him?

9   **A.**  Cascade Building Systems, ADM Properties, EC and WT

10  Construction, E.R. Mitchell Construction.

11         MR. KITCHENS:  I'm going to publish Government's Exhibit

12  195.

13  BY MR. KITCHENS:

14  **Q.**  And who is this individual again?

15  **A.**  It is Charles Richards.

16  **Q.**  And who was Charles Richards?

17  **A.**  He was also a general contractor who received contracts from

18  the City of Atlanta and other government entities.  And he

19  typically ventured with E.R. Mitchell in most of the contracts

20  that I saw.

21  **Q.**  Did he have any companies that were associated with him?

22  **A.**  Yes, he had a couple of companies.

23  **Q.**  And what were those companies?

24  **A.**  C.P. Richards Construction and C.P. Richards & Associates, I

25  believe.

1  **Q.**  Now, Special Agent Relyea, in the course of your investigation
2  did you also look at certain other City of Atlanta officials?
3  **A.**  Yes, I did.
4  **Q.**  Who were the other City of Atlanta officials that you
5  primarily focused on?
6  **A.**  City of Atlanta officials were Cotena Alexander and Katrina
7  Taylor-Parks.
8  **Q.**  Let's start with Cotena Alexander.  Who is she?
9  **A.**  She was a program officer or manager with the Department of
10  Public Works at the time.
11  **Q.**  And was this -- in what period of time were you focused on?
12  **A.**  The 2010 to 2014 time frame.
13  **Q.**  Who was Katrina Taylor-Parks?
14  **A.**  She held several roles at the City of Atlanta, one being
15  within the Department of Public Works.  And I believe she ended up
16  being the deputy chief of staff under Mayor Reed.
17  **Q.**  And was that also during that same time period?
18  **A.**  Yes, it was.
19  **Q.**  As part of your investigation did you also look at certain
20  city officials in the City of Jackson, Mississippi?
21  **A.**  Yes.
22  **Q.**  And who was the focus in your review of city officials in
23  Jackson?
24  **A.**  Tony Yarber.
25  **Q.**  I'm going to show you what's been marked as Government's

1  Exhibit 196.

2          MR. KITCHENS:  Your Honor, may I approach?

3          THE COURT:  Yes.

4  BY MR. KITCHENS:

5  Q.  Do you recognize that document?

6  A.  Yes.

7  Q.  And what is it?

8  A.  This is the driver's license photo of Tony Yarber.

9  Q.  And does that fairly and accurately depict Mr. Yarber?

10  A.  Yes.

11          MR. KITCHENS:  The government offers for admission

12  Government Exhibit 196.

13          MR. FINDLING:  No objection, Your Honor.

14          THE COURT:  196 is admitted without objection.  You may

15  publish, if you so desire.

16          MR. KITCHENS:  Thank you, Your Honor.

17          (Government's Exhibit 196 was received and marked into

18  evidence.)

19  BY MR. KITCHENS:

20  Q.  And who is Tony Yarber?

21  A.  Tony Yarber is also a pastor, and he was the -- elected as the

22  mayor of the City of Jackson.

23  Q.  And when was he elected mayor?

24  A.  In April of 2014.

25  Q.  Now, as part of your investigation, did you obtain documents?

1  **A.**   Yes.

2  **Q.**   What type of documents did you obtain?

3  **A.**   So we obtained tax returns for the individuals that we were

4  looking into, and we also subpoenaed many records.

5  **Q.**   Did you subpoena any financial records?

6  **A.**   Yes, we did.

7  **Q.**   Did you subpoena records from various retailers?

8  **A.**   Yes.

9  **Q.**   Did you obtain currency transaction reports?

10  **A.**   Yes, we did.

11  **Q.**   What were the types of things that you were -- we'll talk

12  first about some of those retailers you mentioned.  What

13  were -- what type of records were you sending subpoenas to try to

14  obtain?

15  **A.**   We were trying to -- during any financial investigation we

16  want to follow the money, so we wanted to see where the money was

17  being spent, ultimately, and who had control over that.

18      So we subpoenaed documents from Gucci, Louis Vuitton,

19  automobile dealerships, Walt Disney World Resorts, Carnival Cruise

20  Line.

21          MR. FINDLING:  Your Honor, I'm actually going to object

22  to the phrase "where the money was being spent."  He can say what

23  he was doing, but not speculate on where the money derives from.

24          THE COURT:  I think he did the investigation,

25  Mr. Findling, so I'm going to overrule that objection.

1  BY MR. KITCHENS:

2  **Q.**  And based on your review of those documents, did you determine

3  that Pastor Bickers had made purchases at various locations

4  between 2010 and 2014?

5  **A.**  Yes.

6  **Q.**  What were the types of purchases that you saw during that

7  period?

8  **A.**  There was vacations, travel, airfare, hotels, goods such, as I

9  said, Gucci and Louis Vuitton, automobiles, WaveRunners.

10 **Q.**  Did you collect any records concerning a purchase of a house?

11 **A.**  Yes, I did.

12 **Q.**  What did you obtain regarding the purchase of a house?

13 **A.**  We obtained the closing files or the closing records.

14 **Q.**  I'll show you what's been marked as Government's Exhibit 6.

15     Do you recognize that document?

16 **A.**  I do, yes.

17 **Q.**  And what is it?

18 **A.**  These are the closing records, the real estate closing

19 documents from the closing of Ms. Bickers' residence.

20         MR. KITCHENS:  The government offers for admission

21 Government Exhibit 6.

22         MR. FINDLING:  No objection, Your Honor.

23         THE COURT:  6 is admitted without objection.  You may

24 publish it, if you so desire.

25             (Government's Exhibit 6 was received and marked into

1    evidence.)

2    BY MR. KITCHENS:

3    **Q.**  And look at this just very briefly.  If you look at the first

4    page of what's been admitted as Government Exhibit 6, will you

5    please tell me what this document is?

6    **A.**  Yes.  This is a typical business record certification that we

7    receive from companies when we subpoena them for records.

8    **Q.**  And what is -- what information is provided on that business

9    record certification?

10   **A.**  This is just a record that certifies that these are business

11   records from the business.  And it includes the records as

12   described.  For instance, in this one it says real estate closing

13   documents.  And it also certifies that the records are made by a

14   records custodian for the business and that they were maintained

15   in the normal course of business, made in the normal course of

16   business.

17   **Q.**  So, for this example, who is the records custodian that was

18   certifying that they were made in the ordinary course of business?

19   **A.**  Albert G. Bantley, who looks like the vice president of

20   Brochstein & Bantley.

21   **Q.**  And did the other records that you obtained in your

22   investigation based on those subpoenas also contain similar

23   business record certifications?

24   **A.**  Yes, they did.

25   **Q.**  Now, just to orient you to the document, I won't go into any

1  substance, but what follows right after the business record

2  certification?

3  **A.**   This is the receipts and disbursements ledger for the

4  purchase, indicating closing date of the property, the property

5  address, et cetera.

6  **Q.**   And what is contained in the remainder of this document?

7  **A.**   These are just the remainder of the closing documents, deeds,

8  et cetera.

9  **Q.**   Special Agent Relyea, you also mentioned that you saw evidence

10  of purchases of certain vehicles?

11  **A.**   Yes.

12  **Q.**   What were the types of vehicles that you saw that were

13  purchased?

14  **A.**   There was a GMC Acadia Denali, a Mercedes-Benz, and several

15  WaveRunners.

16  **Q.**   And who was it who made these purchases?

17  **A.**   Either Pastor Bickers or Ms. Keyla Jackson.

18  **Q.**   I'm going to show you documents that have been marked for

19  identification as Government's Exhibit 12, 17, and 19.

20          THE COURT:  Any objections?

21          MR. FINDLING:  No objection, Your Honor.

22          THE COURT:  All right.  7 -- 12, 17, and 19?

23          MR. KITCHENS:  It's Government Exhibit 12, 17, and 19,

24  Your Honor.

25          THE COURT:  They're admitted without objection.

1              (Government's Exhibits 12, 17, and 19 were received and

2    marked into evidence.)

3    BY MR. KITCHENS:

4    **Q.**  And those exhibits -- I won't show them to you, but first for

5    12 and 17, Agent Relyea, would you say what business records those

6    are from?

7    **A.**  Yes.  The Government Exhibit 12 is from Cycle Specialty

8    company.  And 17 is from Hennessy Cadillac, Inc.

9    **Q.**  And for Exhibit 19, is that a -- is that a disk?

10   **A.**  Yes.

11   **Q.**  And did you review that disk before your testimony this

12   morning?

13   **A.**  I did, yes.

14   **Q.**  And how do you know that that disk marked as Exhibit 19 is the

15   same disk that you reviewed?

16   **A.**  After I reviewed it, I initialed and dated it.

17   **Q.**  And what is contained on that disk, what records?

18   **A.**  These are records from Infiniti of South Atlanta.

19   **Q.**  Okay.  You can put those aside, Agent Relyea.

20       You also mentioned I think that you saw travel expenses during

21   this period between 2010 and roughly 2014 or 2015?

22   **A.**  Yes.

23   **Q.**  What type of travel expenses did you see, based on your review

24   of the records?

25   **A.**  There were airfare from Delta Airlines, Carnival Cruise Lines,

1 limousine services and other transportation costs and hotels, for

2 instance.

3 **Q.**  And who was it who purchased those items?

4 **A.**  The majority of them were purchased either by or on behalf of

5 Pastor Bickers.

6 **Q.**  And were those travel expenses, were they --

7        MR. FINDLING:  Your Honor, I'm going to object to that,

8 that answer.  By or on behalf of, I don't know what "on behalf of"

9 means.  It's conjecture on this witness' part.  Speculation.

10        THE COURT:  Do you want to respond?

11        MR. KITCHENS:  I think -- I don't think there's any

12 conjecture or speculation in his answer.  I think he explained,

13 it's purchases made by or on behalf of Pastor Bickers.

14        THE COURT:  I'm going to overrule that objection, Mr.

15 Findling.  And I'll note your exception.  I'm going to overrule

16 that objection, Mr. Findling.

17        MR. FINDLING:  Thank you.

18 BY MR. KITCHENS:

19 **Q.**  And, Agent Relyea, was all that travel, was it purchased for

20 travel in all cases by Pastor Bickers?

21 **A.**  There were -- there was also some that were purchased by Keyla

22 Jackson, Ms. Keyla Jackson.

23 **Q.**  And were there any -- did you see evidence based on the

24 records you obtained of any travel expenses that were paid on

25 behalf of certain city officials?

**A.**   Yes.

**Q.**   And who were those city officials that you saw evidence of payments for travel expenses?

**A.**   In particular, I recall purchases for Mr. Tony Yarber, who was the mayor of the City of Jackson, and several of his cabinet members.

**Q.**   I'm going to show you in a minute documents that have been marked for identification as Government Exhibit 1, 5, 8, 9, 14, and 24.  I'm sorry, one more.  13A and 13B as well.

            THE COURT:  Any objections?

            MR. FINDLING:  No objection, Your Honor.

            THE COURT:  Would you name once again what we're admitting?

            MR. KITCHENS:  Yes, Your Honor.  That's Government's Exhibit 1, 5, 8, 9 -- actually, I don't think I showed you 8.  I apologize about that, Drew.

            One moment, Your Honor.

            MR. FINDLING:  Your Honor, may we approach for 30 seconds or less?

            THE COURT:  What is it?  Can you just tell me what it is?

            MR. FINDLING:  Just an objection for the record.

            THE COURT:  All right.

            (Side bar.)

            MR. FINDLING:  We object to this one.  I know Your

1   Honor's position.  This is on behalf of, one, these -- we will

2   object to Defendant's -- Government's Exhibit 8.  This is an on

3   behalf of one, as we objected earlier.  This is involving Keyla

4   Jackson, who is not indicted in this case.  So for the record

5   we're going to pose an objection.

6           THE COURT:  All right.  Well, that will be the one --

7           (End of discussion at sidebar.)

8           THE COURT:  What number is that?

9           MR. KITCHENS:  That's No. 8, Your Honor.

10          THE COURT:  No. 8 is admitted over objection.

11          MR. KITCHENS:  Okay.

12          THE COURT:  Let's make sure we've got all of the ones

13  in.  You're offering 1, that's admitted without objection.  5 is

14  admitted without objection.  8 is admitted over objection.  9 is

15  admitted without objection.  12 -- excuse me -- 13 is admitted

16  without objection, 13A and 13B admitted without objection.  And 14

17  is admitted without objection.

18          MR. KITCHENS:  Exhibit 24 is the last one, Your Honor.

19          THE COURT:  And 24 is admitted without objection.

20          And I note your exception on the record for No. 8.

21          (Government's Exhibits 1, 5, 8, 9, 12, 13A, 13B, 14, and

22  24 were received and marked into evidence.)

23  BY MR. KITCHENS:

24  Q.  Agent Relyea, we're not going to look at these individual

25  documents, but if you could just identify the vendor for

1  Government Exhibit 1?

2  **A.**   A National Limousine Service.

3  **Q.**   Where were the records from Government Exhibit 5?

4  **A.**   The Beau Rivage Resort.

5  **Q.**   And where were the records from for Exhibit 8?

6  **A.**   Carnival Corporation.

7  **Q.**   Where was the business records from for Exhibit 9?

8  **A.**   Char Restaurant.

9  **Q.**   Will you tell us where the records -- business records were

10 for Exhibits 13A and 13B?

11 **A.**   They're both Delta Airlines.

12 **Q.**   And would you also identify the records for Exhibit 14?

13 **A.**   Walt Disney Parks & Resorts.

14 **Q.**   And lastly for Exhibit 24, who provided those business

15 reports?

16 **A.**   Marriott International.

17 **Q.**   Did you also collect records relating to other types of

18 shopping?

19 **A.**   Yes.

20 **Q.**   And what types of -- what retailers did you obtain records

21 for?

22 **A.**   They're mainly clothing, so Gucci, Louis Vuitton are the two

23 that I can remember off the top of my head.

24 **Q.**   I show you what's been marked as Government's Exhibit 16 and

25 20.

1              THE COURT:  Any objections?

2              MR. FINDLING:  Your Honor, to the -- regarding No. 16.

3   With respect to the part of the -- that's being admitted, that is

4   a third-party other than Pastor Bickers, we object.  Otherwise,

5   anything relating to Pastor Bickers, we have no objection.

6              As to No. 20, we have no objection.

7              THE COURT:  All right.  On 16, I need to look to see if

8   any of that needs to be redacted -- if parts are not related to

9   Pastor Bickers.  I'll let 16 in, but before we publish it to the

10  jury or present it, I need to look at it to see what needs to be

11  redacted.  With that understanding, 16 is admitted.

12             20 is admitted without objection.

13             MR. KITCHENS:  Thank you, Your Honor.

14             (Government's Exhibits 16 and 20 were received and

15  marked into evidence.)

16             MR. FINDLING:  Yes, Your Honor.  And I would request at

17  the appropriate time that, with some of the other admitted ones,

18  that we noted third-party references, if you could do the same.

19             THE COURT:  I will.

20             MR. FINDLING:  Thank you, Your Honor.

21             THE COURT:  I will.

22             MR. FINDLING:  Thank you, sir.

23             MR. KITCHENS:  Thank you, Your Honor.

24  BY MR. KITCHENS:

25  Q.  Special Agent Relyea, would you identify what retailer

1  provided the records in Exhibit 16?

2  **A.**   Exhibit 16 is Gucci America, Inc.

3  **Q.**   And Exhibit 20, what was the retailer that provided records?

4  **A.**   Louis Vuitton North America.

5  **Q.**   We can set those aside.

6     Special Agent Relyea, aside from records you got from

7  retailers, you mentioned that you also collected tax returns?

8  **A.**   Yes.

9  **Q.**   What were the type of tax returns that you obtained?

10  **A.**   We obtained business and personal tax returns.

11  **Q.**   And for what individual did you collect tax returns?

12  **A.**   Pastor Bickers.

13  **Q.**   Why did you obtain tax returns as part of your investigation?

14  **A.**   We were looking into allegations that there was potential

15  money going to Pastor Bickers and we wanted to compare that to

16  what was reported on her tax returns.

17  **Q.**   And did you obtain official copies of those tax returns?

18  **A.**   Yes, we did.

19  **Q.**   How do you know that they were official copies?

20  **A.**   When we get official copy returns, we call them blue sheets.

21  They have a blue page on top of them with a gold seal, and those

22  are certified records, saying they're certified from the IRS.

23  **Q.**   And I show you what has been marked as Government Exhibit 28

24  through 31.

25            THE COURT:  Any objections?

1          MR. FINDLING:  Counsel, what is the number of the 2011

2     return?

3          MR. KITCHENS:  28.

4          MR. FINDLING:  Your Honor, we have no objection to

5     Government's Exhibit 28, as that is what is referenced in Count 12

6     of the indictment.

7          As to the other tax returns, namely, 29, 30, and 31,

8     they are not part of this indictment.  They are not referenced in

9     count 12.  And, therefore, are irrelevant.

10          THE COURT:  Mr. Kitchens?

11          MR. KITCHENS:  I think this was addressed in part in a

12     motion in limine filed before.  This -- these tax returns

13     certainly are evidence and probative evidence of Pastor Bickers'

14     wealth during this time period, in addition to that.  These other

15     tax returns from 2012 and 2014 are certainly relevant evidence in

16     terms of Pastor Bickers' knowledge and intent regarding the 2011

17     tax return, which is at issue in the filing of a false tax return

18     charged in the indictment.

19          THE COURT:  Listen, I think I've already addressed that

20     matter regarding those tax returns.  But if I haven't, I'll give

21     you one last word and then I'll rule right now.

22          MR. FINDLING:  Your Honor, I do not recall this being

23     specifically referenced.  But, again, not being within the content

24     of count 12 or being part of the adjudication of this matter, we

25     just object on relevancy ground, as well as -- on relevancy

1    grounds.

2           THE COURT:  Thank you.  I'll respectfully disagree with

3    you and find they're relevant, and I will admit 29, 30, and 31

4    over objection.

5           (Government's Exhibits 29, 30, and 31 were received and

6    marked into evidence.)

7    BY MR. KITCHENS:

8    Q.  Agent Relyea, I'm going to hand you Government Exhibits 28

9    through 31.  We're not going to look at these at this time, but

10   can you identify what is the tax year for Government Exhibit 28?

11   A.  Tax year 2011.

12   Q.  For Government Exhibit 29, what is the tax year?

13   A.  2012.

14   Q.  And for Government Exhibit 30?

15   A.  2013.

16   Q.  For Government Exhibit 31?

17   A.  2014.

18   Q.  Agent Relyea, you also mentioned that you collected currency

19   transaction reports?

20   A.  Yes.

21   Q.  What is a currency transaction report also known as?

22   A.  A CTR.

23   Q.  And what entity collects and stores those CTRs?

24   A.  They are filed by financial institutions, and they're

25   collected by FinCEN, or the Financial Crimes Enforcement Network.

1  **Q.**  And what is FinCEN part of?

2  **A.**  It's a government body, it's a bureau of the Department of

3  Treasury.

4  **Q.**  What type of information is provided on the CTRs?

5  **A.**  It provides transactional information.  So it'll show how much

6  money was either deposited or withdrawn in cash.  It'll indicate

7  the location of the deposit or withdrawal.  It will indicate who

8  made that deposit or withdrawal.  And also on whose behalf that

9  transaction was conducted.

10  **Q.**  And are banks required to file these in certain types of

11  transactions?

12  **A.**  Yes.

13  **Q.**  And are they cash transactions?

14  **A.**  Yes.

15  **Q.**  Why do you collect this information as part of an

16  investigation, a financial investigation?

17  **A.**  Well, as I mentioned earlier, in a financial investigation we

18  have to follow the money, follow the cash.  And cash is

19  particularly difficult to follow when you don't know if somebody

20  is making a deposit, for instance, on somebody else's behalf.  And

21  with these records, we could then identify who the individuals are

22  that are making transactions into other people's accounts, for

23  instance.

24  **Q.**  And who were the entities or individuals for whom you

25  collected CTRs in this investigation?

1    **A.**  We collected a lot.  We collected for Pastor Bickers and her

2    companies, Mr. E.R. Mitchell and his companies, Pirouette,

3    Ms. Keyla Jackson.

4    **Q.**  And did each of those CTRs contain record certifications from

5    FinCEN?

6    **A.**  Yes.

7    **Q.**  I'm going to show you what's been marked as Government's

8    Exhibit 32 through 40.

9            THE COURT:  Are you all okay?  I know you all have been

10   sitting in your boxes for over -- anybody need a break?  Okay.

11   Let's stop and take a break right here.  I'll let y'all step into

12   the jury room, please.

13           (Jury out at 10:54 a.m.)

14           THE COURT:  Okay.  Y'all can be seated.  We'll take a

15   15-minute break, start back at 11:10.  Well, hold on a second.

16   I've got a note, so...

17           Okay.  One of the jurors needed to go to the restroom.

18   So I just handled that.  Thank y'all.

19           MR. FINDLING:  Your Honor, can we take the time to

20   review these documents?

21           THE COURT:  In that case, let's take a 20-minute break.

22           MR. FINDLING:  Thank you very much.

23           THE COURT:  We'll start back at 11:15.

24           (Recess at 10:55 a.m.)

