1                    UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION

3   UNITED STATES OF AMERICA, )
                              )
4            PLAINTIFF,       )
                              )
5    -VS-                     )  DOCKET NO. 1:18-CR-98-SCJ-LTW
                              )
6   MITZI BICKERS,            )
                              )
7            DEFENDANT.       )
    _____

8
                         TRANSCRIPT OF SENTENCING
9                  BEFORE THE HONORABLE STEVE C. JONES
                     UNITED STATES DISTRICT JUDGE
10                  THURSDAY, SEPTEMBER 8, 2022

11
    APPEARANCES:
12
    ON BEHALF OF THE GOVERNMENT:
13       JEFFREY W. DAVIS, AUSA
         NATHAN PARKER KITCHENS, AUSA
14       TIFFANY RENE DILLINGHAM, AUSA

15
    ON BEHALF OF THE DEFENDANT:
16       DREW FINDLING, ESQ.
         MARISSA HELEN GOLDBERG, ESQ.
17

18

19

20

21
              VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
22       Official Court Reporter TO THE HONORABLE STEVE C. JONES
                    United STATES District Court
23                       Atlanta, Georgia
                          404-215-1479
24            VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV

25

```
 1                    (HELD IN OPEN COURT AT 10:00 A.M.)

 2              THE COURT:  Good morning.  You-all can be seated.

 3              Ms. Wright, you can call the case for today.

 4              THE DEPUTY CLERK:  Yes, sir.  The Court calls the United

 5    States of America v. Mitzi Bickers, Criminal Case No.

 6    1:18-cr-98-SCJ.

 7              THE COURT:  Representing the government this morning?

 8              MR. DAVIS:  Good morning, Judge.  Jeffrey Davis for the

 9    United States, along with Tiffany Dillingham and Nathan Kitchens.

10              THE COURT:  Good morning to each one of you-all.

11              Representing the defense this morning?

12              MR. FINDLING:  Your Honor, Drew Findling along with

13    Marissa Goldberg and our client, Mitzi Bickers.

14              THE COURT:  Good morning to each of you-all.  Good

15    morning, Pastor Bickers.

16              Pastor Bickers, have you reviewed the presentence report

17    with your attorneys in this case?

18              THE DEFENDANT:  Yes, Your Honor.

19              THE COURT:  At this time the Court will announce the

20    guidelines as provided by the probation officer.

21              For count -- this is a Group A base level for Count 1

22    under 2C1.1.  It is a recommended level 14.  That's a two-level

23    enhancement for the number of bribes under 2C1.1B1.  There is a

24    recommended 16-level enhancement for the loss amount under

25    2C1.1B1.  There's a recommended four-level enhancement for a
```

1  public official.  There is a recommended three-level enhancement

2  for role in the offense of aggravated role under 3.B1.8.  Gives us

3  for Group A an adjusted level of Count 1 of a 39.

4           The Group A base level for Counts 4 through 6 under

5  2S1.1, the base offense level for Count 1 excluding role is a

6  recommended 36 level.  That's a one-level enhancement for money

7  laundering.  There is a three-level recommended enhancement for

8  role in offense.  Gives us a Group A adjusted offense level of a

9  40.

10          For Group B offense level under 2B.1 is a recommended

11  level of 7.  There is a 10-level enhancement recommended for loss

12  amount under 2B1.1b1.  Gives us a Group B adjusted level of 17.

13          Group C basic offense level is a 2T1.1; there's a

14  recommended 16 level.  There is a two-level enhancement for the

15  source of income exceeding $10,000.  Gives us a Group B adjusted

16  offense level of an 18.

17          Now, there's a multiple count adjustment under 3B1.14.

18  The total number of units is an additional one.  And the greater

19  adjusted offense level is a 40.  The increase in level offense is

20  not increased.  Gives us an adjusted offense level of 40.  A total

21  offense level again is a 40.  We have a criminal history category

22  of a one.

23          A recommended custody guideline range of 292 to 365

24  months.  The fine guideline range is 50,000 to $5 million.

25          Count 1 four through six, terms of supervised release,

1   Counts 1 -- under Count 1 four through six is seven to ten, is one

2   to three years.  For count 12 is one year.

3           The Court will adopt the facts in the presentence report

4   since no objections have been made as to the findings of this

5   Court.

6           Now, Mr. Davis, my understanding, there are no guideline

7   objections coming from the government?

8           MR. DAVIS:  That's correct, Judge.

9           THE COURT:  And, Mr. Findling, I understand there are a

10  number of guideline objections coming from the defense.  We'll

11  take them one at a time, paragraph by paragraph:  Ms. Goldberg,

12  will you be the one -- okay.

13          Let's talk about paragraph 119 which deals with the loss

14  amount.  Paragraph 119 is the first one that you-all are objecting

15  to?

16          MS. GOLDBERG:  That's correct, Your Honor.  We object to

17  the calculations in the probation and sentencing report as to the

18  loss amount.  We did file with the Court our sentencing

19  memorandum.

20          THE COURT:  I read it.

21          MS. GOLDBERG:  And we, obviously, have some additional

22  argument today.  But primarily our objections to the calculation

23  of loss amount are kind of twofold, Your Honor.

24          Number one, the government cannot prove that the losses

25  attributed in the probation sentencing report, and as adopted by

1  the government, are bribery payments as contemplated by the

2  guidelines.  And, two, the use of acquitted conduct as the bulk of

3  the loss amount that is attributed in the PSR was derived from

4  Count 2 for which Ms. Bickers was acquitted.  Approximately, $2

5  million of that --

6           THE COURT:  Well, conduct is allowed, is it not?

7           MS. GOLDBERG:  I understand.  I understand the case law,

8  and as we acknowledged in our sentencing memorandum, there is kind

9  of a growing trend among the judiciary to reject the use of

10 acquitted conduct enhancing sentencing, especially when it comes

11 to the level of what we have here, Your Honor, which is a

12 difference of approximately twofold.  For the conduct for which

13 Ms. Bickers was convicted and for the conduct for which she was

14 acquitted, we're dealing with under $1 million versus an

15 additional $2 million of which she was acquitted of.

16           Your Honor, the position that we have here is, as the

17 Court notes, we've tried this case in front of this Court.  We

18 fought this case.  We're at the juncture now of sentencing in

19 which we have to acknowledge the jury's verdict.

20           THE COURT:  Right.

21           MS. GOLDBERG:  We respect the jury's verdict.  And so

22 what we're doing here today is asking the Court to do the same.

23           The government is asking the Court to reject the jury's

24 verdict, to reject the fact that the jury acquitted her of Count 2

25 and attributed approximately 2 million additional dollars of loss

1  amount to Ms. Bickers, which would enhance her sentence, her

2  potential sentence to a point in which it would deprive her of due

3  process, as we noted in the Maddox case in the Eleventh Circuit

4  that there is an acknowledgement that when it comes to that level

5  using acquitted conduct to enhance someone's sentence as we have

6  here, approximately, twofold, is a due process violation.  And so

7  the Court has the discretion --

8          THE COURT:  The government is going to argue the United

9  States v. Siegelman, 786 F.3d 1322, it says they can use relevant

10  conduct in this matter.  What do you have to say about that?

11          MS. GOLDBERG:  And, Your Honor, again, I acknowledge

12  that there is a case law that says that it can be done.  There is

13  also case law that says the Court has the discretion not to do it.

14  And as we cited in the Maddox case is that when it rises to the

15  level of what we have here, the Court can exercise the discretion

16  to say we're going to follow the jury's verdict.  We're going to

17  follow the facts that the jury rejected the government's attempt

18  to convict Ms. Bickers of these offenses for which the $2 million

19  is attributed to her.  The jury heard the evidence over a course

20  of several weeks and said, no, we reject this.

21          And so we ask the Court to exercise its discretion

22  because of the difference we're dealing with here.  We're not

23  dealing with a situation where, you know, it's a matter of a few

24  extra hundred dollars or something like that.  I mean, this is a

25  substantial difference.

1          And, also, Your Honor, I would note, and I think that

2    this is going to come in kind of when we talk about grouping and

3    things like that, you know, maybe I'm getting ahead of myself, but

4    the scheme that is alleged in Count 2 that the government alleged

5    is distinctly different from what the jury convicted Ms. Bickers

6    of in Count 1.

7          So the difference, Your Honor, as the Court may

8    remember, that in Count 1 Ms. Bickers was an employee of the City

9    of Atlanta.  And the jury convicted her of accepting bribes as an

10   employee of the City of Atlanta.

11         Now, Count 2 is distinctly different from that.  Count 2

12   was -- Ms. Bickers was no longer employed by the City of Atlanta.

13   Count 2 was the government attempting to shoehorn some evidence in

14   without evidence of that -- an indicted co-conspirator, which we

15   dealt with on so many occasions in front of Your Honor.  Without

16   the testimony of that person, they tried to say Ms. Bicker was no

17   longer a city official, bribe somebody.  There was some sort of

18   conspiracy to bribe somebody, and the jury rejected that.  The

19   jury rejected that attempt.

20         And so based on that, Your Honor, I think this is one of

21   those situations in which the Court should exercise the

22   discretion.

23         And, Your Honor, I don't necessarily concede to the

24   calculations as -- as indicated by the government in their

25   sentencing memorandum as it stands, anyway, just based on the

1  facts that were presented to the Court at trial.  But I think the

2  most important thing as it pertains to the guideline calculations,

3  as the Court knows, the guidelines -- the ranges in the guideline

4  calculations are pretty broad.  I mean we're dealing with under

5  500, 500 to 1.5, 1.5 to 3.  Those are broad ranges.  And so to

6  that end, Your Honor, we would concede that I think that the

7  evidence before the Court rose to the level of 500, 500 to 1.5.

8        Now, where we really differ here is that we don't

9  believe that the acquitted conduct should push her over the next

10  level.  So that's kind of the crux of our argument, Your Honor.

11        THE COURT:  Thank you.

12        Mr. Davis.

13        MR. DAVIS:  Judge, numerically there is a significant

14  difference between 1 and 3 million dollars, but from the guideline

15  standpoint, we're only talking about two levels.  It's just a

16  single order of magnitude.  And I don't say that to diminish that

17  1 and 3 million dollars are substantial, but the effect on the

18  guidelines is not as substantial as tripling the loss amount as,

19  perhaps, it's been represented.

20        And while the jury did ultimately acquit Ms. Bickers as

21  to Count 2, convicted her on Counts 4 through 6, and 4 through 6

22  are money laundering accounts.  And the money laundering accounts

23  are spending money derived from bribery in Count 2.

24        So they definitely agree that Ms. Bickers was getting

25  money that was the product and spending money that was the product

1  of a bribery scheme; and not any bribery scheme, specifically the

2  bribery scheme alleged in Count 2.

3          And, Judge, you know, the government is not trying to do

4  anything here today.  We're not trying to treat Ms. Bickers

5  unfairly or treat Ms. Bickers any different than anyone else.  As

6  it stands today, Judge, September 8, 2022, the law in the Eleventh

7  Circuit and the law under 3661, is in effect.  And it says that

8  relevant conduct can encapsulate acquitted conduct.  And in

9  following that rule and in following that precedent, we have

10  submitted to you, Judge, that the appropriate relevant conduct for

11  this case is slightly under 3 million, 2.9, 3 million, Judge.

12          THE COURT:  Thank you, Mr. Davis.

13          Ms. Goldberg.

14          MS. GOLDBERG:  Yes, Your Honor.  And I think we'll

15  address, again, the money laundering issue as we kind of get to

16  some of those objections.

17          I believe that this is an inconsistent verdict from the

18  jury.  We can deal with that as the appellate process moves

19  forward, but those were very specific counts dealing with very

20  specific items that were alleged, not what we're dealing with

21  here.  That was about $90,000.  We're dealing with 3 million

22  dollars.  Those things are not -- they're not the same.

23          I think the operative word that Mr. Davis just mentioned

24  was that the Court can.  And, again, we acknowledge that that is

25  the law.

1        But also the law is that the Court has discretion.  And

2   so when we're dealing with, you know, each one of these things,

3   the government may say it's only two levels.  It's only three

4   levels.  It's only four levels.  But what are levels?

5        Levels are months of Ms. Bickers' life.  And so we have

6   to put that in context.  And especially when these things start to

7   add up, I think the Court needs to take these things very

8   seriously, and I think the Court will.  And I think the Court

9   should exercise its discretion in not attributing this acquitted

10  conduct for which the jury found Ms. Bickers not guilty to enhance

11  her loss amount.

12        THE COURT:  Okay.  I'm going to overrule your objection.

13  The 16-level enhancement will count.  I'll note your exception for

14  the record.

15        The next one to deal with that is on there is 2C1.1B3,

16  public officials, there's a four-level enhancement.

17        Ms. Goldberg.

18        MS. GOLDBERG:  Yes, Your Honor.  So as it pertains to

19  sensitive position, public official.  Again, we're dealing with a

20  four-level enhancement in which probation has attributed to

21  Ms. Bickers.  I think -- you know, really what we have to go back

22  to is what the evidence was presented at trial.  And I think the

23  evidence in that regard is substantially lacking.  I think what --

24  the government and the Court can reference the transcripts and the

25  testimony that was presented, there was very little that was said

1    as to the position that Ms. Bickers held for the City of Atlanta.

2    We knew that her position was the Director of Human Services.

3    They presented a person from human resources who testified about

4    her position and the name and --

5              THE COURT:  Let me ask you this question.  Under the

6    notes -- excuse me for interrupting you.  I apologize.

7              Under the notes under 2C1.1 it says, a high-level

8    decision or sensitive position means the position characterized by

9    direct authority to make decisions for or on behalf of a

10   government department or agency or other government unit.

11             Ms. Bickers was director of the human services

12   department.  So she had the ability to make decisions for this

13   department or agency, did she not?

14             MS. GOLDBERG:  I think, Your Honor, what we're dealing

15   with is conjecture.

16             THE COURT:  How?

17             MS. GOLDBERG:  Because I really have to go back to what

18   the facts were presented at trial.

19             THE COURT:  Well, here is my question to you, though.

20   Was she not the Director of Human Services Department?

21             MS. GOLDBERG:  I believe that -- yes.

22             THE COURT:  Well, hold on.  Did she make decisions for

23   the Human Services Department?

24             MS. GOLDBERG:  I believe that was her position, yes.

25   The Human Services Department, which was in a building that was

1  separate from City Hall, which was a building which dealt with

2  homelessness outreach and those kind of things.  Yes, Your Honor,

3  except for, again, the evidence was lacking.  I mean, the

4  government had the ability to put on evidence about what the

5  duties were of that particular person, who reported to her, what

6  authority she had, what authority she exercised, if she exercised

7  any.  We didn't hear any of that.

8          What we did hear was that she held a position, that she

9  was appointed to that position, she was not elected, that she made

10 under $60,000, approximately $60,000 a year in that position, and

11 we didn't hear about her attending meetings with the mayor.  We

12 didn't hear about her attending high-level ranking -- I think

13 there was some reference to being on the mayor's cabinet, things

14 like that.  We didn't hear evidence about that, Your Honor.

15         And I think the government is trying to make the

16 assumptions of evidence that they did not present.  So she had a

17 position with the city, absolutely.  And that was the title.  And,

18 you know, we could presume that there was some sort of authority,

19 but we don't know what it was.  And we certainly know that it

20 wasn't as it dealt with the procurement process.  And that's

21 really the operative thing here, Your Honor, is that there was no

22 evidence that Ms. Bickers had any authority -- actually there was

23 evidence to the contrary, that she had no authority as it dealt

24 with the procurement process particularly related to government

25 contracts.

1          So I think that's really what is at issue here, Your

2    Honor.  And I know that there is case law that says that, you

3    know, it can be outside of her position if she has influence and

4    things like that.

5          Again, I point to the evidence that was not presented at

6    trial.  The government presented evidence of city employees.  We

7    had Richard Mendoza, Michael Ayo, Rita Braswell.  We had people

8    who were there at the time.  And the government could have asked

9    about Ms. Bickers' potential influence.  Did she have influence?

10   Was she an influential person?  What were her duties?  We didn't

11   hear any of those things, Your Honor.  And, again, they're trying

12   to have the Court enhance Ms. Bickers' sentence by four levels,

13   four levels which corresponds to a substantial amount of months of

14   Ms. Bickers' life based on conjecture.

15         They had the opportunity with these people on the stand

16   to present that to Your Honor for purposes of sentencing.  And I

17   know the standard is low, Your Honor.  I know we're not dealing

18   with beyond a reasonable doubt anymore.  I understand that.  But

19   they presented nothing.  And they're asking the Court to make a

20   determination based on, well, this is the title, we presume that

21   this person had this authority.  We don't operate in the world of

22   presume in this Court, Your Honor.

23         And so we would ask the Court to sustain this objection.

24         THE COURT:  Thank you, Ms. Goldberg.

25         Mr. Davis.  Okay.  Proceed.

1          MS. DILLINGHAM:  Good morning, Your Honor.

2          THE COURT:  Good morning.  How are you doing?

3          MS. DILLINGHAM:  So we framed this issue as actually a

4    twofold argument.

5          THE COURT:  Okay.

6          MS. DILLINGHAM:  And I believe Ms. Goldberg has

7    addressed the first argument, which is that, you know, their

8    position is that Ms. Bickers' position itself was not a high-level

9    position.  And there was evidence presented by the government,

10   and, actually, evidence that came out on cross from City of

11   Atlanta witnesses as to the kind of authority Ms. Bickers had in

12   that position as Director of Human Services.

13         So we know that based on the testimony that Ms. Bickers

14   was appointed directly by the mayor as a result of her good work

15   on his campaign.  Witnesses from the City of Atlanta testified

16   that she reported to the mayor's chief of staff.  So there is one

17   person standing between Ms. Bickers and the Mayor of the City of

18   Atlanta.

19         Her personnel file was presented in evidence.  We saw

20   that she was characterized as an executive department employee.

21   We know that Ms. Bickers identified herself as a commissioner,

22   department head or equivalent on her financial disclosure forms.

23   And when asked, when the City of Atlanta of employees were asked,

24   well, Ms. Bickers didn't have any control over procurement for

25   Public Works?  At least one of those employees responded, well,

```
 1  no, she didn't have procurement authority in Public Works, but she
 2  did have procurement authority as to her department.  And that is
 3  precisely the kind of decision-making authority that the
 4  guidelines contemplate.
 5          We also looked at the other side of that coin, and we
 6  cited cases where even where the position itself is not a
 7  high-level position, where the defendant actually exercises
 8  decision-making authority and has substantial influence over the
 9  process, regardless of their position, then the guideline and
10  enhancement applies.
11          THE COURT:  Ms. Goldberg said that you-all didn't
12  present any evidence showing that she exercised that authority.
13          MS. DILLINGHAM:  Well, Your Honor, I think most of the
14  trial was about the exercise of that authority by Ms. Bickers.
15          So we saw that even though Ms. Bickers had no formal
16  authority in procurement, she was able to make things happen in
17  procurement as part of this bribery scheme.
18          Mr. Mitchell testified that he was able to get
19  the -- get a head start on the emergency bridge repair contract
20  because Ms. Bickers not only provided him -- we saw a spreadsheet
21  that had "draft" stamped across it; right?  She provided that
22  spreadsheet to Mr. Mitchell.  And then she told Mr. Mitchell, "And
23  these are the engineer's estimates.  These are what the engineer
24  estimates that these repairs will cost, and keep your bid within
25  these estimates."  That shows that Ms. Bickers had influence over
```

1  these people in public works.