25           THE COURT:  I understand you all have reviewed these

 1  records previously.  Is there any way we can kind of speed up the
 2  process just a little bit?  Can they look at them before you offer
 3  them, Mr. Kitchens?  Is this the first time y'all have seen those
 4  records, this morning?
 5       MR. FINDLING:  Everything we've received has been so
 6  massively presented, they haven't been isolated like this.  That's
 7  why we need to take more time, because we're actually seeing them
 8  together.
 9       MR. KITCHENS:  So, Your Honor, we -- last week we noted
10  that we would be presenting a summary witness, John Relyea, he
11  would go through these documents, offered their ability to review
12  the documents.  What we ultimately agreed in talking with them was
13  that we would provide essentially an index and list of the
14  documents we would seek to get in.  And so that's what we provided
15  I think on Monday of this week.  And so that's when we found out
16  that they did have some objections to certain exhibits, but that's
17  where we are.
18       THE COURT:  Let me ask you this.  I don't want to
19  interrupt -- you have set the way you plan to present it.  I don't
20  want to interrupt that.  Is there any way possible that they can
21  be looking at ones ahead of time?  Again, I don't want to
22  interrupt the way you have planned to present your case, I want
23  you to present your case the way you planned on presenting with
24  this witness.  If that's a problem, we won't do it.  But if it's
25  not a problem, can they look at it ahead of time and then go from

1 there?

2          MR. KITCHENS:  We have taken advantage of this break and

3 have done exactly that.

4          THE COURT:  As usual, y'all are one step ahead of me.

5          MR. FINDLING:  Your Honor, if you don't mind, if we want

6 to go through what we've been working on during the 20 minutes,

7 it'll save us time when these folks get back in the jury box.

8          So, Nathan, you gave us, in total -- you can tell His

9 Honor what you gave us.

10          MR. KITCHENS:  Sure.  I think the exhibits before we

11 broke, it was Exhibits 32 through 40.

12          THE COURT:  Right.

13          MR. KITCHENS:  The additional exhibits, the remaining

14 ones, the paper documents that I gave the defense was Exhibit 41,

15 42, and 197.  Those are documents concerning files from the City

16 of Atlanta.

17          And then I also gave them Government Exhibits 44 through

18 47, which are records from the City of Jackson.

19          The only remaining exhibits are those disk of bank

20 records that we spoke about earlier this morning.  Again, I think

21 we understand that there are some objections from the defense

22 about certain of those records.  My only objective with the

23 witness would be to have him identify that he's reviewed the

24 contents of them and that they contain what they say they do, they

25 have certifications and that's it.

 1             THE COURT:  And we could deal with redactions later?

 2             MR. KITCHENS:  That's right.

 3             THE COURT:  I'm not being critical.  I understand this

 4   case is three weeks, I'm assuming, I'm looking at a list of

 5   probably close to 200 exhibits.  Obviously you've got a ton of

 6   things to look at.  One thing I do as judge, I watch the jury.

 7   And if there is a delay of any time, they kind of wander a little

 8   bit off.  And sometimes when you're sitting there going through

 9   them, they're kind of looking around.

10             MR. KITCHENS:  I hear you.

11             THE COURT:  I'm not saying that to be critical of the

12   government or the defense, I'm just trying to keep things going

13   with the jury.

14             MR. FINDLING:  If the government wants to, maybe in

15   anticipation of the next day, documents, if they want us to stay

16   after 5:00, we'll stay as late as we have to to move things along,

17   Your Honor.

18             THE COURT:  Okay.  Thank you, Mr. Findling.  Thank you,

19   Mr. Kitchens.  Again, it's --

20             MR. FINDLING:  So, Your Honor, to move things along on

21   these, that Mr. Kitchens just ran through, Your Honor, and you've

22   actually -- you gave to us, we have no objection from anything

23   from that batch, Mr. Kitchens, with the exception, Your Honor, of

24   No. 42, which is, I believe, the bridge work, Mr. Kitchens.

25             We're going to suggest the following:  We have no

1  objection to its admission to -- with one caveat.  There seems to

2  be some documents thrown in there that do not appear to have been

3  kept during the normal course of business, handwritten notes

4  people took, Post-it notes, and it looks like the City of Atlanta

5  just copied everything and threw it in.  If we could have the

6  opportunity before it is ever published to review with the

7  government, I think we can probably agree what can be pulled out

8  of there.

9          THE COURT:  I don't have any problem with that.

10         MR. KITCHENS:  We don't at all.  We, again, would not be

11 publishing anything from these exhibits at this point.

12         THE COURT:  So, Mr. Findling, here's the way we'll

13 proceed now.  On the ones I've already indicated, there are some

14 I'm going to have to look into to see what needs to be redacted.

15 And the ones you think is not held in the normal course of

16 business, we're going to look at those as well, and before they're

17 published to the jury.  And some will be put in, but I'm going on

18 the record with the understanding the ones that are being put in,

19 that you have those questions about, before they're published to

20 the jury, I will review them, Mr. Kitchens will look at them, and

21 you and Ms. Goldberg can look at it.

22         MR. FINDLING:  That is perfect, Your Honor.

23         And then, Your Honor, with regard to 45, Mr. Kitchens,

24 which I believe is the City of Jackson, we have no objection to

25 the RFP that is in there -- the RFP, the request for proposal.

1  And we have no objection to the internal memorandum that's in

2  there.

3          We do object to -- we don't think that the ACOM

4  documentation is appropriate to come through the business records

5  of the City of Jackson.  It's prepared by an outside company and

6  obviously folks from there can take care of that, but we don't

7  think it's appropriate to come through the City of Jackson.

8          THE COURT:  Through the City of Jackson.

9          MR. KITCHENS:  Your Honor, there -- it was a bid in

10 response from ACOM that obviously was provided to the city.  It's

11 part of the city's records, receiving those bids from any

12 contractor.

13         THE COURT:  Why would that not be in the normal course

14 of business, Ms. Goldberg or Mr. Findling?  If it was part of the

15 bid process for the City of Jackson?

16         MR. FINDLING:  I understand.  I just -- the city -- the

17 business records exception, as I understand, talks about prepared

18 by.  And it doesn't seem to be prepared by the City of Jackson,

19 but rather prepared by -- from an outside agency.

20         MR. KITCHENS:  Also, in addition to business records,

21 there are also public records, Your Honor.  And those are records

22 that, of course, were obtained and stored by the City of Jackson

23 as part of the bid process and part of its activities, and so the

24 record certification covers the contract file that they received.

25         THE COURT:  I think it falls under the business

1  exception, Mr. Findling, but what I'll do, I'll take a quick look

2  at it.  Again, it's not going to be published right now.  And if

3  you're right, will come -- that part will come in.  I think it

4  falls in that, but to be 100 percent sure, I'll take a quick look

5  at it.

6          MR. FINDLING:  Okay.  Thank you very much.

7          And then the other documents they referenced right

8  before the break, again, the only objection would be from third

9  parties.  And I think it would be, if I remember correctly,

10  Ms. Jackson, Keyla Jackson.  But anything from third parties, we

11  would continue with that objection.  I think Your Honor indicated

12  you would be reviewing those documents initially.

13          THE COURT:  I will.

14          MR. FINDLING:  Thank you.

15          All right.  We'll proceed like that.

16          Anything else before I bring the jury in?

17          MR. KITCHENS:  No, Your Honor.

18          THE COURT:  And when we get to those particular records,

19  just say something so I can make a little mental note that I can

20  go back and look at them.

21          (Jury in at 11:25 a.m.)

22          THE SECURITY DEPUTY:  Please be seated and come to

23  order.

24          (At sidebar.)

25          THE COURT:  This is an administrative matter.

1          MR. DAVIS:  Okay.

2          THE COURT:  I'm just going to say at the lunch break,

3  just remind me to say at the lunch break that any of the letters,

4  we'll get to them.  It's the same person.

5          THE DEPUTY CLERK:  I got most of them this morning, but

6  Mr. Minus (phonetic) took back the ones I hadn't prepared.  I just

7  asked if there was somebody else to --

8          THE COURT:  We'll take care of it.

9          MR. DAVIS:  Thank you, Your Honor.

10         (End of discussion at side bar.)

11         THE COURT:  As soon as Mr. Davis and Mr. Findling is

12  seated, you may proceed, Mr. Kitchens.

13         MR. KITCHENS:  Thank you, Your Honor.

14  BY MR. KITCHENS:

15  Q.  Special Agent Relyea, I think where we left off, the

16  government was -- had marked for identification Government

17  Exhibits 32 through 40.  I show you those documents.

18         THE COURT:  32 through 40 is admitted without objection,

19  except for the exceptions pointed out by Mr. Findling.

20         MR. FINDLING:  Yes, Your Honor.

21         THE COURT:  All right.  They're admitted.

22         (Government's Exhibits 32 through 40 were received and

23  marked into evidence.)

24  BY MR. KITCHENS:

25  Q.  Agent Relyea, can you tell us first with Exhibit 32

1  what -- what those CTRs or what person or entity those CTRs are

2  related to?

3  **A.**   Yes.   These are for Bickers Group, Inc., d/b/a Bickers Group,

4  Inc.

5  **Q.**   And if we look at Exhibit 33, what are those CTRs related to?

6  **A.**   Bickers Group, Inc., doing business as Bickers Group LLC.

7  **Q.**   Exhibit 34?

8  **A.**   Cascade Building Systems.

9  **Q.**   Exhibit 35?

10  **A.**   E.R. Mitchell & Company.

11  **Q.**   Exhibit 36?

12  **A.**   E.R. Mitchell Construction Company, DBA as E.R. Mitchell

13  Construction Company, Inc., E.R. Mitchell Construction Company,

14  Inc., E.R. Mitchell Construction Company, EC and WT Construction

15  Company.

16  **Q.**   Exhibit 37?

17  **A.**   Elvin R. Mitchell, Jr.

18  **Q.**   Exhibit 38?

19  **A.**   Keyla A. Jackson.

20  **Q.**   Exhibit 39?

21  **A.**   Mitzi L. Bickers.

22  **Q.**   And, finally, Exhibit 40?

23  **A.**   Pirouette Company, DBAs Pirouette Companies, Pirouette

24  Company, Pirouette Dance Company.

25  **Q.**   And do each of those documents have a certification from

1   FinCEN?

2   **A.**   Yes.

3   **Q.**   Now, you also mentioned that you collected various contract

4   files; is that correct?

5   **A.**   Yes.

6   **Q.**   In what cities were -- was your investigation focused on?

7   **A.**   The City of Atlanta and the City of Jackson, Mississippi.

8   **Q.**   Did you, as part of your investigation, collect various

9   records related to City of Atlanta contracts?

10  **A.**   Yes.

11          MR. KITCHENS:  I'll mark for identification what's been

12  marked as Government Exhibit 41, 42, and 197.

13          THE COURT:  Okay.  My understanding is that there are no

14  objections to 44 through 47, but there are certain exceptions for

15  42 and 45 that the Court will need to review.

16          MR. FINDLING:  That is correct, Your Honor.

17          MR. KITCHENS:  Thank you, Your Honor.

18          THE COURT:  Okay.  Admitted with that understanding.

19          (Government's Exhibits 41, 42, and 197 were received and

20  marked into evidence.)

21  BY MR. KITCHENS:

22  **Q.**   Agent Relyea, if you look at Exhibit 41, would you please tell

23  me what -- what that document is?

24  **A.**   It is a copy of contract FC4943A.

25  **Q.**   And what was that contract relating to?

1  **A.**  The annual contract to construct sidewalks, driveways, curbs

2  and gutters.

3  **Q.**  For Exhibit 42, what contract is that?

4  **A.**  This is the C688 emergency request for additional repairs of

5  the Marietta Boulevard bridge.

6  **Q.**  And finally, Exhibit 197, what records are those?  What record

7  is that?

8  **A.**  These are Excel spreadsheets from the City of Atlanta showing

9  payments to various entities and the amounts and the dates those

10  payments were made for payments made to Cascade Building, C.P.

11  Richards Construction, for example.

12  **Q.**  And whose companies are those?

13  **A.**  Those are Elvin Mitchell's, or E.R. Mitchell's and C.P.

14  Richards'.

15  **Q.**  Did you also obtain similar records from the City of Jackson?

16  **A.**  Yes.

17  **Q.**  And did you -- what records, what type of contract records did

18  you obtain?

19  **A.**  There were two main contracts with the City of Jackson.  One

20  was for the Wastewater Consent Decree and the other one was for

21  city convention center hotel.

22  **Q.**  And did you collect both the contract as well as bid

23  information?

24  **A.**  Yes.

25  **Q.**  And what company was it that Mitzi Bickers consulted with in

1   connection with the Wastewater Consent Decree?

2   **A.**   The company was called AECOM.

3   **Q.**   I'm going to show you what's been marked for identification as

4   Government Exhibits 44, 45, 46, and 47.

5       And, Agent Relyea, do you recognize what those documents are?

6   **A.**   I do, yes.

7   **Q.**   Okay.  And what -- what are those exhibits?

8   **A.**   44 is the RFP for the Wastewater Consent Decree project, along

9   with the award letter from Mayor Tony Yarber to AECOM.  And the

10  letter from Mayor Tony Yarber withdrawing that award.

11  **Q.**   What is Exhibit 45?

12  **A.**   This is the request for proposal for the City of Jackson's

13  Wastewater Consent Decree program, and AECOM's submission for

14  Wastewater Consent Decree.

15  **Q.**   What is Exhibit 46?

16  **A.**   This is the letter to AECOM letting them know that they got

17  the bid.

18  **Q.**   And, lastly, Exhibit 47?

19  **A.**   This is the letter to AECOM letting them know that the bid had

20  been withdrawn.

21          MR. KITCHENS:  Government offers for admission

22  Government Exhibits 44 through 47.

23          THE COURT:  I think we already admitted those in.

24          MR. KITCHENS:  I'm sorry, Your Honor.  Thank you.

25          You can set those all aside now, Special Agent Relyea.

1          THE COURT:  Let me say, though, we did admit 197.  And

2    197 stands admitted without objection.

3          MR. FINDLING:  That's correct, Your Honor.

4          THE COURT:  Thank you.

5    BY MR. KITCHENS:

6    **Q.**  And, Agent Relyea, I think you mentioned that you also

7    collected various bank records as part of your investigation?

8    **A.**  Yes.

9    **Q.**  Whose financial records, bank records, did you collect?

10   **A.**  We collected records for Pastor Bickers and her related

11   companies, Ms. Keyla Jackson, E.R. Mitchell and his companies,

12   C.P. Richards and his companies, individuals by the name of

13   Shedreka Poole, Diedra Hayes, Cotena Alexander.  I think that was

14   the majority of the records.

15   **Q.**  And what type of records did those banks provide in response

16   to your subpoenas?

17   **A.**  We have general bank records, bank statements, deposit items,

18   withdrawal slips, mortgage records, credit card records, other

19   loans, the currency transaction reports.

20   **Q.**  Now I'm going to show you what's been marked as Government

21   Exhibit 2, 3, 4, 7, 10, 11, 15, 22, 25, 26, and 27.

22          THE COURT:  Any objections?

23          MR. FINDLING:  Counsel understands we are objecting.

24   He's not seeking their admission right now.

25          THE COURT:  You're not seeking to admit those?

1           MR. KITCHENS:  We are ultimately, Your Honor.  These are

2    ones where we understand that there's objections that we are going

3    to address later with the Court regarding some of these bank

4    documents.  We are going to ask the witness to try to identify the

5    disk themselves and we can address the objections later.

6           THE COURT:  All right.  So you're just going to have him

7    identify them and you're not going to publish them to the jury or

8    have him testify about anything from them, you're just going to

9    identify them?

10          MR. KITCHENS:  That's correct, Your Honor.

11          THE COURT:  Okay.

12   BY MR. KITCHENS:

13   **Q.**  Agent Relyea, let's start with what's been marked as

14   Government Exhibit 2.  What -- what is that -- the document?

15   **A.**  There is a business certification records along with a disk.

16   **Q.**  And for all those documents that I handed you, are they all

17   disks?

18   **A.**  Yes.

19   **Q.**  Did you review those disks before your testimony this morning?

20   **A.**  I did, yes.

21   **Q.**  And how do you know that those disks are the same ones you

22   reviewed before your testimony?

23   **A.**  After I reviewed the disks, I initialed and dated the sleeves.

24   **Q.**  And what -- what bank provided the documents in Exhibit 2?

25   **A.**  These are from American Express.

1  **Q.**  What bank for Exhibit 3?

2  **A.**  BancorpSouth bank.

3  **Q.**  What bank for Exhibit 4?

4  **A.**  Bank of America.

5  **Q.**  What bank for Exhibit 7?

6  **A.**  Capital City Bank.

7  **Q.**  What bank for Exhibit 10?

8  **A.**  Citibank.

9  **Q.**  What bank for Exhibit 11?

10  **A.**  Credit Union of Atlanta.

11  **Q.**  What bank for Exhibit 15?

12  **A.**  First Citizens Bank.

13  **Q.**  What bank for Exhibit 22?

14  **A.**  BancorpSouth bank.

15  **Q.**  What bank for Exhibit 25?

16  **A.**  State Bank and Trust Company.

17  **Q.**  What bank for Exhibit 26?

18  **A.**  SunTrust Bank.

19  **Q.**  What bank for Exhibit 27?

20  **A.**  Wells Fargo Bank.

21  **Q.**  Was that all of the disks that you reviewed for the bank

22  records?

23  **A.**  Yes.

24  **Q.**  And attached to the -- can you tell us what is attached to

25  each of those disk.

1    **A.**  Each of these -- various business certification records that
2    were received.
3    **Q.**  And was there a business record certification from each of
4    those banks for the accounts that are contained on those disks?
5    **A.**  Yes.
6    **Q.**  And what is contained on the disk themselves?  Just a high
7    level, the type of documents.
8    **A.**  They're -- yeah, they're PDF files, typically separated by
9    account number for each of the years and accounts that we
10   requested.
11             MR. KITCHENS:  Your Honor, we will be offering those for
12   admission later.  We understand there are objections that we can
13   address later.  We won't be publishing anything at this time.
14             And I don't have any further questions.
15             THE COURT:  All right.  Your witness.
16             MR. FINDLING:  No questions, Your Honor.
17             THE COURT:  All right.  Thank you, sir.  You may step
18   down.
19             Mr. Kitchens, Mr. Findling, regarding the question of
20   preparation of business record, under 8033, it is not required
21   that the witnesses need to have prepared the document, only
22   firsthand knowledge of preparation.  So it can still fall under
23   the business record section, even if you're not the one preparing
24   it under 8033.
25             All right.  Call your next witness.

 1            MR. DAVIS:  Your Honor, the United States calls Danielle

 2   Nichols.

 3            THE COURT:  Danielle Nichols.

 4            THE DEPUTY CLERK:  Would you raise your right hand,

 5   please.

 6                          ******

 7                     DANIELLE NICHOLS,

 8         having been duly sworn, testified as follows:

 9                          ******

10            THE DEPUTY CLERK:  Have a seat.  You can remove your

11   mask, if you'd like.  If you would state and spell your name for

12   the record.

13            THE WITNESS:  Danielle Nichols, D-A-N-I-E-L-L-E,

14   N-I-C-H-O-L-S.

15            THE DEPUTY CLERK:  Thank you.

16   DIRECT EXAMINATION

17   BY MR. DAVIS:

18   **Q.**  Good morning, ma'am.  It's still morning.  How are you?

19   **A.**  I'm well.  How are you?

20   **Q.**  Ma'am, can you tell us where you currently work?

21   **A.**  For the City of Atlanta.

22   **Q.**  And what's your position?

23   **A.**  Deputy commissioner of human resources.

24   **Q.**  How long have you had that job?

25   **A.**  Approximately, three years.

1  **Q.**  And where did you work before the city?

2  **A.**  For Turner, now known as WarnerMedia.

3  **Q.**  Can you tell the jury very briefly about your educational

4  background?

5  **A.**  Yes.  I have a bachelor's degree in urban policy studies and a

6  master's degree in human resources administration.

7  **Q.**  As the deputy commissioner of human resources, what are your

8  responsibilities?

9  **A.**  I have leadership oversight of a team of human resources

10 business partner, professionals that provide consultative and

11 HR-related support.

12 **Q.**  And does your position include overseeing the onboarding and

13 separating of city employees?

14 **A.**  Yes.

15 **Q.**  Does the City of Atlanta maintain personnel files for its

16 employees?

17 **A.**  Yes.

18 **Q.**  And as the deputy commissioner of human resources, do you have

19 access to those personnel files?

20 **A.**  Yes.

21 **Q.**  Do you know the name Mitzi Bickers?

22 **A.**  Yes.

23 **Q.**  And have you checked the City of Atlanta files to see if

24 Ms. Bickers used to be a City of Atlanta employee?

25 **A.**  Yes.

1  **Q.**  And was Ms. Bickers ever an employee with the City of Atlanta?

2  **A.**  Yes.

3  **Q.**  Does the city have a file, a personnel file, for Ms. Bickers?

4  **A.**  Yes.

5  **Q.**  Prior to coming to court today, did you have a chance to

6  review that file?

7  **A.**  Yes.

8          MR. DAVIS:  One moment, Your Honor.

9          Your Honor, may I approach?

10         THE COURT:  Yes, sir.

11  BY MR. DAVIS:

12  **Q.**  Ma'am, I'm going to show you what's been premarked for

13  identification as Government Exhibit 48.  Can you take a look at

14  that, please?

15      Do you recognize that set of documents?

16  **A.**  Yes.

17  **Q.**  And what is that, ma'am?

18  **A.**  The documents that were -- are -- that were contained or are

19  contained in Ms. Bickers' file, personnel file.

20         MR. DAVIS:  Your Honor, the government is going to move

21  Government's Exhibit 48 into evidence.

22         THE COURT:  Any objections?

23         MS. GOLDBERG:  No objection, Your Honor.

24         THE COURT:  Admitted without objection.  You may

25  publish, if you so desire.