2         THE COURT:  Well, there is a requirement established

3  that shows she had influence over people in public works; is it

4  based as you read it, authority in the department of research,

5  period?

6         MS. DILLINGHAM:  I'm sorry, Your Honor?

7         THE COURT:  In other words, does it have to be shown

8  that she had authority over people in another department, as you

9  read the notes in the section?  It just says, "Has the authority

10  to make decisions."

11         MS. DILLINGHAM:  Absolutely.  Absolutely, Your Honor.

12  That is exactly right.  And I guess my point is that the

13  government has gone above and beyond that standard --

14         THE COURT:  Good point.

15         MS. DILLINGHAM:  -- by showing that there was actual

16  substantial influence by Ms. Bickers in each of the contracts that

17  were presented by the government, and each of her co-conspirators,

18  Mr. Mitchell and Mr. Richards, testified that, yeah, they had a

19  lot of experience as contractors in the public sector, and neither

20  one of them thought that they would have gotten the contracts and

21  the work that they got at the prices they got them.

22         THE COURT:  There is a seat in this front bench up here.

23  Is that okay, Mr. Findling, if they sit on that front bench?  Is

24  that okay if they sit on that front bench?

25         MR. FINDLING:  Of course.  Of course, Your Honor.

1          THE COURT:  I'm sorry, Ms. Dillingham.  They were

2    distracting me from listening.  I've got to find them a place to

3    sit so I can concentrate on Ms. Dillingham.

4          MS. DILLINGHAM:  So what I was saying, Your Honor, is

5    that essentially most of the trial was garnered around the actual

6    substantial influence that Ms. Bickers exercised, and it was

7    because of her proximity to people in power and her actual power

8    in the government.  The government presented evidence that that is

9    how she was able to get these contracts for these contractors at

10   the -- at the rates that they were able to get these contracts.

11          Mr. Richards said the profit margin on these contracts

12   was unusual.  That he was making more money on these contracts

13   than he ever would have expected to make, because they were

14   inflating the prices so much.  And despite the government's

15   interest -- and by the government, I mean the City of Atlanta --

16   despite the City of Atlanta's interest in getting a contractor to

17   do the work that is most effective and cost-conscious for the City

18   of Atlanta, these contractors were getting these contracts.  And

19   all of the evidence at trial pointed to Ms. Bickers' substantial

20   influence.

21          THE COURT:  Thank you, Ms. Dillingham.

22          Ms. Goldberg, you get last words on this.

23          MS. GOLDBERG:  Yeah, I think, Your Honor, maybe we were

24   sitting through different trials.  Again, we accept and

25   acknowledge the jury's verdict as it relates to these things.  But

1  so much of that was conjecture.

2        Again, there were people on the stand that the

3  government could have asked about Ms. Bickers' influence.  They

4  didn't do it.  They relied on, again, as the government just

5  cited, E.R. Mitchell making assumptions, speculation.  Well, we

6  think this couldn't have happened but... if not for.  But there

7  was still those vast gaps in information, which the government

8  didn't provide.  Where someone said, yeah, I was influenced.  Yes,

9  she has influence over me.  This is what happened.  We're missing

10 that piece.

11        And, again, I acknowledge -- I acknowledge the case law,

12 but I think on both sides of it, I think we failed to have

13 information that she has influence other than conjecture by a

14 convicted co-conspirator, alleged co-conspirator.

15        THE COURT:  Yes.

16        MS. GOLDBERG:  Or, again, they could have provided

17 evidence of what her actual position was in the city, other than a

18 document through human resources saying the name and title.  That

19 was very easy for the government to do.  They didn't do it.  We're

20 in this world where we're making assumptions.  It's just not

21 appropriate for purpose of sentencing, Your Honor.

22        THE COURT:  Thank you, Ms. Goldberg.

23        Ms. Goldberg, I am going to respectfully disagree with

24 you.  I'm going to count the four-level enhancement.  I note your

25 exception for the record.

1          The next matter we're dealing with is the role of the

2    offense, aggravated role of the 3.B1.1A.  The government is asking

3    for a three-level -- well, the probation officer recommended a

4    three-level enhancement.  The government is asking for a

5    four-level enhancement, and, of course, you-all asked for no

6    enhancement.

7          So let's let Ms. Goldberg go first.  And if you are

8    asking for a four-level enhancement, after --

9          MR. DAVIS:  Judge, ultimately, Ms. Dillingham is going

10   to make this argument.  But for a variety of reasons, we're going

11   to follow the probation officer's recommendation of three.

12         THE COURT:  Okay.  In that case, you're addressing --

13   you don't have to deal with the four-level, you're starting at the

14   three-level enhancement, Ms. Goldberg.

15         MS. GOLDBERG:  Understood, Your Honor.

16         And so, obviously, based on our objections in the

17   sentencing memorandum, we object to Ms. Bickers being given any

18   enhancement for her role in the offense.  We think that she should

19   be given no enhancement for her role in the offense.

20         As the Court notes from the trial, what actual evidence

21   was presented at the trial, even though the government wanted to

22   present Ms. Bickers as some sort of -- I think, in the opening

23   they used the word "mastermind," that didn't really come out

24   through the trial.

25         What we had was Mr. E.R. Mitchell taking the stand

1  talking about his Harvard MBA.  We through cross, through Mr.

2  Findling's cross of Mr. Mitchell, we found out about the fact that

3  he had done stuff like this before.  Even though, you know, we had

4  some back and forth with the government about that, about that

5  situation, Mr. Mitchell was the person who had the past of

6  organizing such things.  Mr. Mitchell was the person who recruited

7  C.P. Richards into this alleged scheme.  We know these things.

8         The testimony that was presented at trial was that

9  Mr. Mitchell and Ms. Bickers had a history, a personal business

10 friendship history.  They've known each other for some time.  They

11 met when she was on the school board.  And that he hired her to

12 work for his company.  He was her boss.  She was his employee.

13 She worked for him for some time.

14        And then the recession got bad, he had to lay her off,

15 and eventually came back and engaged in a consulting agreement

16 with her and hired her again.  Again, he was her boss.  And that

17 was the relationship that continued, Your Honor.  That is the

18 relationship, as much as the government wants to portray it

19 otherwise, that is the relationship that really came out at trial.

20        That Mr. Mitchell with his Harvard MBA, when he talked

21 about his banking ideas and his particular profit loss, or loss

22 carry-forward bank accounts where he was evading taxes and how he

23 advised Ms. Bickers on how to do these things, he was the one

24 calling the shots.  He was the one who had the history of cash

25 withdrawals.  He was the one who had history of structured

1  payments.  And the government knows this.  And so to try to tell

2  the Court at this juncture something different that no, no, this

3  was Ms. Bickers' show, she was calling the shots, that she was

4  telling Mr. Mitchell what to do, I think that completely is belied

5  by the evidence.

6          THE COURT:  Let me ask you this, Ms. Goldberg.  I fully

7  expect Ms. Dillingham to get up here in the next three to five

8  minutes and argue that whereas Pastors Bickers was not the

9  organizer of this, that she was a manager or supervisor.  I expect

10  her to argue that, to show that she was a supervisor.  In fact,

11  she was the one having direct contact with the individuals, you

12  know, that worked for the city.  The way I heard the evidence,

13  Mr. Mitchell would talk to Pastor Bickers, and then Pastor Bickers

14  would be the one communicating with the people of the city.

15          So whereas they're not asking for a level four, which

16  would have to show an organizer or leader, they're saying she was

17  the manager or supervisor.  And I fully expect Ms. Dillingham is

18  going to argue that.

19          So tell me why she will not be a supervisor if she is

20  not the one having contact back and between -- or manager between

21  Mitchell and the people that are actually in procurement at the

22  city?

23          MS. GOLDBERG:  Your Honor, because there was no evidence

24  of that.  That's what I would argue.  So as much as again the

25  government wants to speculate -- the evidence that we have, the

1  e-mails that were presented at trial, was Mr. Mitchell

2  communicating with individuals within the city.  He was the one

3  who communicated.  He's the one that set the prices.  He's the one

4  who set the contracts.

5        Again, the government wants to speculate that there was

6  communication, but nobody got up and said, yes, there was.  So

7  where is that evidence, Your Honor?

8        The evidence that we have is the opposite.  Even though

9  Mr. Mitchell testified -- and that's the only evidence, I would

10  say -- that he was told X, Y and Z.  Nobody actually in the city

11  said that.  Nobody corroborated that testimony.  And we do have

12  the e-mail evidence, the actual physical evidence that he was the

13  one communicating with folks.

14        THE COURT:  I'm trying to remember the name of the lady

15  that testified that worked at the city, was still working for the

16  city at the time we tried the case, that testified her direct

17  communications was with Pastor Bickers.  I'm trying to remember

18  her name, and I apologize to her, her name has been in the paper a

19  number of times, and she testified that she was working for the

20  City of Atlanta.

21        MS. GOLDBERG:  And, Your Honor, I think if the Court is

22  referencing Ms. Rita Braswell --

23        THE COURT:  And I apologize to Ms. Braswell for not

24  remembering her name.

25        MS. GOLDBERG:  I think her testimony was at one point

1  when she was trying to reach Mr. Mitchell, she reached out to

2  Ms. Bickers because they knew they had a friendship relationship

3  or a business friendship relationship.

4         So I think that was really the culmination of any of the

5  evidence.  I mean, it wasn't that we had conversations related to

6  procurement, we had conversations related to contracts, we had

7  conversations where she told me to do something where I was -- I

8  was somehow supervised or managed by Ms. Bickers.  I think there

9  needs to be something more than when I was trying to reach out to

10  E.R. Mitchell because he was my contact, I couldn't get ahold of

11  him, but I knew they had this connection.  So I reached out to

12  Ms. Bickers to get ahold of him.  That was the testimony.  I

13  think, again, that's just not sufficient here.

14         The evidence is -- I mean, we had several witnesses that

15  said, yeah, I thought he was her boss.

16         THE COURT:  She did not testify, Ms. Braswell, that

17  Pastor Bickers and another individual was communicating?  She did

18  not testify to that?

19         MS. GOLDBERG:  Your Honor, the evidence that I remember

20  from the trial was, I think, that statement where she said there

21  was a point in which she was trying to reach out to Mr. Mitchell.

22         THE COURT:  I'm not talking about when Ms. Braswell was

23  trying to reach out to Mr. Mitchell.  I thought, and I could be

24  wrong, that Ms. Braswell testified that Pastor Bickers had contact

25  with another lady who, again, her name was in the paper, was

1    communicating --

2            MS. GOLDBERG:  Again, if you're referencing, Your Honor,

3    Ms. Cotena Alexander --

4            THE COURT:  Yes, thank you.

5            MS. GOLDBERG:  -- was the alleged unindicted

6    co-conspirator in this case, a person who did not take the stand.

7    We have e-mails from her that represent --

8            THE COURT:  I guess my question is did not Ms. Braswell

9    testify that Pastor Bickers and Ms. Alexander were communicating?

10           MS. GOLDBERG:  So I don't recall that testimony, Your

11   Honor.

12           Now, I think that, again, had Ms. Alexander taken the

13   stand and been able to testify and said that, maybe that would

14   meet that burden, but we don't have that.  Again, we have very,

15   very scant evidence.  And the actual physical evidence that we

16   have, the e-mail chains and things like that that were presented

17   by the government were direct communication by Mr. Mitchell to

18   city officials, and, otherwise, it is just conjecture and

19   speculation.

20           THE COURT:  It is the defense's position that Pastor

21   Bickers had no contact whatsoever with anybody at the City of

22   Atlanta?

23           MS. GOLDBERG:  Well, Your Honor, she was an employee of

24   the City of Atlanta.

25           THE COURT:  No, I mean, as far as the bribery counts.

1          MS. GOLDBERG:  So our position at this point is that the

2    government can't meet their burden for which -- that she can be

3    enhanced for her role in the offense, because the evidence, like I

4    said, is contrary to that.

5          Mr. Mitchell was the one who was the mastermind here.

6    It was -- that was a substantial part of the testimony.  He is the

7    one who had done this before.

8          THE COURT:  And, again, they're not saying that Pastor

9    Bickers was the organizer or leader for a level four.  They're

10   going for a level three, that she was a manager or supervisor.

11         MS. GOLDBERG:  Understood, Your Honor.  But we just need

12   evidence to whom she was supervising, how she supervised them,

13   what she got them to do, what she ordered.  I mean, we just don't

14   have that, Your Honor.

15         And so, you know, I think, yes, the jury has spoken.

16   She's been convicted for conspiracy here, but there is no

17   enhancement necessary.

18         THE COURT:  Thank you, Ms. Goldberg.

19         Ms. Dillingham.

20         Ms. Dillingham, where is the evidence that she had any

21   contact with anybody other than Mr. Mitchell?

22         MS. DILLINGHAM:  So we have Mr. Mitchell's testimony,

23   Your Honor.  We also have the results of that contact.  We have

24   that -- the unusual results.

25         THE COURT:  You agree with Ms. Goldberg that there was

1  no contact between Pastor Bickers and Ms. Braswell and

2  Ms. Alexander?

3       MS. DILLINGHAM:  Well, Ms. Braswell did testify that she

4  spoke with Ms. Bickers during the snow.  We also -- sorry, Your

5  Honor.  I lost my train of thought.

6       So we do know that Ms. Braswell spoke with Ms. Bickers

7  during the snow, and she said that it wasn't just her who was

8  looking for Mr. Mitchell.  There was an understanding in the

9  public works department that if they needed to find Mr. Mitchell,

10 Ms. Bickers was their person.  That was their contact person.

11      In addition to the unusual --

12      THE COURT:  You agree then that Pastor Bickers had no

13 contact with anyone -- I think you've been given a note.

14      MS. DILLINGHAM:  Oh, that's the thought that I lost.

15      THE COURT:  Always good to have back-up.

16      MS. DILLINGHAM:  Always good to have back-up.  Thank

17 you.

18      In addition to the testimony of Rita Braswell, who was

19 in the public works department, we also had phone toll records

20 showing numerous calls between Pastor Bickers on her cell phone,

21 her personal cell phone, and Cotena Alexander.  We put that

22 information in, and we put it in for the time -- for the entire

23 length of the conspiracy.  We showed how the phone calls increased

24 substantially around these contracts, and how before and after,

25 very little conversation between Cotena Alexander and Ms. Bickers.

1          So there is evidence in the record of direct

2     communication between Ms. Bickers and Ms. Braswell and

3     Ms. Alexander.

4          In addition to that direct contact, Your Honor, and

5     beyond Mr. Mitchell, there is ample evidence that Ms. Bickers both

6     managed and organized this scheme.  And not just to make the

7     bribery happen, to effectuate the bribery scheme, but, also, to

8     cover it up.

9          So we see -- we had evidence in this case, we presented

10    evidence in this case that before Mr. Mitchell's conversation with

11    Ms. Bickers in 2010 about the sidewalks contract, he was

12    struggling.  He was -- his business was down in the dumps,

13    suffering from the Great Recession.  And in 2010, Ms. Bickers

14    presented him the sidewalk contract and said, if you want this

15    contract, you've got to give me $100,000 upfront.  And then once

16    you get the contract, I want a piece of that, too, of any payment

17    made by the city.

18         And we see that every time there was a contract, the

19    government put up evidence of a contract, how did it start?

20    Ms. Bickers brought it to Mr. Mitchell.  She brought him the

21    bridge work contract.  She gave him the engineer's estimate.  And

22    she did it four months before any other contractor even knew that

23    the city was going to pursue this RFP for emergency bridge work.

24         Mr. Mitchell testified that she did it with the 2011

25    snow.  She came to him and she said, hey, there is going to be a

1  bunch of work with this snow, they are going to declare it as an

2  emergency, so they'll be able to get you in.  And that's exactly

3  what happened in 2011.  It happened again even in 2014, after the

4  city went through all of these efforts to stop that kind of thing

5  from happening.

6         And we heard Mr. Mitchell talk about how after that 2011

7  snow, his heart was racing because he got a calendar invite from

8  the city for a meeting at City Hall about his rates.  His rates

9  were so exorbitant that two City of Atlanta commissioners were

10  complaining that he had essentially price gouged.  And the person

11  who told him about what that meeting was going to be about was

12  Ms. Bickers.  He knew when he walked in that meeting exactly what

13  he needed to say because of Ms. Bickers.  And the city ended up

14  paying him those 2011 rates.

15         And even though the city made all of these efforts to

16  have contractors in place for emergency debris removal,

17  Mr. Mitchell still got a large percentage of the work in the 2014

18  snow.  He got an exorbitant amount of work regarding the salt and

19  the spreading in 2014, and he got to do it at inflated rates, all

20  of which had to take into account Ms. Bickers' percentage.

21         THE COURT:  All right.  Who are the five people?  It

22  says five or more people, participants say she was involved.  Who

23  are the five you-all are alleging?

24         MS. DILLINGHAM:  So, Your Honor, we are actually -- and

25  we briefed this, Your Honor, we are proceeding on the "or" part of

1  that sentence.

2          THE COURT:  Okay.

3          MS. DILLINGHAM:  So after the "or" is -- and otherwise

4  extensive language which says, if you don't have five identified

5  participants, which are people who are criminally responsible,

6  then you've got to show that the scheme was otherwise extensive.

7          So here we say, we're looking at the scope of the

8  conspiracy.  We're looking at how much money was flowing.  We're

9  looking at what was used to effectuate the conspiracy, if that was

10  extensive.  And here we see the scope of this was at least 2010 to

11  2014.  We know that throughout this conspiracy, Ms. Bickers used

12  multiple banks, multiple bank accounts.  And split up her deposits

13  to numerous deposits to effectuate this scheme.

14          She, also, brought in people that were used to make this

15  happen.  So we know that we had Ms. Shedreka Poole and

16  Deidra Verdier on the stand talk about her relationships with

17  Ms. Bickers.  And during Ms. Poole's relationship with

18  Ms. Bickers, they set up the Chateau Land Company account but

19  never used it.  It was Ms. Poole's belief that no money really

20  came into that account, and then she saw the bank statements.  And

21  what she saw were large deposits and then withdrawals in that

22  Chateau Land account.  And the government demonstrated that that

23  was bribe money.  And we saw she set up a joint account with

24  Ms. Verdier, and that account was used to funnel that bribe money.

25          And we know that Ms. Bickers -- both of those witnesses

1  and Mr. Mitchell testified -- that Ms. Bickers told all of them

2  the same story about how cash was important to use to avoid

3  detection of law enforcement.  And even though we're using cash,

4  we've got to make sure if we're going to deposit this money into a

5  bank account, it has to stay under $10,000, because that's the

6  threshold that will trigger bank reporting.