 1              (Government's Exhibit 48 was received and marked into
 2    evidence.)
 3    BY MR. DAVIS:
 4    **Q.**  Can we take a look at page 14, please.
 5              THE COURT:  Hold on a second.  Ms. Wright is going to
 6    take a quick look at that monitor.  It's not showing.
 7              Ladies and gentlemen of the jury, it gets kind of hard
 8    before lunch.  If anybody wants to stand up and stretch you can at
 9    this point while Ms. Wright is doing that.
10              I apologize for the interruption.
11              MR. DAVIS:  Thank you, sir.  Thank you.
12    BY MR. DAVIS:
13    **Q.**  Ms. Nichols, can you tell us when Ms. Bickers joined the City
14    of Atlanta?
15    **A.**  February 18, 2010.
16    **Q.**  And let's take a look at page 17, please.  Can you tell us,
17    please, what Ms. Bickers' position was with the city?
18    **A.**  Human services director.
19    **Q.**  And is that a leadership position?
20    **A.**  Yes.
21    **Q.**  And what chain of command does that position report to?
22    **A.**  It reports --
23              MS. GOLDBERG:  Your Honor, I would object to this.  It
24    has not been established that Ms. Nichols was in her position at
25    this time, and there's no indication of whether any of this has

1  changed or whether she's in any position to offer an opinion about

2  things that were not in effect at the time when she was in her

3  employment.

4          THE COURT:  Mr. Davis, lay a foundation on this witness'

5  knowledge about the position and whether or not there has been any

6  changes in the position since 2010 in the organizational chart.

7  I'll sustain the objection based on that.

8          MR. DAVIS:  That's fine, Judge.  It's a small point.

9  BY MR. DAVIS:

10  **Q.**  Can you explain whether human services is different from human

11  resources?

12  **A.**  Yes.  So human services focused --

13          MS. GOLDBERG:  Your Honor, same objection.  I'd just ask

14  for that foundation first before she goes into offering any

15  opinions.

16          THE COURT:  Sustained.  Lay a foundation.

17          MR. DAVIS:  Sure.

18  MR. DAVIS:

19  **Q.**  Ms. Nichols, do you work for the human resources department?

20  **A.**  Yes.

21  **Q.**  Do you know what that department does?

22  **A.**  Yes.

23  **Q.**  In your position are you also familiar with what the human

24  services department does?

25  **A.**  Yes.

1  **Q.**  Can you explain the difference between the two?

2  **A.**  Yes.

3          MS. GOLDBERG:  Your Honor, same objection.  We're

4  talking about now versus a decade ago.

5          THE COURT:  Well, she can explain what it is now.

6          As far as you know, has there been any change in the

7  human services, human resources department in the City of Atlanta

8  since 2010?

9          THE WITNESS:  No.

10         THE COURT:  Overruled.  You can answer the question.

11         THE WITNESS:  So human services works to improve and

12  enhance social services for City of Atlanta residents by way of

13  coordination, program development, advocacy and resources

14  mobilization.

15  BY MR. DAVIS:

16  **Q.**  And can you tell us a little bit more in laymen's terms?

17  **A.**  Yes.  So human services focuses on making certain that there

18  are resources and opportunities available for some of the programs

19  that are offered.  For example, summer food services programs,

20  coordination of services for homelessness and so forth.

21  **Q.**  Does Ms. Bickers still work for the city?

22  **A.**  No.

23  **Q.**  Can we take a look at page 4, please.  When did Ms. Bickers

24  separate from the city?

25  **A.**  May 22, 2013.

1  **Q.** So approximately how long, according to her file, did

2  Ms. Bickers work for the City of Atlanta?

3  **A.** Approximately three years.

4  **Q.** Now, did Ms. Bickers work continuously for those three years?

5  Let me help you out.

6  **A.** Okay.

7  **Q.** Can you take a look at page 9, please.

8  **A.** Okay.  This document reflects that Ms. Bickers was on a leave

9  without pay from May 7, 2012, through August 22, 2012.

10 **Q.** And what is a leave of absence, ma'am?

11 **A.** When an employee leaves their role, and in this instance does

12 not receive pay, for a multitude of reasons.  Typically related to

13 some sort of extenuating circumstances related to, perhaps, a

14 medical condition.

15 **Q.** And according to the form, what is the reason for the leave of

16 absence?

17 **A.** Personal time requested.  Leave without pay.

18         MR. DAVIS:  Thank you, ma'am.

19         THE COURT:  Your witness.

20         MS. GOLDBERG:  Thank you, Your Honor.

21 CROSS-EXAMINATION

22 BY MS. GOLDBERG:

23 **Q.** Good morning, Ms. Nichols.

24 **A.** Good morning.

25 **Q.** So you indicated that you are currently the deputy

1  commissioner of HR.  How long have you been in that position?

2  **A.**  Approximately three years.

3  **Q.**  Okay.  So you were not in that role at any time when Pastor

4  Bickers was employed for the City of Atlanta?

5  **A.**  No.

6  **Q.**  And you indicated that the human services director have

7  several different programs that they're responsible for, but some

8  are food services, homeless services, things like that?

9  **A.**  Yes.

10 **Q.**  Okay.  Nothing in that position has anything to do with the

11 awarding of, lack of word, infrastructure contracts for the City

12 of Atlanta?

13 **A.**  No.

14 **Q.**  And someone in the human services director role would not have

15 any authority to award such contracts?

16 **A.**  No.

17 **Q.**  Hand --

18          MS. GOLDBERG:  Do you have a copy of the two exhibits?

19          May I approach, Your Honor?

20          THE COURT:  Yes.

21          MS. GOLDBERG:  Thank you.

22 BY MS. GOLDBERG:

23 **Q.**  I'm going to show you what's already been admitted as

24 Government's Exhibit 48, on page 4.  And what is that -- what is

25 that page?

1  **A.**   State of Georgia separation notice.

2  **Q.**   And what does it indicate for the reason for the separation?

3  **A.**   Retired.

4  **Q.**   And can I see that again?  Thank you.

5      Again, I'm showing you what's been marked as Government's

6  Exhibit No. 48.  And now I'm referencing page number 11.  And can

7  you tell the jury what that is?

8  **A.**   This is a performance evaluation form.

9  **Q.**   And does it indicate a particular rating for her performance?

10  **A.**   Yes.

11  **Q.**   And what is that?

12  **A.**   Outstanding.

13  **Q.**   Thank you.

14      And on direct you talked a little bit about the document in

15  there, Government's Exhibit 48, regarding a leave without pay.

16  Now, you wouldn't have any personal knowledge of any sort of

17  conversation related to that leave because you weren't with the

18  city at that point, correct?

19  **A.**   No, I don't have any personal knowledge.

20          MS. GOLDBERG:  Okay.  No more questions, Your Honor.

21          THE COURT:  Redirect?

22          MR. DAVIS:  One question, sir.

23  REDIRECT EXAMINATION

24  BY MR. DAVIS:

25  **Q.**  Ms. Nichols, are you aware of the circumstances under which

```
 1    Ms. Bickers retired in 2013?
 2  A.   No.
 3            MR. DAVIS:  Thank you, ma'am.
 4            THE COURT:  Recross?
 5            MS. GOLDBERG:  No, Your Honor.
 6            THE COURT:  Thank you, ma'am.  You may step down.
 7            THE WITNESS:  Thank you.
 8            THE COURT:  Call your next witness.
 9            MS. DILLINGHAM:  Your Honor, at this time, the
10   government calls Nina Hickson.
11            THE COURT:  All right.  Nina Hickson.
12            THE DEPUTY CLERK:  Ma'am, would you raise your right
13   hand, please.
14                          ******
15                       NINA HICKSON,
16          having been duly sworn, testified as follows:
17                          ******
18            THE DEPUTY CLERK:  Have a seat.  You can remove your
19   mask, if you'd like.  If you would please state and spell your
20   name for the record.
21            THE WITNESS:  My name is Nina, N-I-N-A, Hickson,
22   H-I-C-K-S-O-N.
23            THE DEPUTY CLERK:  Thank you.
24   DIRECT EXAMINATION
25   BY MS. DILLINGHAM:
```

1   **Q.**  Good morning, Ms. Hickson.

2   **A.**  Good morning.

3   **Q.**  Can you tell the jury how you're currently employed?

4   **A.**  I'm currently the city attorney for the City of Atlanta.

5   **Q.**  And how long have you been in that position?

6   **A.**  I came there on an interim basis in May of 2018.  Became

7   permanent in August of 2018.

8   **Q.**  And before you started as city attorney, did you hold any

9   other positions with the City of Atlanta?

10  **A.**  I did.

11  **Q.**  Can you tell us about those positions?

12  **A.**  I was the ethics officer for the City of Atlanta from 2012 to

13  2016.

14  **Q.**  And can you briefly describe your educational background for

15  the jury?

16  **A.**  Yes.  I have a bachelor's degree from Howard University and my

17  law degree from Emory University.

18  **Q.**  All right.  And when you started at the ethics office in 2012,

19  did you familiarize yourself with the office's practices in 2010

20  and 2011?

21  **A.**  I did.

22  **Q.**  How is the ethics office or the ethics department structured

23  inside the City of Atlanta?

24  **A.**  The ethics office is actually an independent body, in that it

25  doesn't report to either the executive or legislative branch of

1  government.  It is composed -- or it reports to an ethics board
2  which is composed of citizens from the City of Atlanta who have
3  been recommended by various organizations, such as the Metro
4  Chamber of Commerce, Gate City Bar Association, Atlanta Bar.  But
5  those individuals are the persons who actually supervise the
6  ethics officer and make determinations when there are ethics
7  complaints and violations where there may be sanctions.
8  Q.  All right.  And who -- again, who does the ethics officer
9  report to?
10 A.  The ethics board.
11 Q.  So let's turn to the ethics code itself.  Does the City of
12 Atlanta have an ethics code?
13 A.  It does.
14 Q.  And when was the ethics code established?
15 A.  This particular iteration was established in early 2000.  So
16 maybe 2001, 2002, but it was during the Shirley Franklin
17 administration.
18 Q.  All right.  And was the ethics code in place between 2010 and
19 2013?
20 A.  Yes, it was.
21 Q.  And is the ethics code substantially the same now as it was
22 between 2010 and 2013?
23 A.  To the best of my knowledge, it is substantially the same.
24 Q.  All right.  What is the purpose of the ethics code?
25 A.  The ethics code is also called standards of conduct.  So it

1  provides guidance to elected officials, city employees, citizens

2  who serve on boards who have been appointed by either the city

3  council or the mayor.  But it establishes how they should conduct

4  themselves, particularly as it relates to potential conflicts of

5  interest.

6  **Q.**  All right.  Are all City of Atlanta employees subject to the

7  code of ethics rules?

8  **A.**  Yes.

9  **Q.**  When a new employee is hired by the city, how are they

10  introduced to the ethics code?

11  **A.**  There is a new employee orientation, which is a day-long

12  orientation, where the ethics division has about an hour or so to

13  provide training on the ethics code.  At the completion of that

14  training, the employees typically sign an ethics pledge.

15  **Q.**  And was that the case between 2010 and 2013?

16  **A.**  As far as I know.  I got there 2012, so it was going on at

17  that time.  It was going on immediately prior to then, before I

18  came.  I'm not sure the year that it started.

19  **Q.**  Did the ethics office conduct regular training in addition to

20  that initial orientation for new employees?

21  **A.**  Yes.  The training that was provided by the ethics office

22  included what we call lunch and learns, where there would be an

23  opportunity to learn some particular aspect of it.  There were

24  periodic newsletters.  There was an annual kind of event that was

25  held to emphasize the ethics code.  When there were requests from

1    departments, we would come and do training there or for meetings.

2    **Q.**  All right.  And in addition to that periodic training, if an

3    employee had an ethics question, could they seek guidance directly

4    from the ethics office?

5    **A.**  Yes, that was one of the functions of the office, to provide

6    advice and counsel.

7    **Q.**  And were employees aware that y'all were there as a resource?

8    **A.**  To the best of my knowledge, they should have been.  We would

9    advertise in terms of having posters and different things

10   throughout the city buildings which indicated that that was a

11   function that we carried out.

12   **Q.**  In addition to the ethics code, do other departments in the

13   city have ethics provisions included in their code?

14   **A.**  Yes.

15   **Q.**  Which department in the City of Atlanta is responsible for

16   procuring goods and services for the city?

17   **A.**  The procurement department.

18   **Q.**  And does the procurement department have its own code?

19   **A.**  It has its own code.

20   **Q.**  And does that procurement code have its own ethics provisions?

21   **A.**  Yes, it does.

22           MS. DILLINGHAM:  Your Honor, may I approach?

23           THE COURT:  Yes, ma'am.

24   BY MS. DILLINGHAM:

25   **Q.**  Ma'am, I'm showing you what's previously been marked as

1 Government's Exhibit 50.  Do you recognize Exhibit 50?

2 **A.**   I do.

3 **Q.**   And can you tell us what it is?

4 **A.**   Yes.  This is the procurement code that -- for the City of

5 Atlanta.

6         MS. DILLINGHAM:  At this time the government offers for

7 admission Exhibit 50.

8         THE COURT:  Any objections?

9         MR. FINDLING:  No objection.

10         THE COURT:  50 is admitted without objection.  You may

11 publish it, if you so desire.

12         (Government's Exhibit 50 was received and marked into

13 evidence.)

14 BY MS. DILLINGHAM:

15 **Q.**   All right.  Could you please pull up Exhibit 58.

16     All right, ma'am.  Can you tell us, looking at Section 2-1104

17 here, what is the purpose of the procurement code?

18 **A.**   The purpose is to provide -- to provide guidance on how the

19 procurement of services or products on behalf of the city should

20 take place.  Typically, when you're in the government environment,

21 the goal is that there be some kind of competitive process so that

22 the public can be sure that you have done your best to act in its

23 best interest when you procure services, as well as products.

24 **Q.**   And can you read Subsection 4 for us, ma'am?

25 **A.**   "Ensure the fair and equitable treatment of all persons who

1  deal with the procurement system and real estate transactions of

2  the city."

3  **Q.**  All right.

4          MS. DILLINGHAM:  Ms. Etienne, can we move to page 2.

5  BY MS. DILLINGHAM:

6  **Q.**  All right, ma'am.  Can you tell us what the title of Division

7  13 in the procurement code is?

8  **A.**  Would you repeat the question?

9  **Q.**  If you look on your screen, ma'am.

10 **A.**  Okay.  Okay.  Yes, Division 13 speaks to ethics in public

11 contracting.

12 **Q.**  All right.  Are these the ethics-related sections of the

13 procurement code?

14 **A.**  Yes, they are.

15 **Q.**  And can you tell the jury which sections of the code -- of the

16 procurement code concern ethics and procurement?

17 **A.**  Okay.  It starts with Section 2-1470 -- hold on.  I'm sorry.

18 2-1481 is where the provisions related to ethics and procurement

19 and public contracting begins.  So Sections 2-1481, 2-1482,

20 2-1483, 2-1484, 2-1485, 2-1486, 2-1487, 2-1488, 2-1489, 2-1490.

21 **Q.**  Thank you, ma'am.  And can you put that to the side.

22     Ms. Hickson, do you know Pastor Mitzi Bickers?

23 **A.**  I do.

24 **Q.**  Do you see her in the courtroom here today?

25 **A.**  I do.

1  **Q.**  Can you describe her by an article of clothing she's wearing?

2  **A.**  It appears to be a blue blazer and a pink shirt.

3  **Q.**  All right.

4         MS. DILLINGHAM:  Your Honor, may the record reflect that

5  Ms. Hickson has identified the defendant.

6         THE COURT:  So noted for the record.

7  BY MS. DILLINGHAM:

8  **Q.**  How do you know Pastor Bickers, ma'am?

9  **A.**  I met Pastor Bickers about 20 years ago through a mutual

10  friend who was aware that I was in the process of adopting a

11  daughter, that Ms. Bickers had an interest in adoption.  And so we

12  met during that time, became friends.  And I've known her also

13  related to the fact that she was the chair of the school board, I

14  believe, during that time.  And just, you know, her work,

15  generally.

16  **Q.**  All right.  And did Ms. Bickers work for the City of Atlanta?

17  **A.**  Yes.

18  **Q.**  When?

19  **A.**  It was, I believe, 2010.  That would have been the beginning

20  of the Reed administration to about 2013.

21  **Q.**  And what was Ms. Bickers' position?

22  **A.**  Director of human services.

23  **Q.**  At the time, what kind of position was the director of human

24  services?

25  **A.**  Well, it was a position that was in one of the offices that

1  falls under the office of the mayor.  So it was a leadership

2  position that had -- that fell under the mayor's jurisdiction.

3            MS. DILLINGHAM:  Your Honor, may I approach?

4            THE COURT:  Yes.

5  BY MS. DILLINGHAM:

6  **Q.**  I'm showing you what has previously been marked as

7  Government Exhibit 49.  Do you recognize this document, ma'am?

8  **A.**  Yes, I do.

9  **Q.**  What is it?

10  **A.**  This is the Atlanta city code of ethics or standards of

11  conduct.

12  **Q.**  Is that a public record, ma'am?

13  **A.**  Pardon me?

14  **Q.**  Is that a public record?

15  **A.**  Yes, it is.

16            MS. DILLINGHAM:  At this time the government moves to

17  admit Exhibit 49 into evidence.

18            THE COURT:  Any objections?

19            MR. FINDLING:  No objection.

20            THE COURT:  49 is admitted without objection.  You may

21  publish, if you so desire.

22            (Government's Exhibit 49 was received and marked into

23  evidence.)

24            MS. DILLINGHAM:  Ms. Etienne, can we pull up Exhibit 49,

25  page 12.

1   BY MS. DILLINGHAM:

2   **Q.**  All right, ma'am.  If we can, can you please look on page 12

3   of this document, Section 2-812.  What's the title of this

4   section?

5   **A.**  This section is entitled "Participation in Contracts."

6   **Q.**  Generally, what does the ethics code say about whether an

7   employee can participate in contracts awarded by the city?

8   **A.**  As a general rule, city employees cannot participate in

9   contracts with the City of Atlanta.

10  **Q.**  All right.  And when an employee has a financial interest, are

11  they permitted to participate either directly or indirectly with

12  the matter?

13  **A.**  That's prohibited under the ethics code.

14  **Q.**  And would Pastor Bickers have been covered by this provision

15  of the ethics code?

16  **A.**  During her employment with the city, she would have.

17         MS. DILLINGHAM:  Ms. Etienne, can we move to page 17.

18  And can we isolate Section 2-818.

19  BY MS. DILLINGHAM:

20  **Q.**  All right.  Ma'am, can you tell us what the title of Section

21  2-818 is?

22  **A.**  "Solicitation."

23  **Q.**  And what does this section provide, generally?

24  **A.**  It prohibits public officials or employees of the city from

25  either seeking or accepting anything of value, gifts, whatever,

1  that is being given with the purpose of influencing a vote or

2  decision to be made in their capacity on behalf of the city.

3  **Q.**  All right.  Would this section have applied to Pastor Bickers

4  during her employment?

5  **A.**  Yes, it would have.

6  **Q.**  Does the ethics code require certain employees to make

7  financial disclosures to the city?

8  **A.**  Yes, it does.

9  **Q.**  Why?

10  **A.**  The purpose is to disclose, first of all, make the public

11  aware of any potential conflicts of interest.  When you become a

12  public official or employee, part of your responsibility is to

13  make sure that the interest of the city or that, you know, comes

14  first and that your decision-making is not influenced by a

15  personal interest, as opposed to the interest of the city.

16          MS. DILLINGHAM:  Ms. Etienne, can we go to page 14.

17  BY MS. DILLINGHAM:

18  **Q.**  All right.  And, ma'am, I'm looking at Section 2-814.  What

19  does this section -- what's the title of this section?

20  **A.**  Section 2-814 is entitled "Disclosure of Income and Financial

21  Interest."

22  **Q.**  And is this the section that describes employee obligations to

23  make financial disclosures?

24  **A.**  Yes, it does.

25  **Q.**  And would Pastor Bickers have been covered by this requirement

1  during her employment?

2  **A.**   Yes, she would have.

3  **Q.**   Under this section how often are the financial disclosures

4  filed?

5  **A.**   They're filed annually.

6  **Q.**   And who maintains the forms once they are submitted to the

7  city?

8  **A.**   The ethics office maintains those forms.

9  **Q.**   Do employees submit these forms under penalty of perjury?

10 **A.**   Yes.

11 **Q.**   Was it important to the city that employees complete these

12 forms annually?

13 **A.**   Yes, it was.

14 **Q.**   Why was it important for city employees to make these

15 disclosures to the city?

16 **A.**   Again, it was a part of the process of trying to engender the

17 trust of the public by being transparent about any potential

18 interest that may conflict with the person's interest on behalf of

19 the city and their position on behalf of the city.  But the

20 seriousness with which this was held, was there was an annual

21 process if -- that the documents had to come in on time.  If they

22 didn't come in on time, or at all, then the person was subject to

23 being found to be in violation of the ethics code and there was

24 a -- there were fines that could be assessed.

25 **Q.**   And you mentioned the public needing to be aware of financial

1  interests; is that right?

2  **A.**   Yes.

3  **Q.**   Is that why the forms are filed publicly?

4  **A.**   That's correct.

5  **Q.**   In addition to maintaining those forms, did the ethics office

6  ever review them?

7  **A.**   We did.  There were quite a few and we were a very small

8  office.  So I can't say that we had a regular procedure in place

9  when I was there.  I know we were moving toward that, but, yes, we

10  would periodically review them.  Whether it was during the process

11  of the filing of them, as we were trying to make sure people filed

12  on time, but, also, periodically if we got an inquiry or a

13  question or a lead or some information through the hotline that

14  indicated we needed to review a financial disclosure form.

15  **Q.**   If an employee failed to disclose their financial interest,

16  could it affect their continued employment with the city?

17  **A.**   Potentially.

18  **Q.**   Did the ethics office or the ethics board have the power to

19  make any employment or personnel decisions?

20  **A.**   Neither.  All that could be done were recommendations.