7            All of that evidence came into this case.

8            I would, also, argue, Your Honor, that Mr. Mitchell's

9  testimony about the kind of control that Ms. Bickers exercised

10  over him, was -- it was a total environment.

11            THE COURT:  Ms. Goldberg said it is just the other way

12  around.

13            MS. DILLINGHAM:  And I'm going to point to evidence,

14  Your Honor.

15            THE COURT:  Okay.

16            MS. DILLINGHAM:  So we heard Mr. Mitchell testify that

17  during the course of this scheme, Ms. Bickers was the person who

18  was organizing everything.  And that she had so much

19  organizational control that she had to be kept in the loop about

20  any conversations, any correspondence with the City of Atlanta.

21  And while she was with the city, Mr. Mitchell printed out e-mails,

22  he forwarded e-mails, he bcc'd Ms. Bickers on e-mails so that she

23  could be a part of the communications, but it wasn't until she

24  left the city that he felt comfortable actually sending e-mails to

25  Ms. Bickers.

1           Mr. Mitchell also talked about how he had near daily

2 phone conversations with Ms. Bickers to keep her in the loop on

3 everything that was happening.  And that was important, because

4 whenever they had a problem getting paid, they would pick up the

5 phone and call Ms. Bickers and suddenly they would get paid.

6           If there was ever any question about their rates, they

7 would pick up the phone and call Ms. Bickers and that issue would

8 be resolved.

9           And that environment of control even extended to how

10 they met.  They met on Ms. Bickers' territory, at her home and at

11 her church.

12           And even still if we take Mr. Mitchell out of the

13 equation, look at Mr. Richards.  He testified that at one point

14 Mitchell came to him and said Bickers needs $53,000, or she needs

15 $50,000, she needs it right away.  I need you to wire the money.

16 And Mr. Richards, under this environment of control --

17 Mr. Mitchell is not even involved in this transaction --

18 Mr. Richards sends that $50,000 wire.  Mr. Mitchell is not getting

19 any of that money.  And then when we find out that she needed a

20 little bit more money, that same day, he sends another wire of

21 $3,000.

22           All of that is evidence of the control she exerted over

23 this entire scheme.

24           I also just want to point the Court to Exhibit 218.  I

25 have a copy of it, if the Court would like to see it.

1          THE COURT:  Yes, I would like to see it.  Have you seen

2     this, Ms. Goldberg?

3          MS. GOLDBERG:  No, Your Honor.

4          THE COURT:  Let Ms. Goldberg see it first.

5          Ms. Goldberg, do you have any objection to the Court

6     looking at this?

7          MS. GOLDBERG:  Your Honor, I believe this was a document

8     that was admitted at trial.  So no objection.

9          THE COURT:  All right.  Then you may proceed,

10    Ms. Dillingham.

11         MS. DILLINGHAM:  Yes, Your Honor.  So 218I was admitted,

12    and the agent who testified about this particular exhibit

13    testified that this was a document that was provided from

14    Ms. Bickers' own records.  And this is a resume that was submitted

15    in connection with a bid, and it was created by Ms. Bickers.  And

16    what does it show?

17         It shows that Ms. Bickers herself wanted to take credit

18    for the contracts that were the subject of the bribe payments that

19    she was receiving.  So when we look under the project experience

20    that Ms. Bickers lists on her personal resume, she says she was

21    responsible for annual sidewalk repairs and maintenance.  She also

22    says right under that, that she was responsible for work hauling

23    aggregate, clearing and sweeping streets and highway of snow and

24    ice.

25         It's not until the fourth thing on this resume that she

1   even mentions that she was the director of human services.  And

2   how does she talk about that job compared to the other ones?  The

3   exact same way.  She was responsible for homeless services in the

4   City of Atlanta.

5          Ms. Bickers' own words were that she was responsible for

6   the very contracts and the very work that was being completed by

7   the City of Atlanta, despite being here today representing she had

8   nothing to do with it.

9          And I think I said, Your Honor, that Ms. Braswell did

10  testify that Ms. Bickers was known to the city to be the point of

11  contact for E.R. Mitchell.  I believe I said that, but I just

12  wanted to --

13          THE COURT:  You did.

14          MS. DILLINGHAM:  -- clarify that point.  All of these

15  factors, Your Honor, point to management and supervision of this

16  scheme.  And we pointed the Court to several Eleventh Circuit and

17  cases outside the circuit that demonstrate a four-level

18  enhancement.  So here we're looking at an enhancement that

19  represents Ms. Bickers' role as higher and more involved than

20  Mr. Mitchell, who incidentally, Your Honor, received a two-level

21  enhancement at his sentencing for his leadership role in this

22  scheme.

23          THE COURT:  Ms. Goldberg.

24          MS. GOLDBERG:  Thank you, Your Honor.

25          I think the statement that the government just made,

1   which is the most poignant, is that we need to look to evidence

2   outside of Mr. Mitchell.  I mean, the vast majority of this

3   information which the government relies on is based on his

4   testimony and his testimony alone.  And that's the problem, Your

5   Honor.  He's going to say, yes, she was above me.  I was above

6   her, even though the evidence is very much to the contrary.  But

7   what really is important is what actually did Ms. Bickers do?  Who

8   did she supervise?  What did she tell them to do?  When did she

9   tell them to do it?  What were those steps that she took that made

10  her in this position as a supervisor?  We just don't have evidence

11  to that.

12          The government referenced C.P. Richards' testimony.  His

13  testimony was you-all brought me into this.  I didn't know

14  Ms. Bickers.  I actually didn't really know she had anything to do

15  with this.  I think I met her once.  Everything I heard about this

16  whole thing came from Mr. Mitchell.  So I think his testimony

17  actually works in our argument here.

18          We've got E.R. Mitchell who is, you know, obviously

19  trying to help himself, which we know he cooperated.  But he took

20  the stand and continued to try to help himself.  And C.P. Richards

21  who said, really, I didn't know Ms. Bickers.  I didn't have any

22  dealings with her at all.  And then they point to, well, there was

23  some communication, there were some phone records.  Okay, there is

24  communication, but what was the substance of that communication?

25  Was that a check-in?  Was that a direction of something to do?  I

1    mean, that would fall into this purview, but we just don't know.

2          Again, this is conjecture.  We're operating under the

3    fact, well, we can see there were this many phone calls, but,

4    again, no one testified.  She called me on this date.  She told me

5    to do this.  She told me this is what we had to do.  We just don't

6    have that, Your Honor.  We're really just operating on the very

7    edge here and trying to assume.

8          And the government, a lot of their arguments to this

9    end, keeps relating back to 2014 and activities that happened in

10   2014 for which Ms. Bickers was acquitted, which the jury rejected.

11   So we really need to make those distinctions, Your Honor.

12         They talk about E.R. Mitchell's testimony about cash

13   withdrawals and structuring and things like that.  Again, belied

14   by the evidence.  Because bank records shows that Mr. Mitchell had

15   been doing this for some time.  He has been in the business of

16   withdrawing cash.  He had been in the business of obstruction.

17   Clearly that did not come from Ms. Bickers.  The government knows

18   that there was evidence to the contrary.

19         There just really was nothing -- and the government

20   cited the fact that we're saying, well, she said had nothing to do

21   with this.  No, we're in the posture, Your Honor, where the jury

22   has spoken.  But we're talking about what was her actual role in

23   this at this point.  And there should be no enhancement, because

24   there just is no evidence as to that.  There was no evidence as to

25   what she actually did other than conjecture, Your Honor.

1          THE COURT:  Thank you, Ms. Goldberg.

2          The Court is going to find that Pastor Bickers did

3    manage or supervise the criminal activity which she is convicted

4    of, and that it was extensive.  So I'm going to overrule your

5    objection.  I note your exception to the three-level enhancement.

6          And then we talk about the base offense level under

7    2S1.1.

8          MS. GOLDBERG:  One moment, Your Honor.

9          THE COURT:  Take your time.  Paragraph 132.

10         MS. GOLDBERG:  Got it, Your Honor.

11         So I mentioned this a little bit before and said we

12   would come back to it when we got here.

13         So, Your Honor, the jury rejected Count 2.  Ms. Bickers

14   was acquitted.  They didn't convict her on the money laundering

15   accounts which were associated with that count.  The government

16   made a very specific decision to charge Ms. Bickers with very

17   specific items in those counts.  So as the Court remembers the

18   WaveRunners, the vehicle --

19         THE COURT:  Yes.

20         MS. GOLDBERG:  -- and that is what the jury did convict

21   Ms. Bickers on.  And so again, we just ask the Court to follow the

22   jury verdict.  And so I think it's clear under 2S1.1, that in

23   order to relate back to the underlying conduct which the

24   government wants us to do, you have to find that she committed the

25   offense.  That's one of the -- under, I believe, A1, 2.2A1, one of

1    the factors is that she committed the offense.  The jury rejected

2    that fact.  So it puts under the posture of A2, in which we really

3    have to look at the amounts in question, Your Honor.  And so

4    that's what I ask the Court to do.

5            I think the amounts specifically were approximately in

6    total about $90,000.  And so that is the jury's verdict.  I think

7    the guidelines direct the Court on how to do that, and that it is

8    inconsistent here to try to relate back to Count 2 and enhance her

9    guidelines based on that acquitted conduct when the jury was very

10   specific, the government was very specific in their evidence

11   presented at trial -- the pictures of the WaveRunners, the person

12   who sold the WaveRunners, all these things.  And part of that was

13   their -- probably strategic decision, Your Honor, because these

14   items were expensive.  They wanted to use the word "luxury items,"

15   right.  That Ms. Bickers was engaging in this behavior getting

16   some luxury items.

17           And so they used those specific items to present their

18   case on a strategic basis.  And now they're going to say, well,

19   no, disregard all that.  Those were just a few of the items, but

20   let's disregard the jury's verdict where they acquitted her on

21   Count 2, and let's relate back to that and enhance this back up,

22   that $2 million, in which we raise the base offense level up based

23   on that $2 million of that acquitted conduct.  Where really the

24   jury said, look, we saw these particular items.  We believe at

25   this point the government met their burden.  We're going to

1   convict her on these counts.  For whatever reason, I don't -- I

2   don't seek to understand sometimes why juries do what they do, but

3   certainly those were based on the acquitted count.  But a

4   strategic decision of the government was to very specifically list

5   these items, show these items, present these to the jury.  The

6   jury convicted her on those counts, and those that should be

7   attributed to her for purposes of the sentencing.

8           THE COURT:  Tell me, Ms. Goldberg, in looking at Section

9   2S1.1, the comment section, under Note 2C, there are some cases in

10  which subsection A1 applies, application, and any Chapter 3

11  adjustment should be determined based on the offense covered by

12  the guidelines.  In other words, the laundered or criminal-derived

13  funds and not under the underlying offense in which the laundered

14  funds were derived.  Therefore, the two-level adjustment in the

15  role in the offense applies.  And we're talking about paragraph

16  132, base offense level.  Therefore, the two-level adjustment for

17  role in the offense applies, and paragraph 128 should be deducted.

18  We did that.  But according to the base offense level set -- in

19  other words, explain that note to me.  You're arguing against that

20  note, particularly the first part of it where it says, in cases in

21  which subsection A1 applies.  Are you arguing that is -- that is

22  what you're arguing?

23          MS. GOLDBERG:  I'm sorry, Your Honor, can you point me

24  to the note again?

25          THE COURT:  I'm looking at paragraph 132 in the PSR.

```
 1              MS. GOLDBERG:  Yes, Your Honor.

 2              THE COURT:  The probation officer bases her -- making

 3   this recommendation.  So are you arguing with the probation

 4   officer on this or against the probation officer on this?

 5              MS. GOLDBERG:  So we're arguing, Your Honor, that the

 6   amount in question should be determined based on the particular

 7   amounts of conviction.  And so because those particular amounts

 8   were specified that -- under the guidelines they say if the -- if

 9   the amounts can be determined -- which they can in this case,

10   because they were very specifically identified in the

11   indictment -- that those are the amounts that should be looked to

12   for purposes of sentencing.

13              THE COURT:  Okay.  All right.  Let me hear from the

14   government.

15              MR. DAVIS:  Yes, Judge.

16              With regard to the amount, Judge, I think 2S1.1A1 is

17   pretty clear, given your finding as it relates to relevant conduct

18   for Count 1.  I think the loss amount or laundered funds amount

19   ought to be that same number.  So the $2.39 million.  And I think

20   the second part that you spoke about, which is the role

21   adjustment, I think that was briefed separately, but it relates

22   back to the 2C1.1 calculation.

23              THE COURT:  Ms. Goldberg?

24              MS. GOLDBERG:  Yes.  I didn't speak specifically of the

25   role issue.
```

```
 1              THE COURT:  I cut you off.  I apologize.

 2              MS. GOLDBERG:  That's okay.  But, I mean, I think the

 3    argument -- the same argument applies as already has been

 4    presented to the Court.  But our argument, again, understanding

 5    relevant conduct, understanding the Court's decision as to

 6    relevant conduct, the government made a very specific decision in

 7    the indictment.  The jury made their verdict.  Again, we're

 8    enhancing Ms. Bickers based on acquitted conduct.  And so we would

 9    ask the Court to sustain.

10              THE COURT:  Ms. Goldberg, as you very well know, you

11    said this, so I'm not telling you anything you don't know.  In

12    this circuit, irrelevant conduct is allowed.  It's allowed to

13    proceed this way.  So I'm going to overrule your objection on

14    that, but I note your exception.

15              We go now to the value of the bribes.  Paragraph 125.

16              I don't disregard your argument that -- I'm not

17    disregarding your argument that you've been making.  I'm just

18    pointing out why I ruled the way I'm ruling.  What I'm saying,

19    you're making -- you're not making a frivolous argument, in other

20    words.

21              MS. GOLDBERG:  Your Honor, so I think -- again, I think

22    we addressed this in part.

23              Our argument based on the trial, based on the counts of

24    conviction is that the offense level should be between 500 and

25    1.5, not 1.5 and 3 million.  As -- as I indicated earlier,
```

1   the 2 million as noted, again, was based on the acquitted conduct.

2   But, also, Your Honor, I think even parsing that issue out, now

3   given the Court's rulings, I don't think the government can even

4   show that 2 million were bribe payments.  We haven't really dealt

5   with that issue in depth.  But the government certainly has

6   information that a lot of that money went to other sources.

7          THE COURT:  You're saying there is $2,027,126.11 the

8   government cannot prove that they were bribe payments?

9          MS. GOLDBERG:  Correct, Your Honor.  And that argument

10  goes to this.  Ms. Bickers was not an employee of the City of

11  Atlanta anymore during that period of time from which the

12  $2 million is attributed to her.  Being paid money in and of

13  itself to her is not illegal.  She's not an employee anymore.  If

14  she gets paid money by E.R., all money coming to her is not a

15  bribe payment.

16         So the government would have to specifically show what

17  money was actually used to bribe people.  So at this point, based

18  on the government's case, you know, to boil things down,

19  she -- she transforms from in Count 1 from the payor to the payee;

20  right?  So she then is alleged to be paying someone else.  So all

21  the money -- they're just saying, look, we looked at our accounts,

22  we saw this money.  Now they actually can't specifically know, and

23  we dealt with this in the trial --

24         THE COURT:  What amount are you alleging they have

25  proven?  You're saying they haven't proven the $2 million.  In

1  other words, what are you saying -- because the burden is not on

2  you to prove what they have proven.  But, in other words, you're

3  saying if it is not the $2 million -- and, again, you don't have

4  to answer this question, because the burden is on them to prove

5  what it was.  But you're saying they haven't proven the

6  $2 million.  Have they proven any of it?

7       MS. GOLDBERG:  She was acquitted of it, Your Honor.  And

8  for purposes of today, for purposes of their burden at sentencing,

9  they can't prove that.  Because like I said, Your Honor, she

10 wasn't an employee.  So they just can't say as noted, I think, in

11 their -- at least in the exhibits to their sentencing memorandum,

12 they had folks look at money coming out of E.R. Mitchell's

13 accounts.  They had folks looking at money coming into

14 Ms. Bickers' accounts.  Although realistically, there very much

15 wasn't a correlation between the two.  I mean, there is no direct

16 correlation anyway.  But they're saying, look, all money coming

17 out, all money coming in, therefore, must be bribe payments.  And

18 I'm saying, Your Honor, that that's not the case, because

19 Ms. Bicker wasn't a city employee.  So even if she gets money in,

20 you can't make assumption.

21       THE COURT:  I think they're extending it a little bit

22 further.  Look at 2C1.1B2.  Look at that.  I think their argument

23 in there, the sentencing memorandum, and what I think they're

24 going to argue and what this says is that if the value of the

25 payment, the benefit received or to be received in return for the

```
 1  payment, the value of anything obtained, obtained or to be
 2  obtained by a public official or others acting with a public
 3  official, or the loss of the government from the offense,
 4  whichever is the greatest -- you know, I think 6500 -- increased
 5  by the number of levels, I think that's the one they're proceeding
 6  under.  Is that not correct?  Is that not the one you're
 7  proceeding under, Ms. Dillingham or Mr. Davis?
 8            MR. DAVIS:  Correct, Judge.
 9            THE COURT:  All right.  Look at -- it's not -- it's at
10  least three or four different "ors" in there they can kind of
11  proceed against.  In other words, if the value of the payment, the
12  benefit received or to be received in return for the payment.  Do
13  you want to address that?
14            MS. GOLDBERG:  And, Your Honor, I think that still is
15  not my argument.
16            THE COURT:  Again, I apologize.
17            MS. GOLDBERG:  That's okay.  That's okay.
18            THE COURT:  I heard your argument, and again the burden
19  is not on you; it's on them.
20            MS. GOLDBERG:  And I'm still waiting for that, Your
21  Honor.
22            THE COURT:  I think you're going to get in about three
23  to five minutes, or attempt at it.
24            MS. GOLDBERG:  Understood.  And what I'm saying, Your
25  Honor, is that they're making the assumption that all money coming
```

```
1   in is, therefore -- I mean, they still have to show that these are
2   bribe payments.  I mean, whether it's a value received, whether
3   it's direct, you know, to be made -- but they're just making the
4   assumption that any cash at all should be attributed.  And they
5   don't have evidence to that.  They don't have that specific tie,
6   other than here's money coming out, and although they don't really
7   line up, we're going to say all money, therefore, coming in must
8   be this.  Even though, again, we argue, you know, they double
9   count certain things.  We argue that, you know, they have evidence
10  of other sources of income that are, you know, kind of all folded
11  into the mix here.  But they're saying, look, this is how much
12  money she got in during this time period.  We're going to assume
13  everything falls under this purview.  And that's just not
14  accurate, Your Honor.  There has to be a showing of actually what
15  the benefit is.
16          And so I think the issue we have, Your Honor, is that
17  they're just making assumptions they can't make.  Again, we're
18  back to that same problem.  You know, looking at a spreadsheet and
19  saying this is how much cash she got in through a period of time,
20  without any sort of direct correlation, is not sufficient for this
21  Court.  And we're back to that same problem.
22          THE COURT:  Mr. Davis.
23          MR. DAVIS:  Yes, sir.
24          THE COURT:  He walks up here with a spreadsheet.
25          MR. DAVIS:  Yeah, you might as well, Judge.  I'm going
```

 1  to reference Exhibit 200, which was Exhibit 202 which was admitted

 2  at trial.  I'm not going to reference it a lot.  So I'm not going

 3  to --

 4          MS. GOLDBERG:  If I can --

 5          THE COURT:  Yes, let her take a look at it.

 6          MR. DAVIS:  Of course.  You can keep it.

 7          MS. GOLDBERG:  Thank you.

 8          MR. DAVIS:  I'll try to address some of these arguments

 9  in pieces, Judge.