21  **Q.**   Who had the power to make those personnel decisions if there

22  was an ethics violation?

23  **A.**   That would be up to the supervisor of the person who has been

24  found to have violated.  So whether it's a supervisor or their

25  supervisor, but it would be in their division.

1  **Q.**  Did Pastor Bickers file City of Atlanta financial disclosure

2  forms during her employment?

3  **A.**  Yes.

4  **Q.**  And during that time, did Ms. Bickers ever come to your office

5  and ask you for help with her financial disclosures?

6  **A.**  She did not ask me for help.  I believe that she worked with

7  some of my staff.

8  **Q.**  And how many times did that happen?

9  **A.**  I'm -- I can recall one occasion.

10  **Q.**  Did Pastor Bickers ever discuss her financial disclosures with

11  you?

12  **A.**  No, not with me.

13  **Q.**  Did she ever discuss any financial or other business outside

14  of her work for the city with you?

15  **A.**  That's kind of broad.  During the time that I was the ethics

16  officer, no.  But, as I indicated, I've known Pastor Bickers for

17  over 20 years.  I'm sure that issues related to business or

18  finances probably have come up.

19          MS. DILLINGHAM:  May I approach, Your Honor?

20          THE COURT:  Yes.

21  BY MS. DILLINGHAM:

22  **Q.**  Do you recognize this document, ma'am?  And I'm sorry.  What I

23  put in front of you is -- has been marked as Government's Exhibit

24  51.

25  **A.**  Yes.  This is a certified copy of a number of the financial

1   disclosure statements filed by Pastor Bickers.

2          MS. DILLINGHAM:  At this time, the government offers for

3   admission Exhibit 51.

4          THE COURT:  Any objections?

5          MR. FINDLING:  No objection.

6          THE COURT:  51 is admitted without objection.  You may

7   publish it, if you so desire.

8          MS. DILLINGHAM:  Thank you, Your Honor.

9          (Government's Exhibit 51 was received and marked into

10  evidence.)

11         MS. DILLINGHAM:  Ms. Etienne, can we bring up page

12  Exhibit 51, page 2.

13  BY MS. DILLINGHAM:

14  **Q.**  All right.  So, ma'am, before we start looking at the details

15  of this document, we see at the top that this indicates that this

16  is a 2011 city financial disclosure statement.  Am I reading that

17  correctly?

18  **A.**  You are.

19  **Q.**  All right.  So what year's information is contained on this

20  form?

21  **A.**  It would have covered calendar year 2010.

22  **Q.**  All right.  So for this 2011 disclosure, we're looking at

23  financial interest in the year prior, 2010; is that right?

24  **A.**  That's correct.

25  **Q.**  So it's kind of like a tax return in that sense?

1  **A.**  That's correct.

2  **Q.**  Can you tell us whose financial disclosure we're looking at?

3  **A.**  I'm looking at Pastor Bickers' disclosure form.

4  **Q.**  All right.  And if we look at the bottom of the page, labeled

5  "Part 3," can you please read for us the first question?

6  **A.**  "Since January 1, 2010, have you been employed by or received

7  employment from the City of Atlanta or a city-related agency?"

8  **Q.**  All right.  And how did Ms. Bickers answer?

9  **A.**  Her response was "Yes."

10  **Q.**  All right.  What did she list as her job title?

11  **A.**  Director of human services.

12  **Q.**  All right.  And can you read for us the second question?

13  **A.**  "Since January 1, 2010, have you been self-employed or

14  employed by any corporation, partner, proprietorship, other

15  business entity, nonprofit organization, or other governmental

16  entity besides the City of Atlanta?"

17  **Q.**  And did Pastor Bickers disclose anything for 2010?

18  **A.**  She did.  She indicated that she did -- or provide

19  professional services through The Bickers Group as a consultant.

20  **Q.**  All right.

21      MS. DILLINGHAM:  Ms. Etienne, can we move to page 3.

22  BY MS. DILLINGHAM:

23  **Q.**  All right.  And, ma'am, can you please read the first question

24  at the top of this page, which is still in Part 3?

25  **A.**  "Since January 1, 2010, have you received more than $5,000 in

 1   annual income from any corporation, partnership, proprietorship,

 2   nonprofit organization, or other business entity, including

 3   limited partnerships or limited liability corporations not listed

 4   previously?"

 5   **Q.**   And did Ms. Bickers disclose anything in response to that

 6   question for 2010?

 7   **A.**   She did.

 8   **Q.**   What did she disclose?

 9   **A.**   She indicated that she had received more than $5,000 in annual

10   income from The Bickers Group.

11   **Q.**   All right.

12           MS. DILLINGHAM:   Ms. Etienne, can we please go to page

13   4.   And can we isolate Part 8.

14   BY MS. DILLINGHAM:

15   **Q.**   All right, ma'am.   Can you please read for us the text under

16   "Part 8.   Signature"?

17   **A.**   The text says, "I declare under penalty of perjury that I have

18   reviewed this 2011 city financial disclosure statement, and to the

19   best of my knowledge, it is a true, accurate, and complete

20   statement of my current financial interests.   I understand that

21   intentionally filing a statement that contains false or misleading

22   information can result in sanctions or other penalties."

23   **Q.**   All right.   And did Pastor Bickers electronically sign this

24   form?

25   **A.**   Yes.

1           MS. DILLINGHAM:  Ms. Etienne, can we move to page 5,

2  please.

3  BY MS. DILLINGHAM:

4  **Q.**  All right.  So what year's disclosure are we looking at here,

5  ma'am?

6  **A.**  This is labeled the 2012 city financial disclosure statement.

7  It would have covered the period of calendar year 2011.

8  **Q.**  All right.  And whose disclosure is this?

9  **A.**  This is Pastor Bickers'.

10 **Q.**  And let's look at Part 3 again.  Did Ms. Bickers disclose any

11 non-city employment income she received in 2011?

12 **A.**  She did not.

13 **Q.**  All right.

14          MS. DILLINGHAM:  And if you move to page 6, Ms. Etienne.

15 BY MS. DILLINGHAM:

16 **Q.**  The top of this page, did Ms. Bickers disclose any other

17 business income over $5,000 she received in 2011?

18 **A.**  She did not.

19 **Q.**  And if we go to page 7.  Did Ms. Bickers sign this form under

20 penalty of perjury, ma'am?

21 **A.**  Yes.

22          MS. DILLINGHAM:  Can we please move to page 8,

23 Ms. Etienne.

24 BY MS. DILLINGHAM:

25 **Q.**  All right.  Ms. Hickson, is this the next year's financial

1  disclosure form?

2  **A.**   It is.

3  **Q.**   And who filed this disclosure?

4  **A.**   Pastor Bickers.

5  **Q.**   Okay.  Looking again at that same section, Part 3, did Pastor

6  Bickers disclose any non-city employment income she received in

7  2012?

8  **A.**   Yes, she did.

9  **Q.**   What did she disclose?

10  **A.**   She indicated that she was employed with the Emmanuel Baptist

11  Church.

12         MS. DILLINGHAM:  And, Ms. Etienne, can we move to

13  page 9.

14  BY MS. DILLINGHAM:

15  **Q.**   Did Ms. Bickers disclose any other business income over $5,000

16  that she received in 2012?

17  **A.**   She did not.

18  **Q.**   And if we move to page 10, did Ms. Bickers submit this form

19  under penalty of perjury?

20  **A.**   Yes, she did.

21  **Q.**   And can you tell us when Ms. Bickers submitted this form to

22  the City of Atlanta?

23  **A.**   January 28, 2013, 4:11 p.m.

24         MS. DILLINGHAM:  Ms. Etienne, can we please move to page

25  11.

1  BY MS. DILLINGHAM:

2  **Q.**  What is this document we're looking at here on page 11?

3  **A.**  This document is entitled "2013 City Financial Disclosure

4  Statement, Amendment No. 1."

5  **Q.**  So are we still looking at financial interests in 2012?

6  **A.**  Yes.

7        MS. DILLINGHAM:  And, Ms. Etienne, can we please go to

8  page 13.

9  BY MS. DILLINGHAM:

10 **Q.**  Ma'am, can you tell us when Pastor Bickers submitted this

11 amended disclosure?

12 **A.**  March 19, 2013, 10:50 a.m.

13 **Q.**  So was that about two months later?

14 **A.**  Two months after the original, yes.

15       MS. DILLINGHAM:  All right.  Ms. Etienne, can we please

16 go back to page 11.

17       THE WITNESS:  Okay.

18 BY MS. DILLINGHAM:

19 **Q.**  Did Pastor Bickers change her disclosure of non-city

20 employment income she received in 2012?

21 **A.**  Yes.

22 **Q.**  How so?

23 **A.**  She added that she had received employment income from

24 Pirouette Companies, LLC, and indicated that she had received

25 income over $5,000 from both Emmanuel Baptist Church and Pirouette

```
 1  Companies, LLC.
 2          MS. DILLINGHAM:  Ms. Etienne, can you show us page 12.
 3  BY MS. DILLINGHAM:
 4  Q.  Ms. Hickson, is this where Ms. Bickers indicated that she had
 5  received over $5,000 from both Emmanuel Baptist Church and
 6  Pirouette Companies?
 7  A.  Yes.
 8  Q.  And, again, did Ms. Bickers submit this amendment under
 9  penalty of perjury?
10  A.  Yes, she did.
11  Q.  All right.
12          MS. DILLINGHAM:  And, finally, let's move to page 14,
13  Ms. Etienne.
14  BY MS. DILLINGHAM:
15  Q.  Can you tell us what this document is, ma'am?
16  A.  This document is entitled "2014 City Financial Disclosure
17  Statement."
18  Q.  For which year, ma'am?
19  A.  It would have covered calendar year 2013.
20  Q.  And did Pastor Bickers disclose any non-city employment income
21  over $5,000 she received on this form?
22  A.  She did not.
23  Q.  And did she disclose any non-city employment income she
24  received at all in 2013?
25  A.  She did not.
```

1  **Q.**  And did she sign and submit this disclosure under penalty of

2  perjury as well?

3  **A.**  She did.

4  **Q.**  All right.

5          MS. DILLINGHAM:  Thank you, Ms. Etienne.  You can take

6  that exhibit down.

7  BY MS. DILLINGHAM:

8  **Q.**  I want to turn your attention, Ms. Hickson, to 2013.  Do you

9  recall receiving an open records request from the media in 2013

10 regarding Pastor Bickers?

11 **A.**  Yes, I recall --

12          THE COURT:  Hold on.  Hold on.

13          MR. FINDLING:  Relevance and hearsay, Your Honor.

14          MS. DILLINGHAM:  It's not offered for the truth of what

15 they said to her.  It's the impact it had on her.

16          MR. FINDLING:  It's impossible to extricate the

17 interpretation that it's about the truth.

18          THE COURT:  I kind of see that, Ms. Dillingham.  You're

19 saying it's not offered for the truth of the matter.  You're

20 offering it to show the impact on her?

21          MS. DILLINGHAM:  I'm just asking if she received one.

22 I'm not asking --

23          THE COURT:  Don't say what's in it.  She can ask if she

24 received it, as long as she doesn't go into what's in it.

25 BY MS. DILLINGHAM:

1  **Q.**  Ma'am, do you recall receiving an inquiry from the media in

2  2013?

3  **A.**  That's -- I received, or my office received an inquiry from

4  the media.

5          MR. FINDLING:  Objection, Your Honor, because now it's

6  calling for another layer of hearsay.  It's not Ms. Hickson, with

7  due respect, but it's some unknown party in her office.

8          THE COURT:  How do you know you got an inquiry from the

9  media?  Did somebody tell you they received one?

10          THE WITNESS:  That's correct.

11          THE COURT:  I think it can show what she did -- my

12  understanding, Mr. Findling and Ms. Dillingham, as a result of

13  receiving this inquiry, did you do something?

14          THE WITNESS:  Yes.

15          THE COURT:  Yeah.  She can explain her actions,

16  Mr. Findling.  She's not saying what the inquiry was, but as a

17  result of someone in the office getting an inquiry, Ms. Hickson

18  directly did something.  That can be done.  So I'm going to

19  overrule that objection.  Let's don't go into what -- who the

20  inquiry is from and what it said, just what you do as a result of

21  receiving it.

22          MS. DILLINGHAM:  Yes, Your Honor.

23  BY MS. DILLINGHAM:

24  **Q.**  Ms. Hickson, did Pastor Bickers resign from the city shortly

25  after you received that inquiry?

1          MR. FINDLING:  Objection.  Objection.  Calling for

2    conjecture, whether or not that was a result thereof.

3          THE COURT:  That's a different question.  That's kind of

4    different.  I thought she was going to explain what she did, not

5    what Pastor Bickers did.

6          MS. DILLINGHAM:  That's okay, Your Honor.

7          I have no further questions.

8          Thank you, ma'am.

9          THE COURT:  Sustained.

10          No further questions?

11          Your witness.

12          MR. FINDLING:  Are you ready for me?  I just didn't know

13    what time --

14          THE COURT:  Well, it's 12:30.  How long do you think

15    your cross is going to take?

16          MR. FINDLING:  Between 20 and 25 minutes.

17          THE COURT:  Let's do it after lunch.

18          Ladies and gentlemen, we're going to stop right here for

19    the lunch break.  Again, I will remind you, don't talk about the

20    case during lunch.  Don't look for anything.  We'll start back at

21    1:30.  Have a good lunch.

22          (Jury out at 12:32 p.m.)

23          THE COURT:  All right.  We'll start back at 1:30.  Have

24    a good lunch, ma'am.  Thank you.

25          (Recess at 12:32 p.m. until 1:35 p.m.)

1          THE COURT:  Hope everyone had a good lunch.  I received

2    another message from the jury, a juror.  This is Juror No. 2.  He

3    indicated he forgot to tell us yesterday he wasn't feeling well

4    and he wasn't feeling too well today, but I think he's going to be

5    okay.

6          So with that stated, put Ms. Hickson back on the stand.

7          (Jury in at 1:35 p.m.)

8          THE SECURITY DEPUTY:  Please be seated and come to

9    order.

10         THE COURT:  You are still under oath.

11         Mr. Findling, you may proceed.

12         MR. FINDLING:  Thank you, Your Honor.

13   CROSS-EXAMINATION

14   BY MR. FINDLING:

15   Q.   Good afternoon, Ms. Hickson.

16   A.   Good afternoon.

17   Q.   How are you doing?

18   A.   Good.  How about you?

19   Q.   In fairness, we went to school together.  So it's great seeing

20   you.

21   A.   Good seeing you, too.

22   Q.   So, Ms. Hickson, I just want to leave off with one fact that

23   was a little bit confusing at the end, and that was the kind of

24   parting question, was that Pastor Bickers actually retired in the

25   final document.  So when she left the City of Atlanta, just to be

1  clear, okay, she retired; am I correct?

2  **A.**   I don't know.

3  **Q.**   Okay.  And the reason you wouldn't know that, going back to

4  that last question, is because you weren't in human resources; is

5  that correct?

6  **A.**   That's correct.

7  **Q.**   Okay.  And so I do want to talk for a second about the

8  department that she was in.  Okay.  And that was in, what, human

9  relations?

10  **A.**   Human -- no, sorry.  Human services.

11  **Q.**   Okay.  All right.  And so -- and to be clear, so we can make

12  sure that the members of the jury understand, that division, that

13  department, and going back you have a long history with the City

14  of Atlanta.  Right now you are the city attorney, right?

15  **A.**   Uh-huh, yes.

16  **Q.**   And back then you were the ethics officer; am I correct?

17  **A.**   That's correct.

18  **Q.**   Okay.  And so physically that office back then was not in city

19  hall, just so we're clear for these folks, correct?  It was not

20  physically located at that point in city hall?

21  **A.**   The human services?

22  **Q.**   Yes, human services, where she was employed was not in city

23  hall; correct?

24  **A.**   That's correct.

25  **Q.**   Okay.  All right.  So it was another building altogether; am I

1  right?

2  **A.**   That's correct.

3  **Q.**   All right.  And I want to just kind of jump to something,

4  because I'm a little familiar with the case and we expect things

5  to kind of play out over the next weeks.  But in the division that

6  she was in, right, it handled things like making sure that

7  government grants and funds were available, for example, for

8  veterans and homeless; am I correct?

9  **A.**   I believe that was under that office.

10  **Q.**   Okay.  But it had nothing to do with physically paying

11  contractors; am I correct?

12  **A.**   It wouldn't -- the payment of contractors would not have come

13  through human services.

14  **Q.**   Okay.  Right.  So that would be -- that would be nothing that

15  Pastor Bickers, during her employment, would have anything to do

16  to make sure that checks for hundreds of thousands of dollars were

17  being paid to contractors that were cleaning snow or fixing

18  bridges; am I correct?

19  **A.**   If you're limiting it to cleaning snow or fixing bridges, no,

20  she would not have had that responsibility.

21  **Q.**   Okay.  That was handled by a completely different division;

22  fair to say?

23  **A.**   That is correct.

24  **Q.**   Okay.  Now, as you -- as you indicated, she was employed, from

25  your recollection and from your review here today, between 2010

1    and 2013; am I correct?

2    **A.**   That's correct.

3    **Q.**   All right.   And you did review certain ethical obligations

4    that she had at the time and you went through Government's Exhibit

5    49, the code of ethics; am I correct?

6    **A.**   That's correct.

7    **Q.**   And so one of those things was to make sure that if she wasn't

8    able to donate -- dedicate herself full time to the city, that she

9    would put her supervisor on notice of that; is that correct?

10   **A.**   At the level where Pastor Bickers was, that would have been a

11   discussion between she and her supervision, the mayor.

12   **Q.**   Okay.   Right.   And to be clear, at the time, and in fairness

13   to these folks, as with our colleagues from the government, I had

14   the opportunity, you were kind enough to let me interview you in

15   preparation for the trial; correct?

16   **A.**   Yes.

17   **Q.**   Okay.   So back then we understand that Kasim Reed was the

18   elected official and he, you know, had a lot of the pomp and

19   circumstance of a mayor, but he had a chief of staff at the time;

20   am I correct?

21   **A.**   Yes.

22   **Q.**   Okay.   And his chief of staff at that time was Candace Byrd;

23   am I correct?

24   **A.**   That is correct.

25   **Q.**   Okay.   And so given the position that Pastor Bickers had at

1  that time, her supervisor, the person that she would speak to,

2  okay, would have been the chief of staff at that time, Candace

3  Byrd; am I correct?

4  **A.**  I'm not sure what the organization structure was at that time.

5  **Q.**  Okay.  But would that have made sense?

6  **A.**  It's a great possibility that would have been the case.

7  **Q.**  Okay.  All right.  So in reviewing records in this case, in

8  fairness when I interviewed you, and now folks have learned, she

9  was employed at 2010 and was working for a certain salary.  Okay?

10 **A.**  Okay.

11 **Q.**  Working 2011, for a certain salary.  And then her salary goes

12 down a decent amount in 212 and 213 because she takes a leave of

13 absence.  Now, that would be something ethically, if you're taking

14 a leave of absence, which means you don't think you can dedicate

15 yourself full-time to the city, it would be ethical conduct, am I

16 correct, to let your supervisor know, I can't dedicate all my

17 time, I need a leave for whatever reason.  Is that ethical

18 conduct?

19 **A.**  It would be considered -- yes, it would be consistent with the

20 standards of conduct, but, I mean, we're speaking real broadly.

21 **Q.**  I understand.  I understand.  And I'm -- because you've been

22 called by the government here as your position back then, it was

23 an ethics officer.

24 **A.**  That's correct.

25 **Q.**  And you have been cited to Government's Exhibit 49, with --

1  which is the code of ethics.  So looking in that rear-view mirror,

2  in that position that you -- important position you held with the

3  City of Atlanta, putting the city on notice, I cannot dedicate

4  myself full-time during the calendar year because of perhaps other

5  work, that would, under the code of ethics, be considered back

6  then ethical conduct; fair to say?

7  **A.**  If authorization was granted by the supervisor --

8  **Q.**  Yes.

9  **A.**  -- then, yes, that would have been considered in compliance

10  with the standards of conduct.

11  **Q.**  Okay.  Now, you also -- thank you for that.

12     Now, you also talked about it -- there are violations, there

13  are certain things that can take place, right?

14  **A.**  That's right.

15  **Q.**  And I think you even mentioned penalties can be assessed on

16  the employee; is that correct?

17  **A.**  That's correct.

18  **Q.**  Okay.  And in reviewing documents of executives back then, it

19  appears, and I asked you this, in fairness, when I interviewed

20  you, that there are certain type of reprimands that can take place

21  if it's determined that someone has not followed the rules, so to

22  speak; right?

23  **A.**  Right.  There is a personnel code that would set out what that

24  would be.

25  **Q.**  Okay.  And so, for example, we talked about -- the testimony

1  was about whether or not Pastor Bickers told about making $5,000

2  or more or indicating outside employment, if those violations were

3  determined, there's some possibilities that could have taken place

4  in real-time, because we're looking back in the rear-view mirror

5  to a decade ago.  And so I want to go over some of the things that

6  could have taken place.  Okay?

7      There could have been an oral reprimand; is that correct?

8  **A.**  I need to clarify.  Because the ethics office did not have

9  jurisdiction over personnel matters, the ethics office would not

10 have imposed any kind of personnel-related sanction.  And so, to

11 the best of my knowledge, based on my being a supervisor with the

12 city, then, yes, there could be serial or progressive discipline,

13 because those positions are at will or at the pleasure of, you can

14 be terminated for any reason or no reason.

15 **Q.**  Okay.  And including in that could be oral reprimand, written

16 reprimand, suspension, or even termination, as you said; correct?

17 **A.**  That's correct.