10          So, for example, one of the arguments per the defense is

11  that there is no correlation.  There is no way to tell that a cash

12  deposit is, in fact, related to a payment.  And I'll just give an

13  example.

14          On March 5, 2014, the City of Atlanta pays Cascade

15  Building Systems, E.R. Mitchell's company, approximately

16  $2.49 million.  Two days later Mr. Mitchell withdraws $150,000.

17  And on the same day Pirouette Dance Company gets a deposit of

18  $150,000.

19          To the extent that that is not a perfect correlation,

20  Judge, I don't know what is.  But what is much different about the

21  conduct in 2014 than the conduct in 2010, '11, '12 and '13, is

22  Mitzi Bickers' position.  When Mitzi Bickers worked for the City

23  of Atlanta, she couldn't have a paper trail of checks and ACHs and

24  wire transfers from E.R. Mitchell and C.P. Richards going into her

25  account.  And that's why for the vast majority of the payments

1  during that time, you see cash deposits.  You see almost no

2  checks.  You very rarely see a wire, except for that emergency

3  wire right before Ms. Bickers had to close on her house in June of

4  2011.

5          But after she leaves the city, that concern is no longer

6  there.  And that's what makes the evidence in 2014 so much more

7  powerful, the evidence presented in Government's Exhibit 202 so

8  much more powerful, because the vast majority of the transactions

9  from Mr. Mitchell and some by Mr. Richards are ACHs or checks.  So

10  you don't have to question the source of the funds.

11          Now, do you want to talk about, well, what is that for?

12  Well, Mr. Mitchell and Mr. Richards were unequivocal, that they

13  never were giving Ms. Bickers any money for anything but their

14  bribery scheme.

15          Mr. Richards, who is listed on Ms. Bickers' resume,

16  specifically said she never worked for me.  She was never a

17  consultant.  I had no reason to pay her.

18          So, Your Honor, at trial the government presented

19  evidence pursuant to Government's Exhibit 202 that traced the

20  source of funds, money from the City of Atlanta to E.R. Mitchell

21  and from E.R. Mitchell to one of Ms. Bickers' numerous accounts.

22  And we submit, Judge, that that evidence that was presented at

23  trial shows the money that was going from E.R. Mitchell and

24  occasionally directly from C.P. Richards to Ms. Bickers.  And

25  there is no evidence at all at trial that any of these payments

1   were for anything but the bribery scheme.

2           And to your point about the multiple theories under

3   which a bribery can be calculated, it really doesn't matter under

4   the guidelines whether $100,000 is paid to Ms. Bickers and she

5   keeps it all as a bribe, or she keeps $10,000 as a cut and then

6   gives nine other people $10,000.  Under the guidelines, the

7   calculable amount is the $100,000 that she receives to effectuate

8   the bribery scheme.

9           So for all those reasons, Judge, based on the testimony

10  at trial, based on Exhibit 202, we submit as played out in our

11  sentencing memorandum, that the loss amount as it pertains to 2014

12  is just over $2 million.

13          THE COURT:  Do you have Exhibit 202 in front of you

14  there?

15          MR. DAVIS:  Yes, Judge.

16          THE COURT:  One second, Ms. Goldberg.

17          MS. GOLDBERG:  I'm sorry, Your Honor.

18          THE COURT:  I saw this during the trial, but it's been a

19  while.  I want to kind of take another look at it.

20          Ms. Wright, give this back to Mr. Davis.

21          Thank you, Ms. Davis.

22          THE COURT:  Ms. Goldberg, as soon as Mr. Davis is

23  seated, you may proceed.

24          MS. GOLDBERG:  Thank you, Your Honor.

25          And, Your Honor, having looked at this exhibit as well,

1   I think that kind of exemplifies the problem that I have.  They

2   just throw everything in the pot.  You've got $13 and $320 and

3   $280 which they know don't correlate with the -- the withdrawals

4   from Mr. Mitchell.  They just throw everything in the pot and make

5   assumptions that everything counts, and that's the problem.  I

6   mean, unless E.R. Mitchell said, yeah, that $13, I gave her that

7   $13 -- we don't have that.

8          I understand there are direct transfers and checks and

9   things like that.  I mean, they were not hiding anything.  The

10  jury said she is not guilty, but they just throw everything in the

11  pot and expect everything to be considered to get it over that

12  $2 million threshold, and that is really offensive at this point.

13  I mean, they've got the burden to show all of these funds were at

14  issue, not some of them.  Not this $150,000 we can point to here

15  but all of it.  We can't just -- again, we're back to making

16  assumptions and saying close enough.

17         And Mr. Davis just came before the Court and said there

18  was no other reason for him to be giving her money.  Again, belied

19  by the evidence.

20         Mr. Mitchell testified that although Ms. Bickers was

21  acquitted of anything to do with Jackson, Mississippi, that this

22  was the time period in which they were investing in Jackson,

23  Mississippi, together.  And the Court -- and the government knows

24  that a lot of the money went to business development in Jackson,

25  Mississippi, in which Ms. Bickers was acquitted.  So that's just

1   not true.  Mr. Mitchell testified as to that.  And we know that

2   there is another purpose.  And so we can't just make these

3   assumptions.  And all you do, again, is look at bank records.

4   They provided them to the Court.  It's part of the trial

5   exhibits -- where the money went.  It's just not true that this

6   was only for this one purpose.

7            So we can't just throw everything in the pot, ignore the

8   facts we don't like, and say this is good enough.  Again, I'm not

9   dealing with levels; we're dealing with lives.

10           THE COURT:  The Court sat through this trial as well and

11  heard all of the evidence as well.  And based on the arguments I

12  heard today, I'm going to overrule your objections to paragraph

13  125, value of bribes under 2C1.1B2.

14           That leaves us with the grouping counts under paragraphs

15  122 and 150.  I think we touched on them, but I would like to give

16  you -- make your record.

17           MS. GOLDBERG:  Your Honor, we did touch on this.  It

18  goes to the -- what a common scheme was.  The money laundering

19  having being grouped with Count 1, which was not -- they're not

20  part of the same thing.  Again, two totally different areas.

21           Ms. Bickers is not an employee with the City of Atlanta.

22  Not -- the 2014 money laundering not tied to Count 1, not tied to

23  Count 2.  So we would argue those should not be grouped together.

24  And, Your Honor, I made the record as to my reasons.

25           THE COURT:  Their argument is, basically, that Count 2,

1  notice of acquittal, and I shouldn't consider the relevant

2  conduct.  I can't disregard it.

3       MS. GOLDBERG:  And, Your Honor, to group them together,

4  you have to consider whether it's part of a common scheme.  And,

5  you know, Your Honor, totally different things.  Like I said,

6  involving different people, Ms. Bickers not being an employee of

7  the City of Atlanta, and the argument being she goes from being

8  the payor to the payee.  Totally different thing; shouldn't be

9  grouped together.  Although, I do note based on your ruling of our

10  earlier objections, I think that is probably irrelevant.

11       THE COURT:  Thank you, Ms. Goldberg.

12       Ms. Dillingham?

13       MS. DILLINGHAM:  Your Honor, I won't belabor the point

14  that you've already made a ruling on the relevant conduct of what

15  happened in 2014, but I will note that the government did

16  demonstrate that there was a common or a similar harm.  So that

17  is -- that is the crux of grouping.  It's not necessary the

18  language in the indictment.  It's the actual harm that's inflicted

19  by -- here, bribery and money laundering.  And probation made a

20  determination that there is a similar harm here.  And there is a

21  societal harm as a result of these crimes, and we cited a case

22  that gets to that point exactly.

23       And there was a common scheme, and I think the Court's

24  ruling already reflects that.

25       And I just want to note we did drop a footnote as to

1  this point, but if the Court were not to group these counts, given

2  the Court's already ruling that that 2014 conduct is part of the

3  the relevant conduct in this case, that would actually work out

4  worse for the levels.

5        THE COURT:  It would.

6        MS. DILLINGHAM:  And one unit would be assigned for that

7  money laundering offense, because it would be based on that bribe

8  amount.

9        So for all of those reasons, we think that grouping is

10  appropriate here, Your Honor.

11       THE COURT:  Thank you, Ms. Dillingham.

12       Ms. Goldberg.

13       MS. GOLDBERG:  I agree with that, Your Honor.  Based on

14  the Court's earlier ruling, we agree that it's better off to group

15  them together at this point.

16       THE COURT:  We all agree.  All right.

17       I'm going to overrule that objection.

18       And then we have the last one is paragraph 139.  Loss

19  amount of the 2B1.1.

20       MS. GOLDBERG:  Your Honor, again, we come back to the

21  same argument we've done before as it relates to the wire fraud

22  counts.  The government made very specific strategic decisions on

23  how to indict and what to present.  And now probation, I think --

24  although the government took a different position in their

25  sentencing memorandum about the actual amount here -- that her

1  entire salary as an employee should, therefore, be considered wire

2  fraud.  I think that's very, very much a stretch.

3      THE COURT:  They make an argument -- I'll address it to

4  them, but I'll allow you to say something else about it.  I'm

5  concerned about this arbitrary way of determining -- I think

6  $179,025 -- the government is recommending that 20 percent of her

7  time or 20 percent of it -- and the government can -- I have some

8  concern about the arbitrary amount.  I've read the cases, and the

9  cases do go on to say, Ms. Goldberg, that a percentage can be

10  taken.  The way I read it, Ms. Goldberg, that's why I want you to

11  address it, it's somewhat left to my discretion of what that

12  percentage should be.

13      Now, I'm a little concerned about the arbitrary amount.

14  Now, I thought about one point.  Well, how much are they saying

15  are bribes?  And take a percentage of that bribe amount against a

16  percentage of $179,000, and I thought it came out to -- there's a

17  reason I went to law school; okay?  But, again, I thought about

18  eight percent or something like that.  So I'm telling you-all

19  right now, be prepared.  I'm a little concerned about this

20  arbitrary amount.  And I know the case law says it can be 10

21  percent, it can be 20 percent, and it is somewhat -- not somewhat,

22  it is totally -- well, nothing is totally my discretion, but I do

23  have discretion.  Let's talk about that.

24      MS. GOLDBERG:  I completely agree with Your Honor as to

25  this point.  I ask the Court to consider the amounts in the

1    indictment, because then we are not arbitrary anymore.

2            THE COURT:  What's the amount in the indictments?  I'm

3    trying to come up with -- I can see the argument from the

4    government, look, while she was getting paid by the city, she was

5    doing these criminal acts.  That argument I can see.  My concern

6    is about what percentage of that should be restitution back to the

7    City of Atlanta?

8            MS. GOLDBERG:  And, Your Honor, the amounts in question,

9    $600, $829.64, $600, $809.28 over the four counts, that's what is

10   specified in the indictment.  That is what the jury did find.

11   Anything else would be arbitrary.

12           I think the testimony for the Court at the trial was

13   Ms. Bickers was a good employee.  She did her job.  She got good

14   performance reviews.  Saying that somehow we're just going to

15   assign a percentage of that good work to being fraud -- again,

16   Your Honor, we've argued before the Court.  We don't even believe

17   that these --

18           THE COURT:  Well, the jury --

19           MS. GOLDBERG:  I understand, Your Honor.

20           THE COURT:  -- agrees with the government.

21           MS. GOLDBERG:  We're at the posture where we have to

22   determine the amounts.

23           THE COURT:  Yes.

24           MS. GOLDBERG:  And so I think that the best way to do

25   that is to follow the jury, follow the indictment.  There are

1    specific amounts listed.  Anything else would be arbitrary.  We're

2    just coming up with a number without having any idea of what she

3    did, how her job was, how that affected the job, what -- it's just

4    completely arbitrary.  And I think, Your Honor, the easiest way to

5    resolve that issue is just to go with the amounts contained in the

6    indictment.

7         THE COURT:  Well, I don't think that's quite the way the

8    circuit says to do it, though.  I'm trying to be fair as possible.

9         MS. GOLDBERG:  And, Your Honor, this theory in itself is

10   very, very rarely used, as we've argued before the Court.  The

11   whole salary theory of wire fraud is very rarely used.

12        The jury has spoken, but I think the case law is scant.

13   I think that the Court should consider what's in the indictment.

14        THE COURT:  Thank you, Ms. Goldberg.

15        Mr. Davis.

16        MR. DAVIS:  Judge, it's sort of interesting to say that

17   the City of Atlanta considered Ms. Bickers a good employee when

18   they didn't know that for three -- for two-and-a-half years she

19   was lying to them and taking hundreds of thousands of dollars of

20   bribes while she was a city employee.

21        But to the issue at hand with regard to wire fraud.

22   While an appeal in this case is probably very, very unlikely, I

23   think to be safe, not using the $170,000 number is probably a

24   prudent course.

25        As to the exact percentage, the cases go anywhere from

1  between 10 and 25, and quite honestly, Judge, given this

2  particular aspect of the case, the government really has no

3  objection to whatever you would decide between those parameters.

4          THE COURT:  I think I'm safer at 10.  All of the cases

5  I've read and what the circuit is saying, that's the lowest amount

6  they've done in any of the cases.

7          MR. DAVIS:  It seems reasonable, Judge.

8          THE COURT:  Ms. Goldberg, you read the same cases as

9  I've read.  Ms. Davis is right, it goes from 10 percent, 12

10  percent, 25 percent.  I'm trying to go to the lowest amount in

11  there.

12          MS. GOLDBERG:  Your Honor, again, I object to the way

13  that this is calculated and the arbitrary nature of it.  The fact

14  that the wire fraud was even used in this context, I note my

15  objections.

16          THE COURT:  Well, here is my question.  Am I

17  interpreting the circuit, the Eleventh Circuit wrong on this?

18          MS. GOLDBERG:  Your Honor, the case law you were not.

19  But again, I think the case law is arbitrary and scant, and we're,

20  again, we're pulling numbers without evidence.

21          So I note my objections and understand the Court's

22  ruling.

23          THE COURT:  Well, Ms. Goldberg, I read the cases.  As

24  you know, I'm bound by what the Eleventh Circuit says I can and

25  can't do.

1          Based on how I'm interpreting, and if I'm interpreting
2   it wrong, they will definitely tell me.  But I'm going to go with
3   10 percent, not the 20 percent you-all were talking about.  10
4   percent of that $179,272.
5          Simone, have you already figured this out?
6          It's going to be $1,792.20.
7          Thank you, Simone.  Maybe she didn't figure that out
8   right.
9          MR. DAVIS:  Judge, we've got $17,970.
10         THE COURT:  $17,000.  You had the comma in the wrong
11  spot -- or I read the wrong spot.  All right.  It's my fault, not
12  Simone's fault.  It's totally my fault.  I read it wrong.
13         All right.  Now, Ms. Goldberg, to be fair to your
14  record, I have exceptions to every one I overruled you on, but if
15  you want to add anything else before we move from this part, I'll
16  hear from you.
17         MS. GOLDBERG:  No, Your Honor.
18         THE COURT:  And I offer the government, if you all want
19  to say anything else before we move from this part, I'll hear it
20  right now.
21         MR. DAVIS:  No.  Thank you, Judge.
22         THE COURT:  Okay.  Then the Court is now going to talk
23  about the sentencing options.
24         Count 1 conspiracy to commit bribery under 18 U.S.C.
25  371.  It's a Class D felony, is five years, a $250,000 fine,

1  there's a statutory penalty.

2          For Counts 4 through 6 under money laundering under

3  18 U.S.C. Section 1957 and 18 U.S.C. Section 2, a Class C felony

4  is ten years and $250,000 fine.

5          Counts 7 through 10 wire fraud, under 18 U.S.C. Section

6  1343 and 1349, a Class C felony is 20 years and a $250,000 fine.

7          And Count 12, filing false tax return under

8  26 U.S.C. Section 7206, Subsection 1, a Class E felony is three

9  years and a hundred dollars -- $100,000 fine, excuse me.

10         There are no mandatory minimums to any of these counts.

11         Now, we have a total offense level of a 40, a criminal

12  history category of a one, a custody guideline range of 292 to 365

13  months.  A fine guideline range of $50,000 to $500,000.  And

14  restitution as alleged here is three million six hundred and

15  eighty-three dollars -- six hundred and eighty-three dollars and

16  nineteen cents.  That might change somewhat based on the fact that

17  I ordered 10 percent rather than 20 percent, and Simone is going

18  to figure that out for us.

19         MR. DAVIS:  Thank you, Judge.

20         THE COURT:  And for the special assessment, it's $900

21  due and payable immediately.

22         Forfeiture.  My understanding, Mr. Davis and

23  Ms. Goldberg, that all forfeiture is taking place -- has already

24  taken place in this case; is that correct?

25         MS. GOLDBERG:  That's correct, Your Honor.

1          MR. DAVIS:  Yes, Judge.

2          THE COURT:  Okay.  Now, the cost of confinement annually

3    is $44,258.  The cost of supervision annually is $4,454.  There is

4    no probation options.  Supervised release for Counts 1, and 4

5    through 6, and 7 through 10 is one to three years.  Count 12 is

6    one year.  And Pastor Bickers is a United States citizen.

7          Mr. Findley and Ms. Goldberg, I have read your

8    sentencing memorandum, the 78 letters that were submitted.  But

9    I'm prepared to hear from anybody you wish me to hear from this

10   morning.  And if Pastor Bickers wishes to allocute, I will hear

11   from her.  And, of course, I will hear any argument you-all want

12   to make.

13         MR. FINDLING:  Your Honor, can we take a five-minute

14   break right here?

15         THE COURT:  Yes, sir.  Let's take a 10-minute break

16   here.  It is 11:30, let's come back at 11:45.

17         (Recess taken from 11:30 a.m., until 11:45 a.m.)

18         THE COURT:  There are two cases I would like to put on

19   the record before you start, if you don't mind.  One regarding the

20   restitution amount back to the City of Atlanta.  I think I have to

21   make it clear, when I said arbitrary, I don't mean arbitrary where

22   I just pick a number out of the air.

23         The 10 percent I decided on is based on the evidence I

24   heard during the course of the trial.  We had 12 jurors hear the

25   evidence, but I also heard the evidence.  The 10 percent I felt

1  comfortable with is based on what I heard during the course of the

2  trial regarding this matter.