18 **Q.**  Okay.  And so we would expect then that, as you say, there was

19 somebody else at that time.  So if it were Candace Byrd, let's say

20 she was the person back then, right, as the chief of staff, it

21 would seem, from what you're saying, that she would be the

22 appropriate one to sit in that chair and to explain what the

23 possible punitive measures would have been.  Fair to say?

24 **A.**  As relates to personnel matters, yes.

25 **Q.**  Yes.

1   **A.**   Yes.

2   **Q.**   Okay.  And so issues like suspension, reprimands, or even

3   termination would be somebody -- back then, a decade ago, would

4   have been someone like Candace Byrd.  Fair to say?

5   **A.**   If she was a supervisor, yes.

6   **Q.**   Okay.  Now, given your ethics position back then, you were, I

7   take it, when there were ethical violations, you were aware of

8   punitive measures that were taken, albeit not by you, but I would

9   take it that you were in proximity to knowing about what took

10  place or didn't take place; is that correct?

11  **A.**   There was no formal reporting.  If I found out, you know, I

12  wanted to find out, but there was no requirement that anybody tell

13  the ethics office what the personnel matter was.

14  **Q.**   Okay.  And although there was nothing formal, I would take it

15  that you would at least try to keep up with what had happened?

16  **A.**   Yes.

17  **Q.**   Okay.  All right.  And if you would, tell me the years that

18  you were the ethics officer.

19  **A.**   From 2012 to 2016.

20  **Q.**   Okay.  And so in 2012 to 2016, and I asked you about this when

21  we interviewed, anybody that didn't say -- indicate on their form

22  about outside employment; right?

23  **A.**   Um-hmm.

24  **Q.**   Or making in excess of $5,000 during a calendar year, to the

25  best of your knowledge, none of those people were referred to the

1  U.S. Justice Department for federal prosecution; is that correct?

2  **A.**  I did not and no one in my office made a referral of that type

3  based on that particular type of violation.

4  **Q.**  Okay.  Thank you.

5     Now, I want to talk to you about something that was referenced

6  in your direct testimony, that you started to talk about, but took

7  place very, very briefly.  But it's significant in that role that

8  you played in 2012 to 2016, and for people in Atlanta, it's still

9  significant to this day.  And that is that, back then, under your

10  leadership and continuing now, the City of Atlanta has a very

11  robust ethics hotline; is that correct?

12  **A.**  It -- I don't know that I would use the word "robust," but it

13  is one that existed over a number of years.  And there's a lot of

14  advertising or publication of it, yes.

15  **Q.**  Okay.  And I say robust for the following reason:  It offers a

16  multiple -- multitude of -- not multitude, but it offers several

17  options on how to report ethical violations; okay?  And when I say

18  that, you can pick up a phone; right?

19  **A.**  That's correct.

20  **Q.**  1-800-884-0911, that's the number; right?

21  **A.**  That's correct.

22  **Q.**  Okay.  And it also offers an e-mail address.  So if you don't

23  want to pick up the phone, but you just want to drop it from your

24  Gmail account, you can do an ethics violation; correct?

25  **A.**  You can, yes.

**Q.** Okay. And, of course, you can -- there is an address available, so if you want to be old school, like my late mother, you would just write out the letter and you put it in and you complain about something you observed; is that correct?

**A.** That is correct.

**Q.** Okay. And in this ethics hotline, okay -- and by the way, it doesn't have to be someone on the outside; right? It doesn't have to be like a citizen that maybe sees something that they think is unethical. It could be an employee; right?

**A.** That's correct.

**Q.** All right. And when I say that it can be an employee, and when I say it's robust, one of the reasons is when one studies the City of Atlanta ethics hotline, it specifically provides for whistleblower protection; correct?

**A.** That's correct.

**Q.** Okay. And so that for the edification of these folks here in the jury, whistleblower edification -- I mean, excuse me -- protection means if you're working for the City of Atlanta and you're seeing some contracts that you think are funky; right? And you're like, you know what, I'm not standing for this, I'm about to -- I'm about to snitch somebody out, I don't like what's going down, you can't get fired for that; am I correct?

**A.** You should not be fired for that.

**Q.** Well, there's a lot of lawyers that all of us know that would love to have the case for the person who gets fired because of it;

1   right?

2           THE COURT:  Stay away from the commentary and ask

3   questions.

4   BY MR. FINDLING:

5   Q.  All right.  So whistleblower protection means that you should

6   not be getting fired for dropping the dime on somebody that is

7   conducting themselves in an unethical way; am I correct?

8   A.  That is correct.

9   Q.  Okay.  And it also, as I said, also includes, right, people on

10  the outside; right?  So it could be people not just employed by

11  the City of Atlanta, but people on the outside that go, uh-huh,

12  this is shady what's going on here, there are -- there are funky

13  contracts going down, people getting jobs that shouldn't be

14  getting, I'm calling the 1-800 number, I'm calling 1-800-844-0911

15  and reporting this, or I'm dropping an e-mail or I'm putting an

16  envelope in the mail and complaining.  You can do that from the

17  outside as well as the inside as an employee of the City of

18  Atlanta; is that correct?

19  A.  That's right.

20  Q.  All right.  And you could also -- and this is very, very

21  important, and this is why I said robust, because I have studied

22  this.  You could also make that complaint anonymously; right?

23  A.  That is correct.

24  Q.  Okay.  So that means if you don't want retribution, if you

25  don't want people getting ticked off at you, all right, if you

1   don't want somebody to think you're a snitch, you just make the

2   complaint, make the phone call, drop the e-mail, drop the letter

3   in the mailbox, and you don't even have to give your name.  You

4   could just make the complaint; am I correct?

5   **A.**   You can just make the complaint, that is correct.

6   **Q.**   Okay.  From 2012 to 2016, you were the ethics officer.  Isn't

7   it true that during that period of time, when it came to Mitzi

8   Bickers, Pastor Mitzi Bickers, there was no complaint, either by

9   telephone, e-mail, or correspondence, whether anonymously or with

10  a name, complaining about Pastor Mitzi Bickers; is that correct?

11  **A.**   During my tenure as the ethics officer, I'm not aware of any

12  complaints, through the hotline or otherwise.

13  **Q.**   Now, these -- I'm looking at Government's Exhibit 51.  And

14  these were the financial disclosure statements; am I correct?

15  **A.**   I have to assume.  I don't have it in front of me.

16  **Q.**   Okay, I'm sorry.  I'm going to show them to you now and then

17  I'll come back.  Take my little cheat sheet.

18  **A.**   Thank you.

19      Yes, Government's Exhibit 51 consists of city financial

20  disclosure statements.

21  **Q.**   And just to be -- just to be fair, these are submitted

22  electronically; am I correct?

23  **A.**   That's correct.

24  **Q.**   Okay.  So this is not like somebody sitting down at the

25  closing table, all right, with lawyers on both sides and going

1  over documents.  There's no way for you to tell how quickly --

2  whether it was one minute or ten minutes -- the person that's

3  submitting these has taken to sit and focus on the executive of

4  these.

5      Is that fair to say?

6  **A.**  I don't know that that's fair to say.  I would not have, but

7  it doesn't -- I'm not sure whether our consultant who actually

8  built the system didn't have a way to determine that.  But I

9  didn't have a way, other than to ask him.

10  **Q.**  Okay.  So there's no way you'd know how long -- how short or

11  long or -- that it took for anybody to execute these; am I

12  correct?

13  **A.**  Not on my own.

14  **Q.**  Okay.  In Government's Exhibit 50 --

15  **A.**  Yes.

16  **Q.**  -- the City of Atlanta charter code, procurement section, it

17  talks about a subject called debarment.

18      Are you familiar with debarment?

19  **A.**  I am.

20  **Q.**  Okay.  So the section on debarment talks about that someone

21  can be sanctioned in a way that prohibits them from -- with regard

22  to City of Atlanta, for example, doing business with the City of

23  Atlanta; am I correct?

24  **A.**  I would need to look at the section.  I know that's what

25  debarment means, but I -- the specific language of that section,

1   I'm not really sure.

2   **Q.**   Okay.  So I'm going to let you look at this section and then

3   I'm generally going to speak to you about debarment.  Is that

4   okay?

5   **A.**   That's fine.

6      Counsel, it's voluminous.  If you want to direct me to that, I

7   would appreciate it.

8   **Q.**   I'll tell you what I'm going to do.  I'm just going to

9   generally speak about it.

10  **A.**   Okay.

11  **Q.**   Because as a former ethics officer and a city attorney, just

12  generally speaking, the City of Atlanta has a debarment provision,

13  correct?

14  **A.**   That is correct.

15  **Q.**   Okay.  And so, generally speaking, a debarment provision is

16  where somebody is prohibited, either by agreement or by penalty,

17  from doing business with a government entity, correct?

18  **A.**   That is correct.

19  **Q.**   Okay.  So it can be global, right, where somebody is punished

20  and is prevented for some period of time from doing business with

21  any government entity; is that correct?

22  **A.**   That wouldn't be the City of Atlanta's debarment, but there

23  probably is a provision that would be global.  I don't -- I just

24  don't know.

25  **Q.**   Okay.  And the City of Atlanta, of course, would have their

1  own to keep you from doing business with the City of Atlanta?

2  **A.**   That's correct.

3  **Q.**   And I'm sure other governmental units may have their own

4  unique ones as well --

5  **A.**   That's correct.

6  **Q.**   -- is that correct?

7  **A.**   That's correct.

8           MR. FINDLING:  One second, Your Honor.  I just need to

9  put these back.

10          THE COURT:  Just hand them to Mr. Kitchens.

11          MR. FINDLING:  No further questions.

12          THE COURT:  Redirect?

13          MR. KITCHENS:  Just one question, Your Honor.

14  REDIRECT EXAMINATION

15  BY MS. DILLINGHAM:

16  **Q.**   Ms. Hickson, was the ethics office conducting an investigation

17  when Ms. Bickers retired?

18  **A.**   No, there was not an investigation being conducted at the time

19  of her retirement.

20  **Q.**   Had the ethics office done any investigation before her

21  retirement?

22  **A.**   There wasn't an investigation.  There was a query that was

23  made regarding the amendment and what led to the amendment.

24  **Q.**   And can you remind us which amendment that was?

25  **A.**   The amendment to the 2013 financial disclosure.

```
 1              MS. DILLINGHAM:  Thank you, ma'am.

 2              THE COURT:  Recross?

 3              MR. FINDLING:  No, Your Honor.

 4              THE COURT:  Thank you, Ms. Hickson.

 5              Call your next witness.

 6              MS. DILLINGHAM:  The government calls Kimberly

 7  Spell-Fowler.

 8              THE COURT:  Can Ms. Hickson be released?

 9              MR. DAVIS:  She can from us, Your Honor.

10              MR. FINDLING:  Your Honor, we'd just ask she stay on

11  call for our subpoena.

12              THE COURT:  Okay.  You can go back to your office, but

13  you're still subject to being called back by the defense.

14              THE DEPUTY CLERK:  Remain standing and raise your right

15  hand, please.

16                         ******

17                    KIMBERLY SPELL-FOWLER,

18          having been duly sworn, testified as follows:

19                         ******

20              THE DEPUTY CLERK:  You can take off your mask, if you'd

21  like.  If you would please state and spell your name for the

22  record.

23              THE WITNESS:  My name is Kimberly Spell-Fowler,

24  K-I-M-B-E-R-L-Y, last name Spell, S-P-E-L-L, hyphen, F-O-W-L-E-R.

25              THE DEPUTY CLERK:  Thank you.
```

1   DIRECT EXAMINATION

2   BY MS. DILLINGHAM:

3   **Q.**  Ma'am, how are you?

4   **A.**  Good.  Thank you.

5   **Q.**  All right.  Can you tell us how you're currently employed?

6   **A.**  I am a special agent with the FBI.

7   **Q.**  And how long have you been a special agent with the FBI?

8   **A.**  Approximately, eight years.

9   **Q.**  And are you assigned to any particular unit of the FBI?

10  **A.**  Yes.  I'm assigned to the public corruption squad here in

11  Atlanta.

12  **Q.**  And can you tell us generally what you do as a special agent

13  in the public corruption squad?

14  **A.**  We work on cases for corrupt politicians, color of law, and

15  civil rights issues primarily.

16  **Q.**  And in your role did you participate in the investigation of

17  Pastor Mitzi Bickers?

18  **A.**  Yes.

19  **Q.**  As part of that investigation, did the government request

20  records from the Georgia Secretary of State?

21  **A.**  Yes.

22  **Q.**  And did you review the records provided by the Secretary of

23  State?

24  **A.**  Yes.

25          MS. DILLINGHAM:  Your Honor, may I approach?

1          THE COURT:  Yes.

2   BY MS. DILLINGHAM:

3   **Q.**  Ma'am, I'm showing you what's previously been marked as

4   Government's Exhibit 53, 55, 56, 58, 59, 60, 61, and 62.

5   **A.**  Yes.

6   **Q.**  Do you recognize these documents?

7   **A.**  Yes.

8   **Q.**  What are they?

9   **A.**  These are the records from the Secretary of State for the

10  State of Georgia.

11          MS. DILLINGHAM:  At this time, Your Honor, the

12  Government offers into evidence Exhibits 53, 55, 56, 58, 59, 60,

13  61, and 62.

14          THE COURT:  Any objection?

15          MS. GOLDBERG:  No objection.

16          THE COURT:  They're admitted without objection.  You may

17  publish, if you so desire.

18          (Government's Exhibits 53, 55, 56, 58, 59, 60, 61 and 62

19  were received and marked into evidence.)

20          MS. DILLINGHAM:  Thank you, Your Honor.

21          Ms. Etienne, could you please pull up Exhibit 63 for us.

22  BY MS. DILLINGHAM:

23  **Q.**  All right.  Ma'am, can you tell us, Agent Spell-Fowler, which

24  company's filings we're looking at?

25  **A.**  The Bickers Group, Inc.

1  **Q.**  And when was The Bickers Group formed?

2  **A.**  March 10, 2004.

3            MS. DILLINGHAM:  And, Ms. Etienne, can we go to page 14.

4  And can we highlight the bottom half of the page.

5  BY MS. DILLINGHAM:

6  **Q.**  Who was the CEO of The Bickers Group, ma'am?

7  **A.**  Mitzi Bickers.

8  **Q.**  And what is the address listed for The Bickers Group?

9  **A.**  950 Eagles Landing Parkway, Suite 468.

10 **Q.**  And did you visit The Bickers Group business address?

11 **A.**  Yes.

12 **Q.**  All right.

13            MS. DILLINGHAM:  Your Honor, may I approach?

14            THE COURT:  Yes.

15 BY MS. DILLINGHAM:

16 **Q.**  Ma'am, I'm showing you what's been marked as Government's

17 Exhibit 54.

18     Do you recognize that document?

19 **A.**  Yes.

20 **Q.**  How are you able to recognize it?

21 **A.**  I took that photo.

22 **Q.**  And when did you take that photo?

23 **A.**  It was in May of 2018 -- or, I'm sorry, '19.  May 18th of

24 2000 -- I'm sorry.  I have dates running through my head.  2020.

25 Sorry.

1  **Q.**  Can you tell us one more time what that date was?

2  **A.**  Yes.  May in 2020.

3  **Q.**  All right.  And does this photograph accurately and fairly

4  depict the scene as it appeared on the day it was taken?

5  **A.**  Yes, it does.

6          MS. GOLDBERG:  Objection, Your Honor.  At this time --

7  if the photo was taken in 2020, I don't know what relevance it has

8  to anything on this indictment.

9          THE COURT:  Ms. Dillingham?

10         MS. DILLINGHAM:  It shows the address that was

11 identified in the filings.

12         THE COURT:  The address for Pastor Bickers?

13         MS. DILLINGHAM:  For The Bickers Group and these

14 documents.

15         MS. GOLDBERG:  And, Your Honor, the document that was

16 just shown is 2014.  We're talking about 2020.  Licenses change,

17 as the Court admonished the jury earlier.

18         THE COURT:  What document is this?  Is this a document

19 that has been admitted in evidence?

20         MS. DILLINGHAM:  So Document 53, Your Honor, talks about

21 The Bickers Group --

22         THE COURT:  It's already in evidence.

23         MS. GOLDBERG:  Your Honor --

24         THE COURT:  54 or 53?

25         MS. DILLINGHAM:  So we're talking right now about 54,

1    Your Honor.  It hasn't been admitted yet.

2            THE COURT:  Why is it relevant, Ms. Dillingham?

3    Ms. Goldberg says it's not relevant.  Tell the Court why is it

4    relevant.

5            MS. DILLINGHAM:  It is a photograph of the address

6    contained in the Secretary of State's records.

7            THE COURT:  What address and whose address?

8            MS. DILLINGHAM:  Of The Bickers Group.

9            THE COURT:  Why is that not relevant?

10           MS. GOLDBERG:  Because, Your Honor, the document was

11   referenced that it was incorporated in 2004.  That's a photograph

12   from 2020.

13           THE COURT:  Overruled.  It's admitted over objection.

14           (Government's Exhibit 54 was received and marked into

15   evidence.)

16           MS. DILLINGHAM:  May we publish to the jury, Your Honor?

17           THE COURT:  You may publish it.

18           MS. DILLINGHAM:  Ms. Etienne -- thank you.

19   BY MS. DILLINGHAM:

20   **Q.**  Ms. Spell-Fowler, can you tell us what is depicted in this

21   photograph?

22   **A.**  This is the UPS Store.  This is the address for the 950 Eagles

23   Landing Parkway.

24   **Q.**  Thank you, ma'am.

25           MS. DILLINGHAM:  Ms. Etienne, can you please pull up

1    Exhibit 55.

2    BY MS. DILLINGHAM:

3    **Q.**   Can you tell us which company's filings we're looking at?

4    **A.**   Chateau Land Company, Inc.

5    **Q.**   And when was Chateau Land formed?

6    **A.**   June 20, 2006.

7              MS. DILLINGHAM:   And, Ms. Etienne, can you please take

8    us to page 6.   And we're going to be looking at the bottom half of

9    that page.

10   BY MS. DILLINGHAM:

11   **Q.**   Ma'am, who was the CEO of the Chateau Land Company?

12   **A.**   Shedreka Poole.

13   **Q.**   And who was the CFO?

14   **A.**   Mitzi Bickers.

15             MS. DILLINGHAM:   All right.   Can we look at Exhibit 56,

16   Ms. Etienne.

17   BY MS. DILLINGHAM:

18   **Q.**   And which company's filings are we looking at?

19   **A.**   Pirouette Companies, LLC.

20   **Q.**   Can you say that one more time for me?

21   **A.**   Pirouette Companies, LLC.

22   **Q.**   Okay.

23             MS. DILLINGHAM:   And can we look at page 2, Ms. Etienne.

24   BY MS. DILLINGHAM:

25   **Q.**   Was this company originally named something else?

1  **A.**  Yes.  It was originally named Pirouette Dance Company, Inc.

2  **Q.**  And when was Pirouette Dance Company formed?

3  **A.**  March 6th, 2007.

4          MS. DILLINGHAM:  Ms. Etienne, can you please take us to

5  page 10.

6  BY MS. DILLINGHAM:

7  **Q.**  And when did Pirouette Dance Company, Inc., change its name to

8  Pirouette Companies, LLC?

9  **A.**  February 29, 2012.

10         MS. DILLINGHAM:  All right.  And, Ms. Etienne, can we

11 see page 11.

12 BY MS. DILLINGHAM:

13 **Q.**  Who signed as the president of Pirouette?

14 **A.**  Keyla A. Jackson.

15         MS. DILLINGHAM:  And, Ms. Etienne, can we see page 12.

16 And looking at the bottom half of this page.

17 BY MS. DILLINGHAM:

18 **Q.**  Can you tell us the address for Pirouette Companies, LLC?

19 **A.**  Yes.  It's 1266 West Paces Ferry Road, Suite 217.

20 **Q.**  And did you visit this business address provided by Pirouette

21 Companies?

22 **A.**  Yes.

23         MS. DILLINGHAM:  May I approach, Your Honor?

24         THE COURT:  Yes.

25 BY MS. DILLINGHAM:

1  **Q.**  I'm showing you what's been marked as Government's Exhibit 57.
2  Do you recognize this document, ma'am?
3  **A.**  Yes.
4  **Q.**  How are you able to recognize it?
5  **A.**  I took this photo.
6  **Q.**  And when did you take this photo?
7  **A.**  May of 2020.
8  **Q.**  And does the photo accurately and fairly depict the scene as
9  it appeared on the day it was taken?
10 **A.**  It does.
11        MS. DILLINGHAM:  At this time, the government moves to
12 admit Exhibit 57 into evidence.
13        MS. GOLDBERG:  Same objection as earlier, Your Honor.
14        THE COURT:  Hang on a second.  You're saying this is
15 relevant from May of 2020 because of?
16        MS. DILLINGHAM:  Because it's the address provided in
17 the Secretary of State's records.
18        MS. GOLDBERG:  Your Honor, a document from 2007 again.
19 There's no -- there's no connection there.
20        THE COURT:  I can't hear you with the mask on.
21        MS. GOLDBERG:  I'm sorry.  I forgot to take the mask
22 off.
23        We're talking about 13 years later, Your Honor.  So
24 there is no relevance.
25        THE COURT:  I'm allowing it.  You can give it whatever

```
1   weight it is due to be given.  I'll allow it over objection.
2            (Government's Exhibit 57 was received and marked into
3   evidence.)
4            MS. DILLINGHAM:  May I publish it?
5            THE COURT:  You may publish it.
6            MS. DILLINGHAM:  Okay.  Ms. Etienne, can we see that
7   document.
8   BY MS. DILLINGHAM:
9   Q.  Can you tell us what's depicted in this photograph, ma'am?
10  A.  The UPS Store.
11  Q.  And where was that located?
12  A.  It was located at the address of the 1266 West Paces Ferry.
13  Q.  Thank you, ma'am.
14           MS. DILLINGHAM:  Can we see Exhibit 58, Ms. Etienne.
15  BY MS. DILLINGHAM:
16  Q.  Whose filings are we looking at in Government's Exhibit 58?
17  A.  E.R. Mitchell Construction Co., Inc.
18           MS. DILLINGHAM:  And can we see page 10, Ms. Etienne.
19  BY MS. DILLINGHAM:
20  Q.  Did this company originally have another name, Agent
21  Spell-Fowler?
22  A.  Yes, it did.
23  Q.  What was that name?
24  A.  EC and WT Construction Company, Inc.
25  Q.  And when did it change its name?
```

1  **A.**   May 14th, 1986.  Sorry.