3         Now, the other matter is that -- I think Mr. Davis and

4  Mr. Findling, the restitution amount we're looking at with

5  subtraction out is $2 million -- and you-all check us on this, is

6  $2,982,755.99.  One more time.  $2,982,755.99.  One more time.

7  $2,982,755.99.  Again, that's the restitution amount we have

8  calculated.  Of course, I invite you-all to check the numbers.

9         Okay.  With that I stated, Mr. Findling and

10  Ms. Goldberg, it's up to you.  Yes, sir.

11         MR. FINDLING:  Yes, Your Honor.

12         So if I can just get some procedure from Your Honor how

13  you would like to --

14         THE COURT:  Here's the way I usually do it, but I'm

15  flexible, Mr. Findling.  I usually have the defense put up any

16  evidence they wish to put up regarding sentencing, and allow, if

17  the defendant likes to, to allocute.  You can make an argument.

18  And then I turn to the government, and then they are allowed to

19  put up any evidence they want to put up and they are allowed to

20  make their argument, and then I come back to you and you get the

21  last argument.

22         I usually don't set time limits on you-all.  You-all are

23  experienced attorneys.

24         Now, if you want to do it in a different way, we can.

25         MR. FINDLING:  Well, I think I would do, I have a few

```
 1  witnesses.  Your Honor has kindly read all of the letters, so I'm
 2  not going to waste your time and put up a bunch of people.  I'll
 3  put up a few people.  My client will make a brief statement, and
 4  then I think given what I perceive to be the uniqueness of this
 5  sentencing, I think 3553 is probably more significant here than
 6  any of the sentencing.  I will just reserve so I don't have to
 7  argue --
 8           THE COURT:  That's fine.
 9           MR. FINDLING:  -- because I think I'm going to do it
10  times two and waste your time.  I'll just let the government make
11  their presentation, and this way I can be more responsive.
12           THE COURT:  Well, I appreciate it.  But I want you to
13  know, Mr. Findling, I never considered you to be wasting my time.
14  So whatever you think you need to do, you do it.  But we'll do it
15  that way.
16           MR. FINDLING:  Your Honor, at this time, I would like to
17  call Dr. Carroll Harrison Braddy.
18           THE COURT:  Let me ask, Mr. Davis.  Are you going to
19  question any of these people?  If not, they can just come up to
20  the podium.  If you're going to question them, then they need to
21  take a seat in the witness stand.
22           MR. DAVIS:  I think everyone here is just for character,
23  Judge.  The podium will be fine.
24           MR. FINDLING:  I'm not going to ask a single question.
25           THE COURT:  All right.  Then we're not going to swear
```

1 | them in.  They're just going to come up and talk.

2 |         MR. FINDLING:  Sir, would you be kind enough to

3 | introduce yourself to His Honor and make your statement to the

4 | Court.

5 |         THE WITNESS:  Yes.  Greetings, Your Honor.

6 |         THE COURT:  Good morning, sir -- Doctor.

7 |         DR. BRADDY:  It's an honor to be here and stand before

8 | you.

9 |         I am Dr. Carroll Harrison Braddy.  I'm from southeast

10 | Atlanta.  So I come from humble beginnings.  I -- when I walked

11 | into court today, I apologize I was a little late.

12 |         THE COURT:  Don't worry about it, you're fine.  You're

13 | fine.

14 |         DR. BRADDY:  But I felt a lifting.  I don't know why.  I

15 | felt a lifting in my spirit.  And Pastor Bickers called me earlier

16 | this morning and she said that her pastor was ill at the time and

17 | wanted to see if I could stop by and speak, you know, some words.

18 | And I said, yes, I definitely would.  And the first thing I

19 | thought about was, oh, geez, that Peachtree Road traffic.  I heard

20 | you once speak on the Peachtree Road traffic.

21 |         THE COURT:  I travel it.  I can't go into details, the

22 | marshals will be very upset with me.  But I'm familiar with it,

23 | put it that way.

24 |         DR. BRADDY:  But what you said when you cross over to

25 | that Clark County line or that Athens, your car starts to feel a

 1  little bit better, starts to drive a little bit better.

 2          THE COURT:  Bulldog country.

 3          DR. BRADDY:  That's right.  And I look and I say, what

 4  good can come out of Nazareth; right?  When I look at you -- and

 5  at the time I was listening to a speech, and the speech was

 6  prefaced by Martin Luther King, Dr. Martin Luther King, and it was

 7  a celebration.  And I believe it was at one of the UGA conferences

 8  or speeches.  And one thing that hit me was your words.  And your

 9  words was -- and I want to paraphrase it, because I want to be

10  sensitive to not quote, because -- but it was simply, had it not

11  been for Dr. King, I wouldn't be where I am.  Had it not been for

12  Dr. King, you wouldn't be where you are.

13          And I thought about that.  And it pondered -- it hit me

14  in a different place.  How can I stand now as a medical scientist,

15  a doctor of behavioral health, born and raised in the ghetto of

16  Southeast Atlanta.  I had a brother who was murdered.  But while I

17  was in elementary school and primary school, there was a lady on

18  the Board of Education and her name was Mitzi Bickers.  She was a

19  different breed.  She would fight to make sure that we had

20  adequate food.  I never will forget, lunch food was terrible.  It

21  was so terrible.  And Mitzi, you know, spoke up.  And we would

22  write letters to the Board of Education then, and they'd actually

23  respond.  They would actually show up.

24          And I believe, Your Honor and counsel, that I had an

25  obligation today to show up, because she showed up.  No one is

1  perfect.  We all make mistakes, but when I stand in awe in this
2  great hall of justice and look at someone who looks like me, and
3  I'm unapologetically sound today, sitting under the United States
4  District Court, Northern District Court -- Northern District of
5  Georgia, it gives me chills.  Because I know that there is
6  equality when you work hard and when you put your strength and put
7  God first.

8          I say all of that to say, Your Honor, Pastor Bickers has
9  been a beacon of light in the community.  And so weighing the
10 gravity of good and bad, as a justice you're blind.  And clearly
11 walking by faith and holding that scale, you can do within the law
12 what minimum or maximum you can do.  It's almost like Jesus was,
13 and he said, you know, whatever you do -- except the father gives
14 you that, you know.  You can't do anything without the father.
15 And he washes his hand and he says, I'm going to let you-all deal
16 with this.

17         But I'm confident that you are strong and a student of
18 the law.  I'm not legally inclined.  That's not my field.  But my
19 spirit bears witness that as a student of the law, as a justice in
20 the law, that you can see the right, the wrong, the indifferent,
21 and you can close your eyes as justice and say, what can I do to
22 restore, to restore, restore justice so that the church can live
23 on.  So the veterans' home that Pastor Bickers has established can
24 live on.  So that the foster care system that she's established
25 can live on.  So that her mother, who is in her 80s, can have a

1  sense of knowing what to do, how to pay bills for the church, how
2  to take care of this.  A son suffering with a chronic illness.
3  You know, all of these things, the weight appears to some to be on
4  Pastor Bickers' shoulders.  But I believe there is a weight on
5  your shoulders.  And I believe that you don't take it lightly.
6          As you stated in one of your speeches, that when
7  you -- after all of the traffic you stand in this Court and you
8  get to your office and you look, and you look around and you say,
9  how in the world did I get here?  The grace of God.
10         So I ask, Your Honor, if you dispense and when you
11  dispense your sentence, that you dispense with grace.  And thank
12  you.
13             THE COURT:  Thank you, sir.
14             MR. FINDLING:  Thank you, sir.
15             THE COURT:  Will you guys do me a favor, don't put that
16  out on Peachtree Road because you'll get me in trouble with the
17  marshals.
18             MR. FINDLING:  Introduce yourself.
19             DR. JACKSON:  Good morning, Your Honor.
20             THE COURT:  Good morning.
21             DR. JACKSON:  I'm Dr. Keila Jackson.
22             THE COURT:  Good morning, ma'am.
23             DR. JACKSON:  I come to you today on behalf of Pastor
24  Mitzi Bickers, on behalf of Bishop Mitzi Bickers, on behalf of
25  Dr. Mitzi Bickers, on behalf of just Mitzi, my wife.

1          Thinking about, you know, everything that she has been

2 enduring made me think back on the very first time I met her.  I

3 was a student at Spelman College.  She walked into the classroom

4 and she was speaking to us on public policy.  Speaking about

5 campaigns and advocacy.  And she was so riveting.  She was so

6 intriguing.  I remember the royal blue suit she had on.  And she

7 lit a fire in us, so much so that some of us girls got together

8 and we did a light protest down towards the West End.  Because she

9 lit a fire in us to want to do something, to do something in

10 political science.  To do something more.  To work in advocacy.

11 And little did I know years later, I would have another connection

12 with her.

13          I met her as I was a budding political scientist trying

14 to establish my way, needing mentorship.  And she made me look at

15 every single detail, every single time, every campaign, every

16 candidate.  And she encouraged me not to be good in what I did,

17 but to be great at everything that I did.

18          I then started working with her in ministry.  Never

19 thought I'd get up to preach a sermon.  But when she called me to

20 do it, I felt that she saw something in me that I had not seen in

21 myself.  And God used me, but He used me and empowered me because

22 He sent an angel my way, Mitzi Bickers.

23          And over the years that I have known her, many, many,

24 many years, I have seen her offer grace, mercy, to so many

25 people -- not just in Atlanta, but across the United States.  I

1  have seen her pull together second chance programs for men who

2  were previously incarcerated and provide opportunities for them to

3  work in various states.  They have chances and opportunities and

4  have gained skills that they wouldn't get somewhere else, because

5  it took a special person to believe in them.

6          I've seen her work with the youth in our church saying

7  that the youth are our future.  If we don't invest in them, if we

8  don't try for them, if we don't believe in them, if we don't give

9  a little bit more, if we don't enhance their opportunities and

10  expose them, they won't have the opportunity.  She provides it.

11          She's opened Emmanuel's House, the Veteran's home where

12  she serves men with disabilities, mental and physical.  And she

13  provides food.  She provides care with medicine.  She provide

14  trips to the doctor, extracurricular activities.  And these men

15  refuse to be under any other leadership and care other than Bishop

16  Mitzi Bickers.

17          I have been with her, she has given the people the shirt

18  off of her back, the coat that she's wearing in the cold, and

19  she's just different.

20          I understand the person that they have presented before

21  you.  But I ask that you dig deep in your heart.  She is good.

22  She tries.  She works.  She cares.  And as Dr. C.H. Braddy said,

23  no one is perfect.  No one is perfect.  But Bishop Mitzi Bickers

24  tries.  She cares.  She works.  She teaches.  She empowers

25  relentlessly, and teaches everyone who comes in her path not to be

1  good, but to be great at what we do.

2         I stand here today because she took me under her

3  mentorship when I needed guidance.  When I wanted to make my way.

4  And I have only been successful because God sent this angel to me.

5         And I just pray, Your Honor, because you have the power,

6  you have the power.  I ask that you think about the heart of

7  Bishop Mitzi Bickers in your sentencing.  She has not been a

8  flight risk the entire time she has been out.  She has continued

9  to work in ministry.  She has continued to service the Veterans.

10  She has continued to help her mother with foster care.  She has

11  continued to care for her son who has a severe condition of lupus.

12  She has continued to be a spiritual cover, Your Honor, a spiritual

13  cover for all of these people sitting here today.  And she has

14  handled this situation with grace and with mercy.  And it is my

15  prayer, it is my prayer that you will have mercy in sentencing

16  her.  Thank you.

17         THE COURT:  Thank you, ma'am.

18         MR. FINDLING:  Ethyl Bickers.

19         If you would introduce yourself to His Honor, please,

20  and make your statement.

21         MS. ETHEL BICKERS:  Your Honor --

22         THE COURT:  Yes, ma'am.

23         MS. ETHEL BICKERS:  -- it is a pleasure to be in your

24  courtroom.

25         THE COURT:  The pleasure is all mine, ma'am.

1          THE WITNESS:  I am Ethel Bickers.  I'm Mitzi Bickers'

2   mother.  First, I want to know how long do I have to talk about my

3   great daughter.

4          THE COURT:  Ma'am, I will listen as long as you want to

5   talk, but --

6          THE WITNESS:  Thank you so much.

7          THE COURT:  I'll tell you if you're going too long.  You

8   just talk, and I'll tell you if you are going too long.

9          MS. ETHEL BICKERS:  All right.  I appreciate that.

10          THE COURT:  My momma would rather have it that way.  So

11   I'm going to do it that way.

12          MR. FINDLING:  I might sit down, Your Honor.

13          THE COURT:  You can sit down, if you would like.  Go

14   ahead and sit.

15          MS. ETHEL BICKERS:  Your Honor, we are here this day, we

16   have come as a church group and family members.

17          I note that you have heard all of the evidence and you

18   have done all of the things that need to be done.  And I beg to

19   differ with whoever said this, no one is perfect, but -- I believe

20   that.  But I believe you and I might be the only ones that are

21   pretty near perfect.

22          THE COURT:  I have a wife that would disagree with you

23   there.

24          MS. ETHEL BICKERS:  But we are here today to ask for

25   leniency on our beloved daughter, Pastor, friend.  She has been

1  the glue that keeps our family and our church together.

2  Without -- without her guidance and her -- her love for people in

3  general, I don't know where we would be.  Because she has been

4  there for us at all times.

5        I have a 15-year-old son, and mind you, I will be 80

6  years old next month, and it's a miracle.  15 years old, an

7  80-year-old mother.  But he is so dependent on his sister taking

8  care of him and looking after him and doing the things, and

9  counseling him and keeping him on the right track.

10        There is nobody that I love more in this world than my

11  daughter Mitzi, my son, my grandson, and I have two other

12  daughters that I reared.  I love these people with all of my

13  heart.

14        And if you were a parent, you know what it is like to

15  have a daughter or a child who is standing before the judge asking

16  for mercy for her.  I ask you, please, Judge, to consider, her

17  absence from the community will be a great loss.

18        Our church has grown tremendously since the passing of

19  my husband and she became the pastor of the church.  I must admit

20  that some of the -- some of the brilliance that she has came from

21  her father, but her good lucks came from her mother.

22        THE COURT:  I agree.  I agree.

23        MS. ETHEL BICKERS:  But she has been a steller community

24  advocate, starting back when she was just 26 years old.  She was

25  on the school board, and she served well during all that time that

 1  she served.  She served almost ten years doing all of the things

 2  to help the children in the City of Atlanta, and the things that

 3  she put in place, she and the other members of that school board.

 4  They are still active today and still working today.

 5          I have worked for juvenile court for almost 30 years,

 6  and every time I come before a judge, I'll tell you, I still get

 7  nervous and a little shaky.  But juvenile court was nothing like

 8  this fabulous place like you have here.  I was a probation

 9  officer, and I was there pleading all the time for the young

10  people that came before the judge.

11          But now I'm pleading for my daughter, who is way grown

12  now.  But I'm asking that if you would just be -- consider all of

13  the things that she has done and how she would be missed in the

14  community.  And if you find it in your heart to be lenient in

15  your -- in your sentencing.

16          We -- at Emmanuel Baptist Church and Family Worship

17  Center, we have implemented so many new programs that's helping

18  the people not just in the church, but the people in the

19  community.  All of the community are embracing her, even through

20  all of this.  This has been going on for so many years now that

21  I -- I don't even remember how long, but they have stood by her

22  and supported her through all of -- all of that.  We love her

23  dearly.

24          My son, my grandson, would be at a loss.  And I don't

25  know what I would do if my daughter was not here with me.

1            When my son came into my life, I was already pretty much

2   senior.  And I knew then that I had more years behind me than I

3   had before me, but I thought, Mitzi is here.  If anything should

4   happen, she's going to be the one to take care of my little boy.

5   He's 15 now.  He's not a little boy.  But I still consider him a

6   little boy.  He gets embarrassed when I say "my little boy."  But

7   I -- I thought about that and I said, well, she will be here to

8   take care of him, because I'm not going to be here forever.

9            Emmanual, her son, he has a condition that she has to

10  monitor.  I know he's 20 years old now, but she has to monitor his

11  condition because if she don't, it could be devastating.

12           I'm just pleading and begging that you would be lenient

13  in making your decision.  And I know it's in your hands.  I know

14  it's all in your hands, and you have the power to do what you know

15  is the best thing to do in her interest and in the interest of her

16  family, her church family, and the community.

17           I don't know if -- I don't know how --

18           THE COURT:  Do you need some water, ma'am?

19           MS. ETHEL BICKERS:  -- we will continue to function

20  without her presence.  Our church and our community loves her so

21  much that she has empowered us to do the things to keep going.

22  But it is going to be hard without her.  She's taught us.  She's

23  done all of the things that a pastor should do for her

24  congregants, but it will be hard for all of us if anything -- if

25  she is not there with us.  And I ask -- I'm just pleading and

1  begging, because it's my child, and I love her dearly.

2       Everybody that you see sitting in the back feels the

3  same way that I feel about her.  She takes this giving and this

4  giving -- being so benevolent, she gets that from her father,

5  Dr. Benjamin Weldon Bickers.  He was just that way.  And she gets

6  all of those traits from him.  We brought her up in a way that she

7  would love and respect others, and I believe that she does.

8       All of the years that we have been -- I have been around

9  young people, she has always been an example for others -- even as

10  a teenager, even when she was in college, even in elementary

11  school even, she was always an example for others.  And I always

12  taught her, you don't let people to stoop -- you don't stoop to

13  other folks' level, you bring them up to where you are.  And I

14  think she practiced that.  Don't ever let anything get in the way

15  to make you stoop down to something that you know is not in your

16  best interest.  And I believe she adhered to that.

17       Mitzi Bickers is a kind, loving, pastor, daughter,

18  mother, and she exemplifies that in her daily life.  And I

19  certainly am praying.  We prayed and prayed and prayed.  I

20  think -- I sometimes wonder if the Lord is tired of me because I'm

21  praying -- I'm calling on him daily, all day and every day, that

22  He would be with us through all of this, all of this that we have

23  been going through for many years now.