2  **Q.**   And what did it change its name to?

3  **A.**   To the E.R. Mitchell Construction Company, Inc.

4          MS. DILLINGHAM:  And can we see page 18, Ms. Etienne.

5  And the bottom half of this document.

6  BY MS. DILLINGHAM:

7  **Q.**   Who is the CEO of E.R. Mitchell Construction, ma'am?

8  **A.**   E.R. Mitchell, Jr.

9  **Q.**   All right.

10          MS. DILLINGHAM:  Can we move to Exhibit 59, please.

11  BY MS. DILLINGHAM:

12  **Q.**   Which company's files are we looking at now?

13  **A.**   E.R. Mitchell & Company.

14          MS. DILLINGHAM:  And if we move to page 25, Ms. Etienne.

15  BY MS. DILLINGHAM:

16  **Q.**   Can you please tell us who the CEO of E.R. Mitchell & Company

17  is?

18  **A.**   E.R. Mitchell, Jr.

19  **Q.**   All right.  And now let's look at Exhibit 60.

20      Can you tell us the name of the company in Exhibit 60?

21  **A.**   Cascade Building Systems, LLC.

22  **Q.**   All right.

23          MS. DILLINGHAM:  Can we look at page 6, Ms. Etienne.

24  BY MS. DILLINGHAM:

25  **Q.**   Did this company originally have another name?

1  **A.**   Yes.  It was previously E.R. Mitchell Construction I, LLC.

2  **Q.**   And when did it change its name?

3  **A.**   February 20th, 2008.

4         MS. DILLINGHAM:  And can we go to page 9, Ms. Etienne,

5  and highlight the bottom half, please.

6  BY MS. DILLINGHAM:

7  **Q.**   And if we look in the bottom corner, who is the authorized

8  signer for Cascade?

9  **A.**   E.R. Mitchell.

10         MS. DILLINGHAM:  Can we look at Exhibit 61, please.

11  BY MS. DILLINGHAM:

12  **Q.**   And which company are we looking at, ma'am?

13  **A.**   C.P. Richards Construction Co., Inc.

14         MS. DILLINGHAM:  Okay.  And can we look at page 59,

15  Ms. Etienne.

16         MS. ETIENNE:  59?

17         MS. DILLINGHAM:  59.

18  BY MS. DILLINGHAM:

19  **Q.**   Did this company originally have another name?

20  **A.**   Yes.  ABCO Builders, Inc.

21  **Q.**   And when did it change its name?

22  **A.**   February 1st, 2013.

23         MS. DILLINGHAM:  And can we go to page 61.

24  BY MS. DILLINGHAM:

25  **Q.**   Who is the CEO of C.P. Richards Construction?

1   **A.**  Richards -- or -- I'm sorry.  Charles Richards, Jr.

2   **Q.**  Thank you, ma'am.

3           MS. DILLINGHAM:  Can we look at Exhibit 52, please.

4   BY MS. DILLINGHAM:

5   **Q.**  Which company is shown in these records, ma'am?

6   **A.**  C.P. Richards Construction Co., Inc.

7   **Q.**  And when was this company formed?

8   **A.**  September 20, 2002.

9           MS. DILLINGHAM:  And can we please go to page 5.

10  BY MS. DILLINGHAM:

11  **Q.**  All right.  And did this company change its name?

12  **A.**  Yes.  It was previously ABCO Construction, Inc.

13  **Q.**  And when did it change its name?

14  **A.**  June 20, 2005.

15          MS. DILLINGHAM:  And can we please look at page 6.

16  BY MS. DILLINGHAM:

17  **Q.**  Can you tell us the title of this document, ma'am?

18  **A.**  Articles of Amendment to Articles of Incorporation of ABCO

19  Construction, Inc.

20  **Q.**  Can you tell us who the president is?

21  **A.**  Charles P. Richards, Jr.

22  **Q.**  Thank you, ma'am.

23          MS. DILLINGHAM:  We can take that exhibit down.  Thank

24  you.

25  BY MS. DILLINGHAM:

**Q.** As part of the government's investigation, did the government
also request records from the Mississippi Secretary of State?

**A.** Yes.

**Q.** And did you review those records from the Secretary of State?

**A.** Yes.

          MS. DILLINGHAM:  May I approach, Your Honor?

          THE COURT:  Yes.

BY MS. DILLINGHAM:

**Q.** All right.  I'm showing you what's been marked for
identification as Government's Exhibit 63, 64, and 65.

    Do you recognize these records, ma'am?

**A.** Yes.

**Q.** What are they?

**A.** This is the Secretary of State for Mississippi, the company
records.

**Q.** All right.

          MS. DILLINGHAM:  At this time, the Government offers for
admission Exhibit 63, 64, and 65.

          THE COURT:  Any objection?

          MS. GOLDBERG:  No objection.

          THE COURT:  They're admitted without objection.  You may
publish it.

          (Government's Exhibits 63, 64, and 65 were received and
marked into evidence.)

          MS. DILLINGHAM:  All right.  Ms. Etienne, can you please

1  pull up Exhibit 64.

2  BY MS. DILLINGHAM:

3  **Q.**  All right, ma'am.  Can you please tell us what company was

4  formed here?

5  **A.**  The Bickers Group, LLC.

6  **Q.**  I'm sorry, ma'am.  We're at Exhibit 64.

7  **A.**  Oh, I apologize, I was on 63.

8  **Q.**  We're a little out of order.

9  **A.**  Sorry.  This is E.R. Mitchell Company, LLC.

10        MS. DILLINGHAM:  And can we go to page 2, Ms. Etienne.

11  BY MS. DILLINGHAM:

12  **Q.**  All right.  Can you tell me when this company was formed?

13  **A.**  Yes.  May 18, 2015.

14  **Q.**  And who was the registered agent and manager for this company?

15  **A.**  The registered agent was E.R. Mitchell.

16  **Q.**  And at the bottom of the page can you tell us who the manager

17  is?

18  **A.**  Yes.  E.R. Mitchell.

19  **Q.**  Thank you, ma'am.

20        MS. DILLINGHAM:  Ms. Etienne, can we please see Exhibit

21  63.  And can we just go to page 2, please.

22  BY MS. DILLINGHAM:

23  **Q.**  All right.  Ma'am, can you tell us what company was formed in

24  Mississippi here?

25  **A.**  The Bickers Group, LLC.

```
 1  Q.  And when was it formed?

 2  A.  I apologize.

 3          MS. DILLINGHAM:  Ms. Etienne, if you highlight --

 4          THE WITNESS:  June 3rd, 2014.

 5  BY MS. DILLINGHAM:

 6  Q.  Thank you, ma'am.

 7      And what is the business e-mail listed there?

 8  A.  Mbickers@thebickersgroup.com.

 9  Q.  Thank you, ma'am.

10          MS. DILLINGHAM:  And, finally, can we go to Exhibit 65.

11  And can we go straight to page 2.

12  BY MS. DILLINGHAM:

13  Q.  Can you tell us what company was formed here?

14  A.  Mississippi Developers, LLC.

15  Q.  And when was this company formed?

16  A.  June 29, 2015.

17  Q.  And can you tell us who the registered agent is for this

18  company?

19  A.  Mitzi Bickers.

20          MS. DILLINGHAM:  Nothing further, ma'am.  Thank you.

21          THE COURT:  Your witness.

22          MS. GOLDBERG:  Nothing for the defense, Your Honor.

23          THE COURT:  Thank you.  You're free to go.

24          THE WITNESS:  Thank you.

25          THE COURT:  Call your next witness.
```

1          MS. DILLINGHAM:  At this time, the government calls
2   Jimmy Kirby.
3          THE COURT:  All right.
4          THE DEPUTY CLERK:  Would you raise your right hand,
5   please.
6                           ******
7                        JIMMY KIRBY,
8          having been duly sworn, testified as follows:
9                           ******
10         THE DEPUTY CLERK:  You can remove your mask if you'd
11  like.  And if you would have a seat and state and spell your name
12  for the record.
13         THE WITNESS:  My name is Jimmy Kirby, J-I-M-M-Y,
14  K-I-R-B-Y.
15         THE COURT:  Mr. Kirby, you'll probably have to speak up
16  a little bit louder.
17         THE WITNESS:  Okay.  J-I-M-M-Y, K-I-R-B-Y.
18  DIRECT EXAMINATION
19  BY MS. DILLINGHAM:
20  **Q.**  Hi, Mr. Kirby.  How are ya?
21  **A.**  I'm good.  Thank you.
22  **Q.**  Over here.
23  **A.**  Okay.
24  **Q.**  All right.  Can you please tell the jury where you work, sir?
25  **A.**  I work at the Financial Crimes Enforcement Network at the U.S.

1  Treasury Department.

2  **Q.**   Okay.  And where is that office located?

3  **A.**   Our office is located in Vienna, Virginia.

4  **Q.**   And how long have you worked for the Financial Crimes

5  Enforcement Network?

6  **A.**   A little over six years.

7  **Q.**   All right.  And does the Financial Crimes Enforcement Network

8  also go by FinCEN?

9  **A.**   Yes.

10  **Q.**   All right.  What is your position at FinCEN?

11  **A.**   I am the associate director of FinCEN's intelligence division.

12  **Q.**   And what are your duties in that position?

13  **A.**   I oversee a team of analysts that analyzes various types of

14  financial intelligence, both filed with FinCEN and from other

15  sources, to combat money laundering and other types of illicit

16  finance.

17  **Q.**   Can you speak up just a little bit more?

18  **A.**   I'm sorry.

19  **Q.**   Thank you.

20     Are you assigned to any particular section of FinCEN?

21  **A.**   Yes.  I'm -- I over -- I'm in the intelligence division.

22  **Q.**   All right.  And how long have you been in that division?

23  **A.**   Approximately a year-and-a-half.

24  **Q.**   All right.  And before that what did you do?

25  **A.**   I was the chief counsel of FinCEN.

Case 1:18-cr-00098-SCJ-LTW   Document 240   Filed 11/16/22   Page 143 of 189

356

**Q.**  Can you tell us what FinCEN is?

**A.**  FinCEN is a bureau of the Treasury Department that its mission is to combat -- to protect the U.S. financial system from money laundering, terrorist financing, and other types of illicit finance.

**Q.**  All right.  And when you say "illicit finance," can you tell us what that means?

**A.**  Abuse of the U.S. financial system to engage in criminal or other types of inappropriate activity in the financial sector.

**Q.**  All right.  And where did FinCEN -- where did this bureau come from?

**A.**  It's been a part of the department -- I'm sorry -- the Treasury Department since the early 1990s.  It became a bureau of the Treasury Department after 9/11.

**Q.**  And are you familiar with FinCEN's recordkeeping system?

**A.**  Yes, I am.

**Q.**  And what kinds of records does FinCEN maintain?

**A.**  Financial institutions and other types of -- and other actors and individuals' companies file a variety of reports with us under the Bank Secrecy Act.  And our team reviews a lot of those reports.

**Q.**  All right.  And you said financial institutions.  Can you tell us what that means?

**A.**  Financial institutions would include banks, credit unions, money services, businesses.  Those types of entities.

**Q.**  And why do those financial institutions provide this data to FinCEN?

**A.**  They are required to provide it to us via FinCEN's legal authorities.

**Q.**  All right.  Are they required to provide accurate information to FinCEN?

**A.**  Yes, they are.

**Q.**  And is that mandated by law?

**A.**  Yes, it is.

**Q.**  Can you tell us which law?

**A.**  FinCEN administers a collection of statutes known as the Bank Secrecy Act, and we also administer regulations implementing those statutes.

**Q.**  And does the Bank Secrecy Act provide any penalties for banks that do not report the required information to FinCEN?

**A.**  Yes, it does.

**Q.**  Sir, what is a currency transaction report?

**A.**  It is a report that banks file with FinCEN when a customer engages in a cash transaction of more than $10,000.

**Q.**  And are those commonly -- those reports commonly referred to as CTRs?

**A.**  Yes, they are.

**Q.**  And are CTRs one of those records we just discussed that are required by the Bank Secrecy Act?

**A.**  Yes, they are.

**Q.** Under what circumstances does a bank file a CTR?

**A.** When a customer engages in a cash transaction of more than $10,000 in a day, either on their own behalf or on behalf of someone else.

**Q.** So if I came into a bank and deposited a check over $10,000, would it trigger a CTR?

**A.** No, it would not.

**Q.** So if I come into a bank and deposit over $10,000 in cash, does it trigger a CTR?

**A.** Yes, it would.

**Q.** And the same with a withdrawal?

**A.** Yes.

**Q.** Are you familiar with the ways individuals attempt to avoid generation of a CTR?

**A.** Yes.

**Q.** Can you describe that practice?

**A.** That's commonly known as structuring.  And most commonly, at least that I'm aware of, it involves breaking up transactions to avoid the $10,000 threshold.

**Q.** And can you tell us what kind of information is reported in a CTR?

**A.** It would normally include the name of the person or persons. It would identify the financial institution where the transaction occurred.  It would include identifying information for the persons involved in the transaction.  And I think it would include

1  the amount of the transaction as well.

2  **Q.**  And you mention identifying information for the persons

3  involved.  Do I have that right?

4  **A.**  Yes.

5  **Q.**  What kind of identifying information does the bank collect?

6  **A.**  It would include the individual's name, also, I believe it

7  include the -- any identification that was provided by the

8  individual.  It may also include address information, but I'm not

9  sure about that off the top of my head.

10          MS. DILLINGHAM:  No further questions.  Thank you, sir.

11          THE COURT:  Your witness.

12          MS. GOLDBERG:  No questions, Your Honor.

13          THE COURT:  Thank you, sir.

14          Call your next witness.

15          MS. DILLINGHAM:  The government calls Deborah Lonon.

16          THE COURT:  All right.

17          THE DEPUTY CLERK:  Would you remain standing and raise

18  your right hand, please.

19                      ******

20                  DEBORAH LONON,

21       having been duly sworn, testified as follows:

22                      ******

23          THE DEPUTY CLERK:  You can remove your mask, if you'd

24  like to.  If you would have a seat and state and spell your name

25  for the record, please.

 1                THE WITNESS:  Deborah Lonon, D-E-B-O-R-A-H.  Last name,

 2    L-O-N-O-N.

 3                THE DEPUTY CLERK:  Thank you.

 4    DIRECT EXAMINATION

 5    BY MS. DILLINGHAM:

 6    **Q.**  Hello, ma'am.  How are you?

 7    **A.**  I'm doing well.

 8    **Q.**  Can you please tell us how you're currently employed?

 9    **A.**  I am the City of Atlanta's Commissioner for the Department of

10    Grants and Community Development.

11    **Q.**  And can you tell us a little bit about your work history

12    before you served as the commissioner?

13    **A.**  Yes.  Immediately prior to serving in this capacity, I was the

14    Assistant County Manager for Athens-Clarke County Unified

15    Government.  Immediately prior to that, I was the Housing and

16    Community Development Director for Athens-Clarke County for about

17    three years.  And prior to that, I served in the county attorney's

18    office, also for about three years.

19    **Q.**  All right.  Ma'am, can you briefly describe your educational

20    background for the jury?

21    **A.**  Sure.  I attended the University of Georgia and obtained a

22    bachelors in business administration and finance.  And I graduated

23    and then attended the University of Georgia and obtained a JD from

24    the law school in 2005.

25    **Q.**  Ma'am, what are your primary responsibilities as Commissioner

1  of Grants and Community Development?

2  **A.**   The primary responsibility is really compliance based.   The

3  city receives federal funding and the responsibility of my

4  department is to ensure that those funds are properly awarded,

5  expended, and that we submit timely reports to the U.S. Department

6  of Housing and Urban Development, and that we respond to any

7  inquiries regarding those grants.

8  **Q.**   All right.   And you mentioned the U.S. Department of Housing

9  and Urban Development.

10       Is that a federal agency, ma'am?

11 **A.**   It is.

12 **Q.**   All right.   Are you familiar with the kinds of programs

13 administered by the Department of Grants and Community

14 Development?

15 **A.**   I am, yes.

16 **Q.**   And what kinds of programs are provided by your department?

17 **A.**   For the funds that we receive from HUD, we -- what -- we

18 receive entitlement grants from HUD.   And the city receives four

19 primary entitlement grants, and those are the HOPWA program, which

20 is Housing Opportunities for Persons with AIDS.   ESG is Emergency

21 Solutions Grants for homeless services.   HOME Investment program

22 is used to build affordable housing.   And then the Community

23 Development Block Grants are used for primarily community

24 improvements, affordable housing, economic development,

25 infrastructure, and facilities improvements.   And so those are the

1    CDBG grant purposes.  Those are the four primary entitlement

2    grants that the city receives from HUD.

3    **Q.**  And how does a city like Atlanta generally obtain, just for

4    example, a Community Development Block Grant from HUD?

5    **A.**  HUD entitlement grants are formulated through -- they're

6    determined -- the amounts are determined from a formula that the

7    federal government utilizes.  The State of Georgia gets an

8    allocation from HUD.  The City of Atlanta gets its own separate

9    allocation from HUD, and that's what makes it an entitlement, is

10   that it gets its own funding from Congress and from HUD.

11       So the formula is out of our hands.  It's a federal process.

12   And then we receive annual updates and announcements as to how

13   much the city will be allocated.

14   **Q.**  Can you describe for the jury just generally, I want to focus

15   on the Community Development Block Grant program.  Can you tell us

16   just generally what that program is for?

17   **A.**  Sure.  So Community Development Block Grants, also known as

18   CDBG, are specific for community revitalization.  The focus,

19   though, is on low to moderate income residents.  And for us, with

20   low to moderate income residents within the City of Atlanta.  And

21   there are specific types of purposes and target populations that

22   you can use those funds for.

23       CDBG funds can be used for affordable housing.  So, for

24   example, helping low or moderate income residents obtain housing

25   and become homeowners.  Or go through housing counseling so that

1  they learn how to save to become homeowners.

2      Another purpose is economic development.  And that's really

3  job creation and making sure that jobs are created specifically

4  for low to moderate income residents in the city of Atlanta.

5      Another purpose is public services.  So you can do job

6  training.  You can use it for child care.  Again, for low to

7  moderate income residents.  You can use CDBG funds to address

8  blight in neighborhoods and really to just revitalize low and

9  moderate rate income residents so that they are uplifted and

10 economically improved.

11 **Q.**  Thank you, ma'am.

12          MS. DILLINGHAM:  Your Honor, may I approach?

13          THE COURT:  Yes.

14 BY MS. DILLINGHAM:

15 **Q.**  Ma'am, I'm showing you a document that has previously been

16 marked as Government's Exhibit 73.

17     Do you recognize that document?

18 **A.**  I do.

19 **Q.**  Can you tell us what it is?

20 **A.**  It's a certificate of copies of public records, pursuant to

21 Federal Rules of Evidence.  And these are grant agreements that

22 the City of Atlanta receives from HUD for each year funding.

23 **Q.**  All right.  And can you tell us which years?

24 **A.**  Yes.  These are grant agreements specifically for 2010 through

25 2014.

1          MS. DILLINGHAM:  At this time the Government moves to

2  admit Exhibit 73 into evidence.

3          THE COURT:  Any objections?

4          MS. GOLDBERG:  Your Honor, I would object as to

5  relevance.

6          THE COURT:  Ms. Dillingham, why is this exhibit

7  relevant?

8          MS. DILLINGHAM:  It establishes the threshold of funding

9  for one of the counts in the indictment, federal funding.

10          THE COURT:  Which count?

11          MS. DILLINGHAM:  The four wire fraud counts.  No.  The

12  first two counts.  Those are Count 1.

13          THE COURT:  What's Count 1?  What's Count 1 and Count 2?

14          MS. DILLINGHAM:  I'm sorry.  Conspiracy to commit

15  bribery.  And Count 2 is also conspiracy.

16          THE COURT:  And Exhibit 73 is relevant to conspiracy

17  counts instead of allowing grant agreements?

18          MR. DAVIS:  Judge, can we have a quick second?

19          THE COURT:  Yeah.

20          MR. DAVIS:  Thank you.

21          MS. DILLINGHAM:  Your Honor, so the --

22          THE COURT:  Hold on one second.

23          Ms. Goldberg, there has to be a certain amount of money

24  that the city has to receive in order for the -- for it to be

25  brought here in the jurisdiction.

1          MS. GOLDBERG:  I understand that, Your Honor.  And I

2  think -- we probably could stipulate that the city receives, you

3  know, the minimum threshold of federal funding.  However, you

4  know, all of this testimony is completely irrelevant --

5          THE COURT:  Well, I don't -- you could stipulate, but

6  they elected not to stipulate.  They have a right to present it as

7  they see fit.  They have to establish it.  If Ms. Dillingham wants

8  to establish it this way, they have a right to do that, so...

9          Overruled.  You can proceed.

10          MS. DILLINGHAM:  Thank you, Your Honor.  May we publish

11  to the jury, Your Honor?

12          THE COURT:  Yes.

13          MS. DILLINGHAM:  Ms. Etienne, can we look at Exhibit 73,

14  please.  And can we look at page 4, specifically.