24       But I know that -- I know that things will work out for

25  our good.  And we are depending and leaning on you to make that

```
 1   decision for us.  And I know that you are a good person.  You have
 2   to be to get to where you are now, to get to be such a great
 3   Superior Court judge, is that what it is?
 4           THE COURT:  At one point I was a Superior Court judge.
 5   But whatever judge you think I am, that is, of course --
 6           MS. ETHEL BICKERS:  But I do thank you for taking the
 7   time to listen to what we have to say.  And I certainly pray that
 8   things will work out in our favor.  And we're praying that God is
 9   still in control of everything.  I believe that.  And whatever the
10   decision is, I believe that God is in control.  And he will guide
11   us and lead us.  But we need her to be a part of what we are
12   about, what we are doing.
13           We are trying to implement some more programs in our
14   church to help our community.  We have this house where we take
15   care of these men who otherwise would be homeless.  But we take
16   care of them, and we make sure that they have everything that they
17   need.  It's just something that was in our heart to do to -- for
18   the community.  And we have people there that don't want to leave.
19   They've been there with us for many years, and none of them want
20   to leave because we take good care of them.  And I would certainly
21   want you to consider all of this when you decide -- in making your
22   decision.  Thank you so very much for hearing us.
23           THE COURT:  Thank you, ma'am.
24           MR. FINDLING:  Pastor Bickers.
25           MS. MITZI BICKERS:  Good afternoon, Your Honor.
```

```
 1              THE COURT:  Good afternoon, Pastor.

 2              PASTOR MITZI BICKERS:  Please excuse my allergies.  My

 3  voice is a bit rough.

 4              THE COURT:  You're fine.

 5              PASTOR MITZI BICKERS:  Thank you, sir.

 6              I'm humbled to come before you, and, you know, as

 7  I -- as I think back over, you know, this whole process, one of

 8  the most devastating moments in my life was when I received the

 9  indictment in my hand and it said United States of America v.

10  Mitzi Bickers.  And I thought, wow, the whole United States of

11  America?  And then I thought, well, maybe not all of the United

12  States of America -- you know, factions of the United States of

13  America.  And it's the same United States of America that I

14  have --

15              THE COURT:  Take your time, ma'am.  Do we have any

16  Kleenex here?

17              PASTOR MITZI BICKERS:  -- that I have given the majority

18  of my life to assure that people that we supported were good for

19  government.

20              I've been a part of the political process in the City of

21  Atlanta for over -- over 40 years, because my first set of

22  campaigns were as a volunteer.  And then when I graduated

23  from -- from college, I decided that I didn't want to teach school

24  anymore, but that I did want to be on the school board because

25  there were things that I saw.  I saw a lot of injustices.  I saw a
```

1   lot of poverty, and I saw that there were so many people who

2   suffered because of the inequities.  And I took that on as a

3   cause.

4           And while I sat on that side of politics was actually

5   when I met E.R. Mitchell.  And I had no idea that when his dad

6   introduced him to me, that 30 years later I would be standing

7   here.

8           One of the fights that I continued to fight and continue

9   to fight is minority participation, but not so that I could get a

10  kickback or that I could give a kickback.  I still stand very firm

11  on the fact that there are a lot of inequities.  I have no idea

12  what E.R. Mitchell is talking about.  But I do respect the work of

13  this Court and the work of the jury.

14          My heart is very heavy because of this picture that

15  these young people behind me have tried to paint of me.  The

16  PowerPoints that left out so much.  The information that was so

17  tainted.  But I still sat hopeful, just believing that it was part

18  of the process.

19          I never said anything when these guys over here would

20  bombard me, because I didn't want to be inappropriate in how I

21  felt about the mischaracterizations.  I just remained humbled

22  believing that some way, somehow the people that I fought for was

23  not in vain, and some way somehow that the God of my salvation

24  would not fail me.  I look down -- you talk about the years and

25  just -- it's just so bad that I -- I could do nothing but sit in

1  humility and just ask God to -- to move.  And that's what I'm

2  asking God to do now, to move on your heart.

3          There have been moments of bitterness and anger, and

4  there have been moments of -- at times when I knew that if I had

5  not had the Lord on my side, that I could have gone crazy.  And I

6  still had to be strong for everybody, because they were depending

7  on me.  I'm sure my attorneys will instruct me if I'm going too

8  far, but when -- when E.R. Mitchell asked me to join in helping

9  to -- I couldn't do it.

10          THE COURT:  I don't want you to say something --

11          PASTOR MITZI BICKERS:  I couldn't do it.

12          THE COURT:  -- that could hurt your case.  This case is

13  not going to finish today.  I want to hear everything you say, and

14  I don't want to put Mr. Findling in an awful situation, but I

15  would advise, don't go into a conversation that you had with

16  Mr. Mitchell.

17          PASTOR MITZI BICKERS:  Yes, sir.  Yes, sir.  Yes, sir.

18          (A discussion takes place off the record.)

19          PASTOR MITZI BICKERS:  I'll just say that I pray and

20  believe that God is not through with this situation, and that you,

21  sir, will see beyond this awful pictures that has been painted and

22  you will allow me to, one, self-surrender, and that you would show

23  mercy.

24          My dad used to tell all of the politicians that came

25  into the church that the Lord requires of us to do mercy, love

1    justice -- love justice, do mercy, and walk humbly with our God.

2    And I would just implore you to do justice and to love mercifully

3    and to walk humbly with your God.

4         I want to say thank you to an incredible team of

5    attorneys.

6         I want to say thank you to my family and my friends,

7    Keila, who has gone through as much as I have gone through,

8    through this process.  It's been mean, Judge.  It's been mean and

9    very ugly.  And I refuse to believe that what I've -- what I've

10   endured over the last nine years of my life is representative of

11   the United States of America.  It's been ugly.  We have suffered

12   greatly.  Thank you.

13        THE COURT:  Thank you, ma'am.  Any other witnesses?

14        MR. FINDLING:  No, Your Honor.

15        THE COURT:  I will let the government present.

16        MR. FINDLING:  Thank you, Your Honor.

17        MR. DAVIS:  Mr. Davis.

18        Your Honor, cases like there are difficult.  They're

19   difficult because we have to try and balance otherwise meaningful

20   and productive life against egregious criminal conduct.  And I

21   know, Judge, that you have read Ms. Bickers' sentencing memorandum

22   and the 68 character letters that were attached to it.  And they

23   tell a story of Ms. Bickers' life.  Letters from friends and

24   family, letters from the clergy, letters from sitting public

25   officials.  And the story that those letters tell is that

1   Ms. Bickers is loved, that she has achieved great heights during a

2   life, and that she is well-supported.  And just look around the

3   courtroom and you can tell that, Judge.

4           And I imagine today is one of the most difficult days of

5   Ms. Bickers' life.  It is a tragic day for her.  It's a tragic day

6   for her friends and family, and it's a tragic day for her church.

7   And that is because Ms. Bickers is an accomplished women.  She is

8   well-educated.  She's a talented Pastor.  She's a gifted political

9   operative.

10          But that's not what brings us here today, Judge.  We're

11  not here because Ms. Bickers, who is a devoted wife or a committed

12  pastor or public servant, because that is not what lands you in

13  federal court.

14          And, Judge, we're here because that's not the only story

15  of Ms. Bickers' life.  There is another story that's not captured

16  in those character letters.  It's a story about accepting millions

17  of dollars in bribes.  It is a story about lying under the penalty

18  of perjury.  It's a story of laundering money, and it's a story of

19  not paying over $200,000 in taxes.  It is a story, Judge, of

20  abusing your power and your connections to steal millions of

21  dollars of government contracts for bribes.

22          In short, Judge, we're here today because Ms. Bickers

23  broke the law.  We're here today because Ms. Bickers cheated the

24  system.  And we're here today so Ms. Bickers can answer for what

25  she did.

1          Your Honor, in this case the United States is going to

2   make a recommendation that Ms. Bickers be sentenced to 210 months.

3          Judge, our recommendation is grounded in the principle

4   of 18 U.S.C. 3553, and despite its length, and as I'll explain in

5   a little built, Judge, our recommendation affords Ms. Bickers

6   substantial leniency.

7          With regards to principle of 18 United States Code 3553,

8   Judge, our recommendation demonstrates those -- those principles

9   of reasonableness based on the nature of the offenses, the need

10  for sentences to promote respect for the law, and, Judge, the

11  often unstated need for the imposition of a just punishment.  In

12  this case, Judge, that means it allows the public to see that the

13  punishment fits the crime.

14          So let's talk for a minute, Judge, about the nature of

15  the offense and how that supports our recommendation.

16          In this case, Your Honor, Mitzi Bickers orchestrated a

17  multi-year conspiracy to obtain millions of dollars in City of

18  Atlanta contracts in exchange for bribe money.  Bickers used her

19  formidable skills as a political operative and a public official

20  to execute this scheme.  She used those skills to manipulate

21  people, to manipulate her friends, her associates, and to

22  manipulate the system all to line her pocket.  Ms. Bickers found

23  people like E.R. Mitchell and Shedreka Poole who trusted her, who

24  would follow her and she preyed on them.  She preyed on

25  Mr. Mitchell's desperation during the Great Recession, and she

1  promised Mitchell that she could get him contracts.  As you would

2  expect, Mr. Mitchell paid, and as you would expect, Mitzi Bickers

3  delivered.  She delivered those contracts.

4         Ms. Bickers provided Mr. Mitchell and Richards with

5  inside information.  In one case, she gave them a draft document

6  involving some bridge reconstruction projects.  That document gave

7  Mr. Mitchell and Mr. Richards an unfair advantage.  It gave them a

8  leg up on all of the other contractors that wanted that job, and

9  it tipped the scales from merit to money.  And, Judge, those

10 bridge projects made over $2 million.

11        In fact, for one of those projects, if you remember at

12 trial, Mr. Richards testified that the profit margin was an

13 outrageous 60 percent.  And, of course, Ms. Bickers got her cut.

14 And the financial records tell that story clear as day.

15        Ms. Bickers also got her cut of the sidewalk contracts

16 that she gifted to Mr. Mitchell and Mr. Richards.  And that

17 contract was followed up by 13 amendments for additional work

18 generating another $3 million more.  Judge, these numbers shock

19 the consciousness, and that's just part of the story.  Because we

20 also have to look at the emergency snow contracts in 11 and 14.

21        With regard to the 11 contract, Ms. Bickers got

22 E.R. Mitchell an incredible amount of work, over $1.2 million

23 worth of work.  And almost immediately, Judge, the financial

24 records show that Bickers received hundreds of thousands of

25 dollars in kickbacks.

1            And over the next five months, the financial records

2   show that Ms. Bickers received another 4 or $500,000.  And with

3   that new-found wealth, that's what Ms. Bickers used to purchase

4   her Jonesboro home.

5            And what happens next, Judge, shows the cunning and

6   calculation of this scheme, because Ms. Bickers engaged in a

7   series of explicit acts designed to hide her conduct.

8            First, she had Mr. Mitchell structure the cash payments

9   into her accounts to avoid the federal currency transaction

10  reporting requirements.  She used, like, 11 banks and 95

11  transactions to get about $600,000 into her account.

12           Next, she lies to the City of Atlanta under penalty of

13  perjury on her financial disclosure forms.  She tells the city of

14  Atlanta in 2011, I didn't receive any significant source of

15  outside money and I wasn't employed by anyone else.  I didn't do

16  any outside work.  All of the time, Judge, she's getting paid by

17  Richards and Mitchell.

18           And third, she lies to the IRS.  Again, under penalty of

19  perjury.  In 2011 Bickers tells the IRS that she made, like,

20  $58,000.  Insult to injury, Judge, the IRS actually sends

21  Ms. Bickers a refund in 2011 based on her tax return, when in

22  point of fact, Ms. Bickers had over $600,000 in undeclared income

23  resulting in a tax due and owing of over $200,000, all designed to

24  hide the bribe money.

25           And, of course, Judge, it didn't stop in 2011 and '12.

1  It continued after Ms. Bickers left the city.

2          Ms. Bickers left the city after the press exposed that

3  she lied on her financial disclosure form.  But using her

4  connections and her influence, Ms. Bickers got Mr. Mitchell the

5  2014 snow removal work.  Now, she got him that work, Judge, even

6  though he was not listed as an on-call contractor.  And not only

7  did she get him the work, Judge, she got him the most work.  More

8  than any other contractor, including the contractors that had been

9  pre-vetted and preapproved by the city, $5.5 million in contract

10 work.  And who pays the price for that, Judge?  The citizens of

11 Atlanta paid the price, and the on-call contractors.

12         I think you will probably remember, Judge, at trial one

13 contractor testified that he had to sell equipment and lay off

14 some employees because he did not get that work.

15         And you also probably remember, Judge, that an IRS agent

16 testified at the exorbitant increase in cost to the City of

17 Atlanta to use Mr. Mitchell over the on-call contractors.  Think

18 about the snow -- sorry, the salt, the stone, and some of the

19 vacuums that were used to clean up the sand.

20         All these costs cost the city and its taxpayers dearly.

21 And Ms. Bickers received, approximately, $2 million from Richards

22 and Mitchell in 2014.  In total, Judge, Ms. Bickers received

23 almost $3 million in bribe money.  That number is staggering,

24 Judge, when you consider other cases.

25         The bribery scheme lasted from 2010 to at least 2014.

1   During that time, Ms. Bickers accepted countless bribes.  And

2   nothing about this conduct was aberrational.  These were not

3   isolated acts.  These were knowing and willful acts.  At any point

4   in time Ms. Bickers could have stopped.  She could have said

5   enough is enough.  She could have said, I can't do this anymore.

6   She could have said, I'm better than this.  I know better than

7   this.  But she didn't.  Ms. Bickers was motivated more by money

8   than by character, and in doing so Ms. Bickers' actions broke the

9   delicate trust between the City of Atlanta and its people.

10          Ms. Bickers was a member of the mayoral cabinet.  She

11  had an executive level position, and she held that position for

12  about two and a half years.  The citizens of Atlanta trusted Ms.

13  Bickers, but that trust was misplaced.

14          I would also like to expand a bit, Judge, on how the

15  government's recommendation builds in substantial leniency for

16  Ms. Bickers.

17          First, even though Ms. Bickers went to trial and has

18  failed to accept any responsibility for any of her actions, the

19  government is recommending a substantial variance, a variance of

20  about seven years.

21          Second, Judge, Bickers' role in the offense is

22  commensurate with a four point enhancement.  But based on the way

23  the probation report was generated and based on the overall

24  guideline scores, the judge -- the Court -- sorry, the government

25  did not pursue an additional point enhancement.

1          Third, Judge, the government calculated the loss amount

2   based on the value of the bribes as opposed to the benefit

3   received.  And in this case that difference could be substantial,

4   because you would be looking at the profit margin for Bickers,

5   Mitchell, and Richards as opposed to just money received directly

6   by Ms. Bickers.

7          And fourth, Judge, and this is a really important point.

8   Based on the rules for multiple counts adjustments, Ms. Bickers'

9   four wire fraud convictions and her tax charge are completely

10  unaccounted for by the guidelines.  So even though Ms. Bickers

11  lied on her taxes and defrauded taxpayers out of $200,000, and

12  even though she lied to the city and collected a salary for more

13  than two years based on the grouping rules, Ms. Bickers'

14  guidelines remain exactly the same.  And, in fact, Judge, the

15  guidelines suggest that in circumstances like this, it's

16  appropriate to consider a higher sentence, because conduct has

17  gone completely unaccounted for by the guidelines.  But again,

18  Judge, we have not asked the Court for any increase in the

19  guidelines or increase in the sentence based on the wire fraud

20  counts and the tax fraud counts.

21          And that's all to just make a single point here, Judge.

22  And that point is that a 210-month sentence is reasonable and

23  affords Ms. Bickers leniency.

24          I would also like to address some of the arguments

25  raised in the defendant's sentencing memorandum.

1          First, Judge, in reading Ms. Bickers' memorandum, in

2    general she argues for a below-guideline sentence because of her

3    personal history and personal characteristics.  She's highlighted

4    that she's been part of the church since she was a child.  She

5    held political office.  She highlights that she was recognized by

6    the Georgia House of Representatives for her church and political

7    contributions.  And she, quote, at her core is a public servant.

8          Now, Judge, the government's position is that those

9    factors do not support a lower sentence.  They show that if

10   anyone, anyone knew better, it was Ms. Bickers.  They show that

11   Ms. Bickers betrayed a lifetime of accomplishment for jet skis and

12   Disney cruise, and they show that Ms. Bickers sold her integrity

13   for cash.

14         Second, Ms. Bickers suggests that imposing a sentence

15   longer than approximately 70 months would create an unwarranted

16   sentencing disparity with cases around the country.  And in

17   support of that claim Ms. Bickers cites five cases decided out of

18   district from 2011 to 2016.

19         Judge, as the First Circuit has said, a well-founded

20   claim of disparity assumes that apples are being compared to

21   apples.  In this case, Judge, we're comparing apples and passion

22   fruit.

23         First, in all five of the cases, the defendant pled

24   guilty.  None went to trial.

25         Second, in four of the five cases, the defendant pleaded

1  guilty via information, thus eliminating the need for grand jury

2  and suggesting that, perhaps, those same defendants also

3  cooperated.

4       Third, in four out of five of those cases, the defendant

5  did not hold public office.

6       Fourth, in all of the cases that listed a bribe figure,

7  that amount was well below, well below the figure here.  I think

8  the highest was $265,000.  Here we have slightly under $3 million.

9       And, Judge, as a comparison, we have found some cases

10  that are much more aligned with the facts here.  And I'd like to

11  hand up one particular case, Judge, for you, which was cited in

12  this circuit, the United States v. Smith.  And, Judge, what I will

13  tell you about that case is it's from this district.  The

14  defendant was a public official.  It involved a trial, not a plea.

15  There was substantial loss, and the sentence was 210 months.

16       In her sentencing memorandum, Judge, Ms. Bickers also

17  argues, essentially, that she is at risk for being penalized for

18  going to trial.  And the remedy that she suggests for that

19  situation is to align her sentences with the sentences of

20  Mr. Mitchell and Mr. Richards.  But really, Judge, all we're back

21  to is apples and passion fruit.  Because a more substantial

22  sentence in this case is not based on trial acts or trial penalty;

23  it's based on the fact that Ms. Bickers and Mr. Mitchell and

24  Mr. Richards are not similarly situated under the law and under

25  the guidelines.

1          Mr. Mitchell and Richards pled guilty on criminal

2    information; Bickers did not.  Mitchell and Richards accepted

3    responsibility for their actions; Bickers has not.  Mitchell and

4    Richards cooperated; Bickers has not.  Mitchell and Richards

5    received Rule 35 sentence reductions; Ms. Bickers has not.

6    Mitchell and Richards are private citizens; Bickers is not.  She

7    is a public official.  Mitchell and Richards did not have the same

8    role in the offense that Bickers had.  Mitchell and Richards were

9    convicted of one count; Ms. Bickers was convicted of nine counts.

10   And of course, Judge, when considering sentencing disparities, the

11   Appellate Court states that you look not to co-defendants but to

12   similarly-situated defendants across the board.

13          So in the end, Judge, as the Eleventh Circuit has stated

14   in the United States v. Gains, there is no unwarranted sentencing

15   disparity when a cooperating defendant pleads guilty and receives

16   a lesser sentence than a defendant who proceeds to trial, even if

17   that sentence is substantially shorter.

18          So what the defendant calls the trial penalty, the

19   Eleventh Circuit calls defendants who are not similarly-situated.

20   And I call it apples and passion fruit.

21          Judge, I would like to close by saying, I know you have

22   sentenced a number of public corruption defendants.  I joined you

23   here for quite a few of them.  And these type of cases bring us

24   back to a core principle:  That public corruption crimes must be

25   met with forceful prosecutions and severe consequences.  And that

1   is because public corruption crimes damage the public's faith in

2   its government.  And they should.  We should do better.  Governing

3   is a privilege.  It's based on integrity, and it's based on

4   transparency.  And when powerful and influential people operate

5   outside of the law, the public loses confidence in its government.