15  BY MS. DILLINGHAM:

16  **Q.**  Ms. Lonon, can you see the exhibit on your screen?

17  **A.**  I might get a little closer.

18          MS. DILLINGHAM:  All right.  Ms. Etienne, can we zoom in

19  on the first -- the top half of this document.

20  BY MS. DILLINGHAM:

21  **Q.**  All right, ma'am, is this -- can you tell us what this is?

22  **A.**  This is the city's grant agreement for 2010 for CDBG.

23  **Q.**  And can you tell us the amount approved by HUD?

24  **A.**  $8,393,411.

25          MS. DILLINGHAM:  Ms. Etienne, can we move to page 29,

1  please.  And the same top half of the page.

2  BY MS. DILLINGHAM:

3  **Q.**  Can you tell us, ma'am, what is this showing us?

4  **A.**  This is the city's grant agreement for 2011.

5  **Q.**  And can you tell us the amount approved by HUD?

6  **A.**  7,000,000 -- let me get it right.  For CDBG, $7,017,706.

7  **Q.**  All right.

8         MS. DILLINGHAM:  And, Ms. Etienne, can we see page 23.

9  BY MS. DILLINGHAM:

10  **Q.**  And what are we seeing here, ma'am?

11  **A.**  This is the city's grant agreement for 2012.

12  **Q.**  And what is the approved amount by HUD?

13  **A.**  For CDBG, 7,777,211.

14         MS. DILLINGHAM:  And could we please look at page 62,

15  Ms. Etienne.  Thank you, ma'am.

16  BY MS. DILLINGHAM:

17  **Q.**  Can you please tell us what we're seeing here, ma'am?

18  **A.**  This is the city's grant agreement for 2013.

19  **Q.**  And can you tell us the approved amount?

20  **A.**  For CDBG, 7,129,466.

21  **Q.**  All right.  And did the City of Atlanta use these funds

22  between 2010 and 2014?

23  **A.**  Yes.

24  **Q.**  Can you provide just one or two examples of how the city used

25  those funds?

1  **A.**  Yes.  For the city CDBG funds, during that time period, there

2  were funds that were awarded for blight, for demolition, for

3  affordable housing needs, which it included

4  homeowner -- homeownership.  And it also included facilities and

5  infrastructure funds.  And a lot of times, that's to renovate

6  either streets or community centers that are in low to moderate

7  income residents.  And those uses were examples of funds that were

8  awarded between 2013 and 2014 -- between 2010 and 2014.

9  **Q.**  Thank you, ma'am.

10     And did those projects comply with the requirements of HUD's

11  CDBG program?

12  **A.**  They did.

13  **Q.**  All right.  And for each of the years between 2010 and 2014,

14  did the City of Atlanta receive more than $10,000 in federal grant

15  money?

16  **A.**  The city did, yes.

17          MS. DILLINGHAM:  Thank you, ma'am.  No further

18  questions.

19          THE COURT:  Your witness.

20          MS. GOLDBERG:  No questions, Your Honor.

21          THE COURT:  Thank you.

22          Call your next witness.

23          MR. DAVIS:  The government calls Charles P.

24  Richards, Jr.

25          THE DEPUTY CLERK:  Sir, can you remain standing and

 1  raise your right hand, please.

 2                              ******

 3                    CHARLES P. RICHARDS, JR.,

 4          having been duly sworn, testified as follows:

 5                              ******

 6          THE DEPUTY CLERK:  You can remove your mask, if you'd

 7  like.  And if you could please have a seat and state and spell

 8  your name for the record.

 9          THE WITNESS:  Okay.  I've got the hearing aids in now.

10  DIRECT EXAMINATION

11  BY MR. DAVIS:

12  **Q.**  Sir, can you state your name and spell it, please.

13  **A.**  My name is Charles Philip Richards, C-H-A-R-L-E-S,

14  P-H-I-L-I-P, R-I-C-H-A-R-D-S.

15  **Q.**  You may want to pull that microphone a little bit closer.

16      Sir, can you tell us where you're from?

17  **A.**  I'm from Atlanta.

18  **Q.**  And what do you do, sir?  What do you do?

19  **A.**  Oh, I am a CFO for a home building business.

20  **Q.**  And which company is that?

21  **A.**  It was Green River Builders, Inc.

22  **Q.**  How long have you worked there, sir?

23  **A.**  Three years.

24  **Q.**  And what's your educational background?

25  **A.**  I attended college for four years.  I didn't get a degree.

1  **Q.**  What type of work does Green River building do?

2  **A.**  Residential home building, apartments, and townhomes.

3  **Q.**  How long have you been in the construction industry, sir?

4  **A.**  My entire life.

5  **Q.**  When did you start working?

6  **A.**  My first job was a summer job in 1967.

7  **Q.**  And what company did you work for?

8  **A.**  ABCO Builders, Inc.

9  **Q.**  And whose company was that?

10  **A.**  That was my father's company.

11  **Q.**  What type of work did you do for your father's company when

12  you first started?

13  **A.**  I started out as a laborer.

14  **Q.**  And what does that mean?

15  **A.**  Cleanup work, demolition work, digging ditches.

16  **Q.**  Where was ABCO Builders located?

17  **A.**  90 Rogers Street in Atlanta.

18  **Q.**  Atlanta?  I'm sorry, say it --

19  **A.**  Atlanta, yes.

20  **Q.**  As you got older, did you continue to work for ABCO?

21  **A.**  I did.

22  **Q.**  And did the type of work you do remain the same or did it

23  change?

24  **A.**  No.  I progressed from being a laborer to being the clerk of

25  the works on our first project we ever did out of town.  And then

1    to assistant project manager, estimator, project manager.  And

2    then president of the company.

3    **Q.**   What is clerk of the works?

4    **A.**   Clerk of the works is the guy that keeps track of all of the

5    time, writes petty cash checks, tracks deliveries.

6    **Q.**   Timekeeping and accounting?

7    **A.**   And what?

8    **Q.**   Timekeeping and accounting?

9    **A.**   Yes.

10   **Q.**   Did you ever take over your father's company?

11   **A.**   I did.

12   **Q.**   When did that process start?

13   **A.**   It started in about 1985.

14   **Q.**   And how long did the process take?

15   **A.**   It took about ten years.  He didn't want to quit.

16   **Q.**   What -- did ABCO ever change its name, sir?

17   **A.**   Yes, we did.

18   **Q.**   When was that?

19   **A.**   In 2005, I believe.

20   **Q.**   And what did you change the name of the company to?

21   **A.**   C.P. Richards Construction Company.

22   **Q.**   And is that named after you?

23   **A.**   It's named after my father.

24   **Q.**   What type of business was C.P. Richards Construction?

25   **A.**   We had several niches over the years that I worked from.

1   Schools, parking decks.  We went through a period of building

2   banks, car dealerships, race tracks, Atlanta Motor Speedway, Texas

3   Motor Speedway.

4   **Q.**  At the height of your company, how many folks did you employ?

5   **A.**  400.

6   **Q.**  Did your company stay at 400 employees?

7   **A.**  No.

8   **Q.**  When did you officially take over the company completely?

9   **A.**  About 1997.

10  **Q.**  And what was your official role with the company?

11  **A.**  Oh, I was the president.  But also estimated and project

12  managed.  Did whatever had to be done.

13  **Q.**  What are estimator and project managers?

14  **A.**  Oh, estimator prepares bids, makes quantity surveys, price --

15  obtains prices from subcontractors and suppliers, submits

16  proposals.

17  **Q.**  When you say placed like -- prepares bids, what does that

18  mean?

19  **A.**  You have to put together all of those numbers, put them on the

20  proposal form for the entity that's requesting the proposal, and

21  submit it timely.

22  **Q.**  So if the city wanted to build a parking lot and your company

23  wanted to bid on it, what would you go through?

24  **A.**  I'd find the solicitation.  I'd get the proposal.  I'd read

25  the proposal, read the plans, read the specs.  And then send those

1  out to my suppliers and subcontractors and request them to get

2  back to me prior to the bid date so that I could compile and

3  submit it to the city, in this -- in your scenario.

4  **Q.**  Would you -- when you submit the response, does it include a

5  price that you estimate the project will cost?

6  **A.**  Yes.

7  **Q.**  And you also mentioned the term "subcontractor."  In the

8  construction industry, what does that term mean?

9  **A.**  A subcontractor does a portion of the work, generally their

10  specialty, such as an electrician or a plumber, a drywall

11  contractor, a grading contractor.  Those would be examples of a

12  subcontractor on a typical commercial project.

13  **Q.**  And who's above subcontractor?  What's the --

14  **A.**  The prime contractor or general contractor.

15  **Q.**  And what do the general contractor or prime contractors do?

16  **A.**  Some of them are self-performed contractors and do a

17  significant portion of the work with their own forces.  Typically,

18  the concrete work or carpentry work.  Otherwise, they -- they

19  schedule the project, they finance the project, and they submit

20  pay requests monthly.

21  **Q.**  Do they manage the project?

22  **A.**  They manage -- they're the manager of the project.  They tell

23  the subs when to be there and what -- where to work.

24  **Q.**  And in our example about a city trying to get a parking lot

25  built, who does the city -- who is the city in contact with?

1  **A.**   The prime contractor.

2  **Q.**   You had mentioned that your company had 400 employees at one

3  time.  Did they stay at 400 employees?

4  **A.**   No.

5  **Q.**   Do you recall the Great Recession?

6  **A.**   Yes, I do.

7  **Q.**   Approximately when did that start?

8  **A.**   2008.

9  **Q.**   Did the Great Recession in any way affect C.P. Richards

10  Construction?

11  **A.**   It made it very difficult to obtain work.  I think 2009, we

12  probably bid 50 to 100 jobs to get one.

13  **Q.**   And explain to us what that means.

14  **A.**   Well, we submitted proposals on projects that are awarded to

15  the low bidder.  And we were not the low bidder on 99 out of 100

16  of them.

17  **Q.**   Did the Great Recession affect the amount of work that your

18  company did?

19  **A.**   Yes.

20  **Q.**   How was that?

21  **A.**   Well, my principal client at the time was Sonic Automotive,

22  and they stopped building car dealerships altogether.  Including

23  one in the middle of the project.  And so we -- we shrank some as

24  a result of that.

25  **Q.**   From a revenue standpoint, how did the Great Recession affect

1  your company at the beginning?

2  **A.**  At the beginning of it, I think it shrank our revenue by about

3  50 percent.

4  **Q.**  Do you know someone by the name of E.R. Mitchell, Jr.?

5  **A.**  I do.

6  **Q.**  Approximately when did you meet?

7  **A.**  I met E.R. Mitchell in -- Jr., in 1981.

8  **Q.**  How did you meet?

9  **A.**  He made a cold call to me to discuss business opportunities in

10 the city with the affirmative action programs and minority

11 business enterprise programs that were in the city.

12 **Q.**  What's a minority business program?

13 **A.**  The immediate program was designed to make it easier for

14 minority contractors to participate in the city's procurement,

15 giving them required percentages of minority businesses to be

16 utilized in the construction of the project.

17 **Q.**  Did you ever do any work with Mr. Mitchell?

18 **A.**  I did.

19 **Q.**  When was that?

20 **A.**  The first project was probably -- as I recall, it was in 1981.

21 He did a masonry job for us.

22 **Q.**  Did you say masonry?

23 **A.**  Masonry, yes.

24 **Q.**  And what type of projects did your companies originally work

25 on back in the '80s?

1   **A.**   Oh, in the '80s, we were building -- the early '80s we were

2   building parking deck was our principal line of work.  But we also

3   bid schools and did anything we could find that we thought we had

4   an advantage on.

5   **Q.**   Did you eventually become friends with Mr. Mitchell?

6   **A.**   Yes.

7   **Q.**   Can you sort of describe the relationship you had?

8   **A.**   We met for lunch every couple weeks, about once a month.  We

9   socialized with our wives, went to dinner, went to movies, until

10  we got -- had kids that were too hard to handle for the

11  grandparents.

12  **Q.**   Do you know someone by the name of Mitzi Bickers?

13  **A.**   I do.

14  **Q.**   And when did you first meet Mitzi Bickers?

15  **A.**   My recollection of that is we met in the early '90s.

16  **Q.**   Could you describe your relationship with her?

17  **A.**   I basically met her -- I dealt with her through E.R. Mitchell,

18  and met her at political fundraisers, principally.

19  **Q.**   When you first met Ms. Bickers, how was she employed?

20  **A.**   She was an employee of Atlanta Public Schools.

21  **Q.**   And in the late 2000s how was Ms. Bickers employed?

22  **A.**   As a political organizer or fundraiser, community organizer.

23  **Q.**   As time progressed, did Ms. Bickers change jobs?

24  **A.**   Yes.

25  **Q.**   Do you know if Ms. Bickers ever worked for the City of

1   Atlanta?

2   **A.**   Yes.

3   **Q.**   When did you learn that?

4   **A.**   I learned that in 2011.

5   **Q.**   And do you know for how long Ms. Bickers worked for the city?

6   **A.**   I believe she worked from 2010 to 2013.

7   **Q.**   What was her position?

8   **A.**   It was a position called human -- director of human services.

9   **Q.**   Did Ms. Bickers ever work as a consultant for your company?

10  **A.**   No.

11  **Q.**   Did you ever employ her directly?

12  **A.**   No.

13  **Q.**   Did Ms. Bickers do part-time work for your company?

14  **A.**   No.

15  **Q.**   And have you ever given Ms. Bickers any loans or gifts?

16  **A.**   No.

17  **Q.**   I want to get back to your business again.  After the 1980s,

18  did you work with E.R. Mitchell again?

19  **A.**   Yes.

20  **Q.**   So let's focus on the late 2000s, just before 2010.  Did you

21  do any construction work with Mr. Mitchell?

22  **A.**   Not -- not until the last sidewalk contracts.

23  **Q.**   Well, tell us -- I think I could hear you.  You may want to

24  speak up just a tiny bit.

25       What contract did you mention?

1   **A.**   The Atlanta sidewalk contract.

2   **Q.**   And what city was that contract with?

3   **A.**   The City of Atlanta.

4   **Q.**   Was that the -- let me -- give me one moment here.

5            MR. DAVIS:  Can we pull up the second page of 41,

6   please.

7   BY MR. DAVIS:

8   **Q.**   So, Mr. Richards, I want to show you the face page of what's

9   called FC-4943A.

10       Do you recognize that document?

11  **A.**   Yes, I do.

12  **Q.**   And what's the full title of this contract?

13  **A.**   Original Agreement FC-4943A, Annual Contract to Construct

14  Sidewalks, Driveways, Curbs, and Gutters.

15  **Q.**   And what is this contract commonly known as?

16  **A.**   We always referred to it as the Atlanta sidewalk contract.

17  **Q.**   And were you a party to this contract?

18  **A.**   Yes.

19  **Q.**   And what was the -- what was your -- what was the city looking

20  for with this contract?

21  **A.**   They were looking for a contract that allowed them to procure

22  sidewalks without having to bid all of them every year.  They took

23  one bid, awarded contracts based on that for a renewable one-year

24  period.

25  **Q.**   Yeah, my question's a little more basic.  Like what are the --

1   what was the work that the city wanted your company to do?

2   **A.**   Oh, they wanted sidewalks built.

3   **Q.**   And did your company do work on the sidewalk contract?

4   **A.**   Yes, we did.

5   **Q.**   Was Mr. Mitchell's company connected with your work with the

6   city?

7   **A.**   Yes, it was.

8   **Q.**   And how was Mr. Mitchell's company connected?

9   **A.**   He was -- originally all of the work was to be done by him.

10  C.P. Richards was going to provide the financing and the bonding,

11  banking for the construction, and Mitchell was to do the work

12  himself with his forces.

13  **Q.**   Did your company get the work for the annual sidewalk

14  contract?

15  **A.**   We got part of it, yes.

16  **Q.**   As you sit here today, do you know how you got that sidewalk

17  contract?

18  **A.**   No.  Well, you know, I could assume --

19          MR. FINDLING:  Your Honor, I'm going to object.

20          THE COURT:  Don't guess.  If you don't know --

21          THE WITNESS:  Okay.

22  BY MR. DAVIS:

23  **Q.**   Mr. Richards, have you been convicted of a crime?

24  **A.**   Yes.

25  **Q.**   And what crime was that?

1   **A.**   Conspiracy to commit bribery.

2   **Q.**   And who did you conspire with?

3   **A.**   E.R. Mitchell and Mitzi Bickers.

4   **Q.**   And did you plead guilty to that bribery conspiracy?

5   **A.**   I did.

6   **Q.**   Why did you plead guilty?

7   **A.**   Because I was in fact guilty.

8   **Q.**   How long did you pay bribes?

9   **A.**   From 2009 to 2015.

10  **Q.**   And what was the goal of paying bribes?

11  **A.**   To obtain work without having to compete for it.

12  **Q.**   How much money in bribes do you estimate you paid?

13  **A.**   200,000, perhaps more.

14  **Q.**   Before pleading guilty did you cooperate with the government?

15  **A.**   I did.

16  **Q.**   And after pleading guilty did you continue to cooperate with

17  the government?

18  **A.**   I did.

19  **Q.**   What does it mean to cooperate with the government?

20  **A.**   It means to tell truthfully what happened.

21  **Q.**   Do you recall when you pled guilty, sir?

22  **A.**   October 2017.

23  **Q.**   I'm going to show you a document and see if we can't refresh

24  you.  Well, 2017.

25  **A.**   2017.  Excuse me.

1   **Q.**   Do you recall what your original prison sentence was?

2   **A.**   My original sentence was 27 months.

3   **Q.**   Was there a restitution component?

4   **A.**   Yes.

5   **Q.**   And what's restitution?

6   **A.**   $193,000.

7   **Q.**   And what is restitution?

8   **A.**   Oh, restitution is the repayment of the elicit gains.

9   **Q.**   And who did you pay your restitution to?

10  **A.**   The City of Atlanta.

11  **Q.**   Did you serve all 27 months, sir?

12  **A.**   No, I did not.

13  **Q.**   And why was that?

14  **A.**   I was granted a reduction in sentence for cooperation.

15  **Q.**   And who granted your --

16  **A.**   Judge Jones.

17  **Q.**   Judge Jones?

18  **A.**   I believe so.

19  **Q.**   How much of your sentence did you get reduced because you

20  cooperated?

21  **A.**   It was reduced by seven months.

22  **Q.**   Have you completed your prison sentence, sir?

23  **A.**   I have.

24  **Q.**   And when was that?

25  **A.**   I was released to probation on May the 12th, 2019.

1  **Q.**  And you mentioned restitution.  Have you paid back all of your

2  restitution, sir?

3  **A.**  Yes, I have.

4  **Q.**  And who did you pay that money to ultimately?

5  **A.**  The City of Atlanta.

6  **Q.**  Sir, have you completed every part of your sentence?

7  **A.**  I have.

8  **Q.**  And have you still continued to cooperate with the government?

9  **A.**  I have.

10  **Q.**  And why is that, sir?

11  **A.**  I agreed to do so and it's the right thing to do.

12  **Q.**  When you initially decided to bid on the sidewalk contract,

13  did you discuss that with Mr. Mitchell?

14  **A.**  I did.

15  **Q.**  And what did y'all discuss?

16  **A.**  We discussed the strategy of -- he had -- he'd made me aware

17  that the low bidder wasn't necessarily going to get all the work.

18  That anybody that was close was going to get some part of

19  the -- part of the pie.  And we discussed strategy of where the

20  price needed to be, what -- that it needed to be somewhere close

21  to the low bidder.

22  **Q.**  Did you discuss how you were going to try to get the contract?

23  **A.**  He had told me at that point that if I gave him some marketing

24  money, that he could get us a contract and targeted the city

25  sidewalk contract.

1 **Q.** And what is marketing money, sir?

2 **A.** Bribery.

3 **Q.** Did you and Mr. Mitchell get the sidewalk contract?

4 **A.** Yes, we did.

5 **Q.** And how many companies bid on that contract?

6 **A.** There were about seven.

7 **Q.** And what rank were your -- was your company in that?

8 **A.** Number five.

9 **Q.** But you still got the contract?

10 **A.** Yes.

11 **Q.** Do you recall how much the original contract, not the

12 amendments, but the original contract was worth approximately?

13 **A.** It was about $750,000.

14 **Q.** Now, you mentioned marketing money being bribery money.  Did

15 Mr. Mitchell tell you where that money was going?

16 **A.** No.

17 **Q.** At the time, where did you think the money was going?

18 **A.** I thought it was being spread around in the city.

19 **Q.** And --

20 **A.** With people with influence in the city that could influence

21 contract awards.

22 **Q.** Folks in the city government?

23 **A.** Yes.

24 **Q.** For the sidewalk contract, how much money did Mr. Mitchell

25 originally ask for?

1  **A.**  $50,000.

2  **Q.**  And did you pay?

3  **A.**  Yes.

4  **Q.**  How did you give the money to Mr. Mitchell?

5  **A.**  I wrote a check for that.

6  **Q.**  What was the state of your business at the time?

7  **A.**  We had some cash.  We needed work.  It was -- and it was very

8  difficult to get work.  So having obtained a job without having to

9  bid competitively was advantageous.  It seemed advantageous at the

10  time.

11  **Q.**  Can you explain what you mean by that, having the ability to

12  bid a job without having to competitively bid?

13  **A.**  Well, having bid competing and, as I said, 100 proposals to

14  get one, getting one without having to go through that process,

15  one sure bet was worth pursuing, I thought at the time.

16  **Q.**  In mid-December 2009, did you also give Mr. Mitchell another

17  payment?

18  **A.**  Mid?  I didn't hear it.

19  **Q.**  Sorry.  In December of 2009?

20  **A.**  Yes, I did.

21  **Q.**  Can you tell us the details of that payment?

22  **A.**  I gave Mr. Mitchell $20,000 cash in December of 2009.