6          Ms. Bickers corrupted and manipulated the system for

7   greed.  She put her own financial desires over the City of

8   Atlanta, and she participated in her scheme that rewarded money

9   over merit, and that cannot stand.

10          So, Judge, while the City of Atlanta corruption cases

11   remain open, we're here today to close the chapter on Ms. Bickers.

12          Your Honor, on behalf of the United States, I ask this

13   Court to send a message.  Send a message that corruption will not

14   be tolerated.  That there will be significant consequences for

15   betraying the trust of the public, and that there are true costs

16   for abusing governmental purpose.

17          So, Judge, the United States asks this Court to sentence

18   Ms. Bikers to 210 months.

19          THE COURT:  Thank you, Mr. Davis.

20          Mr. Findling.

21          MR. FINDLING:  Your Honor, I want to address the 3553

22   factors, and I'm going to try to methodically move through them.

23   However, with respect to my colleague, the standard has been set

24   in this case.  E.R. Mitchell was given 60 months.  C.P. Richards

25   was given 24 months.  And ironically as this system works, he's a

1   spectator here for today's sentencing.

2          And I'll jump ahead of myself and say, they were more

3   than similarly-situated, because as we learn from the government

4   with furrowed eyebrows, they went into this case with an opening

5   statement that the mastermind was Mitzi Bickers and she

6   manipulated E.R. Mitchell.  When with furrowed eyebrows in the

7   midst of a trial, they admitted that the documents that supported

8   the fact that he was an ongoing cooperator with the U.S. Justice

9   Department, specifically, the Northern District of Georgia, they

10  didn't know what we were talking about, albeit they supplied us

11  with that information on December 21st of 2021, which we picked up

12  from their office with a courier on December 22, 2022 -- '21.

13         So they made that statement.  They made that assertion

14  that she was a mastermind and a manipulator when these trial

15  attorneys did not even know what he had been up to for the decade

16  before.

17         And I also couch it in the following as I move into

18  these factors:  And that is, that the government, in fact,

19  ascertains that she was entitled to that same type of punishment

20  in terms of the ceiling when former interim U.S. Attorney in the

21  Northern District of Georgia, Kurt Erskine offered her the same

22  371 conspiracy.  So apparently, with all of the hyperbole with her

23  involvement and skill set that she brought to this, had she not

24  gone to trial, it was the belief of the Northern District of

25  Georgia that she was entitled to that same cap of 60 months.

1          3553, when it comes to the sentencing guidelines, and as

2     Your Honor knows, they are nothing but advisory guidelines -- and

3     I think that the terminology "advisory guidelines" is apropos in

4     this case because, respectfully, the 25 years that it works out is

5     truly ridiculous.  And the 17-and-a-half years that is proposed by

6     the same office that suggested a 371 conspiracy cap of 60 months,

7     in like fashion is ridiculous.

8          So the advisory guidelines call for us to -- and call

9     for the Court, I apologize, to impose a sufficient sentence.  And

10    so everything has the backdrop of what qualifies as sufficiency

11    for this particular case, and tells the Court to not give a

12    sentence that is greater than necessary.

13         In this case, it would be, if we look at the

14    government's recommendation, to not give a sentence to a

15    56-year-old woman, a sentence that will have her back with her

16    mother and her wife and her son when she's in her early 70s.

17         The guidelines say in subsection one -- tell us to look

18    at the nature and circumstances of the offense, and the history

19    and characteristics of the defendant.  Regarding the nature and

20    circumstances of the offense, I'm not going to be redundant

21    because you heard Ms. Goldberg articulate our viewpoint of the

22    nature and circumstances of the offense.

23         When we go to 2A to reflect the seriousness of the

24    offense, the first thing that I asked the Court to think about is,

25    again, E.R. Mitchell.  The proposition that somehow Pastor Bickers

1  was the one influencing him is truly ridiculous.  The government

2  saw fit to offer him a sentence of 60 months, and then he

3  cooperated and got 12 months off.  Again, going into it,

4  apparently, not even knowing, because they were so shocked, so

5  shocked in the midst of trial that he had been a cooperator that

6  there had been agreements reached with the U.S. Attorney for the

7  Northern District of Georgia himself, as you remember the

8  documents, actually signing off that he had an agent assigned to

9  him, okay, for a substantial period of time.  And I should say

10  this:  The government never even attempted during the course of

11  the trial to even contact and connect with his handler from the

12  FBI.  Never even made that attempt to try to find out what was the

13  extent of his involvement.  All they did was check with the agent

14  that was sitting here watching the trial, and have him review the

15  file.

16        He had a handler.  We all know he had a handler.  The

17  handler is retired living in Alabama.  They never made any attempt

18  to say what did E.R. Mitchell do?  What was the depth of his

19  involvement?

20        So this individual gets 60 months, the same 60 months

21  that Pastor Bickers was offered when she elected to go to trial.

22        And so by doing so, it seems to me that the seriousness

23  of the offense is measured that way.  Everything that the

24  government said regarding respect of government, the inverse

25  involves E.R. Mitchell.  The only difference is that E.R. Mitchell

1   who they offered this deal with, who they went to bed with in this

2   case, had already the decade before been exploiting two different

3   governmental entities, Fulton County Board of Education and DeKalb

4   County.  While the Court granted a motion in limine and prohibited

5   us from going through civil litigation, I know this Court is well

6   aware of having ruled on those and having read documents and

7   lawsuits, that E.R. Mitchell did not go into this, okay, with a

8   virgin exposure to exploitation of government.  He had a career of

9   exploiting government for his own financial means and his own

10  financial gains.

11       And so we have to assume that even though the government

12  was shocked at the fact that their office cooperated with him,

13  that they knew this when they said, hmm, a 371 conspiracy with a

14  cap of 60 months is good for you.  You've made millions of

15  dollars.  And as you recall, when the experts testified on behalf

16  of the government, they could not account for at least a million

17  dollars of his money.  They knew that they were dealing with a guy

18  that had already had a history of ripping off governmental

19  entities.  But for some reason, the seriousness of the offense as

20  they evaluated it at the time was a 371 conspiracy.  And to us,

21  that sets the standard in this case.

22       And so the question is, a sentence that reflects the

23  seriousness of the offense to promote respect for the law.  And

24  all we can say is this Court has -- I'm sure this is unusual in

25  that this case has taken so long to get to trial, but the one

1  thing we all learn that are in this business, whether we

2  prosecute, whether we defend, or whether we honor to sit on the

3  bench, is that too often the folks that we see that are charged

4  with crimes, give them enough years to sit around and they get

5  into more junk and more problems and more issues.  And Pastor

6  Bickers has never, never had any problems whatsoever.  She has

7  showed up for all court appearances.  She has handled this

8  professionally.  She has sat with honor during this trial.  Okay?

9  Never physically reacting during the course of the trial or to any

10 hearings, regardless of how stressful the trial is at time.

11 During this period of time, there's been no problems at all.

12        You will remember even -- not that there is any history

13 of her having done any controlled substances, but as you recall

14 from the presentence report, she's had to take 22, I think, tests

15 required.  We see these people fail tests all the time.  Trust me,

16 Ms. Goldberg and I are constantly coming back for hearings on

17 these types of issues.  Never a problem with Pastor Bickers at

18 all.

19        So she has shown to the Court in what is essentially a

20 preview of her behavior and a preview of her respect for the law

21 and the system, that she has been problem-free during this period

22 of time.

23        A sentence that would afford adequate deterrence to

24 criminal conduct.  I don't think anybody would argue that here

25 since C.P. Richards, who was given 24 months, testified that he

1  has now gotten a great position with a private company, sits here

2  as a citizen able to enjoy watching this case.  And that was 24

3  months.  And I have no doubt watching him and honestly the respect

4  that he showed me -- cross-examine him, and he's the first one to

5  shake my hand afterwards, seemingly a fine person, but even a

6  sentence of 24 months, I'm sure shook him, shook his family to the

7  bone.

8       So whether it's 24 months, 60 months, 17-and-a-half

9  years, 25 years, deterrence is not even an issue.  Because

10 deterrence went into effect when Pastor Bickers saw her name on

11 the other end of the United States of America versus.

12      Regarding the issue of protecting the public from

13 further crimes of the defendant, again, Your Honor seeing a

14 preview, there has been no issues regarding Pastor Bickers.

15      Your Honor, this case -- this case really as you group

16 Pastor Bickers and really similarly-situated E.R. Mitchell, it

17 breaks into three chapters.  That's how I look at the case.  It

18 breaks into three chapters.

19      The chapters are as follows:

20      One, the allegation of conspiracy to -- excuse me.  The

21 conspiracy to commit bribery during the tenure that she worked for

22 the City of Atlanta.

23      Two, conspiracy to commit bribery in that period of time

24 after she leaves the City of Atlanta.

25      And three, the plain flat-out bribery in Jackson,

1   Mississippi.

2          Three significant chapters that kind of, through

3   tentacles, involve other issues in the case and other charges in

4   the case.  Of those three chapters, we cannot ignore, and I

5   implore the Court to not ignore, the fact that she was acquitted

6   of two of those three chapters.  The money laundering, the

7   relatively small amounts that the jury found her that attributed

8   to the period of time after she leaves City of Atlanta.  We don't

9   know, we'll never know what is in the jurors' minds.  Do they

10  think this is residual money from her period, the substantial

11  period of time that she worked for the City of Atlanta?  We have

12  no way of getting in their minds.

13         But we know two of those three chapters of which so much

14  time was spent by the government, particularly Jackson,

15  Mississippi, so much time was spent that on two of those three

16  chapters, she was -- the indictment was -- the charges were

17  rejected by this jury.

18         And that is the segue into what I think is the most

19  important part of our -- of our 3553 analysis, and that is

20  Subsection 6.  The need to avoid unwarranted sentence disparities

21  among defendants with similar records who had been found guilty of

22  similar conduct.

23         So let me compare and contrast a little bit of what

24  you've heard about Pastor Bickers as we think about whether or not

25  there would be an unwarranted sentence when we talk about the

1  disparities.

2          She's 56 years old.  You heard from her elegant

3  79-year-old mother who commits herself even at this age to being a

4  foster parent and an adoptive parent, which Pastor Bickers plays a

5  relevant part.

6          You heard about her commitment to her church.  And I

7  would say that Ms. Goldberg, in doing our due diligence, has spent

8  time at the church and has spent time at the veteran's center, the

9  two buildings that are -- I'm sure the government knows -- just

10 walking distance away with folks that are, to me, veterans that

11 are homeless.  And Ms. Goldberg and I have gone in, we've talked

12 to them and gotten a feel for this community that -- that Mitzi

13 Bickers has welcomed and takes care of.

14         And you see these letters that come in, and I don't want

15 to go through all of them.  But they're fascinating letters.  You

16 have letters in support by Annette Abernathy speaking on behalf --

17 as the president of the Ralph David Abernathy Foundation.  And as

18 the government said, state senators, state representatives.

19         I found somewhat ironic a letter that, perhaps, you

20 wouldn't know, but at our office brought a smile to our face,

21 Donald Bowen.  If there are any general defense attorneys, most of

22 us know him as the chaplain at Deyton, Lovejoy.  He's been there

23 for many of our clients that have had tough times with their

24 families, personal lives.  We even know an Hasidic Jewish person

25 that was coming through, he went out in the middle of the night

1  and got him kosher food.  Everybody knows Donald Bowen.  And I was

2  struck, I did not even know that Pastor Bickers knew somebody that

3  most of the defense community really during his tenure at Lovejoy

4  kind of considered him the Saint of the Deyton facility; and he

5  wrote a beautiful letter on her behalf.

6          And Rashad Richey, the voice of WALK Radio, who being a

7  criminal defense attorney, I never want him to rip into me about

8  any of my clients.  And I'm sure he's probably going to town on

9  cases that I have as we speak.  But wrote an incredible letter on

10 her behalf.

11         And so the letters just go on, and they're just -- I

12 find the letters to be from such a broad spectrum of folks that

13 respect -- that respect Pastor Bickers.

14         Your Honor, it's not insignificant for those of us that

15 have institutional knowledge of Atlanta, that Emmanuel Baptist

16 Church sits on the border of what was Carver Homes and has

17 sustained during those periods of times.  I'm a former Fulton

18 County public defender, and if I had a dollar for every violent

19 crime that I had that took place in Carver Homes, it would help

20 considerably in the college education of my children.  There were

21 tough times there.  And first, hats off to Pastor Bickers' late

22 father for establishing a much-needed place of worship on the

23 edges of Carver home.  It's right there.  It just stares right at

24 the driveway, and it's sustained for all these decades with no

25 attempt to move and go to a different venue, a different location.

1   But it literally serves the community.  And Pastor Bickers has

2   accepted that challenge of being in a community that is in a lower

3   socioeconomic environment and is a source of support for the

4   seniors, for the veterans, for the homeless, and for the children,

5   and for that she should be commended.

6         Her work, Your Honor, did leak into politics.  And so I

7   think that it doesn't escape me that we think about one of the

8   charges for which she was acquitted.

9         The government spent a substantial amount of time with

10  evidence of who paid for chicken wings and who paid for dinners,

11  and who had strippers and who had lap dances when it came to

12  trying to resolve a consent decree in Jackson, Mississippi.

13        It doesn't escape me the irony that in the news cycle

14  this week, literally when I had on the news at 6 o'clock and 7

15  o'clock this morning, one of the front stories was what was at

16  issue during this trial for which Pastor Mitzi Bickers was

17  acquitted, which is that the people, the children, the seniors,

18  the pregnant women of Jackson, Mississippi, continue to have

19  contaminated water.  And Pastor Bickers made an attempt when she

20  left the City of Atlanta, when she was in private industry, in the

21  private sector to try to bring literally one of the foremost

22  companies on the planet in, AECOM.  We researched it.  I'm sure

23  the government did.  We spent substantial time going, who is this

24  AECOM?  I don't know anything about water.  And then come to read

25  that they were one of the leading companies to come in and try to

1   cure this problem.

2          And it doesn't escape me that the United States of

3   America, because that's who we're dealing with here, had, perhaps,

4   spent more time focusing on the people that were suffering in

5   Jackson, Mississippi, and less time on chicken wings and lap

6   dances, all right, that perhaps funneling that focus and that

7   energy would help the same citizens that Pastor Mitzi Bickers was

8   ultimately trying to help.  Because for that, for those efforts,

9   she was found not guilty across the board.

10          Your Honor, the government discounts the issue of the

11  trial penalty.  First of all, let me say that the apparent

12  $6 million, 105 count indictment the government cites is a little

13  bit different.  We're not 105 count indictment.  We're not a

14  $66 million (sic) case.  We are the United States of America v.

15  Mitzi Bickers.  And we do -- I do feel that the Court needs to

16  look at the other folks charged in this case.  Why?  Let's just

17  focus on E.R. Mitchell.

18          Because Pastor Bickers was offered the same 60 months.

19  She was evaluated by the U.S. Attorney's Office, the Department of

20  Justice, and seen worthy of that same 60 months.  But what she did

21  was she chose to go to trial.  And no matter what the government

22  will tell you, there is a trial penalty.  You're penalized if you

23  choose to go to trial.

24          First, we are better, we are better as a system of

25  justice, we are better because Pastor Mitzi Bickers did go to

1  trial.  Why are we better?  Because we found out -- we don't know

2  what happens when the government goes to a grand jury; right?

3  Because, you know, 10 people could not want to charge you, and

4  it's still a charge.  Hearsay comes in.  Otherwise, inadmissible

5  evidence comes in.  Exculpatory evidence is not presented.  But

6  here's why we find out it is a good decision, because she is

7  acquitted for activity after she leaves City of Atlanta.  Because

8  all of the effort that went into -- and who knows the millions of

9  dollars the government spent on Mississippi -- she's acquitted.

10  We're better when people go to trial.

11         And so I -- I've shared with my colleges before, but

12  I've spent a lot of time on the issue of trial penalty.  And I'm

13  sure, Your Honor, is well aware of a new member of our United

14  States Sentencing Commission as appointed by President Biden,

15  John Gleeson from the Eastern District.  I've had the pleasure of

16  flying up to the Press Club in DC when I was president of the

17  National Association of Criminal Defense Lawyers and hearing him

18  speak on this subject.  And I'm going to quote him in a second.

19  But I think he is, with due respect to the government, the most

20  qualified.  Why?  Because he had this incredible career.  He's the

21  guy that, basically, took down John Gotti.  What did he do when he

22  took down John Gotti?  He did the ultimate cooperating witness.

23  He flipped Sammy the Bull Gravano.  He's this experienced mob

24  prosecutor that, perhaps, flipped the biggest cooperating witness

25  in current American history, and he then goes to the bench for I

1  believe 22 years.  And during the course of that 22 years, and now

2  he brings that position to the sentencing commission, takes the

3  position that one of the most serious negative aspects of our

4  current sentencing structure is that we punish people for going to

5  trial.  That we say that you're worthy of 60 months, but you go to

6  trial and you're found guilty, and the sentencing guidelines may

7  say 25 years -- we're going to give you a break and only ask you

8  to serve 17-and-a-half years.  We're going to ask you to serve

9  more than three times what we thought the case was worth, because

10  you exercised your Constitutional right to go to trial.

11         Gleeson -- Gleeson tells us, Your Honor, that there is

12  no such thing as a perfect criminal justice system, but a healthy

13  one is constantly introspective, never complacent, always

14  searching for injustices within and determined to address them.

15  The sentencing reform movement a generation ago disempowered

16  judges and empowered prosecutors.  Federal prosecutors have used

17  the power to make the trial penalty too severe.  And the dramatic

18  diminution in the federal trial rate is the result.  Our system is

19  too opaque and too severe.  And everyone in it, Judges,

20  prosecutors and defense attorneys is losing the edge that trials

21  once gave them.

22         Most important of all, a system without a critical mass

23  of trials cannot deliver on our Constitutional promises.

24         Your Honor, I'm sure, I don't know if you remember a

25  while back, you were kind enough to do a relatively large variance

1  on a child pornography case that Ms. Goldberg and I had, and I

2  talked to you about history then.  And I'm kind of a fan of

3  John Adams.  And you know, while John Adams, you know, gets a lot

4  of credit for being one of our authors of democracy, there were

5  two causes for John Adams, democracy as we know, and a system of

6  trial and being judged by your peers.  And with that goes that it

7  should never be to the disadvantage of the citizen accused of

8  taking advantage of that right.

9        Your Honor, I -- it is our position that it would be an

10 unwarranted disparity, an unwarranted disparity to have

11 E.R. Mitchell get 60 months; and I truly, truly cannot believe,

12 shocking to the conscience, shocking to the legal conscience that

13 the government sincerely believes that he wasn't the mastermind.