23  **Q.**  And what was that money supposed to be for?

24         THE COURT:  Mr. -- yeah.  Can we stop?  Let's take a

25  break right now.  The jurors need a break.  I think that's what

1   the note coming to me is going to say.

2            Ladies and gentlemen, step inside the jury room, please.

3            (Jury out at 3:07 p.m.)

4            THE COURT:  We'll take a 15-minute break.  And I remind

5   you, we're going to stop at 4:00 today.  So you may not get to

6   cross, but we'll go to 4:00.  We'll take a 15-minute break and

7   come back and start back.  All right?

8            MR. DAVIS:  3:25.

9            THE COURT:  3:25, yeah.  No, 3:20.  3:25.  We'll start

10  back at 3:25.

11           (Recess at 3:08 p.m. until 3:28 p.m.)

12           THE COURT:  You can be seated, sir.

13           THE WITNESS:  Yes, sir.

14           THE COURT:  If you're ready.

15           MR. DAVIS:  I am ready, yes, sir.

16           THE COURT:  You can proceed.

17           Maybe the jury, that might help.

18           MR. DAVIS:  Thank you, Judge.

19           THE SECURITY DEPUTY:  All rise for the jury, please.

20           (Jury in at 3:28 p.m.)

21           THE COURT:  Y'all can be seated.

22           Now you can proceed.

23           MR. DAVIS:  Yes, sir.  Thank you.

24  BY MR. DAVIS:

25  Q.  All right, Mr. Richards.  Just before we broke, we were in

1  mid-December 2009 and we were talking about a payment.

2      Tell us about that.

3  **A.**  I met E.R. Mitchell at his house.  I gave him $20,000 cash.

4  **Q.**  And what was that payment for?

5  **A.**  He didn't tie it to the specific project, but he said he was

6  going to spread it around in the city.

7  **Q.**  I want to talk about the sidewalk contract now a little more

8  particularly.  You mentioned that for the sidewalk contract,

9  Mr. Mitchell's company was a subcontractor.

10     Did I understand that correctly?

11 **A.**  Yes.

12 **Q.**  But you also mentioned that Mr. Mitchell's company was

13 supposed to do all of the actual work?

14 **A.**  Yes.

15 **Q.**  And your company was going to bond the project.  Did I

16 understand that right?

17 **A.**  Right.

18 **Q.**  At the time, how many employees did Mr. Mitchell's company

19 have?

20 **A.**  I was aware of two.

21 **Q.**  Was Mr. Mitchell's company able to do the sidewalk work?

22 **A.**  No.

23 **Q.**  So what happened?

24 **A.**  He was unable to gear up to produce the work fast enough, and

25 we arranged to have him subcontract it to another company.

**Q.** And who owned that other company?

**A.** I owned a third of that other company.

**Q.** And when did that happen, approximately?

**A.** January of 2010.

**Q.** So how long into the sidewalk contract were you?

**A.** We were only a month into it.

**Q.** So beginning in early 2010, did you and your companies start actually doing all of the work connected to the sidewalk contract?

**A.** Yes.

**Q.** And how long did that sidewalk contract last?

**A.** Until 2015.

**Q.** So from early 2010 until 2015, what -- sorry -- what percent of the work did you and your companies do?

**A.** All of it.

**Q.** What percent of the work did Mr. Mitchell's company do?

**A.** None.

**Q.** Did you still pay Mr. Mitchell?

**A.** Yes.  He -- we maintained his position as a subcontractor and he sub -- he -- the money flowed through him to the company that actually did the work.

**Q.** How much money -- what percent was Mr. Mitchell's company keeping?

**A.** Between 15 and 20 percent.

**Q.** As a general matter, did you pay Mr. Mitchell's company before or after you got the work from the city?

1  **A.**  I tried to pay after I got the work from the city.

2  **Q.**  And what were you paying him for?

3  **A.**  I was paying him as the minority subcontractor that I was

4  required to have by -- because of the MBE standards.

5  **Q.**  Were you paying him for anything else?

6  **A.**  No.

7  **Q.**  What was your understanding of what Mr. Mitchell did with the

8  money that you paid him?

9  **A.**  My understanding was that he was paying 5 percent as bribes.

10  **Q.**  To who?

11  **A.**  To -- in 2011, I learned that was Mitzi Bickers.

12  **Q.**  I want to talk about Pastor Bickers for just a moment, sir.

13              MR. DAVIS:  May I approach, Judge?

14              THE COURT:  Yes, sir.

15  BY MR. DAVIS:

16  **Q.**  You had mentioned that you primarily knew Ms. Bickers in

17  person from fundraisers.

18      Did I understand that correctly?

19  **A.**  Yes.

20  **Q.**  I've shown you what's been premarked for identification as

21  Government 66.

22      Do you recognize that photo?

23  **A.**  Yes, I do.

24  **Q.**  And how do you recognize that?

25  **A.**  Well, I'm in it.  It was a fundraiser for Kasim Reed.

1   **Q.**  Do you remember approximately when it was?

2   **A.**  That would have been in 2009, summer 2009, spring of 2009.  I

3   don't remember exactly when it was.

4   **Q.**  Let me see if I can help refresh your recollection.

5           MR. DAVIS:  May I approach, Judge?

6           THE COURT:  Yes.

7           THE WITNESS:  10/6/2009.

8   BY MR. DAVIS:

9   **Q.**  Thank you, sir.

10      Sir, is your memory refreshed, Mr. Richards?

11  **A.**  Yes.

12  **Q.**  And when was that fundraiser?

13  **A.**  10/6/2009.

14  **Q.**  And does that photo fairly and accurately depict you and the

15  other members of the fundraiser?

16  **A.**  Yes.

17          MR. DAVIS:  Judge, I'm going to move Government 66 into

18  evidence.

19          THE COURT:  Any objection?

20          MR. FINDLING:  No objection.

21          THE COURT:  Submitted without objection.  You may

22  publish, if you so desire.

23          (Government's Exhibit 66 was received and marked into

24  evidence.)

25          MR. DAVIS:  Thank you.  May we publish, please?

1   BY MR. DAVIS:

2   **Q.**  All right, sir.  Do you recognize anyone in that photo besides

3   yourself?

4   **A.**  Yes.

5   **Q.**  Can you tell us who you recognize and indicate sort of where

6   in the photo they are?

7   **A.**  Well, from left to right.  Mitzi Bickers, Kasim Reed, E.R.

8   Mitchell.  I do not know the next two.  Then myself.  And I don't

9   recognize the gentleman on the right.

10  **Q.**  Thank you, sir.

11          MR. DAVIS:  Thank you, ma'am.

12  BY MR. DAVIS:

13  **Q.**  Now, you mentioned for the sidewalk contract, initially you

14  paid for it before you got it; is that correct?

15  **A.**  Yes.

16  **Q.**  And then you also just said that you would pay for contracts

17  after the work was done.

18      Did I understand that correctly?

19  **A.**  Yes.

20  **Q.**  What caused that shift?

21  **A.**  I did not -- I did not want to pay any more upfront money.

22  And I told E.R. I wasn't going to do that anymore.  And if he

23  couldn't work it out so that the money was paid after we got paid,

24  then I just wouldn't do it.

25  **Q.**  Tell the jury what upfront money was between you and

1  Mr. Mitchell.

2  **A.**  Well, upfront money would be paying in advance of getting our

3  contract for the work.  The $50,000 that I paid in the summer was

4  to obtain a project that I didn't get paid any money on until

5  January of a year later, of the next year, for instance.

6  **Q.**  So for the sidewalk contracts, were most of the payments

7  upfront or kickback on the back end?

8  **A.**  The first were upfront.  And the subsequent ones after

9  December 2009 were paid after the fact.

10  **Q.**  So from about 2009 till the end of the contract?

11  **A.**  Yes.

12  **Q.**  And when did that contract end again, sir?

13  **A.**  2015.

14  **Q.**  Now, you said that your company did work on the contract from,

15  you know, basically 2010 to 2015.  Was that on that original

16  contract that I showed you or was that on subsequent amendments to

17  the contract?

18  **A.**  The bulk of it was on subsequent amendments.

19  **Q.**  And can you explain to us what an amendment to a construction

20  contract is?

21  **A.**  An amendment is a change that -- in this instance, always

22  added work to our contract.  The original contract was $750,000.

23  The amendments were approximately the same size, you know, in

24  that -- in the six-figure range.

25  **Q.**  When you get amendments, do you have to rebid the contract?

1    **A.**   No.

2    **Q.**   So there's no bidding process at all?

3    **A.**   No.   We perform the work at the annual sidewalk contract unit

4    prices.   It was a unit price contract.

5    **Q.**   How many amendments did you get to the sidewalk contract?

6    **A.**   I got 19, 13 of which involved money.

7    **Q.**   So did I understand that 13 of those amendments were for

8    actual more work?

9    **A.**   Yes.

10   **Q.**   And about how much more work did the city authorize for your

11   company?

12   **A.**   It brought the contract from $750,000, the original contract,

13   to a final contract amount that was approximately $5 million.

14   **Q.**   And how did you get those amendments?

15   **A.**   They were -- they were sent to me by the city somewhat

16   sporadically.   And then they issued a purchase order for the

17   amendment, the work of the amendment.

18   **Q.**   So I understand how you got the paperwork associated with the

19   amendment.   How did you get the extra work itself?

20   **A.**   I paid -- I paid Mitchell the -- his cut and he was paying for

21   the work.   He was paying people in the city for the work after

22   that.

23   **Q.**   Now, you said back in 2009 you didn't -- you knew the money

24   was going to a public official or someone in the city, but you

25   didn't know who.   And then you said that changed.   So I want to

1  focus us on when that changed.

2      Do you recall approximately when that happened?

3  **A.**  May or so of 2011.

4          MR. DAVIS:  One moment, Judge.

5  BY MR. DAVIS:

6  **Q.**  Let's talk about how you found out.  What caused you to

7  realize that it was Pastor Bickers, in particular, that the money

8  was going to?

9  **A.**  Mitchell asked me to come meet him at a branch bank on Cameron

10 Road, and informed me that Ms. Bickers needed $50,000 for legal

11 problems she was having.

12 **Q.**  And how did you think Ms. Bickers was related to the sidewalk

13 contract?

14 **A.**  I wasn't sure she was related to the sidewalk contract, but I

15 wasn't just going to give somebody $50,000.  And I told E.R. no.

16 And he told me that Ms. Bickers was crucial to us getting more

17 sidewalk work.  That if we didn't get more sidewalk work, she

18 would -- that she got in trouble or with legal issues, that we

19 wouldn't get any more sidewalk work and maybe implicated

20 ourselves.

21 **Q.**  What do you mean by you say maybe implicated yourselves?

22 **A.**  Well, he mouthed the word -- when I asked him why she needed

23 the money, he mouthed the word (indicating), which I interpreted

24 to be FBI.

25 **Q.**  FBI?

**A.**   (Witness nods head.)

**Q.**   So specifically on June 27, 2011, did you pay Ms. Bickers some money directly?

**A.**   I did.

**Q.**   And how did you send that money?

**A.**   I wired the money --

**Q.**   And how much --

**A.**   -- directly to her personal account.

**Q.**   How much did you pay Ms. Bickers?

**A.**   I made the first wire of $50,000.  And E.R. then called me up and said that wasn't quite enough money, that it needed to be $3,000 more.  So I made a second wire of $3,000.

**Q.**   Was that on the same day?

**A.**   Yes.

**Q.**   Did you think that -- what was the connection between Ms. Bickers' legal problems and you?  What caused you to send $53,000?

**A.**   Well, I knew that I wasn't doing -- that what we were doing was illegal and I did not want to be implicated.  That was the principal reason for doing so.

**Q.**   And why was this a wire as opposed to you just paying Mr. Mitchell and then Mr. Mitchell pays Ms. Bickers?

**A.**   I brought that up to Mitchell and said I didn't -- I didn't want to pay it.  I wasn't going to.  I would loan him the money to pay it, but he said she needed it that day.  That's why I couldn't

1  just give him the money and have him give it to her, that I had to

2  wire it to her.

3  **Q.**  And do wires clear the day they happen?

4  **A.**  Yes.

5         MR. DAVIS:  Judge, I'd like to approach, if that's okay.

6         THE COURT:  Yes.

7  BY MR. DAVIS:

8  **Q.**  I'm showing you what's been admitted into evidence already as

9  Government's Exhibit -- it's part of Government's Exhibit 26L.

10        MR. DAVIS:  Ms. Etienne, if we could see 26L1.  And can

11 we blow up the section that's below the line that says

12 "Transaction detail report."  A little bit higher.

13        THE COURT:  Mr. Kitchens, he had identified it, but he

14 didn't tender it.

15        MR. DAVIS:  My understanding, Judge, is this is going to

16 be an exhibit that's not objected to.  I just spoke with the

17 defense.

18        THE COURT:  I advised that he -- Mr. Kitchens identified

19 it, but you're tendering it now, you know.

20        MR. FINDLING:  Okay.  Hold on.

21        THE COURT:  Mr. Davis, Mr. Kitchens identified all of

22 the ones down to 27, but he didn't tender it.

23        MR. FINDLING:  Okay.  Your Honor, if that's accurate,

24 Mr. Kitchens just let me know and we agree.  The cluster of

25 documents have not been admitted yet, but for purposes so that

```
 1   counsel can do his cross-examination, I want --
 2             THE COURT:  Direct examination.
 3             MR. FINDLING:  We're not going to object to this part of
 4   that bulk of documents.  So we have no objection to this
 5   particular one.  We're not waiving an objection to the remainder
 6   of it, but we want counsel to be able to do his examination.
 7             THE COURT:  All right.
 8             MR. DAVIS:  Perhaps we can do this, Judge.  The
 9   Government moves to admit 26L1.
10             MR. FINDLING:  No objection.
11             THE COURT:  It's admitted without objection.
12             (Government's Exhibit 26L1 was received and marked into
13   evidence.)
14   BY MR. DAVIS:
15   Q.  All right, sir.  Taking a look at Government's Exhibit 26L1,
16   can you tell us what this details?
17   A.  This is the record of the wire transaction that occurred in
18   June of 2014.
19   Q.  And where did the wire stem from?
20   A.  The wire comes from my -- C.P. Richards Construction's
21   operating account and goes to Mitzi Bickers.
22   Q.  And how much is this wire for, sir?
23   A.  $50,000.
24             MR. DAVIS:  May we see page 2 of this document and may
25   we blow it up.  Thank you.
```

1  BY MR. DAVIS:

2  **Q.**  And, sir, what does this second page detail?

3  **A.**  It's a record of the wire transaction that occurred on the

4  same day, from C.P. Richards' operating account to Mitzi Bickers'

5  personal account.

6  **Q.**  Thank you, sir.

7      And can you tell us how much this transaction was for?

8  **A.**  This was for $3,000.

9  **Q.**  Thank you.

10     After making those two payments directly to Ms. Bickers in

11  June of 2011, did you continue to pay Mr. Mitchell from June of

12  2011 until the end of the sidewalk contract in '15?

13  **A.**  Yes.

14  **Q.**  And from then on, from after June of 2011, what did you

15  understand about the payments you were giving to Mr. Mitchell?

16  **A.**  That Mr. Mitchell was giving a portion of that to Ms. Bickers.

17  **Q.**  And at the time, at times from -- until 2013, was Ms. Bickers

18  a City of Atlanta employee?

19  **A.**  Yes.

20  **Q.**  And what projects were those payments for, generally?

21  **A.**  City of Atlanta sidewalk contracts.  There were bridge

22  contracts involved, milling and paving contract, and a watershed

23  contract.

24  **Q.**  Can you walk us through the way this -- the financial process

25  worked from the time you would get paid by the city?

**A.**   We would submit a pay request to the city for the work that
was performed in a month.  They would pay that 30 days, 60 days
later.  I would pay Mitchell his share.  And on a joint check pay
the subcontractor that was working underneath him.

**Q.**   And would Mr. Mitchell tell you that he was paying Ms. Bickers
his portion -- her portion, rather?

**A.**   Not every month, but it was understood that that was
happening -- that he was paying a 5 percent fee to get the work
from the city.

**Q.**   At some point, I think you said in 2013, Ms. Bickers left the
City of Atlanta.  Did I understand that correctly?

**A.**   Yes.

**Q.**   After that, did you continue to pay money to Mitchell with the
understanding that it was going to Ms. Bickers?

**A.**   Yes.

**Q.**   Why?

**A.**   Well, we -- we were still getting work from the city.  So I
continued to pay Mitchell.

**Q.**   What did you think Ms. Bickers -- Pastor Bickers, rather,
could do for you?

**A.**   As long as we kept getting work, that was what I was concerned
with.

**Q.**   Did you think she had any influence over the process?

**A.**   I believed so.

**Q.**   With regard to this sidewalk contract, did Mr. Mitchell ever

1  have any inside information?

2  **A.**  He did.

3  **Q.**  Can you explain that to the jury, please?

4  **A.**  He was aware of when we would be getting amendments for more

5  work.  And he generally knew when I was going to get paid.

6  **Q.**  Did Mr. Mitchell also have any information about invoices that

7  you didn't share with him directly?

8  **A.**  Yes.  He -- he knew how much and when we were going to get

9  paid.

10  **Q.**  I want to move for a minute from sidewalks to bridges.

11      Did you do any bridge repair work for the City of Atlanta?

12  **A.**  I did.

13  **Q.**  When did you first learn about the City of Atlanta's bridge

14  project?

15  **A.**  In the fall of 2010.

16  **Q.**  And who told you?

17  **A.**  Mitchell told me that this bridge work was coming out.

18  **Q.**  Where were you?

19  **A.**  The principal discussion regarding that work occurred at a

20  Kentucky Fried Chicken on Panola Road.

21  **Q.**  And what did Mr. Mitchell say about the bridge projects?

22  **A.**  He said that they were -- that there were seven or eight

23  bridges coming out that would be awarded to multiple contractors,

24  similar to the sidewalk project.

25  **Q.**  And when you say "coming out," coming out from where?

**A.** Well, that they were going to -- there was going to be a request for proposal from the City of Atlanta for repairs to the seven or eight bridges.

**Q.** Did Mr. Mitchell mention anything about the awarding of those bridges?

**A.** He said they would be awarded in a similar fashion to the sidewalks.  That you wouldn't have to be the low -- that you wouldn't have to be the low bidder, that you picked the jobs that you wanted, that you were most interested in, and he would find a way to get them.

**Q.** When he said he'll find a way to get them, what did you mean by that?

**A.** Oh, it means he was -- I interpreted that to mean that he was going to pay to get those projects.

**Q.** Pay who?

**A.** Pay people in the city with influence over the award process.

**Q.** During the meeting did Mr. Mitchell have any documentation with him?

**A.** Yes.

**Q.** What did he have?

**A.** He had a spreadsheet that listed the bridges and the description of the problems and the scope of the work for repairs. It also had the bridge location, had the sufficiency rating.

            MR. DAVIS:  One moment, Judge.

            THE COURT:  Yes.

```
 1            MR. DAVIS:  Judge, may I approach?
 2            THE COURT:  Yes, sir.
 3  BY MR. DAVIS:
 4  Q.  Sir, if you could please take a look at Government's Exhibit
 5  42G.
 6      Do you recognize that document?
 7  A.  Yes.
 8  Q.  And what is that document?
 9  A.  This document is the City of Atlanta bridges for immediate
10  repair.  It lists the bridges with the problems and deterioration,
11  the scope of the repairs, the location ID, the name of the bridge.
12  That's basically it.
13  Q.  And is that the document that -- is that similar to the
14  document that Mr. Mitchell showed you when you met him in the KFC?
15            MR. FINDLING:  Your Honor, I'm going to object to
16  "similar."  We either have that document or we don't have that
17  document.  So I object to "similar."
18            MR. DAVIS:  Judge -- I would say this, Judge.  We're
19  just about 4 o'clock.  I think we -- the parties need to get
20  together and figure out how C688 is going to be done and then I
21  think it'll be a lot smoother.
22            THE COURT:  I agree with you, Mr. Davis.  This is a good
23  stopping point right here.
24            Ladies and gentlemen of the jury, we're going to stop
25  right here for the day.  But I have some very important
```

```
 1    instructions for you again.  Don't read anything in the newspaper
 2    about this case.  Don't listen to anything on the radio about this
 3    case.  Don't watch anything on television about this case.  Don't
 4    talk about this case with anyone, family members, spouses, per
 5    Judge Jones' instruction.  Throw me under the bus.  Just say,
 6    Judge told me I can't talk about IT.  Because that's what I'm
 7    telling you.
 8              We're going to start back tomorrow at 9 o'clock and
 9    we're going to 5:00 tomorrow.  Okay?  Any questions?
10              Thank you-all.  I'll see you in the morning at 9:00.
11              THE SECURITY DEPUTY:  All rise.
12              (Jury out at 4 p.m.)
13              THE COURT:  Mr. Richards, the only people you can talk
14    to about this case are the lawyers.  You can't talk to anybody in
15    your family about the case.  You can talk to the lawyers about it,
16    but no one else.
17              See you tomorrow morning, sir.
18              Anything else from the government?
19              MR. DAVIS:  No, sir.  Thank you.
20              THE COURT:  Anything else from the defense?
21              MR. FINDLING:  No, Your Honor.
22              THE COURT:  See y'all in the morning at 9:00.  Thank you
23    all.
24              (The trial concluded at 4:00 p.m.)
25
```

```
1                     C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT

4    NORTHERN DISTRICT OF GEORGIA

5

6        I do hereby certify that the foregoing pages are a true and

7    correct transcript of the proceedings taken down by me in the case

8    aforesaid.

9        This the 10th day of March, 2022.

10

11

12

13

14                         /s/Viola S. Zborowski_____
                           VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
15                         OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25
```