14 Shocking to the legal conscience that the government does not

15 sincerely believe that a Harvard MBA person that grew a company

16 with at one point hundreds of employees, with a history of

17 exploiting governmental entities for his financial gain, was not

18 the mastermind here.

19        The government had ample opportunity to show that Pastor

20 Mitzi Bickers had this type of institutional knowledge and

21 methodology.  But they didn't, because they couldn't.  Because the

22 only one that graced this courtroom with that degree of con in his

23 system, that degree of fraud in his system, that degree of

24 manipulation in his system was E.R. Mitchell.  And I literally am

25 convinced that these intelligent three prosecutors in their heart

1   of hearts know that there was no mastermind sitting there from

2   Spelman College who is a pastor to -- to a couple hundred

3   dedicated folks that dedicates all of her time to community

4   service.

5           And so the disparity would be just way too severe.  And

6   so I do ask the Court to take into consideration the disparity and

7   the decency of Pastor Bickers.  There is a sense of decency about

8   her.

9           I will tell you this, Your Honor, and I will close with

10  this.  At the end of the trial, my 93-year-old father was sitting

11  in the front row.  Several people observed him.  He came in, and

12  he was not looking good.  48 hours after my closing argument, he

13  died.

14          THE COURT:  Sorry.

15          MR. FINDLING:  Thank you, Your Honor.  And at his

16  funeral just a few days later came Pastor Bickers.  Pastor Bickers

17  and I are of a different faith.  I try to make it to the cemetery

18  as much as I can, but you know who also goes to the cemetery 35

19  miles away from where she lives?  Pastor Bickers goes and prays

20  over my dad's gravesite.  There is a sense of decency.  And that

21  sense of decency does not warrant 17-and-a-half years.  That sense

22  of decency does not warrant a decade in jail.  That sense of

23  decency has a standard that has already been set in the

24  government's evaluation, and an offer of original 60 months, and

25  their evaluation that the con man of all con men who got away with

1  over $1 million in cash wherever it is and beat the system, she

2  should not have a sentence very different from that which

3  E.R. Mitchell enjoys.  Because he's certainly not here.  I'm sure

4  he's at an island somewhere as we speak.

5          THE COURT:  We're going to take a ten-minute break, and

6  we'll start back at 1:25.

7          (Recess taken at 1:15 p.m., until 1:30 p.m.)

8          THE COURT:  We start off with a total offense level of a

9  40, a criminal history category of a one, and a custody guideline

10 range of 292 to 365 months.

11         Before I sentence anyone, I always have to look first at

12 what we call the 3553(a) factors, and Mr. Findling talked about

13 each one of them in his closing arguments.  And the Court

14 considers each and every one of those before I sentence anyone.

15 And in this case I've done that.  I considered each and every one

16 of those factors before I determined the sentence.  I have also

17 listened very closely to the arguments that have been made today.

18 I read the presentence reports, and, and I have sat through the

19 entire trial of this case.  I have heard every answer of it, and

20 I've read just about most of the transcripts in this case.

21         So I'm not entering this case completely not knowing

22 what happened in this case and what this case is about.

23         Now, Pastor Bickers, in reading the presentence

24 report -- you don't have to stand up?  In looking at everything, I

25 can definitely say that you have a caring heart.  That you care

1   about people, the veterans, the homeless.  When you took a job

2   with the City of Atlanta, I'm sure Mayor Reed gave you some

3   options and you took the one dealing with the homeless, Director

4   of Human Services.  That tells me something right there.

5            I also found out that or realized that people that come

6   out like today, they're here because they love you.  I watched

7   them during the course of the trial, there's always at least two

8   rows of your members here during the entire trial.  I listened to

9   the pastor and doctor as he talked today.  He touched me.  He said

10  I was in school, and when she was on the school board, she made

11  sure I didn't go hungry.  And I've got a lot of members in

12  education, and they were -- a lot of family members in education,

13  and they will tell you that a child can't learn if they're hungry.

14  I don't care what you say; they can't learn if they're hungry.

15  And at 26-years-old being on the school board in a city the size

16  of Atlanta is practically unheard of.  It says a lot about you.

17           You obviously are a very smart person.  And from what I

18  can tell and what I've read, and I try to make sure I come in this

19  courtroom thorough, that you have a political mind that is

20  unlike -- a lot of people would desire to have at this point in

21  time.  That knows how to turn out the vote, that understands about

22  the system, and that you care about the system.

23           Your mom touched me.  Any time a mom talks, I listen.

24  Not that I don't listen to dads, but when moms talk, I listen.

25  And she touched me.  She said a lot of things, and not that other

1  people didn't as well.  But she pointed out, you know, she knows

2  you.  Mom knows you.

3        But what I'm saying is, I -- before I sentence somebody,

4  I like to look at the whole person.  Okay?  And the people being

5  here today tells me a lot about you.  You're 26-years-old on the

6  school board, you're involved in getting people elected, helping

7  people are all things I have taken into consideration in

8  determining a sentence for you.  Again, I've looked at who has

9  been with you.

10       And let me say this.  You couldn't have picked two

11  better lawyers than Mr. Findling or Ms. Goldberg.  Now, we

12  disagree on some legal aspects, and the appellate court is going

13  to have to decide.  But they're more than just lawyers; they care

14  about you.  I know you probably disagreed with me at this point,

15  but I think the government lawyers tried to be fair as possible in

16  this case.  They also have a different outlook.

17       But in taking all of that into consideration, I also

18  have to look at the totality of the situation.  And the totality

19  of the situation tells me that there was a 12-count indictment.

20  And 12 jurors that you and your attorneys participated in

21  selecting, returned guilty verdicts against you in nine of those

22  12 counts.  That is just -- again, you may disagree with that

23  verdict, but that's the verdict.

24       Mr. Findling and Ms. Goldberg, you know I respect

25  you-all to the utmost.  I think you know that.  I'm not just

1  blowing smoke at you-all when I say both of you are outstanding

2  attorneys.  I preface by saying, the respect I have for you when

3  you walk in that courtroom is even greater after listening to how

4  you-all defended your client today.  But I slightly disagree with

5  you about the jury matter.

6         I don't think you get punished.  I don't think in this

7  case -- I can only speak to me -- that whatever sentence I gave

8  Pastor Bickers is punishing her for going to trial.

9         I believe in a jury system which is a very, very

10  important part of any jury trial.  Today I have a different set of

11  people sitting in that box, but during the time we tried that

12  case, there were 12 people sitting in that box, they paid

13  attention, they took notes, and they listened.  And they returned

14  a verdict of nine counts against you, Pastor.

15         Mr. Findling and Ms. Goldberg, I understand your

16  argument.  I've listened to it.  I read it in your sentencing

17  memorandum, and I respectfully disagree with you when you say that

18  Pastor Bickers is being punished for going to trial.

19         She exercised the Constitutional right that she had to

20  make the government or the United States of America prove the

21  charges in the indictment beyond a reasonable doubt to 12 jurors

22  picked out of this community.

23         Now, the name -- excuse me.  E.R. Mitchell played a big

24  role in the whole course of that trial.  But what I have in front

25  of me, and I pulled the sentencing, because I sentenced

1  Mr. Mitchell and I sentenced Mr. Richards, and I pulled both of

2  them.  And what I have in front of me, and that's why this is not

3  a proper comparison, in my opinion.  E.R. Mitchell pled guilty to

4  one count of conspiracy to commit bribery and money laundering.

5  The statutory penalty for that, the most I could have sentenced

6  him to was five years confinement.  And I sentenced him to five

7  years of confinement.  And under the system that says he is

8  allowed to receive something called a 5K if he cooperates.  He did

9  get a 12-month reduction.  But he pled guilty to one count, and he

10 got a five-year sentence and a 5K that reduced it to 48 months.

11        Charles P. Richards, Jr., pled guilty to one count of

12 conspiracy to commit bribery.  And the most he could have been

13 sentenced to was five years of confinement.  And the sentencing

14 guidelines at the top was 37 to 46 months, and I sentenced him

15 originally to 27 months.  And he also got a reduction for 5K.

16        I hold in front of me the verdict that was returned in

17 this case by the jury, and there are 12 counts in this verdict.

18 And out of these 12 counts, Pastor Bickers was convicted of nine

19 of them.  So I'm sentencing Pastor Bickers being convicted of nine

20 counts and not one count.

21        Again, I have the utmost respect for the defense

22 attorneys in this case, but I slightly disagree when it says that

23 Pastor Bickers is being punished for going to trial.  She

24 exercised the Constitutional right.  She made those three people,

25 the United States Attorney's Office of the Northern District of

1  Georgia, prove the charges against her beyond a reasonable doubt,

2  and 12 people sitting in that box returned a nine-count guilty

3  verdict against her.

4        One thing, I listened to the whole evidence in this

5  case.  And what I'm going to say next, Pastor Bickers, again I

6  want you to understand, I respect you to be a pastor of a great

7  church like you are a pastor of.  It's nothing easy to accomplish.

8  To accomplish the things you've accomplished in life and the

9  people you have helped in life, I respect that.

10        But also when I sat here and listened to this trial

11  during the whole time, I don't say to this offend you, but here's

12  what the evidence showed.  A deliberate calculated plan to cheat.

13  And in a sense, to cheat the taxpayers of the citizens of Atlanta.

14  A plan that went on for not one month, not one year, but for

15  numerous years.  This was not an accident.  This was a deliberate

16  plan to get money into your pocket, and to Charles Richards'

17  pockets and E.R. Mitchell's pockets.

18        There has been a lot of people that have been talked

19  about here in this trial, in the trial, and during this, and I

20  sympathize with everybody who has been talked about.  But there's

21  one set of people that has not been talked about that I would like

22  to just kind of talk about for a few minutes.

23        Every morning there are hundreds of employees of the

24  City of Atlanta that get up and they go to work and they work a

25  full day; and they're honest, hard-working, ethical people.  There

1    are people elected to the government to the City of Atlanta that

2    are hard-working, honest, and ethical people.  But what has

3    happened when you do what you have been convicted of, it casts a

4    shadow over them.  It takes away from their honest, hard-working

5    ability, and people start listening, you know, this bid, who paid

6    it?  Who got the bid?  This conviction, this charge, this

7    indictment cast those people in an unfair situation.  A majority

8    of the people that work for the City of Atlanta, a majority of the

9    people that work in the bidding process for the City of Atlanta

10   are honest, hard-working people in Judge Jones' opinion.

11        You're right, Mr. Davis, I have sentenced practically

12   everybody that is involved in this corruption matter, but I still

13   don't believe that a majority of the people that worked for the

14   City of Atlanta are not honest, hard-working ethical people.  But

15   I do believe that there has be a cloud cast over them because of

16   this case.  And, Pastor Bickers, whereas you have worked hard to

17   help others, in a sense you have put them in an unfair situation.

18        So what do I have here?  I have a nine-count guilty

19   verdict here, a level 40, and a criminal history category of a one

20   and a custody guideline range of 292 to 365 months.  I do not

21   believe you deserve 365 months in prison, but on the other hand, I

22   do not also believe that you deserve a sentence of 60 months

23   either.  With that stated, if you will stand up, I will sentence

24   you, ma'am.

25        To Count 1, I sentence you to 60 months confinement,

1   three years of supervised release.  For Count 4 through 6, 120

2   months confinement, three years supervised release.

3          Count 7 through 10 is going to be 168 months

4   confinement, three years supervised release.

5          Count 12 will be 36 months confinement, one year of

6   supervised release.

7          The controlling sentence will be 168 months confinement.

8   All of the other sentences will run concurrent to it.  Three years

9   supervised release, all will run concurrent.

10         Restitution, I ask all of the lawyers to check this,

11   make sure we have it correct, of $2,955,106.51.  I've been

12   informed that that amount changed based on what I said earlier of

13   $2,982,755.99.  But again, I encourage you all to look at that.

14   Ms. Wright, one more time.  It's $2,955,106.51.  There will be no

15   fine.  The restitution to be paid to the City of Atlanta

16   Department of Law, care of Nina Hickson, 55 Trinity Avenue, Suite

17   5000, Atlanta, Georgia 30303.

18         A $900 special assessment due and payable immediately.

19         Again, this sentence is based on what the trial court

20   heard, the evidence during the course of the trial, the

21   presentence report, the arguments that I've heard here this

22   morning in this case.

23         Now, my understanding is that the probation office is

24   recommending that you be allowed -- and I'm sure your attorneys

25   are asking you be allowed -- to turn yourself in, that you not be

1  remanded today.  But I've also been informed by the probation

2  officer that the government is taking a different position.

3           MR. DAVIS:  Yes, Judge.

4           THE COURT:  I'll hear from y'all on that.

5           MR. DAVIS:  Judge, we're going to request that

6  Ms. Bickers be remanded.  This case dates back to 2010.

7  Ms. Bickers was indicted in 2018.  She was found guilty in March

8  2022.  Shortly thereafter, we informed the defense that at

9  sentencing we would be asking for her to be remanded.  She's had

10 months to arrange her affairs.  And for those reasons, we're

11 asking she remanded, Judge.

12          THE COURT:  The question I have, Mr. Davis, does the

13 government feel she poses a flight risk or a danger to the

14 community?

15          MR. DAVIS:  I think, Judge, at this point the burden is

16 on the defense to show that she's not --

17          THE COURT:  And the reason why I ask this is that in

18 reading the probation officer's report, they said she made all of

19 the appointments.  She hasn't missed anything.  I think

20 Mr. Findling said she tested positive -- not tested positive for

21 any drugs.

22          The sentence I gave to Ms. Bickers, I tried to be

23 consistent.  In most of these cases, as you know, you've tried a

24 lot of them in front of me, in a case like this I normally allow

25 them to turn themselves in.  So I guess what I'm saying to you,

1  you're absolutely right, Mr. Davis.  There is no burden on you

2  whatsoever.  But I am asking you, other than the fact that the

3  length of time, how is this case different from the other cases

4  I've had?

5          MR. DAVIS:  I think that's one of the predominant

6  factors, Judge.  This case has been pending for an incredible

7  amount of time.  COVID protracted that.  The sentence was delayed

8  for another two months to give the defense time, additional time

9  to prepare.  The government just feels it's time to move forward.

10          THE COURT:  Thank you, Mr. Davis.

11          Mr. Findling, Ms. Goldberg, do you-all want to address

12  that?

13          MS. GOLDBERG:  Yes, Your Honor.  I think Mr. Findling

14  addressed that to some degree in terms of the time.  I think in

15  the opposite, Your Honor, Ms. Bickers has shown the Court that she

16  has complied with every order, everything that has been imposed

17  upon her, including these drug tests, which certainly there was no

18  need for.  But she did it anyway 22 times, all negative.  She's

19  always been here.  She's always shown up.  She's lived really an

20  exemplary life between the time of this indictment and today.  I

21  think she's the ideal candidate for self-surrendering, Your Honor.

22  As the Court knows in cases like this, this is the typical.  There

23  is nothing outside of that realm that would ever necessitate for

24  Ms. Bickers to be remanded today.

25          THE COURT:  What I'm going to do, and I am going to

1  respectfully disagree with you, Mr. Davis.  But I am going to

2  require Pastor Bickers to be placed on an ankle monitor, house

3  arrest.  She will be allowed to go to church, medical

4  appointments, see her attorneys, and then as the probation

5  officer, I will give you authority if there is any other things

6  that fall in that line to allow her to do.  But she will be placed

7  on an ankle monitor, house arrest until she's asked by the Bureau

8  of Prisons to turn herself in.

9          PROBATION OFFICER:  All right.

10          THE COURT:  All right.  Now, let me say this to you,

11  Pastor Bickers.  I don't think I need to say this.  Please don't

12  do anything that would put me in a situation where I would have to

13  change this and remand you.  All right?

14          MS. GOLDBERG:  And, Your Honor, I would like to

15  additionally note --

16          THE COURT:  Also, I would like to have her passport.  I

17  think we still have it.

18          PROBATION OFFICER:  I think we might still have it.

19          THE COURT:  All right.  Go ahead, Ms. Goldberg.

20          MS. GOLDBERG:  Thank you, Your Honor.

21          I would just ask the Court if the Court could put in its

22  recommendation for placement for Ms. Bickers, it should be

23  recommended that she be placed at Aliceville, Birmingham, Alabama.

24          THE COURT:  I will do that.  Anything else?  All right.

25          Did you want to say something, Mr. Davis?

1          MR. DAVIS:  Judge, I just wanted to address the

2    forfeiture.

3          THE COURT:  Yes.

4          MR. DAVIS:  Judge, Your Honor has already signed

5    Document 241 which forfeits certain items, including Ms. Bickers'

6    residence.  So we would ask that that be incorporated into the

7    JNC.

8          THE COURT:  So ordered.

9          Any objection to that, Mr. Findling or Ms. Goldberg?

10         MS. GOLDBERG:  No, Your Honor.

11         THE COURT:  Now, I just announced the sentence.

12    However, if there are any exceptions or objections, I'll hear from

13    the state -- from the government first?  Sorry.

14         MR. DAVIS:  No objections, Your Honor.

15         THE COURT:  All right.  Other than the objections that

16    have already been made, Ms. Goldberg, are there any additional

17    objections that the defense would like to put on the record?

18         MS. GOLDBERG:  Your Honor, we would maintain objections

19    previously made.  We would just maintain objections previously

20    made.

21         THE COURT:  Hold on one second.  Ms. Bickers, I need to

22    explain one other matter to you.

23         Pastor Bickers, since this case was tried to a jury and

24    you have been found guilty of 9 counts of the 12 counts in the

25    indictment, the law requires that I advise you in open court of

1   your right to appeal the conviction if you care to do so.  I also

2   advise you if you're unable to pay the cost of such an appeal, you

3   may apply for leave of appeal in forma pauperis and have a lawyer

4   appointed to you for that purpose.

5           Pastor Bickers, any questions about your right to

6   appeal?

7           PASTOR MITZI BICKERS:  No, Your Honor.

8           THE COURT:  All right.  Anything else from the

9   government?

10          MR. DAVIS:  Your Honor, given the guideline

11  calculations, the government asks whether this Court would have

12  made the same sentencing, imposed the same sentence regardless of

13  the guideline findings?

14          THE COURT:  Yes.

15          MR. DAVIS:  Thank you, Judge.

16          THE COURT:  Anything else from the defense?

17          MS. GOLDBERG:  No, Your Honor.

18          THE COURT:  Thank y'all.  This Court now stands

19  adjourned.

20          (The hearing concluded at 1:50 p.m.)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT

4    NORTHERN DISTRICT OF GEORGIA

5

6        I do hereby certify that the foregoing pages are a true and

7    correct transcript of the proceedings taken down by me in the case

8    aforesaid.

9        This the 8th day of September, 2022.

10

11

12

13

14                      /s/Viola S. Zborowski _____
                        VIOLA S. ZBOROWSKI,
15                      RDR, FAPR, CMR, CRR, RPR, CRC
                        OFFICIAL COURT REPORTER TO
16                      THE HONORABLE STEVE C. JONES

17

18

19

20

21

22

23

24

25